## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No. **08-61570-11** |
| Debtor. | |
| **CREDIT SUISSE** and **TIMOTHY L BLIXSETH**, | |
| Plaintiffs. | |
| -vs- | |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS**, **YELLOWSTONE MOUNTAIN CLUB, LLC**, **YELLOWSTONE DEVELOPMENT LLC**, **BIG SKY RIDGE, LLC**, and **YELLOWSTONE CLUB CONSTRUCTION COMPANY LLC,** | Adv No. **09-00014** |
| Defendants. | |

## *MEMORANDUM of DECISION*

At Butte in said District this 11th day of June, 2009.

In this Adversary Proceeding, trial was originally scheduled to commence at 09:00 a.m.

on Wednesday, April 22, 2009.  However, after considering Timothy L. Blixseth's ("Blixseth")

Expedited Motion to Bifurcate and Continue Trial of Claims Regarding Blixseth filed April 21,

1

2009, at docket entry no. 203, the Court continued the trial date to Wednesday, April 29, 2009. The Debtors were represented at the trial in this Adversary Proceeding by Tom Hutchinson, Troy Greenfield, Connie Sue Martin and David A. Ernst of Seattle, Washington, and James A. Patten of Billings, Montana; Credit Suisse was represented by Mark S. Chehi, Robert S. Saunders and Joseph O. Larkin of Wilmington, Delaware, George A. Zimmerman, Evan R. Levy and Jeremy M. Falcone of New York, New York, Edward J. Meehan of Washington, D.C. and Shane Coleman of Billings, Montana; the Official Committee of Unsecured Creditors was represented by J. Thomas Beckett, Chris P. Wangsgard, Derek Langton, Sean D. Reyes and Mark W. Dykes of Salt Lake City, Utah, and James H. Cossitt of Kalispell, Montana; and Blixseth was represented by Michael J. Flynn of Boston, Massachusetts, Joseph M. Grant of Houston, Texas, and Joel E. Guthals of Billings, Montana.

The Court heard expert testimony from David Abshier, John Hekman, Kent Mordy and Christopher Donaldson. The Court heard fact testimony from Blixseth, Michael W. Doyle, Stephen R. Brown, Moses Moore, Brad Foster, Samuel T. Byrne, Edra Blixseth, Steve Yankauer, and Robert Sumpter. The testimony of the following witnesses was submitted through deposition transcript:[1] Jeff Barcy, Dean R. Paauw and William G. Griffon.

Prior to commencement of trial on April 29, 2009, the Official Committee of Unsecured

---

[1]  Blixseth listed George Mack as a trial witness in his Amended List of Witnesses filed April 27, 2009. Blixseth testified at trial that George Mack was in Missoula at the time of trial and available to testify. However, Blixseth did not call George Mack as a witness. After trial, a question arose regarding the admission into evidence of George Mack's deposition. Because George Mack was available to testify, but was not called, the Court declines to consider George Mack's deposition under Fed.R.Civ.P. 32(a), made applicable to this proceeding by F.R.B.P. 7032. For the reasons just stated, and because Stephen R. Brown testified, the Court will similarly not consider the deposition testimony of Stephen R. Brown.

Creditors ("Committee"), the Debtors and Credit Suisse filed a proposed Final Pretrial Order on

April 27, 2009, at docket entry no. 238. Blixseth participated in drafting the aforementioned

proposed Final Pretrial Order but then proposed additional changes that could not be timely

reviewed and approved by the Committee, Debtors and Credit Suisse. Thus, Blixseth instead

filed his own proposed Final Pretrial Order on April 27, 2009, at docket entry no. 241. After

hearing comments from counsel and after considering both proposed Final Pretrial Orders, the

Court made some of Blixseth's proposed adjustments to the proposed Final Pretrial Order

submitted by the Committee, Debtors and Credit Suisse and entered a Final Pretrial Order on

April 29, 2009, at docket entry no. 257. The Final Pretrial Order approved by the Court

supercedes the pleadings filed by the parties and governed the course of the trial.[2] Following the

trial in this matter, the Court entered a Partial and Interim Order on May 12, 2009, and following

entry of the Partial and Interim Order, Credit Suisse, the Debtors, the Committee and Cross

Harbor Capital Partners, and its affiliates, entered into a global settlement that negates many

claims in this Adversary Proceeding and also vacates the Court's May 12, 2009, Partial and

Interim Order.

     With respect to the claims by or against Blixseth, the Final Pretrial Order provides

generally as follows:

## II.    Nature of the Action.

     This is a declaratory-judgment and avoidance action arising out of the
September 30, 2005, $375 million pre-petition secured loan (the "Credit Suisse
Loan") by Credit Suisse and other prepetition lenders to the debtors Yellowstone
Mountain Club, LLC, Yellowstone Development, LLC, and Big Sky Ridge, LLC

---

[2] The Court noted that the Final Pretrial Order could be subsequently modified to prevent
manifest injustice.

3

(collectively, the "Borrowers," and, together with their affiliate Yellowstone Club Construction Company, LLC, the "Debtors").

On February 12, 2009, the Official Committee of Unsecured Creditors of the Debtors ("Committee") filed a "Motion for Authorization to File Complaint Against Credit Suisse, Notice of Claims, and Objections to Claims of Credit Suisse." The Committee sought authorization to file and prosecute its complaint "on behalf of and for the benefit of the Debtors, their estates, and the creditors of those estates" on the grounds that "the Debtors are not the proper parties to do so as the litigation implicates the Debtors' former and present owners."

Credit Suisse then commenced its adversary proceeding on February 25, 2009, by filing a complaint against the Debtors and the Committee, Adversary Proceeding #: 09-00014-RBK.

After the Court granted the Committee's motion for authorization to file a complaint on February 27, 2009, the Committee filed its complaint against Credit Suisse on March 3, 2009, which the Court immediately consolidated into Adversary Proceeding #: 09-00014-RBK (hereafter the "Consolidated Adversary Proceeding").

The Debtors are defendants/counterclaimants in the Consolidated Adversary Proceeding. Timothy L. Blixseth, formerly the controlling shareholder of Blixseth Group, Inc. ("BGI"), is the plaintiff-in-intervention in the Consolidated Adversary Proceeding, asserting claims against the Debtors and the Committee, and is the counterclaim-defendant to claims by the Committee and the Debtors against Mr. Blixseth in the Consolidated Adversary Proceeding.

D.    The Claims of Mr. Blixseth.

In his complaint-in-intervention, Mr. Blixseth seeks declaratory judgments:

1.    That the Committee's and the Debtors' claims are barred by the statute of limitations;

2.    That the Credit Suisse Loan was not a fraudulent transfer;

3.    That Mr. Blixseth did not breach any fiduciary duties;

4.    That Mr. Blixseth did not have a fiduciary duty to the Debtors' creditors; and

4

5.      That the loan of a portion of the Credit Suisse Loan proceeds to BGI was not a fraudulent transfer.

E.      The Committee's and Debtors' Counterclaims Against Mr. Blixseth.

The Committee and Debtors claim as follows:

1.      In directing the Debtors to enter into the Credit Suisse Loan, Mr. Blixseth breached his fiduciary duties to the Debtors, entitling the Committee to damages;

2.      Mr. Blixseth was the alter-ego of BGI;

3.      Pursuant to 11 U.S.C. § 544(b), the transfer of proceeds from the Credit Suisse Loan to BGI and Mr. Blixseth or for the benefit of Mr. Blixseth was a constructively fraudulent transfer under Mont. Code. Ann. 31-2-333(1)(b), and can be avoided pursuant to section 550 of the Bankruptcy Code and Mont. Code. Ann. 31-2-339(a); and

4.      The Committee and the Debtors are entitled to a judgment against BGI and Mr. Blixseth for the value of the transfers and to any mediate transferees, in an amount to be proven at trial, and attorney's fees.

F.      Additional Defenses Asserted by the Parties.

4.      In his reply to the Committee's counterclaim, Mr. Blixseth denies the Committee's counterclaims and further asserts that the Committee's counterclaims are barred in whole or in part by failure to state a claim upon which relief can be granted; statute of limitations; waiver; release; estoppel; laches; unclean hands; accord and satisfaction; payment; Committee's lack of standing because its creditors were not creditors at the time of the Credit Suisse loan transactions; assumption of risk by creditors who advanced credit after the Credit Suisse loan transactions; Blixseth's lack of proximate cause for the Committee's claims and damages; proximate causation by the conduct of other persons; causation by unforeseen and unforeseeable events over which Blixseth had no control; Blixseth's conduct and transactions are protected by the business judgment rule; Blixseth's conduct and transactions were based upon Blixseth's reasonable reliance on advice of qualified professionals, including legal and accountant opinions.  In addition, Blixseth asserts that the Committee's counterclaim should be dismissed due to breaches of Blixseth's attorney-client confidences and privileged communications.

III.    **Jurisdiction and Venue**.

These adversary proceedings arise under title 11, and arise in and relate to the Debtors' jointly administered bankruptcy cases, which are pending in this Court. This Court has jurisdiction over these proceedings under 28 U.S.C. § 1334. These are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409.

* * *

V.    **Agreed Facts**.

The following facts are agreed upon and require no proof:

1.    Each of the Debtors is a limited-liability company organized under Montana law.

2.    Debtor Yellowstone Club Construction Company, LLC, was not a party to the Credit Agreement.

3.    On and before September 30, 2005, Mr. Blixseth was the controlling shareholder of BGI, an Oregon corporation that owned a majority interest in the Debtor entities. BGI was the managing member of Yellowstone Mountain Club, LLC and Yellowstone Development, LLC and Mr. Blixseth was the managing member of the Borrowers Big Sky Ridge, LLC. On November 10, 2008, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.    On November 13, 2008, the Court issued the Interim DIP Financing Order.

VI.    **Elements of Claims, Counterclaims, and Defenses**.

A.    <u>Declaratory Judgment</u>.

All parties seek various species of declaratory relief.  28 U.S.C. § 2201 provides in relevant part that:  "In a case of actual controversy within its jurisdiction . . . , any court of the Unit-ed States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

B.    <u>Breach of Fiduciary Duty</u>.

Mont. Code Ann. 35-8-310 sets forth the fiduciary duties of

limited-liability-company members as follows:

(1) The only fiduciary duties that a member owes to a member-managed company and the other members are the duty of loyalty imposed by subsection (2) and the duty of care imposed by subsection (3).

(2) A member's duty of loyalty to a member-managed company and its other members is limited to the following:

(a) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;

(b) to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest adverse to the company; and

(c) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

(3) A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(4) A member shall discharge the duties under this chapter or the operating agreement to a member-managed company and its other members and exercise any rights consistently with the obligation of good faith and fair dealing.

(5) A member of a member-managed company does not violate a duty or obligation un-der this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest.

(6) A member of a member-managed company may lend money to and transact other business with the company. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

(7) This section applies to a person winding up the limited liability company's business as the personal or legal representative of the

7

last-surviving member as if the person were a member.

(8) In a manager-managed company:

> (a) a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member;

> (b) a manager is held to the same standards of conduct as those prescribed for members in subsections (2) through (6);

> (c) a member who pursuant to the operating agreement exercises some or all of the rights of a manager in the management and conduct of the company's business is held to the standards of conduct prescribed for members in subsections (2) through (6) to the extent that the member exercises the managerial authority vested in a manager by this chapter; and

> (d) a manager is relieved of liability imposed by law for violation of the standards prescribed for members by subsections (2) through (6) to the extent of the managerial authority delegated to the members by the operating agreement.

D.      <u>Fraudulent Transfer</u>.

Montana's Uniform Fraudulent Transfer Act sets forth the elements of this claim at Mont. Code Ann. § 31-2-333(b) as follows:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .

>> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

>>> (I) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>>> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to

8

pay as they became due.

E.     Alter Ego.

     In making the determination of whether a shareholder is an alter-ego with an entity, the following factors are considered along with the other evidence and circumstances of each individual case: whether the shareholder owns all or most of the corporation's stock, is a director and/or president of the corporation, makes all the corporate decisions without consulting the other directors or officers, and admits to third parties that the shareholder and the corporation are one in the same; whether the shareholder's personal funds are commingled with the corporation's funds, whether the shareholder's personal credit and corporation's credit are used interchangeably to obtain personal and corporate loans, whether the shareholder and corporation engage in the same type of business, and whether the shareholder and corporation have the same address which is the address of shareholder's personal residence. *Peschel Family Trust v. Colonna*, 75 P.3d 793 (Mont. 2003).

F.     Statute of Limitations.

     Mont. Code Ann. § 27-2-204 provides a three-year statute of limitations on claims for breach of fiduciary duty  The parties disagree as to accrual.  The Committee and the Debtor argue that Montana common law applies the discovery rule towards this statute of limitations.  See *Shupak v. N.Y. Life Ins. Co.*, 780 F. Supp. 1328, 1339 (D. Mont. 1991) (applying MCA § 27-2-102 to breach of fiduciary duty claim); *Burgett v. Flaherty*, 663 P.2d 332, 334 (Mont. 1983); *Stanley L. and Carolyn M. Watkins Trust v. Lacosta*, 92 P.3d 620, 629-30 (Mont. 2004) (legal malpractice claim in which attorney owed fiduciary duties to client); *Estate of Watkins v. Hedman, Hileman & Lacosta*, 91 P.3d 1264, 1270 (Mont. 2004) (same).  *See also Orr v. State*, 106 P.3d 100, 117 (Mont. 2004).  Credit Suisse argues that "[l]ack of knowledge of the claim or cause of action, or of its accrual, by the party to whom it has accrued does not postpone the be-ginning of the period of limitation."  Mont. Code Ann. § 27-2-102(2); *see also Bennett v. Dow Chemical Co.*, 713 P.2d 992 (Mont. 1986) ("The fact that a party with a cause of action has no knowledge of his rights, or even the facts out of which the cause arises, does not delay the running of the statute of limitations until [the party] discovers the facts or learns of his rights under those facts." (citing *Carlson v. Ray Geophysical Division*, 481 P.2d 327, 329 (Mont. 1971))).

H.     Judicial Estoppel.

     The elements of judicial estoppel are:  (I) the estopped party had knowledge of the facts when it took the original position; (ii) the estoped party

succeeded in maintaining its original position; (iii) the position presently taken is inconsistent with the original position; and (iv) the original position misled the adverse party and allowing the stopped party to change its position would prejudice the adverse party. *See Stanley L. and Carolyn M. Watkins Trust v. Lacosta*, 92 P.3d 620, 627 (Mont. 2004).

I.     Promissory Estoppel.

The elements of promissory estoppel are: (I) a party makes a clear and unambiguous promise, (ii) the party to whom the promise is made relies on it, (iii) reliance is reasonable and foreseeable, and (iv) the relying party is injured. *Warner v. Aetna Cas. & Sur. Co.*, 940 F.2d 1537, 1991 WL 148828 at *2 (9th Cir. 1991).

K.     Waiver.

Waiver is "a voluntary and intentional relinquishment of a known right, claim or privilege which may be proved by express declarations or by a course of acts and conduct so as to induce the belief that the intention and purpose was to waive." *Idaho Asphalt Supply v. State, Dept. of Transp.*, 297 Mont. 66, 71 (1999); *see also Kelly v. Lovejoy*, 172 Mont. 516 (1977).

"[W]aiver may be implied by a course of action or conduct which induces the belief that the intention and purpose was waiver[.] *Benson v. Diverse Computer Corp.*, 321 Mont. 140, 147 (2004). " [I]mplied waiver requires a detrimental reliance by the party who is led by the conduct to believe a waiver has occurred." *Id*.

L.     Laches.

"Laches is an equitable doctrine by which a court denies relief to a claimant who has un-reasonably delayed or been negligent in asserting a claim, when the delay or negligence has prejudiced the party against whom relief is sought." *Anderson v. Stokes*, 338 Mont. 118, 126 (2007). "[F]or laches to apply, the court must find lack of diligence by the party against whom the defense is asserted and prejudice to the party asserting the defense." *Id*. (emphasis in original).

M.     Unclean Hands.

"The doctrine of clean hands provides that "[p]arties must not expect relief in equity, unless they come into court with clean hands."" *Rutherford v. Ultra Shield Products Intern., Inc.*, 310 Mont. 541 (2002). The Court "will not assist a

party whose claim originated in the party's wrongdoing, whether the victim of the wrongdoing is the other party or a third party." *Id.*

N.     Accord and Satisfaction.

"Accord and satisfaction" is the substitution of a new agreement in satisfaction of an ob-ligation different from the original rights existing under an antecedent liability, *Nelson v. Young* (1924) 70 M 112.

Further, 28-1-1401 MCA provides that "An accord is an agreement to accept in extinction of an obligation something different from or less than that to which the person agreeing to accept is entitled. Though the parties to an accord are bound to execute it, yet it does not extinguish the obligation until it is fully executed.

O.     Payment.

Payment on an obligation is an affirmative defense to that obligation. *Olson v. McLean* (1957)132 Mont. 111, 115; *Baker National Bank v. Lestar* (1969) 153 Mont. 45, 50. Indeed, the well-settled rule is widely recognized across jurisdictions " A partial performance of an indivisible obligation extinguishes a corresponding portion thereof, if the benefit of such of such performance is voluntarily retained by the creditor, but not otherwise."  California Civil Code Section 1477.

P.     Proximate Cause.

"In Montana, proximate cause is an act or omission which, "in a natural and continuous sequence, unbroken by any new, independent cause, produces injury, and without which the in-jury would not have occurred" [t]he phrase "without which the injury would not have occurred" incorporates the "but for" test."  *Bossard v. Johnson*, 265 Mont. 272, 276 (1994), *citing Bickler v. Racquet Club Heights Associates*, 258 Mont. 19 (1993).

Q.     Intervening and Superseding Cause.

Intervening and superceding cause is a recognized under Montana law, which follows the Restatement (Second) of Torts in analyzing the defense. *Jimison v. U.S.* (D.C.Mont. 1967) 267 F.Supp. 674, 676.  The *Jimison* Court focused on The Restatement (Second) of Torts, Section 442 which "lists considerations which are of importance in determining whether an intervening force is a superseding cause of harm to another:

'* * * * '(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

'* * * * '(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; '

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; '

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.' (*Id.* at 678).

R.    Business Judgment Rule.

The business judgment rule in Montana has been stated as, "when a reasonable basis exists to indicate that the directors of a corporation acted in good faith, the directors are immunized from liability for honest errors." *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 139 (1990); *citing Ski Roundtop, Inc. on Behalf of Ski Yellowstone Inc. v. Hall*, 202 Mont. 260, 273 (1983). In order to determine whether actions were unreasonable, the *Daniels* court determined whether or not the actions "would not have been taken by 'an ordinarily prudent man ... in the management of his own affairs of like magnitude and importance.'" *Id.* quoting *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 278 (Alaska 1980).

**VII.    Relief Sought.**

8.    Joint and Several Liability of Credit Suisse and Mr. Blixseth for Mr. Blixseth's breaches of fiduciary duties to the Debtors and their creditors, as well as return of Credit Suisse Loan monies and/or proceeds to the extent that Credit Suisse's $309,021,984.26 claim is disallowed.

9.    Judgments against Mr. Blixseth on alter-ego claims and return of proceeds received from the Credit Suisse Loan.

10.    A money judgment or award of attorney fees and costs.

B.    The Debtors seek the following relief:

2.    A determination that the Credit Suisse Loan and related transactions constituted a fraudulent conveyance under Montana law, that all

mortgages, liens and security interests must be avoided/released; and that Credit Suisse must repay the estate $139 million in inter-est expense and the $7.4 million fee paid Credit Suisse;

8.      Joint and Several Liability of Credit Suisse and Mr. Blixseth for Mr. Blixseth's breaches of fiduciary duties to the Debtors and their creditors, as well as return of Credit Suisse Loan monies and/or proceeds to the extent that Credit Suisse's $309,021,984.26 claim is disallowed;

9.      Judgments against Mr. Blixseth on alter-ego claims and return of proceeds received from the Credit Suisse Loan; and

10.     Attorney's fees.

D.      Mr. Blixseth seeks the following relief:

1.      A declaratory judgment that the Credit Suisse Loan was not a fraudulent transfer;

2.      A declaratory judgment that Blixseth did not breach any fiduciary duties;

3.      A declaratory judgment that Blixseth did not have any fiduciary duties to creditors of the Debtors;

4.      A declaratory judgment that Blixseth is released from claims as a result of the Marital Settlement Agreement;

5.      A declaratory judgment that the UCC claims are time barred;

6.      The Committee's counterclaims against Blixseth be denied and that no monetary relief sought by the Committee shall be granted;

## VIII.  Legal Issues.

Unless resolved prior to trial, the following legal issues will be argued:

1.      Whether the statute of limitations bars the Committee's and the Debtors' breach-of-fiduciary-duty claims and their aiding-and-abetting breach-of-fiduciary-duty claims.

3.      Whether the Debtors' claims are barred by the doctrine of judicial

estoppel.

4.      Whether the Debtors' claims are barred by the doctrine of promissory estoppel.

5.      Whether the Debtors' claims are barred by the law of the case.

14.      Whether Mr. Blixseth's claims are barred by the doctrine of unclean hands.

15.      Whether Mr. Blixseth's claims are barred by the doctrine of *in pari delicto*.

16.      Whether Mr. Blixseth's claims are barred by illegality, namely breaching a fiduciary duty, as well as accepting fraudulently transferred monies.

17.      Whether BGI was an alter ego of Mr. Blixseth on September 30, 2005.

18.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by the statute of limitations.

19.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred for failure to state a claim upon which relief can be granted.

20.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by waiver.

21.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by release.

22.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by estoppel.

23.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by laches.

24.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by unclean hands.

25.      Whether the Committee's and Debtors' counterclaims against Blixseth are barred by accord and satisfaction.

26.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred by payment.

27.     Whether the Committee and Debtors lack standing because Committee creditors were not creditors at the time of the Credit Suisse loan transactions.

28.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred by assumption of risk by creditors who advanced credit after the Credit Suisse loan transactions.

29.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred  by Blixseth's lack of proximate cause for the Committee's and Debtors' claims and damages.

30.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred as a result of proximate causation by the conduct of other persons.

31.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred as a result of causation by unforeseen and unforeseeable events over which Blixseth had no control.

32.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred because Blixseth's conduct and transactions are protected by the business judgment rule.

33.     Whether the Committee's and Debtors' counterclaims against Blixseth are barred because Blixseth's conduct and transactions were based upon Blixseth's reasonable reliance on advice of qualified professionals, including legal and accountant opinions.

In an attempt to frustrate the trial, Blixseth filed an Expedited Motion to Bifurcate and

Continue Trial of Claims Regarding Blixseth on April 21, 2009.  That Motion was denied by

Order entered April 24, 2009.  However, in an effort to quash Blixseth's due process arguments,

the Court continued the commencement of trial from April 22, 2009, to April 29, 2009.  Blixseth

also sought to derail this Adversary Proceeding by filing two motions to dismiss.  Blixseth filed

an Emergency Motion to Dismiss the Unsecured Creditors' Claims Against Timothy L. Blixseth

on April 14, 2009, at docket entry no. 145, and an Expedited Motion With Memorandum to

Dismiss Claims Regarding Tim Blixseth on April 27, 2009, at docket entry no. 237.  Blixseth

asserts in his April 14, 2009, Motion to Dismiss that the Committee violated Blixseth's attorney-

client relationship and gained confidential attorney-client information from Blixseth's attorney,

Stephen R. Brown.  The Debtors and Committee opposed Blixseth's Motion arguing that Blixseth

had not shown actual disclosure of attorney-client communication or that if a disclosure by Steve

Brown of confidential attorney-client information occurred, that such disclosure has not caused

prejudice to Blixseth.  The Court determined that the pleadings established a factual dispute

between Blixseth, on the one hand, and the Debtors and Committee, on the other.  Thus, the

Court reserved ruling on Blixseth's Motions until after conclusion of the trial.

While the Court has already denied Blixseth's Motion to Bifurcate, Blixseth argued in

said Motion that he had not had an opportunity to conduct and complete adequate discovery and

trial preparation:

> Mr. Blixseth and his lawyers were hopeful that they would be able to
> obtain sufficient discovery and engage in adequate pretrial preparation to allow
> Mr. Blixseth to defend against the many claims brought against him. However,
> Mr. Blixseth and his attorneys have now reluctantly determined that they have not
> been able to review and analyze thousands of documents that are pertinent to this
> adversary proceeding, have not been able to engage expert witnesses, have not had
> access to the records of Mr. Blixseth's former companies, and therefore have been
> unexpectedly hampered in their ability to adequately prepare for the trial of this
> adversary proceeding. To have to defend litigation at this level in a few weeks
> period has resulted in a denial of Mr. Blixseth's fundamental due process rights,
> and does so to such a degree only a dismissal or, at a minimum, a severance or
> bifurcation of his claims would possibly protect what rights he has remaining.

As Blixseth correctly notes in the Memorandum attached to his Motion, the Debtors sought

protection under the Bankruptcy Code on November 10, 2008, and the Court entered an Order on

16

November 13, 2008, allowing for the joint administration of the four separate bankruptcies which comprise the Yellowstone Club. Attorney Joel Guthals filed a Notice of Appearance on behalf of Blixseth in the Debtors' jointly administered bankruptcy on November 24, 2008.

During various debtor-in-possession financing hearings, many of which Mr. Guthals attended, the parties in this proceeding discussed certain loans that the Debtors obtained from Credit Suisse and also discussed various notes that Blixseth, on behalf of BLX Group, Inc., f/k/a Blixseth Group, Inc. or BGI, executed in favor of the Debtors. Those discussions eventually prompted the Court to schedule a show cause hearing on January 13, 2009, for parties in interest to appear and show cause why the Court should not lift the automatic stay to allow enforcement of the three Promissory Notes between the Debtors and BLX Group, Inc. in the approximate stated amount of $275,000,000. Following the January 13, 2009, hearing, the Court entered an Order on January 16, 2009, lifting the automatic stay to allow "[t]he Committee, as fiduciary of the bankruptcy estate, [to] conduct a full review of the causes of action belonging to the Debtors that are related to the Promissory Notes to determine how the Debtors' bankruptcy estates should best proceed to recover the divested proceeds of the Credit Suisse loan[.]"

On February 3, 2009, the Committee filed a Complaint against Edra Blixseth and BLX Group, Inc. The Committee later filed a combined "Notice of Claim Against Credit Suisse, Objection to Claim of Credit Suisse, and Motion for Authorization to File Complaint Against Credit Suisse" on February 11, 2009. Mr. Guthals received Notice of the Committee's February 11, 2009, combined pleading, including the proposed Complaint attached thereto. In anticipation of the Committee's Complaint and as a protective measure, Credit Suisse filed a Complaint against the Debtors and the Committee on February 25, 2009, thereby commencing Adversary

17

Proceeding 09-00014. Credit Suisse's Complaint was accompanied by a Motion to Expedite Proceedings and Set an Immediate Scheduling Conference.

The Committee then filed its Complaint against Credit Suisse and John Does 1-15 on March 3, 2009, thereby commencing Adversary Proceeding 09-00017.  Adversary Proceeding 09-00014 and Adversary Proceeding 09-00017 were consolidated by the Court on March 3, 2009. Mr. Guthals, along with various other attorneys, including counsel for the Debtors, the Committee and Credit Suisse, appeared at a hearing held March 4, 2009. At the March 4, 2009, hearing, the Debtors, Committee and Credit Suisse discussed the need for an expedited trial in the consolidated Adversary Proceedings. At the conclusion of the March 4, 2009, hearing, the Court directed the parties to submit a proposed scheduling order. On March 11, 2009, the Debtors, Committee and Credit Suisse filed a Stipulated Scheduling Order, which the Court adopted as the Scheduling Order governing this case on March 12, 2009. The Scheduling Order set April 22, 2009, as the commencement date of the trial.

On March 16, 2009, Blixseth filed a Motion to File Complaint in Intervention which reads in part:

> By this action, Mr. Blixseth seeks an expedited declaratory judgment confirming that the Loan Transaction does not constitute a fraudulent transfer as alleged by the Committee. Mr. Blixseth also seeks a declaration that any claims regarding Mr. Blixseth's fiduciary duties to the Yellowstone Club are time-barred. In the alternative, Mr. Blixseth seeks a declaratory judgment confirming he did not breach any fiduciary duty to the Club by entering into and performing obligations under the Loan Agreement and that he did not have a fiduciary duty to the Club's other creditors regarding the Loan Transaction.

Three days after Blixseth filed the Motion to File Complaint in Intervention, Blixseth filed a request for expedited hearing on the motion to intervene because it was "essential that Mr.

Blixseth be allowed to intervene immediately to participate in discovery and pretrial proceedings."  Blixseth specifically requested in the request for expedited hearing that the Court set the expedited hearing for March 24, 2009, at 1:00 p.m. in Billings. The Court granted Blixseth's request for expedited hearing.

At the expedited hearing held March 24, 2009, Mr. Guthals appeared and argued that under Fed.R.Civ.P. 24(a)(2), applicable under Bankruptcy Rule 7024, that "the Court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Mr. Guthals explained that the Committee's Complaint contains at least 15 allegations that directly mention Blixseth and includes two claims directly against Blixseth. Given the absence of any opposition, the Court granted Blixseth's motion to intervene subject to the existing Scheduling Order.  According to Mr. Guthals, his objective was to get a fair trial for Blixseth. The Court then advised Mr. Guthals that it would entertain appropriate motions to extend discovery and other such deadlines and told Mr. Guthals to be ready for trial at the end of April.  Mr. Guthals promptly filed Blixseth's Complaint in Intervention on March 24, 2009, and on March 25, 2009, Blixseth filed a request for shortened time to respond to this Complaint in intervention, which the Court granted.

Despite the Court's reminder to Mr. Guthals on March 24, 2009, to be ready for trial on April 22, 2009, Blixseth filed a Motion to Amend Scheduling Order and Continue Trial Date on March 26, 2009, arguing in part:

11. On behalf of Mr. Blixseth, the undersigned requests that the present trial date

19

be continued to a date and time convenient to the Court and counsel, but not earlier than May 11, 2009 and that the pretrial deadlines be adjusted and the time for parties to respond to discovery requests be shortened, all to allow Mr. Blixseth to have a fair opportunity in the trial of this consolidated adversary proceeding.

12. Mr. Blixseth and his lawyers appreciate the Court's need to promptly decide the issues in this case, prior to confirmation of the Chapter 11 Plan, and are willing and able to handle this litigation in an expeditious fashion, as they have so far demonstrated.

Following a hearing held March 27, 2009, the Court entered an Order denying Blixseth's motion

for continuance, explaining:

The Court has tentatively scheduled May 18, 2009, as the date for the hearing on confirmation of the Debtors' Chapter 11 Plan. This Court scheduled May 18, 2009, as the confirmation hearing date because the Court has other commitments between May 20, 2009, and June 9, 2009. A continuance of the April 22, 2009, trial in this proceeding would necessarily result in the confirmation hearing on the Debtors' Chapter 11 Plan being continued to the latter part of June. The issues in this proceeding need to be resolved prior to the hearing on confirmation of Debtors' Chapter 11 Plan and from what the parties have conveyed to the Court, the hearing on confirmation of Debtors' Chapter 11 Plan must be held prior to [June 10, 2009, because Debtors' DIP financing expires in May of 2009]. Thus, Blixseth's request for a continuance must be denied.

Other than trial preparation matters, the Court received nothing remarkable from Blixseth until

Blixseth filed his pending Motions to Dismiss.

In the motion for intervention, Blixseth argued that it was imperative that he intervene to

protect his rights.  The Court allowed the intervention with the caveat that the Court would not

allow Blixseth to delay these proceedings.  Notwithstanding, Blixseth made every effort to slow

and protract this Adversary Proceeding, including arguing ad nauseam about how he has been

damaged by Stephen R. Brown's alleged divulgence of information that is protected by Blixseth's

attorney-client privilege.

HISTORICAL BACKGROUND

20

Blixseth and his former wife, Edra Blixseth ("Edra"), formed the Debtor corporations on the land that Blixseth acquired through various transactions, and began development in the late 1990s of the world's only private ski and golf community, commonly referred to as the Yellowstone Club. The Yellowstone Club is a membership only master-planned unit development, situated on 13,500 acres of private land in Madison County, Montana near Big Sky, Montana.

The Blixseths originally contemplated that the Yellowstone Club would consist of roughly 864 fee dwelling units located within seven planned residential neighborhoods over a total of 2,700 acres. To get the Yellowstone Club off the ground, the Blixseths sold equity interests in the Yellowstone Club to various persons, who were referred to as Pioneer and Frontier Members. The 25 Pioneer and 15 Frontier memberships were sold at substantially reduced prices. In addition to the 864 residential memberships, the Yellowstone Club also has 150 national memberships. The Debtors have not yet sold any of the national memberships, other than possibly one.

The Yellowstone Mountain Club, LLC ("YMC") is primarily engaged in operating the Yellowstone Club. YMC was established in 1997. Yellowstone Development, LLC ("YD") was established in 1999 and is engaged primarily in the business of retail and land sales and development of residential lots in the Yellowstone Club. Big Sky Ridge, LLC ("BSR") was formed in 2002 for the purpose of acquiring and developing land located outside but contiguous to the boundaries of the Yellowstone Club. YMC and YD have two classes of members; Class A members, who have voting rights, and Class B non-voting members. It appears that Yellowstone Club Construction Company is owed by YD and was formed in 2006 for the purpose of

constructing various buildings within the boundaries of the Yellowstone Club.

FACTS

On September 30, 2005, the Debtors were controlled by Blixseth as the sole Class A Shareholder through his holding company, Blixseth Group, Inc. ("BGI").  Approximately 13% of the Club was owned by Class B Members who were referred to as the Class B Shareholders or the "Bs" in this litigation.  BGI was an Oregon sub-S corporation, which was solely owned by Blixseth as President and CEO from 1999 to mid-August of 2008, when Blixseth relinquished control of BGI and the Yellowstone Club to Edra as part of the couple's marital settlement agreement.

In or around December of 2004, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, made several attempts to send Blixseth and his secretary or assistant emails that contained a two to three-page teaser, providing Blixseth with a brief overview of Credit Suisse and its new loan product referred to as a syndicated term loan, which was described to Blixseth as something akin to a "home-equity loan."  Blixseth eventually responded to Barcy's emails by calling Barcy on the telephone.  Blixseth and Barcy had a brief phone conversation and following the telephone conversation, the "next marketing step [for Barcy and his team] was a trip up to the Yellowstone Club[.]"   Following the initial meeting at the Yellowstone Club, Barcy testified that although he could not remember exact details, he and Blixseth "had a number of phone conversations and probably emails back and forth as to why it would be interesting for [Blixseth] to potentially do a loan on the Club."

Credit Suisse was specifically trying to "break new ground with a product by doing real estate loans in the corporate bank loan market."  Through its new syndicated term loans, Credit

22

Suisse was able to offer a loan product the size of which had previously been unavailable to borrowers.  Barcy testified that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay, and Lake Las Vegas.  Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands branch, which allowed the equity holders in said entities to take sizeable distributions from all or part of the Credit Suisse loan proceeds.

Blixseth originally declined Credit Suisse's loan offer, but then contacted Barcy a couple months later and "said that he might have a use of the proceeds for the loan and would be interested in talking again."  Following Blixseth's call, Barcy and another person from Credit Suisse met Blixseth and Chris Campbell, Yellowstone Club's Vice President of Finance, at Blixseth's home in Palm Springs, California.  Blixseth initially agreed to take a loan of only $150 million.  After several months of negotiations between Credit Suisse First Boston and Blixseth, the proposed amount of the loan grew from $150 million to $375 million.

During his negotiations with Credit Suisse, Blixseth formed an in-house team to assist with pursuing the Credit Suisse loan.  That team consisted of Blixseth, Edra, Chris Campbell, Robert Sumpter (Vice President of Real Estate Development), Charlie Callander (Vice President of Sales), Bill Griffon (Vice President of Operations), Hank Kashiwa (Vice President of Marketing), Bruce Bales (Director of Privacy) and Denise Tuohy (Controller).  Blixseth's team also included lead attorney Michael W. Doyle ("Doyle"), attorney Stephen R. Brown, and Blixseth's and the Debtors' accountant, George Mack.

Credit Suisse, Cayman Islands Branch, and Blixseth, on behalf of the Debtors, eventually entered into a credit agreement dated September 30, 2005 ("Credit Agreement").  Prior to the

23

September 30, 2005, Credit Agreement, Cushman & Wakefield did a limited appraisal of the
Debtor's property for American Bank.  In that limited appraisal, as of September 21, 2004,
Cushman & Wakefield determined that the "as-is market value" of those assets that later served
as collateral for Credit Suisse's $375 million loan was $420 million.

Similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and
Lake Las Vegas, the Yellowstone Club Credit Agreement was originally drafted to provide that
the proceeds of the loan would be used, in part, for "distributions" to members of the Borrower
for purposes unrelated to the Yellowstone Development.  During the same period of time that
Blixseth was negotiating with Credit Suisse for his loan, Blixseth was also attempting to buy the
interests of the B shareholders under the guise that Blixseth wanted to repurchase the "B" shares
for estate planning purposes and to involve his children in ownership of the Yellowstone Club.
Not all the B shareholders agreed to Blixseth's proposed purchase and thus, Blixseth purchased
none of the B shareholders' interests because according to Blixseth, his offer was an all or
nothing deal.

Coincidentally, in late August of 2005 or early September of 2005, about the same time
that Blixseth was unsuccessful in buying the B shareholders' interests, Blixseth was allegedly
advised by Doyle and George Mack that he would have to take the Credit Suisse loan proceeds as
a loan rather than a distribution.  The reasoning was two-fold.  First, Blixseth would incur a
substantial tax liability on a distribution.  Second, recording such a large distribution on the
Debtors' books would result in negative owners' equity accounts.

Blixseth thus contacted Credit Suisse sometime between August 22, 2005, and September
4, 2005, and requested that the Credit Agreement be modified to provide that the loan proceeds

24

could be used: "(I) for distribution *or loans* up to [$ _____] to affiliates of the borrower for purposes unrelated to the Yellowstone Development[.]"  Between September 4, 2005, and September 30, 2005, the recitals were once again amended to finally provide that the proceeds of the loan would be used "(I) for distribution or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) for investments up to $142,000,000 into Unrestricted Subsidiaries for purposes unrelated to the Yellowstone Development, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan[.]"  Barcy testified that it was Blixseth's "responsibility to figure out what he had to do internally to make those distributions or not make those distributions.  And as a controlling shareholder of the Yellowstone Club, that was in his court."

After several months of negotiations, Credit Suisse and Blixseth finally came to an agreement on the terms of the Credit Agreement and executed the same.  The Credit Agreement provided the Debtors with a $375 million Senior First Lien Credit Facility, which was funded in its entirety on September 30, 2005.  In accordance with the Credit Agreement and upon closing the loan on September 30, 2005, $24.2 million was disbursed to pay off certain existing indebtedness, $8.7 million was disbursed for transaction costs, and $342.1 million was disbursed to the Debtors.  The $342.1 million that were disbursed to the Debtors were distributed in two significant ways.  First, the Credit Agreement designated up to $209 million of the loan proceeds to be used as  "distributions or loans" for "purposes unrelated" to the Yellowstone Club.  Additionally, up to $142 million was authorized to be used for investments into "unrestricted

subsidiaries" for "purposes unrelated" to Yellowstone Club development.  Thus, the bulk of the

loan proceeds were designated to be used for purposes outside of, and unrelated to, the

Yellowstone Club.

In the years leading up to the Credit Agreement, the Yellowstone Club had receivables

from BGI and other affiliates of approximately $55 million.  The Yellowstone also carried an

additional debt load ranging from a low of approximately $4 to $5 million to a high of

approximately $60 million on a revolving line of credit.  The day before the Loan Transaction

with Credit Suisse, the Yellowstone Club carried, in addition to any amounts owed to BGI and its

affiliates, approximately $19 to $20 million in debt on its books, consisting of a combination of a

revolving line of credit and a term loan with American Bank.  The majority of this debt was

related to the construction of the Warren Miller Lodge, which was already underway.

The Debtors had also experienced negative cash flows in several of the years leading up

to the Credit Agreement with Credit Suisse.  Several of the witnesses made reference to

EBITDA, which is earnings before interest, taxes, depreciation and amortization.[3]  Kent Mordy

("Mordy"), a certified public accountant and a certified insolvency and reorganization advisor,

calculated that the Debtors' Cash EBITDA was a negative $15,701,772 in 2002, a positive

$20,369,766 in 2003, and a negative $45,910,598 in 2004.  According to Mordy, the Debtors

projected Cash EBITDA of $83,500,000 in 2005 but realized Cash EBITDA of only $19 million.

Dr. John S. Hekman ("Hekman"), who has a Ph.D in economics and is employed by LECG to

---

[3]  EBITDA can be used to analyze and compare profitability between companies and
industries because it eliminates the effects of financing and accounting decisions. However, this
is a non-GAAP measure that allows a greater amount of discretion as to what is, and is not,
included in the calculation.  EBITDA is a good metric to evaluate profitability, but not cash flow.

provide expert witness testimony in the area of real estate and real estate finance, also did an EBITDA calculation. Hekman's EBITDA calculation for 2005 was $39 million. Mordy explained that his Cash EBITDA numbers were different from Hekman's EBITDA calculations, which were positive for 2003, 2004 and 2005, because Hekman did not subtract capital expenditures and development costs. Steve Yankauer ("Yankauer"), a Managing Director at Credit Suisse, disputed Hekman's and Mordy's EBITDA calculations for 2005, arguing that such figure was closer to $55,610,953.[4] Whatever the accurate number, it is clear that even though the Debtors' had nine months of operations under their belt before the September 30, 2005, Credit Agreement, they missed their profitability projections by a substantial amount. Such numbers show that Debtors' projections for the future, upon which Credit Suisse relied, were not based upon historical reality.

Hekman also testified that the Federal Reserve aggressively lowered interest rates in 2001 to counteract the 2001 recession. As a result of the low interest rates, Hekman characterized 2003 and 2004 as the peak years for real estate. However, due to concerns about the housing bubble, the Federal Reserve began raising interest rates in 2005, which caused the beginning of a slowdown in the real estate markets.

Despite all the red flags, the Credit Agreement was consummated and $342,110,262.53 was wired to the Yellowstone Club on September 30, 2005. This amount reflected the total loan amount of $375 million less fees, administrative costs, and a $24,241,910.98 takeout to payoff preexisting debt. On the same date that $342,110,262.53 was transferred to the Debtors,

---

[4] The Debtors' combined audited financial statements show that the Debtors' operating income for the year ending December 31, 2005, was $37,819,067. Debtors' operating income for the year ending December 31, 2006, dropped to $9,020,546. *See* CS Exhibit 34.

approximately $209 million was transferred out of the Yellowstone Club by Blixseth to BGI.  As previously noted, the transfer of loan proceeds out of the Yellowstone Club was a key feature of the product that Credit Suisse used to sell the loan.  Yankauer testified that the cornerstone of this loan product was that it allowed preferred resort owners, such as Blixseth, to capitalize on the value of their asset.

The immediate transfer of funds out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any contemporaneous loan documents but was simply reflected on the Debtors' books with a journal entry.  Blixseth, right around the time the B shareholders were threatening suit against Blixseth and the Yellowstone Club, drafted a two-page promissory note in the amount of $209 million.  The $209 million unsecured demand note, payable by BGI to the Debtors, was created in May 2006, and backdated to September 30, 2005.

Roughly all of the $209 million proceeds that were transferred to BGI were then disbursed to various personal accounts and payoffs benefitting Tim and Edra Blixseth personally. Blixseth testified that the Debtors had no interest in any of these accounts or payoffs.  The Debtors, under Blixseth' direction, never made demand of BGI on the demand notes, even when the Yellowstone Club needed cash.

Subsequent to September 30, 2005, the Debtors' audited financial statements show that the outstanding balance owed by BGI and its affiliates to the Debtors was $272 million on December 31, 2005, $254.8 million on December 31, 2006, and $243.7 million on December 31, 2007.  Approximately $18 million of the $28.3 pay down on the BGI notes was the result of a payment made by BGI to settle litigation with four Class B non-voting interest holders.

From 2005 through the filing of the bankruptcy, the Yellowstone Club was persistently

behind on its accounts payable.  When the Yellowstone Club needed cash, Moses Moore ("Moore"), who worked as a Senior Accountant and then later Comptroller for the Yellowstone Club, would request money from George Mack ("Mack"), who served at that time as the Yellowstone Club's outside accountant.  Mack was a go-between between Blixseth and Moore when Moore needed money to pay the bills at the Yellowstone Club.  After Moore would make a request for funds, Moore testified that money may or may not appear in the Yellowstone Club's accounts.  Moore testified that it was not uncommon to have to shuffle the Yellowstone Club's accounts payables due to a lack of money, and creditor and vendor invoices would often go unpaid for 90 days or more.

When funds were tight, rather than make a demand on the BGI promissory notes, Blixseth would instead seek to obtain operating funds from various members of the Yellowstone Club. One such member that Blixseth approached was Samuel T. Byrne ("Byrne").  Byrne, the founder and managing partner of CrossHarbor, first visited the Yellowstone Club in 2004 or 2005 as a guest of another Yellowstone Club member.  As a result of his visit, Byrne purchased two Yellowstone Club lots in 2005.  Blixseth approached Byrne and asked whether he would be interested in making a bulk purchase of Yellowstone Club lots at a substantially reduced price. Byrne made his first bulk purchase in 2006 by taking over the 58 unit Sunrise Ridge Condominium Development for a price of $60 million.  In August of 2007, Blixseth again approached Byrne to purchase 31 lots on the golf course.  That sale was consummated in August of 2007 at a price of $54 million.

After performing his forensic review of the Debtors' books, Mordy concluded that the purported $209 million loan to BGI and its affiliates was not in fact a loan under generally

29

accepted accounting principles, but was rather, a distribution and a return of capital to BGI and its then owner, Blixseth.  Six factors led Mordy to his conclusion.  First, Mordy referred to the Credit Agreement which referred to funds that were earmarked as a Return of Capital.  Second, repayment of the BGI notes payable, which were due on demand, was controlled by Blixseth, who controlled BGI.  Third, the $209 million note payable included no scheduled principal payments and in fact, only minimal principal reductions were made.  Moreover, the principal reduction payments that were made also benefitted BGI and Blixseth.  Fourth, the Debtors continued to finance acquisitions and fund operations through bulks sales of lots rather than make demand on the BGI note payable.  Next, Blixseth used funds of $7.4 million from the Debtors, rather than BGI as contemplated, to purchase St. Andrews in Scotland.  Finally, KPMG indicated in the footnotes of Debtors' 2006/2007 audited financial statements that the fair value of BGI's notes payable was not determined because it was not practical to estimate the value of such notes.

Based on his determination that the $209 was a distribution rather than a loan, Mordy determined that as of December 31, 2005, the Debtors's books should have reflected negative equity of approximately $141 million.[5]  In sum, the $209 distribution to BGI left the Debtors highly leveraged and with too little capital with which to fund their financial plans and projections.

Blixseth and Edra separated sometime in 2006 and Blixseth retained sole control of the Debtors and the Yellowstone Club until August of 2008, when Edra was awarded BGI and the

---

[5]  This amount represents the audited owners' equity balance of $67,701,812 as of December 31, 2005, less the $209 million, leaving roughly $141 million

Debtors as part of a marital settlement agreement.  Although Blixseth was negotiating to sell the Yellowstone Club to Byrne and CrossHarbor Capital Partners as late as March of 2008, Blixseth contends that this bankruptcy is a sham concocted by Edra and Byrne.

In addition to the foregoing, and as stated previously, Blixseth has argued at great length in this proceeding that Stephen R. Brown ("Brown") has divulged a plethora of information during this proceeding that is protected by Blixseth's attorney-client privilege.  Brown represented the Debtors in various matters between the late 1990's through 2008.  Brown has also represented Blixseth on various matters, including two pending matters that were stayed as a result of the Debtors' bankruptcy filings on November 10, 2008.  Brown and his law firm, Garlington, Lohn & Robinson, PLLP ("GLR"), have a substantial unsecured claim against the Debtors for work that Brown and GLR did for the Debtors prepetition.  Because of the substantial claim, Brown agreed to serve as Chairman of the Committee.  Brown testified that he is serving as a layperson on the Committee and is not performing legal work for the Committee.  The Committee is represented by various attorneys from Parsons, Behle & Latimer of Salt Lake City, Utah and by attorney James H. Cossitt of Kalispell, Montana.

Blixseth claims that such violation of Blixseth's attorney-client privilege has tainted every aspect of the trial in this matter.  Given the seriousness of the allegations, the Court instructed the Committee to initially produce copies of those email communications on Blixseth's Exhibit 8 that originated from Brown.  The Committee complied with the Court's request by producing, on May 1, 2009, copies of various email communications between December 22, 2008, and March 19,

2009.[6]  The Court carefully reviewed each of the emails and found that the emails in question were protected by the Committee's attorney-client privilege.  Moreover, and more importantly, the Court found that Brown had been very careful to protect Blixseth's attorney-client privilege. For instance, in an email communication dated March 2, 2009, identified on the Committee's privilege log as YUCC2005303, Brown, because of his prior relationship with Blixseth, abstained from voting on whether the Committee should  file its lawsuit against Credit Suisse and John Does 1-15.[7]  While the foregoing is undoubtedly privileged information, such email communication is consistent with Brown's testimony wherein he testified that he was not on the subcommittee that was charged with oversight of the Committee's decision to file its lawsuit, and ultimately abstained from voting on such matter.

The Court has reviewed the voluminous information provided by the Committee, in which Blixseth claims his attorney-client privilege was violated, and found absolutely no evidence that Brown violated Blixseth's attorney-client privilege.  In sum, Blixseth failed to show any actual disclosure of attorney-client communication.  Blixseth's arguments on this point are nothing but baseless allegations intended to derail these proceedings.  The Court is not persuaded by the evidence that this Adversary Proceeding is tainted and, therefore, Blixseth's request for dismissal on grounds that Brown violated his attorney-client privilege must fail.

Blixseth's counsel also took every opportunity to complain that Blixseth was denied due process because of his inability to properly prepare for trial given the speed with which this case

---

[6]  The Committee has since provided the Court with four diskettes that contain all the privileged communications identified on Exhibit 8.

[7]  Brown presumably abstained because Blixseth was originally named as a defendant in the Committee's complaint.

went to trial.  In particular, Blixseth's counsel argued on a daily basis that the Committee, the Debtors and Credit Suisse had a full month more to prepare for trial because this Adversary Proceeding was commenced on February 25, 2009, yet Blixseth did not file his motion to intervene until March 16, 2009, and said motion was not granted until March 24, 2009.

The evidence at trial showed that Blixseth was originally named as a defendant in the Committee's Complaint and in fact, on or about February 7, 2009, the Committee's counsel contacted Blixseth's counsel, Mr. Flynn, as a courtesy, prior to the date that the Committee filed its Complaint to apprise Blixseth that he was going to be named as a defendant.  About this same time, Blixseth was making noise that he was going to propose to pay many of the unsecured creditors in full.  Blixseth's statements obviously prompted Brown to send an email to the Committee's counsel asking the Committee to hold off on filing the Complaint against Blixseth stating "we need to hear what Tim Blixseth has to say first[.]"  Sometime between February 7, 2009, and March 3, 2009, Blixseth was removed from the Committee's Complaint as a named defendant.

However, as Blixseth's counsel conceded, the Complaint still contained numerous references to Blixseth.  Thus, Blixseth felt compelled to intervene.  While Blixseth was not granted leave to officially intervene until March 24, 2009, Blixseth knew the Committee had its sights on him in early February.  Accordingly, Blixseth had just as much time as the other parties to prepare for trial.  Therefore, this Court finds no merit in either of Blixseth's Motions.

Nevertheless, the evidence produced at trial does not support Blixseth's allegations and arguments.  Blixseth took $209 million from the Debtors and used such funds for purposes wholly unrelated to the Yellowstone Club.  Blixseth knew that the Debtors were having difficulty

33

paying their debts as they became due when the Debtors' obligations were something less than $60 million, so Blixseth had to know that the Debtors had little or no chance of ever servicing a $375 million debt to Credit Suisse.  Notwithstanding his actions, Blixseth claims that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the Debtors into bankruptcy so that Byrne could purchase the Debtors at a deep discount, with no apparent benefit to Edra.  The Court is not persuaded by Blixseth's attempts to paint himself as a victim in these proceedings, particularly where Blixseth was at the center of the Debtors' financial woes.

The evidence to date is not favorable for Blixseth.  However, this Court is very cognizant of how fast this matter went to trial, and thus, the Court will keep the record open and will set a further scheduling conference in August.  At that time, the Court will schedule a continued trial date at which the parties will be afforded additional time to present additional evidence for and against Blixseth.  By keeping this record open and allowing Blixseth additional time to prepare for trial, the Court will permit Blixseth an opportunity to further develop the merits of his case with new, not cumulative, evidence and will further permit and authorize Blixseth to immediately pursue any additional new, not cumulative, discovery that may be permissible under the Federal Rules of Bankruptcy Procedure, without waiting for the August scheduling conference.

For the reasons discussed herein and in accordance with this Memorandum of Decision, the Court will enter a separate order as follows:

IT IS ORDERED that Timothy L. Blixseth's Emergency Motion to Dismiss the Unsecured Creditors' Claims Against Timothy L. Blixseth filed April 14, 2009, at docket entry

no. 145, is DENIED.

IT IS FURTHER ORDERED that Timothy L. Blixseth's Expedited Motion With Memorandum to Dismiss Claims Regarding Tim Blixseth filed April 27, 2009, at docket entry no. 237, is DENIED.

IT IS FURTHER ORDERED that Timothy L. Blixseth is authorized to immediately pursue any additional new, not cumulative, discovery that may be permissible under the Federal Rules of Bankruptcy Procedure, without waiting for the August scheduling conference.

IT IS FURTHER ORDERED that the record in this Adversary Proceeding shall remain open and a further scheduling conference will be held telephonically, Wednesday, August 19, 2009, at 10:00 a.m.  Prior to the hearing, any attorney or party wishing to participate in the telephonic scheduling conference shall provide the Court with the telephone number where the attorney or party can be reached on the date and time of the above scheduled hearing by contacting Deputy Clerk of Court Lynn Myers at lynn_myers@mtb.uscourts.gov or (406) 497-1252.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana