FLYNN AFFIDAVIT EXHBIT 1

# Edra Blixseth Post Settlement Asset List and Liability

Prepared By Jory Russell

### As of 8.15.08
Private and Confidential

## Asset List - Post Settlement

| Assets | | | Security | | Entity and Ownership |
|---|---|---|---|---|---|
| Cash (Checking Account) | PDNB Account | | 492,314 | | |
| | | | | | |
| Accounts Receivable | | | | | |
| Story Mill | | | 19,500,000 | | Edra Blixseth owns 100% of Receivable |
| X Patterns | | | 8,000,000 | | Edra Blixseth owns 100% of Receivable |

## Business

| Business Name | Property Type | Est. Current MV | | Security | Entity and Ownership |
|---|---|---|---|---|---|
| Monarch Investments | LLC | 2,800,000 | Stockman 2 million | | Edra Blixseth owns 100% |
| Monarch Furniture and Design | LLC | 2,879,017 | American Bank 1 Million | | Edra Blixseth owns 100% |
| Monarch Go Build Construction | LLC | 637,000 | Unencumbered | | Edra Blixseth owns 50% |
| Bkware | LLC | 13,262,989 | Wachovia 8 million | | Edra Blixseth owns 65.8% |
| Blixseth Family Investments | LLC | 29,705,699 | First Bank 8 Million | | Edra Blixseth owns 80% |
| | | **49,284,705** | | | |

## Real Estate

| Property Name | Property Type | Current Mrkt Value | | Security | Entity and Ownership |
|---|---|---|---|---|---|
| Yellowstone Club et al | Private | 500,000,000 | CS 300 Million | | BGI owns 91% |
| Porcupine Creek (Land and Improvements) | Private | 207,590,000 | 1st - Cross Harbor (35MM) | | |
| YDI - Chateau De Farcheville | Private | 63,900,000 | Unencumbered | | BGI owns 100% |
| Casa Captiva - Cabo Home | Private | 22,500,000 | Unencumbered | | BGI owns 91% |
| Yellowstone Club - Family Compound | Private | 40,000,000 | 1st - CH (13MM) / 2nd - Lemond (13.5MM) / 3rd - CH (22MM) | | BGI owns 100% |
| Yellowstone Club Home Lot 48 | Private | 7,000,000 | Yellowstone Development | | Edra Blixseth owns 100% |
| Rancho Mirage Homes (Outside PC Gates) | Private | | | | YD owns 85% BFI owns 6% total 91% owned |
| Bellevue Condo - WA Home | Private | 4,000,000 | 800K Encumbrance PDNB | | BGI owns 100% |
| Bozeman Condo | Private | 3,000,000 | WCP / M&I Bank | | Edra Blixseth owns 100% |
| Rancho Mirage Condos (2 @300K) | Private | 300,000 | Unencumbered | | Edra Blixseth owns 100% |
| **Total** | | 600,000 | Unencumbered | | Edra Blixseth owns 100% |
| | | **848,890,000** | | | |

Private and Confidential

## Edra Blixseth Projected Profit and Loss Statement 1 Year

**Assumptions**

1 CF is sold by Sept 15th, 2008

| | | 2008 | | | 2009 | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | | Total |
| **Revenue** | | | | | | | | | | | | | | |
| PC corporate Events | - | - | 500,000 | 500,000 | 1,000,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,000,000 | 500,000 | - | | 9,500,000 |
| YC | 337,000 | 21,600,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | | 22,937,000 |
| Big Springs Realty | 250,000 | 500,000 | 500,000 | 1,000,000 | 1,000,000 | 2,250,000 | 1,250,000 | 1,250,000 | 500,000 | 500,000 | 500,000 | 500,000 | | 10,000,000 |
| Bixware | - | - | - | - | 1,493,765 | 1,496,565 | 1,498,917 | 1,501,883 | 1,508,212 | 3,508,929 | 1,511,280 | 1,518,531 | | 14,088,083 |
| BFI | - | - | - | 50,000 | 2,925,000 | | | | | | | | | 2,925,000 |
| **Total Revenue** | 587,000 | 22,100,000 | 1,100,000 | 1,650,000 | 6,518,765 | 5,346,565 | 4,348,917 | 4,351,883 | 3,608,212 | 5,108,929 | 2,611,280 | 2,118,531 | | 69,450,083 |
| **Expenses** | | | | | | | | | | | | | | |
| PC corporate Events | - | - | 50,000 | 50,000 | 100,000 | 150,000 | 150,000 | 150,000 | 150,000 | 100,000 | 50,000 | - | | 950,000 |
| Bixware | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | 377,540 | | 4,530,480 |
| Porcupine Creek | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | 414,292 | | 4,971,504 |
| Casa Captiva | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | 15,933 | | 191,196 |
| RM homes | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | 3,701 | | 44,410 |
| Bellevue Condo | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | 9,987 | | 119,848 |
| EB Phoenix | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | | 4,320,000 |
| Personal | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | 234,733 | | 2,816,796 |
| Interest | 160,000 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | 72,035 | | 952,385 |
| Other | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | 120,000 |
| **Total Expenses** | 1,586,186 | 1,498,221 | 1,648,221 | 1,648,221 | 1,598,221 | 1,648,221 | 1,648,221 | 1,648,221 | 1,648,221 | 1,598,221 | 1,548,221 | 1,498,221 | | 19,016,619 |
| **Net Cash Flow** | (999,186) | 20,601,779 | (448,221) | 101,779 | 4,920,544 | 3,698,344 | 2,700,696 | 2,703,662 | 1,959,991 | 3,510,708 | 1,063,059 | 620,310 | | 40,433,464 |

**Personal Assets**

| | Description | Current Market Value | | |
|---|---|---|---|---|
| G2B | Jet | 4,500,000 | National City collateral for GIV | Edra Blixseth owns 100% |
| Personal property (Vehicles & Jewelry) | Personal Property | 3,900,000 | Unencumbered | Edra Blixseth owns 100% |
| Inventory | Household Inventory | 12,500,000 | Unencumbered | Edra Blixseth owns 100% |
| Total Personal | | 20,900,000 | | |

**Total Assets** 947,067,019

## Liability List - Post Settlement

**Liabilities**

| Lender | Type of Facility | Outstanding Amount | |
|---|---|---|---|
| CIP Yellowstone Lending LLC | | 35,100,000 | Porcupine Creek/ YC Family Compound |
| American Bank 294 | Bank | 2,000,000 | Edra Blixseth Gaurantee |
| American Bank 919 | Bank | 5,000,000 | Edra Blixseth Gaurantee |
| First Bank | Bank | 7,857,120 | BFI Promissory Note |
| PDNB 71151 7864 | Bank | 2,500,000 | Edra Blixseth Gaurantee |
| PDNB 773817855 | Bank | 850,000 | Edra Blixseth Gaurantee |
| Stockman's Bank 791 | Bank | 2,000,000 | Secured by Monarch Investments Building |
| Stockman's Bank 856 | Bank | 202,000 | Edra Blixseth Gaurantee |
| Wachovia | Bank | 8,000,000 | Secured by Bkware |
| | | 63,509,120 | |

**Other Liabilities**

| | Outstanding Amount | |
|---|---|---|
| Taxes | 1,151,533 | MT and CA |
| TB | 5,750,000 | Dissolution of Marriage |
| LeMond Settlement | 13,500,000 | |
| M&I Bank / WCP | 3,000,000 | Bellevue Condo |
| Legal | 5,461,946 | Outstanding Payables |
| Personal and Business | 5,209,009 | Outstanding Payables |
| Total Debt | 97,581,608 | |

**Net Worth** 849,485,412

**Total Liabilities & Net Worth** 947,067,019

**As of Aug 15, 2008**
## Loan Detail

| Lender | Type of Facility | Total Credit Available | Outstanding Amount | Balance | Int Rate | | Payment | Loan # | Maturity |
|---|---|---|---|---|---|---|---|---|---|
| CIP Yellowstone | Bank | - | 35,100,000 | 35,100,000 | 8.00% | | 14,166.67 | | 10/1/2008 |
| American Bank 294 | Bank | - | 2,000,000 | 2,000,000 | 8.50% | Variable | 14,166.67 | 6406294 | See Edra |
| American Bank 919 | Bank | - | 5,000,000 | 4,986,075 | Prime + 1 | Variable | 25,944.25 | 6405919 | See Edra |
| First Bank | Bank | 142,880 | 7,857,120 | 7,857,120 | 9.00% | Fixed | Int Reserve | 40608I227708 | 10/1/2008 |
| PDNB 711517864 | Bank | - | 2,500,000 | 2,500,000 | 5.25% | Variable | 11,822.92 | 711517864 | 11/15/2008 |
| PDNB 773817855 | Bank | - | 850,000 | 850,000 | 5.00% | Variable | 3,659.72 | 773817855 | 11/15/2008 |
| Stockmans Bank 791 | Bank | - | 2,000,000 | 2,003,517 | 5.00% | Variable | 33,167.32 | 1640016791 | 11/15/2008 |
| Stockmans Bank 856 | Bank | - | 202,000 | 202,000 | 8.75% | Variable | 2,282.86 | 1640016856 | 11/15/2008 |
| Wachovia | Bank | - | 5,000,000 | 5,000,000 | 6.00% | Variable | 25,740.80 | 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-6 | Demand |
| Wachovia | Bank | | 3,000,000 | 2,917,500 | 6.00% | Variable | 16,483.87 | 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-2 | Demand |
| | | | **63,509,120** | | | | | | |

FLYNN AFFIDAVIT EXHBIT 2

# Edra Blixseth Post Settlement Asset List and Liability

## As of 7.15.08
### Private and Confidential

## Asset List - Post Settlement

### Assets

| | | | |
|---|---|---|---|
| Cash (Checking Account) | PDNB Account | 100,266 | |
| Accounts Receivable | Story Mill | 19,500,000 | 1 |

### Business

| Business Name | Property Type | Est. Current MV | Security |
|---|---|---|---|
| Monarch Investments | LLC | 2,800,000 | Unencumbered |
| Monarch Furniture and Design | LLC | 2,879,017 | Unencumbered |
| Monarch Go Build Construction | LLC | 637,000 | Unencumbered |
| Bixware | LLC | 23,027,486 | Wachovia 8 million |
| Blixseth Family Investments | LLC | 29,705,699 | 2 First Bank 8 Million |
| | | 59,049,202 | |

### Real Estate

| Property Name | Property Type | Current Mrkt Value | |
|---|---|---|---|
| Yellowstone Club et al | Private | 900,000,000  3 | CS 300 Million |
| Bucks T-4 Lodge | | 8,000,000 | |
| Porcupine Creek (Land and Improvements) | Private | 207,590,000 | Unencumbered |
| YDI - Chateau De Farcheville | Private | 68,000,000 | Unencumbered |
| Casa Captiva - Cabo Home | Private | 22,500,000 | Unencumbered |
| Yellowstone Club - Family Compound | Private | 65,000,000  4 | Lemond |
| Yellowstone Club Home Lot 148 | Private | 7,000,000 | Unencumbered |
| Rancho Mirage Homes (Outside PC Gates) | Private | 4,000,000 | 800K Encumbrance PDNB |
| Bellevue Condo - WA Home | Private | 3,000,000  5 | WCP / M&I Bank |
| Bozeman Condo | Private | 300,000 | Unencumbered |
| Palm Valley Condo | Private | 300,000 | Unencumbered |
| Total | | 1,285,690,000 | |

| Personal Assets | Description | Current Market Value | |
|---|---|---|---|
| G2B | Jet | 4,500,000 | 6 National City collateral GIV |
| Personal property (Vehicles & Jewelry) | Personal Property | 3,900,000 | Unencumbered |
| Inventory | Household Inventory | 12,500,000 | Unencumbered |
| Total Personal | | 20,900,000 | |

| | | | |
|---|---|---|---|
| Total Assets | | 1,385,239,468 | |

## Liability List - Post Settlement

### Liabilities

| Lender | Type of Facility | Outstanding Amount |
|---|---|---|
| American Bank 294 | Bank | 2,000,000 |
| American Bank 919 | Bank | 5,000,000 |
| First Bank | Bank | 7,857,120 |
| PDNB | Bank | 2,500,000 |
| Stockman's Bank 791 | Bank | 2,000,000 |
| Stockman's Bank 791 | Bank | 202,000 |
| Wachovia | Bank | 8,000,000 |
| | | 27,559,120 |

| Other Debt | | | 7 |
|---|---|---|---|
| Tim Blixseth | See 1st Draw Tab | 8,000,000 | |
| Tim Blixseth/ Cross Harbor | See 1st Draw Tab | 12,000,000 | |
| TB - YC Family Compound 1.5 within 9( | See 1st Draw Tab | 3,750,000 | |
| Lemond Settlement | See 1st Draw Tab | 6,000,000  8 | |
| Income Taxes | See 1st Draw Tab | 3,277,112 | |
| Property Taxes | See 1st Draw Tab | 594,865 | |
| M&I Bank / WCP | See 2nd Draw Tab | 4,500,000 | |
| Legal | See 2nd Draw Tab | 4,037,976 | |
| Personal | See 2nd Draw Tab | 3,340,973 | |

| | | |
|---|---|---|
| Total Debt | | 73,060,047 |
| Net Worth | | 1,312,179,422 |
| Total Liabilities & Net Worth | | 1,385,239,468 |

Footnote
1 Receivble paid within 90 days due to project refinance based off London Group Appraisal.
2 60% Ownership of 5 A Shares ttl $20MM, 1B Share ttl $5MM & 24,509,499 Note Receivable

# Edra Blixseth Post Settlement Asset List and Liability
## As of 7.15.08
Private and Confidential

## Asset List - Post Settlement

### Assets

| | | | Security |
|---|---|---|---|
| **Cash (Checking Account)** | PDNB Account | 100,266 | |
| | | | |
| **Accounts Receivable** | | | |
| Story Mill | | 19,500,000 | 1 |
| X Patterns | | 8,000,000 | 2 |

### Business

| Business Name | Property Type | Est. Current MV | Security |
|---|---|---|---|
| Monarch Investments | LLC | 2,800,000 | Stockmans 2million |
| Monarch Furniture and Design | LLC | 2,879,017 | Unencumbered |
| Monarch Go Build Construction | LLC | 637,000 | Unencumbered |
| Blixware | LLC | 13,262,989 | Wachovia 8 million |
| Blixseth Family Investments | LLC | 29,705,699 | 3 First Bank 8 Million |
| | | 49,284,705 | |

### Real Estate

| Property Name | Property Type | Current Mrkt Value | Security |
|---|---|---|---|
| Yellowstone Club et al | Private | 819,000,000 | 4 CS 300 Million |
| | | | |
| Porcupine Creek (Land and Improvements) | Private | 207,590,000 | Unencumbered |
| YDI - Chateau De Farcheville | Private | 61,880,000 | Unencumbered |
| Casa Captiva - Cabo Home | Private | 22,500,000 | Unencumbered |
| | | | |
| Yellowstone Club - Family Compound | Private | 65,000,000 | 5 Lemond / Cross Harbor/ TB |
| Yellowstone Club Home Lot 48 | Private | 7,000,000 | Unencumbered |
| Rancho Mirage Homes (Outside PC Gates) | | | |
| Bellevue Condo - WA Home | Private | 4,000,000 | 6 800K Encumbrance PDNB |
| Bozeman Condo | Private | 3,000,000 | WCP / M&I Bank |
| Rancho Mirage Condos (2 @300K) | Private | 300,000 | Unencumbered |
| | Private | 600,000 | Unencumbered |
| **Total** | | **1,190,870,000** | |

**Personal Assets** | **Description** | **Current Market Value** |
| --- | --- | --- | --- |
| G2B | Jet | 4,500,000 | 7 National City collateral for GIV |
| Personal property (Vehicles & Jewelry) | Personal Property | 3,900,000 | Unencumbered |
| Inventory | Household Inventory | 12,500,000 | Unencumbered |
| Total Personal | | 20,900,000 | |

**Total Assets** | 1,288,654,971

## Liability List - Post Settlement

### Liabilities

| Lender | Type of Facility | Outstanding Amount | |
| --- | --- | --- | --- |
| American Bank 294 | Bank | 2,000,000 | Edra Blixseth Gaurantee |
| American Bank 919 | Bank | 5,000,000 | Edra Blixseth Gaurantee. |
| First Bank | Bank | 7,857,120 | Secured by BFI |
| PDNB | Bank | 2,500,000 | No Collateral |
| Stockman's Bank 791 | Bank | 2,000,000 | Secured by Monarch Investments Building |
| Stockman's Bank 791 | Bank | 202,000 | Edra Blixseth Gaurantee. |
| Wachovia | Bank | 8,000,000 | Secured by Blxware |
| | | 27,559,120 | 8 |

**Other Liabilities**
| Tim Blixseth | See 1st Draw Tab | 8,000,000 | |
| --- | --- | --- | --- |
| Cross Harbor | See 1st Draw Tab | 12,000,000 | |
| Cross Harbor | | 2,000,000 | YC Family Compound |
| TB - YC Family Compound 1.5 within 9( | See 1st Draw Tab | 3,750,000 | YC Family Compound |
| LeMond Settlement Payment 1 | See 1st Draw Tab | 6,000,000 | |
| LeMond Settlement Payment 2 | See Farceville Sale Tab | 13,000,000 | 9 YC Family Compound |
| Income Taxes | See 2nd Draw Tab | 3,277,112 | |
| Property Taxes | See 2nd Draw Tab | 594,885 | |
| M&I Bank / WCP | See 1st Draw Tab | 4,500,000 | CA Properties including PC |
| Legal | See 2nd Draw Tab | 4,287,976 | Bellevue Condo for Story Mill |
| Personal | See 2nd Draw Tab | 3,340,973 | |

**Total Debt** | 88,310,047

**Net Worth** | 1,200,344,925

**Total Liabilities & Net Worth** | 1,288,654,971

Footnote
1 Receivble paid within 90 days due to project refinance based off London Group Appraisal.

2  10million total receivable, 2Million has been satisfied remaining 8million paid over 3 years period
3  60% Ownership of 5 A Shares ttl $20MM, 1B Share ttl $5MM & 24,509,499 Note Receivable
4  $1.3Billion Appraisal conducted in 2007 less net amount of outstanding balance with  CS Loan 300MM and misc lot sales
5  160 Total Acres. Plotting for 41 density units over 141 Acres for 58-65MM
6  Payment of 4.5MM on Go Build Note will release any security held by WCP/ M& I Bank
7  Collateral for Purchase of GIV from National City
8  Dissolution of Marriage Settlement
9  Remaining LT payment to Lemond $13MM allocated to the proceeds from the sale of the CF

## Liability List - Pre Settlement

### Liabilities

| Lender | Type of Facility | Outstanding Amount |
|---|---|---|
| American Bank 294 | Bank | 2,000,000 |
| American Bank 919 | Bank | 5,000,000 |
| First Bank | Bank | 7,857,120 |
| PDNB | Bank | 2,500,000 |
| Stockman's Bank 791 | Bank | 2,000,000 |
| Stockman's Bank 791 | Bank | 202,000 |
| Wachovia | Bank | 8,000,000 |
| | | 27,559,120 |

| Other Debt | | |
|---|---|---|
| Income Taxes | See 1st Draw Tab | 3,277,112 |
| Property Taxes | See 1st Draw Tab | 584,865 |
| M&I Bank / WCP | See 2nd Draw Tab | 4,500,000 |
| Legal | See 2nd Draw Tab | 4,037,976 |
| Personal | See 2nd Draw Tab | 3,340,973 |
| **Total Other Debt** | | 15,750,927 |

| **Total Debt** | | 43,310,047 |
|---|---|---|

FLYNN AFFIDAVIT EXHBIT 3

For Discussion Purposes Only

Yellowstone Club

Discussions between Edra/YC Entities and CrossHarbor Capital Partners

August 1, 2008



CROSSHARBOR
CAPITAL PARTNERS

# Table of Contents

I.      Preliminary Agreement

II.     CH Bridge Loan to Edra

III.    Loan from Archer Capital Management

IV.     Chateau de Farcheville Closing

V.      YC Preferred Equity Offering and YC Governance

VI.     Real Estate Joint Venture 1

VII.    Real Estate Joint Venture 2

VIII.   Miscellaneous Issues

IX.     Conclusion

CROSSHARBOR
CAPITAL PARTNERS

2

# Preliminary Agreement

➤ CrossHarbor Capital Partners ("CH") seeks to provide short-term bridge financing to Edra Blixseth ("EB") in order to close on her divorce from Tim Blixseth and implement a financial plan to stabilize the Yellowstone Club and all affiliated entities (the "YC").

➤ In order to move forward, CH needs assurance of its complete understanding of the situation; therefore, CH requires it be provided with the following documents:

  – All divorce settlement related documents (RECEIVED).

  – Detailed, updated financial statements for EB.

  – All underwriting materials provided to PEM, Archer, and other potential sources of capital.

  – Detailed, updated financial statements for the YC since 3/31/2008 that may be available to confirm the financial status quo of the YC and all affiliated entities.

➤ Additionally, CH needs a full recognition of its existing rights through the execution of the previously agreed-upon Letter Agreement.



CROSSHARBOR
CAPITAL PARTNERS

3

# CH Bridge Loan to Edra

➢ CrossHarbor ("CH") provides Edra Blixseth with $35 MM loan:

– Closing ASAP (week of 8/4/2008).

– 8% Simple Interest and no fees.

– 60-day term (repayment from sale of Farcheville).

– EB covers CH closing costs.

– Collateral:

• First Mortgage on Porcupine Creek.

• Assignment of proceeds on Farcheville sale.

• First Mortgage on Family Compound/160-acre parcel ("FC").

**Estimated Sources & Uses @ Divorce Settlement (8/4/2008)**

| Source of Funds | Amount | % of Total | Use of Funds | Amount | % of Total |
|---|---|---|---|---|---|
| CrossHarbor Loan | $ 35,000,000 | 100.00% | Repay existing CH FC Loan | $ 13,000,000 | 37.14% |
| Other | - | 0.00% | LeMond Payment | 8,000,000 | 22.86% |
| | | | Cash to Tim | 7,000,000 | 20.00% |
| | | | EB - Financing Deposits | 1,000,000 | 2.86% |
| | | | Property Tax Lien - PCP | 594,865 | 1.70% |
| | | | CH Closing Costs | 300,000 | 0.86% |
| | | | YC Working Capital & A/P | 5,105,135 | 14.59% |
| **Total Sources** | $ 35,000,000 | 100.00% | **Total Uses** | $ 35,000,000 | 100.00% |

➢ CH will control distributions of YC working capital.



CROSSHARBOR
CAPITAL PARTNERS

4

# Loan from Archer Capital Management

➤ **Secure additional financing from Archer Capital Management ($55.1 MM, net):**

– Repay CH Debt.

– Final Payment to LeMond litigants.

– Repay other Edra Debts

  • Personal - $1.46 MM

  • Taxes - $2.2 MM

  • M&I Bank/ WCP - $3.0 MM

– Collateral:

  • All EB assets excluding Montana/YC-affiliated assets.

| | Estimated Sources & Uses @ Archer Closing (8/31/2008) | | | | | |
|---|---|---|---|---|---|---|
| **Source of Funds** | **Amount** | **% of Total** | **Use of Funds** | | **Amount** | **% of Total** |
| Archer Closing (net of fees) | $  55,100,000 | 100.00% | Repayment of CrossHarbor Loan | $ | 35,233,333 | 63.94% |
| Other | - | 0.00% | Final Payment to LeMond | | 13,000,000 | 23.59% |
| | | | Other Edra Personal Debts | | 6,674,604 | 12.11% |
| | | | Legal/Closing Costs | | 192,063 | 0.35% |
| **Total Sources** | $  55,100,000 | 100.00% | **Total Uses** | $ | 55,100,000 | 100.00% |

5

**CROSSHARBOR**
CAPITAL PARTNERS

# Chateau de Farcheville Closing

➤ **Chateau de Farcheville scheduled to close by 9/15/2008.**

– Eliminate All YC-Related Liabilities through Sale of Farcheville.

– Paydown Archer.

– Fund EB Expenses.

| | Estimated Sources & Uses @ Farcheville Closing (9/15/2008) | | | | | |
|---|---|---|---|---|---|---|
| Source of Funds | Amount | % of Total | Use of Funds | | Amount | % of Total |
| Farcheville Closing | $ 68,500,000 | 100.00% | YC Operating Escrow / B-Shareholder Payment | $ | 39,500,000 | 57.66% |
| Other | - | 0.00% | Required Archer Paydown | | 18,000,000 | 26.28% |
| | | | Edra Misc. Repayments | | 9,000,000 | 13.14% |
| | | | Closing Costs/Interest/Legal Fees | | 2,000,000 | 2.92% |
| Total Sources | $ 68,500,000 | 100.00% | Total Uses | $ | 68,500,000 | 100.00% |

➤ **CH estimates that an additional $45+ MM will need to be raised to repay Archer:**

– Liquidation of other assets (Casa Captiva, other?).

– Long-term financing on Porcupine Creek.

➤ **Additional EB investment directly into YC totals $14.6 MM. CH estimates this will cover current accounts payable and operations through 10/31/2008.**

**CROSSHARBOR**
CAPITAL PARTNERS

6

# YC Preferred Equity Offering and YC Governance

➤ **CH desires to create a structure where the interests of EB, CH, and all Yellowstone Club members are aligned. Therefore, CH proposes the following:**

➤ **CH provides [$100] MM of Preferred Equity to invest into the club (all YC-affiliated Entities).**

- [95% / 5%] Joint Venture between new investors / club members and CH.
  - CH serves as agent / fiduciary party / managing member.
- [10%] Preferred Return and [20%] Equity Participation in YC (get to 30% IRR and 2.5x multiple).
- Initial closing ($50 MM) targeted for 10/31/2008 (CH will consider raising the capital in several rounds).
  - Specific use of proceeds to be discussed; peak capital need for the club is expected to occur in 2010.

➤ **Yellowstone Club Executive Committee to be formed between EB, investor representative (from Preferred Equity investors) and CH. Executive Committee will govern the operations and management of the Yellowstone Club, including:**

- Formation of business plan.
- Club operating decisions (including potential hiring of 3rd-party management company).
- Club marketing decisions (including potential hiring of outside sales agent).
- Approval of final Master Plan outlining development plan for remaining density units.
- Implementation of Capital Plan (including prioritizing common area improvements).
- All financing decisions of YC entities (including repayment/refinancing of CSFB Debt).

➤ **YC can leverage off all CH work to date.**

- Joe Harris will provide initial strategic oversight and control of operating cash flow.
- CH will lead Master Planning for remaining density units in YC.

➤ **CH agrees to Joint Venture with the YC entities to buildout existing inventory.**

➤ **CH receives [5%] interest in YC (pari-passu w/EB) as consideration for effort.**



CROSSHARBOR
CAPITAL PARTNERS

7

# Real Estate Joint Venture 1

Λ CH contributes 31 Golf Course lots.

Λ YC contributes 41 units from the Settlement and 40 units from American Spirit.

Λ CH pays down CSFB debt by $64.8 MM ($800K per density unit), reducing the outstanding balance to approx. $240 MM.

Λ CH will invest $135 MM as follows:
 – Contribution of Golf Course ($60 MM)
 – Pay down of CSFB Debt ($64.8 MM)
 – Venture Working Capital ($4.2 MM)
 – Funding Diligence Costs to date ($6 MM)

Λ CH receives 15% preferred return on it's $135 MM of invested capital.

Λ Net Cash Flow after preferred return is split 60% to YC and 40% to CH.

Λ Executive Committee to be formed between YC and CH.
 – CH affiliated entities will act as developer/operator, with responsibility for implementing the business plan of this venture based on predetermined budgets.
 – CH will be Managing Member with the deciding vote by nature of its majority capital investment.

Λ Pro Forma shows $200 MM+ of proceeds to EB/YC.

Λ Pro Forma shows 29% IRR and 2.1x multiple to CH.



CROSSHARBOR
CAPITAL PARTNERS

# Real Estate Joint Venture 2

➢ **Thoughts on buildout of remaining YC density units:**

- CH will lead Master Planning for remaining density units through Preferred Equity investment and Executive Committee formation.

- CH will agree to acquire additional land at final plat (through phased takedowns) based on pro forma showing [35%] profit margin.

- Additional contributions will be as follows:

    • 100% CH

- Distributions will be as follows:

    • 100% to CH until [20%] IRR and [2.0x] equity multiple

    • [50%] to CH / [50%] YC Thereafter

➢ **The intention here is to create a structure where EB and YC participate both upfront (from land sales) and in the success of the venture(s), through the promoted interest.**



**CROSSHARBOR**
CAPITAL PARTNERS

9

# Miscellaneous Issues

➤ **Liquor License**

— CH continues to process the purchases and transfers of the liquor license to the Sunrise Club House facility, but will sell/transfer to the YC (at CH's cost basis) when a global partnership is completed.

➤ **Sunrise Ridge**

— YC must fund marketing monies owed to UpperCross (approx. $200K).

— YC agrees to purchase 4 Sunrise Ridge duplex units for use in Sales & Marketing.

  • 85% of list price.
  • 36 months off market.

— CH will assist in arranging debt & equity financing to enable sale/leaseback program, as capital is available.

➤ **Exclusivity/Confidentiality (until Executive Committee in place)**

— EB/YC and CH mutually agree only to meet or have discussions with CSFB together.

— EB/YC and CH mutually agree only to meet or have discussions with Discovery or any other potential Operators/Partners together.

— EB/YC and CH agree to make only joint public statements, to be organized through Edelman, a nationally recognized public relations firm.

— EB/YC and CH agree to work together on all employment decisions, including hirings, dismissals, and contract executions. CH shall have final approval for all decisions related to Development, Infrastructure, and Sales. EB/YC shall have final approval for all decisions related to Operations.

  • In the case of related party transactions, mutual approval is required.



10

# Conclusion

➤ **CH will work with EB to close the divorce settlement and implement a business plan that will allow the Yellowstone Club to thrive.**

➤ **CH believes it has outlined structures that will align the interests of EB, CH, and all current and future Yellowstone Club members.**

➤ **CH continues to run a variety of financial scenarios for the buildout of the Yellowstone Club and is working on preparing a detailed model to share with EB that incorporates this proposal.**

  –  Early stage analysis indicates future net cash flow to EB of $600+ MM.

CROSSHARBOR
CAPITAL PARTNERS

11

# PRIVILEGED & CONFIDENTIAL
# MEMORANDUM

| | |
|---|---|
| **TO:** | Steven B. Yankelevitz, Esq. and Edra Blixseth |
| **FROM:** | Todd Evan Stark, Esq. |
| **DATE:** | July 19, 2008 |
| **RE:** | **Comments on Proposed Initial Settlement – Letter Agreement dated July __, 2008, from CIP Yellowstone Acquisition LLC and Club YC Acquisition LLC (collectively, "CH Parties"), and Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, Big Springs Realty, LLC and Edra Blixseth (collectively, "YC Parties")** |

Edra has requested that we review and comment on the above-referenced letter agreement (the "**Agreement**"). This memorandum is prepared with out the benefit of any review of the underlying documents referenced in the Agreement or the transactions referenced therein; however, such documents are being collected for my review and an updated memorandum will be provided once those documents are received and reviewed. Subject to the foregoing, I provide the following comments:

1.   **YC Parties:** Are these the appropriate parties?

2.   **CH Parties:** Are these the appropriate parties?

3.   **Introductory Paragraph:** There is a recitation that the Agreement memorializes recent conversations. We should include an "Entire Agreement" provision at the end of the Agreement. See attached.

4.   **Intro to Numbered Paragraphs:** The Agreement recites that following agreements are in consideration of "CH Parties forbearing from exercising their rights prior to the date of [the Agreement]."

    (a)   **Rights Covered.** With respect to any forbearance, there should be a greater specification of what rights are being referenced (e.g., any and all of the CH Parties rights under the Schedule A Agreements). We should confirm whether the CH Parties think they have any other rights to pursue remedies against any of the YC Parties which are not covered by this Agreement.

    (b)   **Forbearance.** The forbearance "prior to the date of [the Agreement]" has been at their own election and is not consideration for any agreement by the YC Parties. If this is truly a forbearance agreement, then for $6MM, we want continued forbearance until the September 30th date at a minimum.[1] We should consider whether we build in the right to have this extended.

---

[1] The $6MM also serves as consideration for the release of claims against the YC Parties.

July 18, 2008
Page 2

5.    **Paragraph No. 1 (Expense Reimbursement):**  Although I do not have the background to evaluate the business terms, $6MM is a very large amount to be reimbursing the CH Parties without a formal evaluation of the potential liability for such sums in the absence of this Agreement.

   (a)    **Reimbursement Obligation Absolute or Contingent; Timing.**  This paragraph makes the obligation to pay the $6MM absolute. However, I am advised by Deborah Klar that Edra Blixseth's understanding is that the $6MM is payable only in the event that the CH Parties and the YC Parties are unable to reach a global settlement on or before September 30, 2008.  If the obligation is contingent, this paragraph will need revision and in order to have the full period to come to a global settlement, the $6MM should be payable (subject to comments in Section 5(c) below) within 3 business days after September 30th[2], not on or before September 30, 2008.  See comments below regarding delivery of diligence materials.

   (b)    **Clarification of $6MM Cap.**  This paragraph is ambiguous and it is not clear that the agreement to pay costs is in fact capped at $6MM.  I would delete "such costs incurred by" from the 9th line of this Paragraph.  See markup.

   (c)    **Verification Mechanism.**  This paragraph does not provide for any mechanism for:

      (i)     the CH Parties to provide reasonably detailed backup and evidence of payment of the costs being reimbursed;

      (ii)    the YC Parties to review and approve the information submitted, and/or dispute portions thereof.

      (iii)   The obligation to pay should be only after receipt, review and approval of information submitted (typically, 10 to 30 days).  Presumably, we would agree to deposit.

   (d)    **Security for Reimbursement Obligation.**  This paragraph makes the obligation to pay the $6MM secured by a deed of trust on Parcel 48.

      (i)     Capacity to encumber Parcel 48.   Does one of the YC Parties own Parcel 48?

      (ii)    Restrictions on encumbrance of Parcel 48.  What is the value of Parcel 48?  Are there existing encumbrances on Parcel 48?  Are there any restrictions on Parcel 48 or the owner of Parcel 48 from encumbering it with the deed of trust referenced in this Paragraph. There may be restrictions against encumbering Parcel 48.

      (iii)   Timing of encumbrance of Parcel 48.  If as noted above, the obligation to reimburse is contingent, then the requirement for security should not be triggered until the obligation becomes fixed.  Given that the obligation is contingent, why

---

[2]  Or such later date after receipt, review and approval of backup and evidence of payment of reimburseable costs.

July 18, 2008
Page 3

would we agree to the encumbrance of Parcel 48 now.  Even if we are agreeing to encumber Parcel 48 now, it will take some time to put the deed of trust in place.  The form and substance of the deed of trust would need to be acceptable to the YC Parties.

(iv)   **Alternative Security.**  Depending upon the resolution of the foregoing issues and the CH Parties insistence on security for the reimbursement obligation, the YC Parties should consider proposing an escrow arrangement where the funds would be deposited into an independent escrow based upon the delivery of back up documentation and released when the obligation to reimburse became absolute and there were no disputes as to the amount.

6.   **Paragraph No. 2 (Releases).**

(a)   **Claims Released by CH Parties.**  The definition of Claims released should be much broader.  It should include any and all Claims arising on or before September 30, 2008 related to any of the transactions by and between the CH Parties and the YC Parties; it should include known and unknown claims (I would reference Civil Code Section 1542).  If there is to be any reservation of Claims, they must be specifically described.

(b)   **Claims Released by YC Parties.**  If the CH Parties want a reciprocal release, then there should be some monetary consideration to the YC Parties.  This could work as an offset to the cost reimbursement amount.

7.   **Paragraph No. 3 (Exclusivity).**

(a)   **Forbearance should be with respect to all rights.**  As written, it is limited to defaults (b) arising prior to the date of the Agreement and (b) to the extent known by the CH Parties.  These limitations should be removed.

(b)   **Forbearance termination conditions.**  Should be limited to defaults under the Agreement and to voluntary bankruptcy or undischarged involuntary bankruptcy (after __ days).

(c)   **Covenant not to engage in discussions re transfer.**  This must exclude any discussions by the YC Parties with any of their respective consultants or advisors.  In addition, as written it only excludes "three-way" negotiations with Discovery Land Company.  Accordingly, any discussions between Discovery Land Company and the YC Parties would violate this provision.  I doubt that this is what our client would want.  The language regarding the conditional waiver with respect to the Discovery Land Company negotiations should be deleted.

(d)   **Transfers excluded.**  As written, the only transfers excluded are lot sales of platted lots as of the date of the Agreement in the ordinary course.  What about lots platted after the date of this Agreement.  It should also exclude transfers in connection with tax or estate planning, required in connection with existing loans and easements and other dedications.

July 18, 2008
Page 4

Finally, it should also exclude any transfers in connection with settlement with the CH Parties or their affiliates.

8. **Paragraph No. 4 (Sharing of Information).**

(a) **Timing.** The sharing of information cannot be tied to the payment of the $6MM since the $6MM will not be payable until after September 30th. The information needs to be delivered immediately upon execution of the Agreement.

(b) **Information Covered.** It should exclude only internal valuation and legally privileged information and it should be expanded to include information in the possession or control of the CH Parties.

(c) **Termination of Confidentiality Provisions.** Without reviewing these provisions, I cannot recommend whether they should be terminated or not.

9. **Paragraph No. 5 (Recognition of Rights).** Comments on this section will be forwarded once the underlying agreements have been reviewed. Based upon the foregoing comments, there will be modifications to this section. Further, any assumption of liabilities should be carefully considered in light of any other restrictions to which the assuming party may be subject. I do not understand the nature of the claim being reserved under clause (b). We may want to review the arbitration provision and determine whether we need additional protections for the YC Parties in connection with such arbitration.

10. **Final Paragraph.** The provisions regarding joint and several liability are too broad and should revised to specifically cover only those obligations which we intend to have jointly and severally liability.

Additional Provisions
July 18, 2008
Page 1

**Entire Agreement.**  This Agreement is the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written, between the parties with respect to the matters contained in this Agreement.  Any waiver, modification, consent or acquiescence with respect to any provision of this Agreement shall be set forth in writing and duly executed by or in behalf of the party to be bound thereby.  No waiver by any party of any breach hereunder shall be deemed a waiver of any other or subsequent breach.  The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressly set forth herein.

# Edra Blixseth Post Settlement Asset List and Liability
## As of 7.15.08
Private and Confidential

## Asset List - Post Settlement

### Assets

| | | | |
|---|---|---|---|
| Cash (Checking Account) | PDNB Account | 100,266 | |
| Accounts Receivable | Story Mill | 19,500,000 | 1 |

### Business

| Business Name | Property Type | Est. Current MV | Security |
|---|---|---|---|
| Monarch Investments | LLC | 2,800,000 | Unencumbered |
| Monarch Furniture and Design | LLC | 2,879,017 | Unencumbered |
| Monarch Go Build Construction | LLC | 637,000 | Unencumbered |
| Blxware | LLC | 23,027,486 | Wachovia 8 million |
| Blixseth Family Investments | LLC | 29,705,699 | 2 First Bank 8 Million |
| | | 59,049,202 | |

### Real Estate

| Property Name | Property Type | Current Mrkt Value | | |
|---|---|---|---|---|
| Yellowstone Club et al | Private | 900,000,000 | 3 | CS 300 Million |
| Bucks T-4 Lodge | | 8,000,000 | | |
| Porcupine Creek (Land and Improvements) | Private | 207,590,000 | | Unencumbered |
| YDI - Chateau De Farcheville | Private | 68,000,000 | | Unencumbered |
| Casa Captiva - Cabo Home | Private | 22,500,000 | | Unencumbered |
| Yellowstone Club - Family Compound | Private | 65,000,000 | 4 | Lemond |
| Yellowstone Club Home Lot 148 | Private | 7,000,000 | | Unencumbered |
| Rancho Mirage Homes (Outside PC Gates) | Private | 4,000,000 | | 800K Encumbrance PDNB |
| Bellevue Condo - WA Home | Private | 3,000,000 | 5 | WCP / M&I Bank |
| Bozeman Condo | Private | 300,000 | | Unencumbered |
| Palm Valley Condo | Private | 300,000 | | Unencumbered |
| Total | | 1,285,690,000 | | |

| Personal Assets | Description | Current Market Value | | |
|---|---|---|---|---|
| G2B | Jet | 4,500,000 | 6 | National City collateral GIV |
| Personal property (Vehicles & Jewelry) | Personal Property | 3,900,000 | | Unencumbered |
| Inventory | Household Inventory | 12,500,000 | | Unencumbered |
| Total Personal | | 20,900,000 | | |

| | | | |
|---|---|---|---|
| Total Assets | | 1,385,239,468 | |

## Liability List - Post Settlement

### Liabilities

| Lender | Type of Facility | Outstanding Amount |
|---|---|---|
| American Bank 294 | Bank | 2,000,000 |
| American Bank 919 | Bank | 5,000,000 |
| First Bank | Bank | 7,857,120 |
| PDNB | Bank | 2,500,000 |
| Stockman's Bank 791 | Bank | 2,000,000 |
| Stockman's Bank 791 | Bank | 202,000 |
| Wachovia | Bank | 8,000,000 |
| | | 27,559,120 |

| Other Debt | | | |
|---|---|---|---|
| Tim Blixseth | See 1st Draw Tab | 8,000,000 | 7 |
| Tim Blixseth/ Cross Harbor | See 1st Draw Tab | 12,000,000 | |
| TB - YC Family Compound 1.5 within 90 | See 1st Draw Tab | 3,750,000 | |
| Lemond Settlement | See 1st Draw Tab | 6,000,000 | 8 |
| Income Taxes | See 1st Draw Tab | 3,277,112 | |
| Property Taxes | See 1st Draw Tab | 594,865 | |
| M&I Bank / WCP | See 2nd Draw Tab | 4,500,000 | |
| Legal | See 2nd Draw Tab | 4,037,976 | |
| Personal | See 2nd Draw Tab | 3,340,973 | |
| | | | |
| Total Debt | | 73,060,047 | |
| | | | |
| Net Worth | | 1,312,179,422 | |
| | | | |
| Total Liabilities & Net Worth | | 1,385,239,468 | |

Footnote
1 Receivble paid within 90 days due to project refinance based off London Group Appraisal.
2 60% Ownership of 5 A Shares ttl $20MM, 1B Share ttl $5MM & 24,509,499 Note Receivable

# Edra Blixseth Post Settlement Asset List and Liability
## As of 7.15.08
Private and Confidential

## Asset List - Post Settlement

**Assets**

| | | | Security |
|---|---|---|---|
| **Cash (Checking Account)** | PDNB Account | 100,266 | |

**Accounts Receivable**

| | | | |
|---|---|---|---|
| Story Mill | | 19,500,000 | **1** |
| X Patterns | | 8,000,000 | **2** |

**Business**

| Business Name | Property Type | Est. Current MV | Security |
|---|---|---|---|
| Monarch Investments | LLC | 2,800,000 | Stockmans 2million |
| Monarch Furniture and Design | LLC | 2,879,017 | Unencumbered |
| Monarch Go Build Construction | LLC | 637,000 | Unencumbered |
| Bixware | LLC | 13,262,989 | Wachovia 8 million |
| Blixseth Family Investments | LLC | 29,705,699 | 3 First Bank 8 Million |
| | | **49,284,705** | |

**Real Estate**

| Property Name | Property Type | Current Mrkt Value | Security |
|---|---|---|---|
| Yellowstone Club et al | Private | 819,000,000 **4** | CS 300 Million |
| Porcupine Creek (Land and Improvements) | Private | 207,590,000 | Unencumbered |
| YDI - Chateau De Farcheville | Private | 61,880,000 | Unencumbered |
| Casa Captiva - Cabo Home | Private | 22,500,000 | Unencumbered |
| Yellowstone Club - Family Compound | Private | 65,000,000 **5** | Lemond / Cross Harbor/ TB |
| Yellowstone Club Home Lot 48 | Private | 7,000,000 | Unencumbered |
| Rancho Mirage Homes (Outside PC Gates) | Private | 4,000,000 | 800K Encumbrance PDNB |
| Bellevue Condo - WA Home | Private | 3,000,000 **6** | WCP / M&I Bank |
| Bozeman Condo | Private | 300,000 | Unencumbered |
| Rancho Mirage Condos (2 @300K) | Private | 600,000 | Unencumbered |
| **Total** | | **1,190,870,000** | |

| Personal Assets | Description | | Current Market Value | |
|---|---|---|---|---|
| G2B | Jet | | 4,500,000 | 7 National City collateral for GIV |
| Personal property (Vehicles & Jewelry) | Personal Property | | 3,900,000 | Unencumbered |
| Inventory | Household Inventory | | 12,500,000 | Unencumbered |
| Total Personal | | | 20,900,000 | |

**Total Assets**  1,288,654,971

## Liability List - Post Settlement

**Liabilities**

| Lender | Type of Facility | | Outstanding Amount | |
|---|---|---|---|---|
| American Bank 294 | Bank | | 2,000,000 | Edra Blixseth Gaurantee |
| American Bank 919 | Bank | | 5,000,000 | Edra Blixseth Gaurantee. |
| First Bank | Bank | | 7,857,120 | Secured by BFI |
| PDNB | Bank | | 2,500,000 | No Collateral |
| Stockman's Bank 791 | Bank | | 2,000,000 | Secured by Monarch Investments Building |
| Stockman's Bank 791 | Bank | | 202,000 | Edra Blixseth Gaurantee. |
| Wachovia | Bank | | 8,000,000 | Secured by Bixware |
| | | 8 | 27,559,120 | |

**Other Liabilities**

| | | | | |
|---|---|---|---|---|
| Tim Blixseth | See 1st Draw Tab | | 8,000,000 | |
| Cross Harbor | See 1st Draw Tab | | 12,000,000 | |
| Cross Harbor | | | 2,000,000 | |
| TB - YC Family Compound 1.5 within 9( | See 1st Draw Tab | | 3,750,000 | YC Family Compound |
| LeMond Settlement Payment 1 | See 1st Draw Tab | | 6,000,000 | YC Family Compound |
| LeMond Settlement Payment 2 | See Farcheville Sale Tab | | 13,000,000 | 9 YC Family Compound |
| Income Taxes | See 2nd Draw Tab | | 3,277,112 | |
| Property Taxes | See 2nd Draw Tab | | 594,865 | |
| M&I Bank / WCP | See 1st Draw Tab | | 4,500,000 | CA Properties including PC |
| Legal | See 2nd Draw Tab | | 4,287,976 | Bellevue Condo for Story Mill |
| Personal | See 2nd Draw Tab | | 3,340,973 | |

**Total Debt**  88,310,047

**Net Worth**  1,200,344,925

**Total Liabilities & Net Worth**  1,288,654,971

Footnote
1 Receivble paid within 90 days due to project refinance based off London Group Appraisal.

2  10million total receivable, 2Million has been satisfied remaining 8million paid over 3 years period
3  60% Ownership of 5 A Shares ttl $20MM, 1B Share ttl $5MM & 24,509,499 Note Receivable
4  $1.3Billion Appraisal conducted in 2007 less net amount of outstanding balance with CS Loan 300MM and misc lot sales
5  160 Total Acres. Ploting for 41 density units over 141 Acres for 56-65MM
6  Payment of 4.5MM on Go Build Note will release any security held by WCP/ M& I Bank
7  Collateral for Purchase of GIV from National City
8  Dissolution of Marriage Settlement
9  Remaining LT payment to Lemond $13MM allocated to the proceeds from the sale of the CF

# Liability List - Pre Settlement

## Liabilities

| Lender | Type of Facility | Outstanding Amount |
|---|---|---|
| American Bank 294 | Bank | 2,000,000 |
| American Bank 919 | Bank | 5,000,000 |
| First Bank | Bank | 7,857,120 |
| PDNB | Bank | 2,500,000 |
| Stockman's Bank 791 | Bank | 2,000,000 |
| Stockman's Bank 791 | Bank | 202,000 |
| Wachovia | Bank | 8,000,000 |
| | | 27,559,120 |

**Other Debt**

| | | |
|---|---|---|
| Income Taxes | See 1st Draw Tab | 3,277,112 |
| Property Taxes | See 1st Draw Tab | 594,865 |
| M&I Bank / WCP | See 2nd Draw Tab | 4,500,000 |
| Legal | See 2nd Draw Tab | 4,037,976 |
| Personal | See 2nd Draw Tab | 3,340,973 |
| **Total Other Debt** | | 15,750,927 |

| **Total Debt** | | 43,310,047 |

FLYNN AFFIDAVIT EXHBIT 4

## Unknown

**From:**     Andrea S. Heller [aheller@linerlaw.com]
**Sent:**     Tuesday, July 22, 2008 10:52 AM
**To:**       Jory Russell
**Subject:** FW: $20 mm from PEM tomorrow

Jory,

I'm not following what your question is regarding the e-mail below.

Andrea

---

**From:** Jory Russell [mailto:jrussell@blxware.com]
**Sent:** Monday, July 21, 2008 10:36 PM
**To:** Steven B. Yankelevitz; G. Frank Glabach; Bertha C. Willner
**Cc:** jgoldfarb@broadstreamcapital.com
**Subject:** FW: $20 mm from PEM tomorrow

Steve, Frank and Bertha – Can you please confirm whether the wire instructions below are for escrow?

Thanks,

Jory

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not
authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of
applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately
by replying to this e-mail and then delete this message. Thank you.

---

**From:** Jory Russell
**Sent:** Monday, July 21, 2008 10:18 PM
**To:** jgoldfarb@broadstreamcapital.com; 'Steven B. Yankelevitz'; 'Joshua Grode'; 'Bertha C. Willner'
**Cc:** Edra Blixseth (External Email)
**Subject:** RE: $20 mm from PEM tomorrow

Jim - Please see below with regards to the wire instructions for Escrow. I will confirm with Steve and
Frank tomorrow.

       1.     Edra shall federal wire transfer Eight Million Five Hundred Thousand
Dollars ($8,500,000) in immediately available funds to the following
account:

     CITY NATIONAL BANK
ONE CENTERPOINTE DR., STE 160
LA PALMA, CA 90623
Account No.: 013508003
Routing No.: 122016066

     Credit to the Account of:
Commerce Escrow Company
Escrow No.:  08-53452-HW

11/18/2009

**From:** Jim Goldfarb [mailto:jgoldfarb@broadstreamcapital.com]
**Sent:** Mon 7/21/2008 10:14 PM
**To:** 'Mitchell C. Regenstreif'; 'Steven B. Yankelevitz'; 'Joshua Grode'; 'Bertha C. Willner'; 'Robert A. Rabbat';
'Deborah A. Klar'; Jory Russell
**Cc:** Edra Blixseth (External Email)
**Subject:** RE: $20 mm from PEM tomorrow

The Family Compound is not part of the Collateral if they only fund $20 mm.  That said, we can't do this without
Cross Harbour's approval.  We are discussing with them at 9:30 am tomorrow.

Also, I've learned from Bertha that the payoff amount to Tim is not correct.  Edra, I will call you to discuss this
shortly.

---

**From:** Mitchell C. Regenstreif [mailto:mregenstreif@linerlaw.com]
**Sent:** Monday, July 21, 2008 9:57 PM
**To:** jgoldfarb@broadstreamcapital.com; Steven B. Yankelevitz; Joshua Grode; Bertha C. Willner; Robert A.
Rabbat; Deborah A. Klar; jrussell@blxware.com
**Cc:** LearG2@aol.com
**Subject:** Re: $20 mm from PEM tomorrow

I did not see that the cross harbor subordinated mortgage is required...correct?

Mitchell C. Regenstreif
Liner Yankelevitz Sunshine & Regenstreif LLP
1100 Glendon Avenue, Fourteenth Floor
Los Angeles, California 90024
phone: (310) 500-3570
fax: (310) 500-3501
email: mregenstreif@linerlaw.com

-----Original Message-----
From: Jim Goldfarb <jgoldfarb@broadstreamcapital.com>
To: Steven B. Yankelevitz; Mitchell C. Regenstreif; Joshua Grode; Bertha C. Willner; Robert A. Rabbat; Deborah A. Klar;
'Jory Russell' <jrussell@blxware.com>
CC: LearG2@aol.com <LearG2@aol.com>
Sent: Mon Jul 21 21:44:06 2008
Subject: $20 mm from PEM tomorrow

PEM and offered and Edra has accepted to fund $20 mm tomorrow on the following terms:

1) Lien on Porcupine Creek
2) Lien on Bellevue Condo
3) Personal Guarantee
4) 30 day negative pledge to not take on additional debt (so they have time to complete the loan)

Uses would be:

- $7,051,045.70 mm to Tim ($8 mm minus interest due to Cross Harbour)
- $8 mm to LeMond
- $3 mm to M&I
- $1 mm to PEM
- $0.2 to GT Securities
- Balance for Payroll, etc

11/18/2009

The catch is that Cross Harbour has not yet agreed to allow this.  We have a call with them at 9:30 am PST to discuss.

Jim Goldfarb
Broadstream Capital Partners, LLC
(o) 323 666 9450
(m) 310 666 9450
(f) 310 861 8954
jgoldfarb@broadstreamcapital.com

No virus found in this incoming message.
Checked by AVG - http://www.avg.com
Version: 8.0.138 / Virus Database: 270.5.4/1566 - Release Date: 7/22/2008 6:00 AM

11/18/2009

FLYNN AFFIDAVIT EXHBIT 5

Edra
Blixseth EXHIBIT 3
K. Pearson-Bell, CSR 3557
For I.D. 4-15-09 Pgs 12
Witness: Edra Blixseth

# MEMORANDUM

| | |
|---|---|
| **TO:** | Samuel T. Byrne |
| | Matthew E. Kidd |
| | Joe Harris |
| | |
| **CC:** | Barry Green |
| | Paige Manning |
| | Adam Curry |
| | |
| **FROM:** | Marc B. Heller |
| | |
| **DATE:** | September 5, 2008 |
| | |
| **SUBJECT:** | Yellowstone Mountain Club Deal Structure between CrossHarbor and Edra Blixseth ("EB") as it relates to that certain $375,000,000 Senior First Lien Credit Facility pursuant to that certain Credit Agreement dated September 30, 2005 among Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC, as Borrower, Credit Suisse, as Administrative Agent and Collateral Agent, and the Lenders party thereto (the "**Credit Agreement**") |

---

| | |
|---|---|
| **Borrower:** | Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC (collectively) |
| | |
| **Administrative Agent/Collateral Agent:** | Credit Suisse |
| | |
| **Lenders:** | Various financial institutions |

This memorandum addresses certain matters relating to the proposed structure of various transactions relating to the Yellowstone Mountain Club between CrossHarbor and Edra Blixseth, as such structure is or may be impacted by the provisions of the Credit Agreement. It is not intended to be a summary of the Credit Agreement. Capitalized terms used but not defined herein have the meanings assigned in the Credit Agreement. Section and subsection references are to the Credit Agreement unless otherwise indicated.

More specifically, this memorandum is intended to highlight those aspects of the proposed deal structure as provided in that certain Agreement to Form dated as of August 13, 2008 which will or may require consent from the Lenders and/or Administrative Agent under the Credit Agreement. For your reference, attached to this memorandum as <u>Exhibits A-D</u> are various organizational charts. <u>Exhibit A</u> is referred to herein as the Existing Structure; <u>Exhibit B</u> is referred to herein as Scenario 1; <u>Exhibit C</u> is referred to herein as Scenario 2; and <u>Exhibit D</u> is referred to herein as JV 1. In addition, we have noted where the transactions contemplated by JV 2 (the master planning/development JV between Discovery and CrossHarbor) may require consent of the Lenders under the Credit Agreement. As this deal evolves, we will need to reexamine how any changes may be affected by the Credit Agreement and whether additional consents may be required.

We would also expect that all parties would want an estoppel and general waivers of all existing defaults under the Credit Agreement, including any that occurred with respect to the transactions effectuated under the marital settlement agreement.

### SUMMARY OF LENDER CONSENTS LIKELY TO BE REQUIRED:

This is a summary of Lender consents likely to be required (see below for further discussion on these points):

1. Restrictions on Asset Sales/Transfers (Sections 5.18 and 6.8) under Scenario 2, JV 1 and JV 2. **[Requisite Lender consent required (meaning the holders of more than 50% of the aggregate Loan Exposure of all Lenders)]**

2. Restrictions on Change in Control (Section 5.19) under the Existing Structure, Scenarios 1 & 2, and JV 1 and JV 2. **[Requisite Lender consent required]**

3. Restrictions on Investments (Section 6.3) under Scenario 2, JV 1 and JV 2. **[Requisite Lender consent required]**

4. Restricted Payments (Section 6.5) under Scenarios 1 & 2, JV 1 and possibly JV 2. This consent may or may not be necessary depending on the results of various calculations. See item 4 below for details. **[Requisite Lender consent required]**

5. Restrictions on Fundamental Changes (Section 6.7) under Scenarios 1 & 2, and perhaps under JV 1 and JV 2. **[Requisite Lender consent required]**

6. Restrictions on Transactions with Shareholders and Affiliates (Section 6.9) under Scenarios 1 & 2, JV 1 and JV 2. **[Requisite Lender consent required]**

7. Mandatory Prepayments (Sections 2.5 B (ii) (b) and 9.5 (g)) of 50% of all Equity Proceeds received by Borrower or any of its Subsidiaries under Scenarios 1 and 2 and perhaps under JV 1 and JV 2. **[100% Lender consent required]**

8. Any additional indebtedness (secured or unsecured) (Sections 6.1 and 6.2) subject to certain exceptions not likely to be applicable here. **[Requisite Lender consent required]**

9. Extension of Maturity Date (Section 9.5 (A)(d)). **[100% Lender consent required]**

10. If applicable, recording of JV 2 Option and ROFRs (Section 6.2). **[Requisite Lender consent required]**.

**NOTE:** Some of the required consents go to the fundamental nature of the proposed transactions (such as, but not limited to, items 1 & 2 above) while others are matters that should be consented to because the transactions may also be covered, perhaps in a more indirect way, by other provisions of the Credit Agreement (such as, but not limited to, items 3 & 6 above) or may flow from the implementation of those transactions (such as item 7 above).

### NOTES REGARDING LENDERS' CONSENT:

000002

Please note that Section 9.1 provides that "…Borrower may not assign or otherwise transfer any of its rights or obligations [under the Credit Agreement] without the prior written consent of each Lender and the Administrative Agent…" So if, as a result of the negotiations with Credit Suisse, and as part of the documentation thereof, it becomes necessary for Borrower to assign its rights in whole or in part to another party (perhaps to a new borrower such as New YC LLC under Scenario 2), this Section may require that unanimous Lender consent be obtained even if only Requisite Lender consent to the underlying transactions necessary to implement Scenarios 1 or 2, JV 1 or JV 2, is required. It is a technical point that should be kept in mind.

Furthermore, if unanimous Lender consent is required for any modification or waiver, and if the Requisite Lenders have consented to such matter, the Agent has the right to purchase the interest of a Lender (and the Borrower has the right to cause an assignment of a Lender's interest to an Eligible Assignee) if such Lender refuses to consent to such modification or waiver.

### BRIEF DISCUSSION REGARDING SUBSIDIARIES.

To the extent JV 1 is characterized as an Unrestricted Subsidiary, certain of the consents described in this memorandum would not be necessary; however, given the proposed structure and control of CrossHarbor over JV 1 and (with Discovery) JV 2, the benefits of an Unrestricted Subsidiary are not available to us.

### FARCHEVILLE, ST. ANDREWS AND OTHER YC PROPERTIES.

Assuming these assets are held in Unrestricted Subsidiaries, there should not be a problem having the sale proceeds distributed up the chain provided that they come out at a point below the level of Borrower or a Restricted Subsidiary. We have not seen anything which would confirm that these assets are held in an Unrestricted Subsidiary but we have been told that is the case. We also need to see how and at what level EB plans to actually pull the sale proceeds out.

Regarding having the sales proceeds infused to support the Yellowstone Mountain Club, that is permitted under the Credit Agreement so long as it is invested in a manner which is consistent therewith (for example, not in the form of a loan to the Borrower or a Restricted Subsidiary in violation of Sections 6.1 or 6.2, and in a manner which will not trigger a mandatory prepayment of 50% of Equity Proceeds pursuant to Section 2.5 B (ii) (b)).

### LENDER CONSENTS LIKELY TO BE REQUIRED (MORE DETAIL)

#### *REQUISITE LENDER CONSENTS REQUIRED*

1.   **Restrictions on Asset Sales/Transfers (Sections 5.18 and 6.8):**

The "drop down" structure of Scenario 2, and the contributions of assets under JV 1 (and possibly JV 2), are not permitted under Section 5.18, nor do any such transfers fall within any of the safe harbors of Section 6.8 which covers various scenarios (to wit, arms length sales of platted and subdivided Residential Units to a third party in the ordinary course of business for fair market value; releases in connection with construction financing; up to 9 Residential Units to insiders or for legitimate business reasons; certain transfers to Unrestricted Subsidiaries; and sale of stock).

2.   **Restrictions on Change in Control (Section 5.19):**

The Permitted Holder (meaning Blixseth Group, Inc. or Timothy L. Blixseth) must at all times directly or indirectly Control the Borrower and own, directly or indirectly, 51% of the beneficial interests in the Borrower; subject only to the death or legal incapacity of the Permitted Holder. Scenarios 1 & 2 would not pass this test under the proposed Executive Committee structure since the Permitted Holder would not have the power to direct or cause the direction of the management or policies of Borrower (which is the definition of "Control"). Note that while the 51% ownership test will be met as to YC and YD, this is not the case now with respect to Big Sky Ridge, LLC.

3.    **Restrictions on Investments (Section 6.3):**

The investment by Borrower in the to-be-formed entities under Scenario 2 and JV 1 would be prohibited, unless the investment falls within the safe harbor of clause (ii) of Section 6.3. Section 6.3 provides that Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make or own any Investments, except (i) the Borrower and its Restricted Subsidiaries may make Investments in Cash Equivalents and (ii) the Borrower may form and invest the remaining portion of the Permitted Investment Amount during the Term of the Loan in Unrestricted Subsidiaries.

4.    **Restricted Payments (Section 6.5):**

Once the preferred returns (and other payments) are structured, Required Lender consent will likely be necessary to approve the timing and amounts thereof.

Section 6.5 provides that Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment. "**Restricted Payment**" means (a) any dividend, loan or other distribution, direct or indirect, on account of any shares of any class of stock (or of any other Capital Stock) of the Borrower or any of its Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding.

So long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrower and its Restricted Subsidiaries may:

(i)    Make Restricted Payments to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the Restricted Payment Amount [which means on any date of determination, an amount equal to 50% (cumulative from Fiscal Year to Fiscal Year) of Excess Cash Flow received by the Borrower or its Subsidiaries during the period commencing on the first day after the Effective Date] (less any portion of the Restricted Payment Amount used for Investments permitted under Section 6.3(ii) [i.e. permitted investments in Unrestricted Subsidiaries]); provided, that no Restricted Payment shall be permitted pursuant to this clause (i) unless the First Lien Debt LTV Ratio [which means

the ratio of (a) the principal amount of the Obligations as of the Calculation Date, to (b) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date] for the most recent Fiscal Quarter prior to the date of such Restricted Payment for which financial statements have been delivered as required by subsection 5.3(ii) and (iii) shall be less than 30%;

(ii)   Make Restricted Payments to the holders of the Capital Stock of the Borrower for the purposes of permitting such holders to pay all federal, state and local income tax obligations with respect to income allocated to them from the Borrower and its Subsidiaries; provided the amount of such Restricted Payments made in any Fiscal Year shall not exceed the combined actual amount of such federal, state and local income tax obligations of such holders resulting from income allocated to them from the Borrower; and

(iii)   Make distributions or loans to the holders of the Capital Stock of the Borrower aggregating no more $209,000,000 of the aggregate proceeds of the Loans, which amount may be distributed in one or more payments prior to the Maturity Date.

5.   **Restrictions on Fundamental Changes (Section 6.7):**

Section 6.7 provides that neither the Borrower nor any of its Restricted Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, **reorganization or recapitalization**, liquidate, wind up or dissolve, or cause or consent to either the Borrower or any Restricted Subsidiary to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve. It is likely that the transactions contemplated by Scenarios 1 & 2, and perhaps JV 1 and JV 2, would be viewed as a reorganization or recapitalization requiring Requisite Lenders consent.

6.   **Restrictions on Transactions with Shareholders and Affiliates (Section 6.9):**

Section 6.9 provides that the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 5% or more of any class of equity Securities of the Borrower or a Restricted Subsidiary or with any Affiliate of the Borrower or of any such Restricted Subsidiary or holder, on terms that are less favorable to the Borrower or that Restricted Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (i) the transactions contemplated by the Credit Agreement, (ii) the amounts expressly contemplated under the Financial Plan to be paid to Affiliates of the Borrower, and (iii) contracts and agreements with Borrower and its Restricted Subsidiaries, owners, manager, or affiliates in force as of the Effective Date. These restrictions potentially affect Scenarios 1 & 2, JV 1 and JV 2

7.   **Additional Indebtedness (Sections 6.1 and 6.2)**

Any additional indebtedness (secured or unsecured), subject to certain exceptions not likely to be applicable here, will require Requisite Lender consent.

8. **Options/ROFRs (Section 6.2)**

Any recording of any applicable option with respect to JV 2 and/or the existing ROFRs with respect to the Base Lodge area and the remaining golf course lots will require Requisite Lender consent.


### *100% LENDER CONSENT REQUIRED*

A. **Mandatory Prepayments of 50% of all Equity Proceeds received by Borrower or any of its Subsidiaries (Sections 2.5 B (ii) (b) and 9.5 (f) and (g)):**

Section 2.5 B (ii) (b) provides that concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by (i) the Borrower from Investments made by the holders of the Capital Stock in the Borrower or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiary and permitted under Section 5.11), the Borrower shall prepay the Loan in an aggregate amount equal to 50% of such Equity Proceeds. Scenario 1 would clearly be subject to the provisions of Section 2.5 B (ii) (b). With respect to Scenario 2, some arguments may be available to avoid the mandatory prepayment requirement but such arguments are not likely to be successful. Clauses (f) and (g) of Section 9.5 require that unanimous consent be obtained to any modification or waiver of this requirement. There are, however, some strategies that may be available to avoid or limit the effect of the requirement to pay 50% of Equity Proceeds to the Lenders given the exception in clause (i) above [including investing through an existing interest holder in the Borrower or making the investment over time (whereby only the first investment would arguably be subject to the 50% payment requirement to Lenders)].

B. **Extension of Maturity Date (Section 9.5 (A)(d))**

Any extension of the maturity date will require unanimous Lender consent.

CrossHarbor Capital, __ ___ LLC
Proposed YC Club Ownership - _ontrol – 2nd Scenario
[CSFB permits assets to be dropped down]
DRAFT As of September 8, 2008

3 MEMBER EXECUTIVE COMMITTEE
1 CH Member
1 Edra Member
1 Club Members Member

Edra Blixseth Entity

Big Sky Ridge LLC (MT LLC)

Member ___%

* Need to resolve treatment of Big Sky Ridge LLC in light of existing ownership

CrossHarbor Institutional Partners, L.P. (DE LP)

MANAGEMENT

Member [5%](undiluted by Class Bs)

Constitute All YC Assets in exchange for coming in as ___% Member

Discovery Land

CrossHarbor Institutional Partners L.P. (DE LP)

Member & Manager $10M ___%

Member $10M ___%

[YC Preferred Equity IV LLC]

Member [20%](undiluted by Class Bs) 10% Preferred Return

Club Members

Member $80M ___%

Blixseth Group, Inc. (OR CORP)

Member ___%

Member ___%

Yellowstone Mountain Club LLC (MT LLC)

Class B Members [___%]

Non-voting B Unit Holders

Contribute All YC Assets in exchange for coming in as ___% Member

Member ___%

Blixseth Family Investments, LLC (MT LLC)

Member ___%

Class B Members [___%]

Yellowstone Development LLC (MT LLC)

Contributes All YC Assets, including interests in Big Sky Ridge, LLC in exchange for coming in as ___% Member

Member ___%

CrossHarbor ... ...ners LLC
Proposed CIP YC Real Es... ...JV 1 (the Development JV)
DRAFT As of September 8, 2008

[Strategic Investor]
$75M Capital Account

NOTE: Need to confirm co-investment requirements are met; if not, CIP GC Owner LLC and Strategic Investor will come into CIP YC Real Estate JV1 LLC separately

55.56% Member

[CIP JV1 Investor LLC]

Member & Manager
Contributes Golf Course Lots (31 Density Units)
in exchange for coming in as 44.45% Member

CIP GC Owner LLC
(DE LLC)
$60M Capital Account

Member & Manager
40%
15% Preferred Return,
compounds monthly, accrues til 12.31.2011

[CIP YC Real Estate JV1 LLC]

Edra Blixseth Entity

Contributes Settlement
in exchange for coming in as
___% Member

NOTE: If Scenario 2 is permitted by CSFB, the [New YC LLC] comes into CIP Real Estate JV1 LLC instead of YMC & YDC

Contributes American Spirit (40 Density Units) and all 41 Density Units for Settlement in exchange for coming in as
___% Member

Yellowstone Mountain Club LLC (MT LLC)

Contributes American Spirit (40 Density Units) and all 41 Density Units for Settlement in exchange for coming in as
___% Member

Yellowstone Development LLC (MT LLC)

Development Services Agreement



CrossHarbor Capital Partners LLC
Proposed YC Club Ownership & Control – 1st Scenario
(CSFB does not permit assets to be dropped down to a new entity)
DRAFT As of September 8, 2008



CrossHarbor Capital Partners LLC
Existing YC Club Ownership & Control
As of August 19, 2008

FLYNN AFFIDAVIT EXHBIT 6

BORROWER(S) FINAL CLOSING STATEMENT

Prepared by
STEWART TITLE -NATIONAL TITLE SERVICES
1980 Post Oak Blvd, Suite 610
Houston, Texas 77056
(800)729-1906  Fax (713)552-1703

Borrower(s): Edra Blixseth
Lender: CIP Yellowstone Lending LLC
Property: Various CA - Montanta
Closing Date: 08/13/2008                Proration Date:  08/13/2008
Escrow Officer: Patricia Rodricks
File Number: 08334078

|  | DEBIT | CREDIT |
|---|---|---|
| NEW LOANS: | | |
| Amount funded by Lender to Escrow | | 18,000,000.00 |
| Net proceeds of Note A&B (30,951,775.80) | | |
| | | |
| PAYOFFS: | | |
| Payoff (buyer) - | | |
|   CIP YELLOWSTONE LENDING, LLC - 8-12-08 | | |
|   POCB $13,094,973.33 | | |
|   PAYEE:    YELLOWSTONE LENDING, LLC | | |
| Payoff (Buyer) - GREG LeMOND ETAL | 8,000,000.00 | |
|   PAYEE:    GREG LeMOND | | |
| Payoff (Buyer) - Tim Blixseth Payment | 4,944,396.17 | |
|   PAYEE:    Tim Blixseth | | |
| Payoff (Buyer) - Internal Revenue Service 8-13-08 | 2,176,779.22 | |
|   PAYEE:    Internal Revenue Service | | |
| | | |
| NEW LOAN CHARGES: | | |
| Lender Closing Costs POCB $225,000.00 | | |
| Archer Financing Fee | 200,000.00 | |
| | | |
| INTEREST CHARGES: | | |
| Interest on New Loan - Pre-Closing Interest | | |
|   POCB $28,000.00 | | |
| | | |
| TITLE CHARGES: | | |
| Owner's Extended Title Policy | 200.00 | |
|   PAYEE:    STEWART TITLE GUARANTY - NTS | | |
| Owner's Extended Title Policy - Montana | 40.00 | |
|   PAYEE:    Security Title | | |
| Endorsements - Lender's Title Policy - Calif. End | 23,013.00 | |
|   PAYEE:    Stewart Title Guaranty Company - NTS | | |
| Endorsements - Owner's Title Policy | 7,594.00 | |
|   PAYEE:    STEWART TITLE GUARANTY - NTS | | |
| Settlement Fee | 23,000.00 | |
|   PAYEE:    STEWART TITLE GUARANTY - NTS | | |
| Security Title | 8,424.00 | |
|   PAYEE:    Security Title Company | | |
| UPDATE/INSPECTION FEE | 200.00 | |
|   PAYEE:    Security Title Company | | |
| $13,500,000.00 LeMond Loan w/Sec.Title | 13,540.00 | |
|   PAYEE:    Security Title | | |
| OVERNIGHT/WIRE/COPIES FEE | 500.00 | |
|   PAYEE:    STEWART TITLE GUARANTY - NTS | | |
| 1st&2nd Loan policies w/end | 9,045.80 | |
|   PAYEE:    Stewart Title of Bozeman | | |
| Montana Inspection Fee | 300.00 | |
|   PAYEE:    Stewart Title of Bozeman | | |
| California Inspection Fees | 550.00 | |
|   PAYEE:    STEWART TITLE OF CALIFORNIA | | |
| Title Prem $30,200,000.00 & $800,000.00 | 34,100.00 | |
|   PAYEE:    Stewart Title Guaranty Company - NTS | | |

Borrower Final Closing Statement (continued)
File Number: 08334078

| | DEBIT | CREDIT |
|---|---|---|
| RECORDING FEES/TRANSFER CHARGES: | | |
| Recording fees - MONTANA/CALIFORNIA ESTIMATE | 2,000.00 | |
| XX amount $2,000.00 | | |
| PAYEE:   STEWART TITLE GUARANTY - NTS | | |
| Riverside Transfer Tax | 880.00 | |
| PAYEE:   Stewart Title of California | | |
| | | |
| MISCELLANEOUS CHARGES: | | |
| Default No. 684-270-016 | 21,734.54 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-270-010 | 189.70 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-023 | 493,113.14 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-460-010 | 10,109.27 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-021 | 6,385.08 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-039 | 14,486.17 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-270-018 | 15,828.01 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-003 | 4,206.35 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-022 | 7,772.90 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-024 | 19,085.63 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-032 | 14,707.69 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-034 | 112.32 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-036 | 69.08 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-470-038 | 69.08 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-460-013 | 1,963.95 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-130-021 | 35.01 | |
| PAYEE:   Riverside County Treasurer | | |
| Supplemental 2005-06(052-687-872-3) | 1,317.22 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-313-010 | 1,987.15 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 684-373-007 | 2,128.04 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID051854863-4, No.0334311 | 617.62 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID 051854862-3 No. 0334310 | 605.21 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID 051854866-7 No. 0334314 | 802.18 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID 051854864-5 No. 0334312 | 345.78 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID 051854867-8 No. 0334315 | 428.01 | |
| PAYEE:   Riverside County Treasurer | | |
| County ID 051854865-6 No. 0334313 | 765.24 | |
| PAYEE:   Riverside County Treasurer | | |
| Default No. 676-390-049 | 5,898.63 | |
| PAYEE:   Riverside County Treasurer | | |
| Legal Fees - Borrower | 500,000.00 | |
| PAYEE:   Liner Yankelevitz Sunshine & Regenstr | | |
| Return Funds to Lender | 396,197.53 | |
| PAYEE:   CIP YELLOWSTONE LENDING LLC | | |
| Commerce Escrow Fee | 18,000.00 | |
| PAYEE:   Commerce Escrow Company | | |

SUBTOTALS: 16,983,522.72   18,000,000.00

(Continued on next page)                                    Page: 2

Borrower Final Closing Statement (continued)
File Number: 08334078

|  | DEBIT | CREDIT |
|---|---|---|
| BALANCE DUE TO BORROWER: | 1,016,477.28 | |
| TOTALS: | 18,000,000.00 | 18,000,000.00 |

Dated this ___13th___ day of ___August___, ___08___.

Edra Blixseth

BY: _____        BY: _____

STEWART TITLE GUARANTY COMPANY

BY: _____        Date: _____

FLYNN AFFIDAVIT EXHBIT 7

**From:** LearG2@aol.com [mailto:LearG2@aol.com]
**Sent:** 11 March 2008 15:01
**To:** ceo@1800-investmentgroup.com
**Subject:** Re: Sam Byrne Email Address.

Thanks so much for the follow up. I will wait to hear what you come up with both in regard to your (and group) interest in moving forward on something and/or Cross Harbor/Sam.

The press did not hit today, fyi. Safe travels, Edra

**************

**It's Tax Time! Get tips, forms, and advice on AOL Money & Finance.**
**(http://money.aol.com/tax?NCID=aolprf00030000000001)**

Friday, April 10, 2009 America Online: TIMBLIXSETH

**From:** LearG2@aol.com [mailto:LearG2@aol.com]
**Sent:** 25 March 2008 17:16
**To:** ceo@1800-investmentgroup.com; jim.fultz@terrapinequitypartners.com
**Subject:** Fwd: (no subject)

From Tim.......there's a lot more, but will tell you later when we can talk. This one is about you guys so thought I should send it.  Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************

Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-stromer?video=15?
ncid=aolhom00030000000001)

Return-Path: <TIMBLIXSETH@aol.com>
From: <TIMBLIXSETH@aol.com>
To: <LearG2@aol.com>
Subject: (no subject)
Date: Tue, 25 Mar 2008 17:36:09 +0200
Message-ID: <c73.2b7b35e2.351a75e9@aol.com>
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="——=_NextPart_000_0282_01C9B9FE.4DC09BF0"
X-Mailer: 9.0 for Windows sub 5132
Thread-Index: AciOmWHwl09ts1CjRsG/a5m8enEX8A==

Edra...WELL....Sam called me and we had it out.
He was so self righteous it made me sick. I told him close the deal or NO deal. He made some pretty pointed threats and tried to persuade me to agree to a prepackaged BK. I asked what that would gain. His answer was to force the B holders to the table and it would eliminate all other claims known or unknown. I told him it would kill the brand and I would not do that.
He went on and on about us lying to him about the power and the Pioneer paybacks. I told him he was wrong and the payback to the Pioneers was in the details Bob supplied them a year ago. He scrambled and said they might have missed it but they made their own model and it was not in it. He made threats like "in BK you will never be able to hold on to the trusteeship" due to all the outside interests competing for control.
I asked him if he had met last Friday with a couple guys and he said their names. He said he told them to contact me and told them to contact me. I said they had but did not tell him we were talking.

Friday, April 10, 2009 America Online: TIMBLIXSETH

Opps, call from Tom Kelly and legal team, will resume afterward.

Create a Home Theater Like the Pros. Watch the video on AOL Home.

| | |
|---|---|
| **From:** | Sam Byrne |
| **Sent:** | Thursday, February 5, 2009 1:21 PM |
| **To:** | Moore, Paul D. <PDMoore@duanemorris.com>; bgreen@goulstonstorrs.com; bhursh@crowleyfleck.com |
| **Cc:** | Matthew Kidd <MKidd@CrossHarborCapital.com>; Joseph Arenson <jarenson@discoverylandco.com>; Robert Garrow <rgarrow@CrossHarborCapital.com> |
| **Subject:** | FW: (no subject) |

My original response to Tim's e-mail.


Samuel T. Byrne
Managing Partner
CrossHarbor Capital Partners, LLC
One Boston Place
Boston MA 02108
617 624 8311 direct
617 624 8340 direct fax
617 624 8300 main
**PRIVILEGED AND CONFIDENTIAL COMMUNICATION**
**This communication is intended only for the use of the individual or entity named as the addressee. It contains information which is privileged and/or confidential under applicable law. If you are not the intended recipient or such recipient's employee or agent, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you are the intended recipient of this communication, you are hereby notified that any dissemination of this communication to others, or any disclosure of the information that is contained within it, is strictly prohibited. If you have received this communication in error, please immediately notify me at (617) 624-8311 or via return Internet e-mail to sbyrne@crossharborcapital.com and expunge this communication without making any copies. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. Thank you for your cooperation.**

---

**From:** Sam Byrne
**Sent:** Tuesday, March 25, 2008 9:38 AM
**To:** 'TIMBLIXSETH@aol.com'
**Subject:** RE: (no subject)

No – the idea was to get around the B shareholder vote, extinguish any unknown liabilities and assume the debt. It could be a very clean way to go and give you some leverage with both LeMond and the Bs. The idea was to pay all of the unsecured classes and get in and out very quickly. I believe that it could solve some tax issues with the deposits as well. It would eliminate the need for the $10 million holdback for the reps and warranties (be it cash or LOC). It would also eliminate any Edra issues and would be completely outside the CA family court.

The issue would be PR, but we could spin that and be in and out inside of 30 days. We could handle this around "there are simply too many people trying to hold up Tim" and this was the cleanest way to go.

If you have some time, I also have another idea that is getting some traction with CSFB, apparently the bond holders are nervous. When can we talk this afternoon>

---

**From:** TIMBLIXSETH@aol.com [mailto:TIMBLIXSETH@aol.com]
**Sent:** Tuesday, March 25, 2008 9:27 AM
**To:** Sam Byrne
**Subject:** (no subject)

Sam,
Good morning,

**Subject to Protective Order**
**CHE07478**

I have a question of you.
When last week you suggested a 2 week "prepackaged bankruptcy," would the idea be to be able to buy the bonds on a deep discount due to the filing? If so how would that effect our price of the deal?
best, tim

---

Create a Home Theater Like the Pros. Watch the video on AOL Home.

Subject to Protective Order
CHE07479

| From: | Joe Harris <joe@gryphonsolo.com> |
| Sent: | Wednesday, October 15, 2008 4:38 PM |
| To: | 'Joey Arenson' <jarenson@discoverylandco.com> |
| Cc: | 'Matthew Kidd' <MKidd@CrossHarborCapital.com> |
| Subject: | DLC YC Business plan |

Edra
Blissett EXHIBIT 20
K. Pearson-Bell, CSR 3557
For I.D. 4-15-09 Pgs 1
Witness: Edra Blissett

Hey Joey-
Could you email Matt and I the current version of DLC's business plan as we get prepared for a pre-pack filing?
Thanks
Joe

Subject to Protective Order
CHE05826

**From:** Sam Byrne <sbyrne@CrossHarborCapital.com>
**Sent:** Monday, October 27, 2008 8:46 PM
**To:** joe@gryphonsolo.com; Matthew Kidd <MKidd@CrossHarborCapital.com>
**Subject:** Re: The plan

It is brilliant

----- Original Message -----
From: joe@gryphonsolo.com <joe@gryphonsolo.com>
To: Sam Byrne; Matthew Kidd
Sent: Mon Oct 27 20:33:16 2008
Subject: Re: The plan

Sounds dangerous........ And possibly evil......... It could be worth over 1 billion dollars............. I hope it includes a dip and filing by friday.
------Original Message------
From: Samuel T. Byrne
To: joe@gryphonsolo.com
To: Matthew Kidd
Sent: Oct 27, 2008 7:24 PM
Subject: The plan

I am going to write the "plan" tonight to solve the entire YC debacle. It could be brilliant.

Sent from my Verizon Wireless BlackBerry

Edra
Blixeth EXHIBIT 22
K. Pearson-Bell, CSR 3557
For I.D. 4-15-09 Pgs 2
Witness: Edra Blixeth

....ım41

Subject to Protective Order
CHE04632

K. Pearson-Bell, CSR 3557.
For I.D. 4-15-09  Pgs (
Witness: Earo Blixseth

| | |
|---|---|
| From: | LearG2@aol.com |
| Sent: | Tuesday, October 21, 2008 7:43 PM |
| To: | Chris.Wright@pinntech.com; thomsont.hwc@gmail.com; mmeldman@discoverylandco.com |
| Cc: | Sam Byrne <sbyrne@CrossHarborCapital.com>; jarenson@discoverylandco.com; jaska.miettinen@bingham.com; sprince@skybridgecapital.com; whitney.peyton@comcast.net |
| Subject: | Re: Revised Draft Member Communication |

In a message dated 10/21/08 4:40:06 PM, Chris.Wright@pinntech.com writes:

But right now we aren't even mentioning bankruptcy or a DIP loan.

that's a good point.......i don't care you all decide the when of this.

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************

New MapQuest Local shows what's happening at your destination. Dining, Movies, Events, News & more. Try it out (http://local.mapquest.com/?ncid=emlcntnew00000002)

6

FLYNN AFFIDAVIT EXHBIT 8

**From:** James Fultz [james.fultz@comcast.net]
**To:** CEO@1800-investmentgroup.com
**Subject:** RE: Fwd: No Subject - See Attachment
**Date:** 3/28/2008 2:38:23 AM
**CC:**
**BCC:**

**Message:**

I am on it... I will be there by noon ...

---

James R. Fultz

339 Beverly Road N.E.
Atlanta, Georgia 30309

312-402-2575

404-414-8407

---

-----Original Message-----
From: J. GARY PETERS [mailto:CEO@1800-Investmentgroup.com]
Sent: Friday, March 28, 2008 5:09 AM
To: James Fultz
Subject: Fw: Fwd: No Subject - See Attachment

Do me a favour....

Calm Edra down and let's not have her write anymore to Tim. We need to see what she has sent to him in the last 48 hours.

Second point is we need to get Greg LeMond on our side...he needs to be aware of what Tim did and what Edra was trying to do.

Third, we need to get in the press that Sam has pulled out of the deal...we need Sam to be removed or at least to go on record as we do not have proof from Tim he ever sent a fax....my guess it was a Trick by Tim if they never gave her a copy.

Fourth, we need to know who the B Shareholders are and tender an offer for them but I need to know the impact and what Tim can counter with...cost is about 5m a share according to Edra.

060061

·1

Fifth, I believe we need also to leak something to the press from an outside source but not through us but you and I to discuss.

Sixth, Edra needs to have her lawyers recant her offer, Tim in most cases will use to show courts she does not need spousal support and what she was prepared to give up when he never gave up anything.

Seventh, I will need to make a statement of account in regards to Sam and Tim but prefer to remain out

Eighth, it had to be Tim's people who called my investors and almost positive it was Andy hawes who is Tim's western pacific lawyer...I explain when I see you both.

Ninth, we should consider a private investigator to track Tim to east Coast...I think he is going to New York and up to gren conn I have feelers out on this but feel I know his plan...

Tenth, ask edra if tim sent her an email about Sam wanting to bankrupt the deal??? Tim hates press so we must hit him quick as he says, he has nothing to loose so we need to take him out where it hurts and that's Ego...nauybe time to get burt sugarman on our side as he is a loud mouth with members....ask edra for comments but we really need to hit Tim hard and step up the pressure...my gut feeling was right and when I had the two callls, one from Dubai and the other from my close friend I knew Tim was going to retrade and was why I was in a bad mood...we did not underestimate him, rather Edra tipped her hand to quick which is what he wanted...we need to have her recant all with legal help asap.

See you soon

Gary

J.GARY PETERS
Managing Partner
CEO
32 Georges Mandel
Paris 75116
+33 686 359 706

-----Original Message-----
From: LearG2@aol.com

Date: Thu, 27 Mar 2008 22:52:43
To:ceo@1800-investmentgroup.com, jamesfultz@comcast.net
Subject: Fwd: No Subject - See Attachment

This pretty much says it....

n00061

| From: | Jim Fultz [jamesfultz@comcast.net] |
|---|---|
| Sent: | Friday, March 28, 2008 2:51 PM |
| To: | LearG2@aol.com |
| Cc: | CEO@1800-investmentgroup.com |
| Subject: | Hitting the ground running |
| Importance: | Low |

Edra,

Spoke with Gary before he boarded and I was enroute to the airport in Ft. Lauderdale. I am now in Houston Intercontinental connecting to Palm Springs. I should be at the property by noon I would expect. But, neither Gary or I wanted any grass to grow before we land.. Here are some thoughts and suggestions:

1. We need to get Greg Lamond's team on our side. They need to understand what Tim is really up to. clearly, he reached an agreement with Tim based on the "old"plan worked out with you... that is no longer in effect. Can we reach them today and let's work out a deal that gets them on our side?

2. We need to get into the press that Sam is no longer in the deal, we need Sam removed. We need to confirm that the fax was received, and get a copy. If not, we can attribute a press leak to Tim. But, we should do that today.

3. We need to know who the B Shareholders are and tender an offer for them but we need to know the impact and what Tim can counter with... per your last point on this the cost is about 5m a share correct?

4. Based on your emails to your legal team, they are moving on their work... But, critical that this morning you have your lawyers recant your offer, make sure that Tim can't use your agreement to work together to show you don't need spousal support.. this is critical this morning.

5. Is it possible to get a Private Investigator on Tim this morning. Gary thinks he knows what he is doing in Greenich Conn. We need to move on this and have a better understanding of what he is doing. Gary has a plan to end run him, particularly after Andy Haas contacted some of Gary's investor's directly. Big mistake, 25 year relationships of Gary's don't go turncote on him.

6. You must shore up your base with your legal team, fire back this morning with letters recanting everything you agreed too, we need to keep punching Tim hard this morning... *no more emails or direct contact from you to Tim.* He needs to just get slammed. Did, you ever get an email from Tim with the email from Sam about bankrupting the YC companies? We may want to leak that to the press of course attributing this to Tim. We need to knock him off his feet today. Perhaps it is time to wrangle in Burt Sugarman, ...loud mouth... but could bring support of some members.

Remember, destabilizing Tim in advance of the offers made on Sunday or Monday by your team to B holders and others is critical. We want ot make sure he can't respond or react.

Sorry for the lengthy email... but we both are up thinking about how to take this guy out once and for all.

I lift from Houston at 7:52am your time. Call me on 404-414-8407 if you are up and want to talk... If not, I hope we can meet at noon at the property.

**000063**

4/24/2009

| From: | LearG2@aol.com |
|---|---|
| Sent: | Friday, March 28, 2008 3:42 AM |
| To: | Djaffe@jaffeclemens.com; SMendell@jaffeclemens.com; WRyden@jaffeclemens.com; dklar@linerlaw.com; fglabach@linerlaw.com; syankelevitz@linerlaw.com |

**Subject:** new plan of action given Tim's actions

All - I think this goes more in Montana court then family court.

I file (again, but this time in Montana) based on Tim's actions of the last year and of recent, that I take over as Manger of BGI and the YC's. That Tim, based on the e-mail that he sent to Sam and the one to me tonight, was threatening and colluding to put YC in BK. That he had driven the asset down to the point that we were going to get almost nothing out of it. That I came up with what Sam was trying to do and stopped it. That I have the money, through valid investors to come in and take care of paying the LeMonds, the B shares (if they want to), get payables current, have an operator and money to move YC forward.

Explain that Tim is just pulling his same old games. We do this in Montana court and keep the family law things going as they are set. We have only lost one week of depo's which Tim canceled not based on this deal, but that he was ill. We reschedule and get those depo's back on track and keep the April 21 date going. This can be done.

We get the pressure on Tim to get PC and CC in my control.

We fight him on all the things that he is trying to pull about the things we are withdrawing for the support. We hit him from all sides.

AND, in Montana court, I try to get control based on his handling of things this past year, now that Sam's deal is dead.

We have to move fast on this, so I need your thoughts NOW. Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************
Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-stromer?
video=15&ncid=aolhom00030000000001)

060'36'

4/24/2009

FLYNN AFFIDAVIT EXHBIT 9

From:      LearG2@aol.com
Sent:      Friday, March 28, 2008 3:42 AM
To:        Djaffe@jaffeclemens.com; SMendell@jaffeclemens.com; WRyden@jaffeclemens.com;
           dklar@linerlaw.com; fglabach@linerlaw.com; syankelevitz@linerlaw.com
Subject:   new plan of action given Tim's actions

All - I think this goes more in Montana court then family court.

I file (again, but this time in Montana) based on Tim's actions of the last year and of recent, that I take over as Manger of BGI and the YC's. That Tim, based on the e-mail that he sent to Sam and the one to me tonight, was threatening and colluding to put YC in BK. That he had driven the asset down to the point that we were going to get almost nothing out of it. That I came up with what Sam was trying to do and stopped it. That I have the money, through valid investors to come in and take care of paying the LeMonds, the B shares (if they want to), get payables current, have an operator and money to move YC forward.

Explain that Tim is just pulling his same old games. We do this in Montana court and keep the family law things going as they are set. We have only lost one week of depo's which Tim canceled not based on this deal, but that he was ill. We reschedule and get those depo's back on track and keep the April 21 date going. This can be done.

We get the pressure on Tim to get PC and CC in my control.

We fight him on all the things that he is trying to pull about the things we are withdrawing for the support. We hit him from all sides.

AND, in Montana court, I try to get control based on his handling of things this past year, now that Sam's deal is dead.

We have to move fast on this, so I need your thoughts NOW. Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

*************
Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-stromer?
video=15&ncid=aolhom00030000000001)

06026

4/24/2009

FLYNN AFFIDAVIT EXHBIT 10

| | |
|---|---|
| **From:** | LearG2@aol.com |
| **Sent:** | Wednesday, March 26, 2008 3:41 PM |
| **To:** | ceo@1800-investmentgroup.com; jamesfultz@comcast.net |
| **Subject:** | Fwd: (no subject) |
| **Attachments:** | (no subject) (2.22 KB) |

PLEASE never tell that I am sending you all of this.  I do it for positive reasons, as I think we are going to have to move fast here.  When Sam does not close tonight, we have to be in a good position for this to come off right with members.  Let's try to talk on the phone today.

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**Create a Home Theater Like the Pros. Watch the video on AOL Home.**
**(http://home.aol.com/diy/home-improvement-eric-stromer?video=15?**
**ncid=aolhom00030000000001)**

000031

4/24/2009

FLYNN AFFIDAVIT EXHBIT 11

**From:**    LearG2@aol.com
**Sent:**    Friday, March 28, 2008 1:35 AM
**To:**    CEO@1800-investmentgroup.com; jamesfultz@comcast.net
**Subject:** Re: important

In a message dated 3/27/08 5:33:13 PM, CEO@1800-Investmentgroup.com writes:

> Good.  See you when I get there.  You have not agreed to anything in writing and only the phone call today with
> B shareholders.

Exactly AND I can easily say to them, that I wrongly trusted Tim again.  They would ALL get that.  He is such a dumb shit and tries to play these games rather then just do straight business.

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

*************

Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-stromer?
video=15&ncid=aolhom00030000000001)

00005%

4/24/2009

FLYNN AFFIDAVIT EXHBIT 12

| | |
|---|---|
| **From:** | Michael Meldman <mmeldman@discoverylandco.com> |
| **Sent:** | Wednesday, November 12, 2008 11:01 PM |
| **To:** | Sam Byrne <sbyrne@CrossHarborCapital.com>; Joey Arenson <jarenson@discoverylandco.com> |
| **Subject:** | Re: DLC |

Perjury

**From:** Sam Byrne
**To:** Michael Meldman; Joey Arenson
**Sent:** Wed Nov 12 20:37:53 2008
**Subject:** DLC

It is clear from all of the written commentary back from the MT courts that both CH and DLC are viewed adversarial by Skadden. Edra also testified that DLC was never part of any CH plan and that she brought them in. Said she studied our business plan (?) and DLC was not part of that equation.

*Edra Blixseth* EXHIBIT **4**
K. Pearson-Bell, CSR 3557
For I.D. 4-15-09 Pgs 1
Witness: *Edra Blixseth*

CUU713

Subject to Protective Order
CHE04301

FLYNN AFFIDAVIT EXHBIT 13

J Gary Peters

**From:** LearG2@aol.com
**Sent:** Thursday, March 20, 2008 11:16 PM
**To:** syankelevitz@linerlaw.com
**Subject:** Re: FYI

In a message dated 3/20/08 3:10:54 PM, syankelevitz@linerlaw.com writes:

> YC is pocket change to Dubai.  It would seem to be worth exploring and if they're interested pay Sam to walk away from the deal.

My guy........is meeting with Sam in the morning, in Boston at 9:30 and then heading this way.  He has a letter with him showing we can close and the money is already in the US.

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************

Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-stromer?video=15?
ncid=aolhom00030000000001)

4/24/2009

060014

| From: | LearG2@aol.com |
|---|---|
| Sent: | Thursday, March 20, 2008 11:18 PM |
| To: | ceo@1800-investmentgroup.com |
| Subject: | Fwd: FYI |
| Attachments: | FYI (2.78 KB) |

Interesting note from my tax lawyer................you can always have the idea that we talked about that if Sam is burnt out on the deal and just wants to do more of the vertical building........to help him close and then take him out of part of it. I will leave it to you trusting your gut feelings when you are with him. Can't wait to hear from you. Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************

**Create a Home Theater Like the Pros. Watch the video on AOL Home. (http://home.aol.com/diy/home-improvement-eric-stromer?video=15? ncid=aolhom00030000000001)**

4/24/2009

**From:**
**To:**          LearG2@aol.com [LearG2@aol.com]
**Subject:**     ceo@1800-investmentgroup.com
**Date:**        Fwd: FYI
**CC:**          3/20/2008 3:18:20 PM
**BCC:**

**Message:**
Interesting note from my tax lawyer...............you can always have the idea that we talked about that if Sam is burnt out on the deal and just wants to do more of the vertical building........to help him close and then take him out of part of it.  I will leave it to you trusting your gut feelings when you are with him.  Can't wait to hear from you.  Edra

This message and any attached documents may be confidential, privileged or both. If you are not the intended recipient, you are not authorized to open, read, copy, store, distribute or use this information in any way. Failure to comply with this notice may be a violation of applicable laws concerning the receipt of electronic mail. If you have received this transmission in error, please notify the sender immediately by replying to this e-mail and then delete this message. Thank you.

**************
Create a Home Theater Like the Pros. Watch the video on AOL Home.
(http://home.aol.com/diy/home-improvement-eric-
stromer?video=15?ncid=aolhom00030000000001)

**Attachments:**
   Re FYI.msg

060316

FLYNN AFFIDAVIT EXHBIT 14

U.S. Department of Justice

Criminal Division

Office of the United States Attorney                                    Washington, D.C. 20530

December 12, 2007

Mr. Timothy Blixseth
71-534 Sahara Road
Rancho Mirage, CA 92270

This letter is supplied to a witness scheduled to appear before the federal Grand Jury in order to provide helpful background information about the Grand Jury. The Grand Jury consists of from sixteen to twenty-three persons from the District of Columbia. It is their responsibility to inquire into federal crimes which may have been committed.

As a Grand Jury witness you will be asked to testify and answer questions, and to produce records and documents. Only the members of the Grand Jury, attorneys for the United States and a stenographer are permitted in the Grand Jury room while you testify.

We advise you that the Grand Jury is conducting an investigation of possible violations of federal criminal laws involving, buy not necessarily limited to 18 U.S.C. § 1959, § 1344. Bank fraud, § 201Bribery of public officials and witnesses. You are advised that the destruction or alteration of any document required to be produced before the grand jury constitutes serious violation of federal law, including but not limited to Obstruction of Justice.

You are advised that you are a target of the Grand Jury's investigation. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you. Anything that you do or say may be used against you in a subsequent legal proceeding. If you have retained counsel, who represents you personally, the Grand Jury will permit you a reasonable opportunity to step outside the Grand Jury room and confer with counsel if you desire.

Cordially,

Ronald Sharpe
Assistant United States Attorney

FLYNN AFFIDAVIT EXHBIT 15



U.S Department Of Justice

Environment and Natural Resources Division

Office of the Assistant Attorney General                Washington, D.C. 20530

November 8, 2007

Timothy Blixseth
42765 Dunes View Road
Rancho Mirage, CA 92270

This office has convened an audit and investigation into numerous land exchanges that you have participated in the past fifteen years. Specifically, the land exchanges known as Gallitan II and in the Payette River Canyon.

Questions have arisen regarding favoritism with regard to political contributions, actual vs reported land valuations, relationships with U.S. Forest Service, Congressmen and Senators, and transactions in Idaho, Montana, Colorado and Washington. There are also allegations of interest hidden from the public, the NEPA, the U.S Forest Service and the U.S. Bureau of Land Management.

Your full cooperation in this matter is requested and expected.

Cordially,



Darlen
As          States Attorney





FLYNN AFFIDAVIT EXHBIT 16

Page 1

Volume I
Pages 1 to 185
Exhibits 1-16
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

```
- - - - - - - - - - - - - - - - -x
                               :  Case No.
                               :  08-61570-11-RBK
    In re:                     :
                               :  Jointly
    YELLOWSTONE MOUNTAIN CLUB, :  Administered
    LLC, et al.,               :  with 08-61571,
                               :  08-61572 and
            Debtors.           :  08-61573
                               :  Chapter 11
                               :
- - - - - - - - - - - - - - -  :
                               :
                               :
    OFFICIAL COMMITTEE OF      :  Adv. Pro. No.
    UNSECURED CREDITORS,       :  09-014
                               :  (Consolidated)
            Plaintiff,         :
                               :
        vs.                    :  Judge:  Ralph B.
                               :  Kirscher
    CREDIT SUISSE, CAYMAN ISLANDS  :
    BRANCH, and JOHN DOES 1-15,    :
                               :
            Defendants.        :
                               :
- - - - - - - - - - - - - - - - -x
```

        VIDEOTAPED DEPOSITION OF SAMUEL T. BYRNE, a
witness called on behalf of the Defendants, taken
pursuant to Rule 45 of the Federal Rules of Civil
Procedure, before Anne H. Bohan, Registered
Diplomate Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Skadden, Arps, Slate, Meagher & Flom LLP, One Beacon
Street, Boston, Massachusetts, on Thursday, April 9,
2009, commencing at 12:10 p.m.

Electronically signed by Anne H. Bohan (601-244-937-3064)          a94780ef-7906-452a-b8d9-64992afda49a

In re: Yellowstone Mountain Club, LLC, et al., Debtors
Videotaped Deposition

Samuel T. Byrne, Vol. I
April 9, 2009

Page 94

1 people had presented the option at various points in
2 time. From the other side, people in the
3 conversation, lawyers, any number of people. It was
4 not something we were pursuing.
5     Q. But it's something that you did ultimately
6 pursue?
7     A. I didn't pursue it, the debtors pursued it.
8 It's got nothing to do with me.
9     Q. When you loaned the $35 million to Edra
10 Blixseth, its purpose was to take Tim Blixseth out
11 of his ownership position in the Club; is that
12 correct?
13         MR. MOORE: Object to the form of the
14 question. You can answer it.
15     Q. Do you understand the question, Mr. Byrne?
16     A. I think the purpose of that loan is clear
17 in what the monies were used for, and part of it was
18 for her to complete her marital settlement agreement
19 with Tim.
20     Q. And remove him from an ownership position
21 in the Club?
22     A. That's what her goal was.
23     Q. And you gave her $35 million to do it?
24     A. I lent her $35 million against a commitment

Page 95

1 to be refinanced within 30 days, to move forward
2 with her transaction.
3     Q. Was there provision in your loan agreement
4 with her whereby --
5     A. Excuse me. Can we go off the record? I'd
6 like to talk to my attorney for a minute.
7         THE VIDEOGRAPHER: The time is 2:24. We
8 are off the record.
9         (A pause)
10         THE VIDEOGRAPHER: The time is 2:26. We
11 are back on the record.
12         MR. MOORE: I just want to explain the
13 break. The reason for the break is that the witness
14 shares my concern that this deposition seems to be
15 dedicated to matters that are entirely unrelated to
16 this litigation. Again, I would urge you, if you
17 have questions related to the litigation, to ask
18 them.
19         MR. FLYNN: We have different views.
20 They're directly related to the breach of the
21 fiduciary duty claims that have been mounted by the
22 UCC in this case against Mr. Blixseth.
23 BY MR. FLYNN:
24     Q. Mr. Byrne --

Page 96

1         MR. MOORE: I appreciate your explanation.
2 Thank you.
3         MR. FLYNN: You're welcome.
4     Q. Mr. Byrne --
5     A. Yes.
6     Q. -- when you loaned Ms. Blixseth the $35
7 million, between your termination on March 26th of
8 the sale of the Club and the filing of the
9 bankruptcy in November '08, did you know what the
10 money was being used for?
11     A. I'm not sure I understand the question.
12 What's the relevance of the dates?
13     Q. Well, on March 26th your company terminated
14 the deal. We agree on that, do we not?
15     A. We sent a notice of termination. I think
16 we've been over and over many times why we felt the
17 need to do that.
18     Q. In November a bankruptcy plan was filed by
19 Ms. Blixseth.
20     A. That's correct.
21     Q. And we also have in the mix that two weeks
22 before you terminated the deal, you proposed a
23 prepackaged bankruptcy --
24     A. I didn't propose.

Page 97

1     Q. -- to Mr. Blixseth?
2     A. I didn't propose.
3         MR. MOORE: Object to the form of the
4 question.
5     Q. You didn't propose it?
6     A. I testified to it already.
7     Q. You had a discussion with him about it?
8     A. The e-mail speaks for itself.
9         MR. MOORE: The testimony speaks for itself
10 too. I think we've had about ten questions on this
11 already.
12         MR. FLYNN: I'm not talking about the
13 e-mail; I'm talking about the issue of your
14 discussion.
15     Q. Did you or did you not have a discussion
16 several weeks before the termination letter that you
17 sent relating to a prepackaged bankruptcy? It's a
18 simple question; I'd like a yes-or-no answer. Did
19 you have that discussion?
20         MR. MOORE: You already have answers to
21 that at least three times.
22         MR. FLYNN: I think I now have conflicting
23 answers.
24     A. What are the conflicting answers?

25 (Pages 94 to 97)

Electronically signed by Anne H. Bohan (601-244-937-3064)                                                                 a94780ef-7906-452a-b8d9-64992afda49a

In re: Yellowstone Mountain Club, LLC, et al., Debtors                                          Samuel T. Byrne, Vol. I
Videotaped Deposition                                                                                           April 9, 2009

Page 98

1        Q.   Did you have that discussion?
2            MR. MOORE:  Object to the form of the
3    question.  Go ahead.
4        A.   We had an e-mail discussion.  You've seen
5    the e-mail.  It is what it is.
6        Q.   Aside from the e-mail did you verbally
7    discuss with Mr. Blixseth --
8        A.   Tim Blixseth called me looking for options
9    for how to resolve the case, and I said, "You've got
10   real problems here," and he suggested how we would
11   deal with it.  We talked about bankruptcy.  He said
12   he was not interested in going down that path, and I
13   said, "That's great, let's just move forward and
14   close."
15           Then he sent me his thoroughly self-serving
16   e-mail trying to establish some record, which is par
17   for the course in this thing, and I responded
18   exactly as I factually did.
19       Q.   Who first used the term, if you can recall,
20   "prepackaged bankruptcy"?
21       A.   I don't recall.  Possibly Credit Suisse,
22   but I don't recall.
23       Q.   Between you and Mr. Blixseth, who first
24   used the term?

Page 99

1        A.   I don't recall.
2            MR. MOORE:  He's answered that at least
3    four times, and he said the same thing four times,
4    which I'm proud of him for that, but enough is
5    enough.
6        Q.   Now, let's go back to the $35 million loan.
7    What were the proceeds being used for, to your
8    knowledge, when you gave her the money?
9        A.   I mean, the sources and uses of the loan
10   are in the record, so I don't recall off the top of
11   my head.  But it involved putting some money,
12   short-term money into the Club, paying off her
13   obligations under the marital settlement agreement,
14   and paying off obligations that Tim had had to the
15   LeMond Litigants.
16       Q.   Did you require as a term of the loan, the
17   $35 million loan, that the LeMond Litigants get
18   paid?
19       A.   I didn't require it.  She requested the
20   loan, as established in the record.  I didn't -- she
21   requested the loan.  What her intentions were with
22   it was to resolve these issues, and she used it for
23   those purposes.
24       Q.   So your testimony --

Page 100

1        A.   I didn't require her to do anything.  To
2    the extent she needed releases from the LeMonds to
3    satisfy Tim's agreement with her, it had nothing to
4    do with us.
5        Q.   Just so we're clear.  So none of these
6    payouts that she was going to make from the $35
7    million was a requirement in the loan; is that your
8    testimony?
9            MR. MOORE:  Object to the form of the
10   question.
11       A.   I don't know.
12           MR. MOORE:  What payouts are you talking
13   about?
14       Q.   LeMond, to the Club, and to satisfy the
15   marital settlement agreement.  I believe that's what
16   you testified to.
17           MR. MOORE:  Didn't he testify there were
18   sources and uses in the agreement?  Why don't you
19   show him that if you want to know what they were.
20           MR. FLYNN:  Please, Mr. Moore.  You're
21   interrupting the deposition.
22       Q.   Mr. Byrne, I'd like a clear-cut answer to
23   this, if I could.
24           MR. MOORE:  We'd like a clear-cut question

Page 101

1    too and a question that's relevant to the
2    litigation, but I'm not succeeding in that either.
3        Q.   Did your loan require her to make payments
4    to either LeMond, to Tim Blixseth, to resolve the
5    marriage, or to the Club for operating capital?
6    It's a real simple question.  Did your loan require
7    it?
8        A.   The sources and uses are what they are,
9    yes.  Whatever they are, they are.
10       Q.   Thank you.  It did require it.
11       A.   No, I didn't say that.  She asked for the
12   money.  You're making up something like we forced it
13   upon her.  We know exactly where you're going with
14   all this.
15       Q.   You may be a lot wiser than me.
16       A.   Oh, please.
17       Q.   I'm trying to get the facts.  So we have an
18   answer "yes."
19           Now, I believe the loan called for
20   repayment of the $35 million in 30 days; is that
21   correct?
22       A.   I believe so, yes.
23       Q.   Did Ms. Blixseth give you financial
24   statements to support the loan before you gave her

Doris O. Wong Associates, Inc.              Professional Court Reporters                     (617)426-2432
50 Franklin Street, Boston, MA 02110            Videoconference Center                     www.doriswong.com

Electronically signed by Anne H. Bohan (601-244-937-3064)                                        a94780ef-7906-452a-b8d9-64992afda49a

In re: Yellowstone Mountain Club, LLC, et al., Debtors
Videotaped Deposition

Samuel T. Byrne, Vol. I
April 9, 2009

Page 102

1   the $35 million to be repaid in 30 days?
2       A.  She did.  And she gave us evidence that she
3   had financing commitments from two different sources
4   to do so.
5       Q.  What were those two sources?
6       A.  One was Archer Capital and the other was --
7   I can't remember -- Kennedy Funding.  It might have
8   been Kennedy Funding at the time.  She had two deals
9   working that she had put deposits up on already.
10      Q.  So when you gave her the $35 million, it
11  was your understanding that:  A, she would become
12  the owner of the Club; is that correct?
13      A.  Yes.
14      Q.  B, she would pay LeMond some amount of
15  money; is that correct?
16      A.  Yes.  That's what she was using the
17  proceeds for.
18      Q.  C --
19      A.  Tim's deal with her required her that she
20  get LeMond off his back.
21          MR. MOORE:  Just answer the question.
22      Q.  C, that Tim Blixseth would be paid some
23  amount of money, correct?
24      A.  That's correct.

Page 103

1       Q.  D, that some amount of money would be put
2   into the Club, correct?
3       A.  Correct.
4       Q.  How much was going into the Club?
5       A.  I don't recall but not a lot.
6       Q.  How much was going to LeMond?
7       A.  Whatever the numbers are, they are.  I
8   don't recall off the top of my head.  I don't want
9   to speak incorrectly.
10      Q.  How much was going to be regained by her
11  personally from the $35 million after those other
12  obligations were met?
13      A.  There was virtually nothing, from my
14  understanding of it.
15      Q.  Now, at the time did you know that she was
16  in financial straits?
17      A.  I didn't know the extent to which she had
18  borrowed money, because it wasn't disclosed to us in
19  the financial statements that were provided to us.
20      Q.  What was not disclosed that you now know
21  about?
22      A.  Just that she had significant personal
23  liabilities out there to banks and to individuals
24  that were not accurately reflected in her financial

Page 104

1   statements that she presented to us.
2       Q.  Have you produced those financial
3   statements in this litigation?
4       A.  I don't know.
5       Q.  As you sit here right now, what banks do
6   you know about, do you now know about, that were not
7   disclosed in the financial statements?
8       A.  I don't know.  I don't know without the
9   information in front of me, I couldn't answer it
10  specifically which ones were or weren't, who she
11  owed money to, what litigation claims she had agreed
12  to settle, I don't know.
13      Q.  Well, apparently from the Montana
14  bankruptcy litigation we know there was a bank
15  called First Bank & Trust of Newport Beach that she
16  got about $8 million from in March '08.  Is that one
17  of the banks you referred to?
18      A.  I don't know.  Like I said, I answered the
19  question I don't know.
20      Q.  Okay.
21      A.  I'd have to look at the statements, and now
22  knowing what we know because of the filings in the
23  bankruptcy, we can reconcile them.
24      Q.  Now, that $8 million, coincidentally or

Page 105

1   not, was received by Ms. Blixseth roughly at the
2   same time as you terminated the sales, if you know?
3       A.  I don't know.
4       Q.  Do you know if there's a correlation of
5   those dates?
6       A.  There is no correlation of those dates.  I
7   have no idea who she borrowed money from before the
8   last five months, six months.  I still don't know
9   who she borrowed money from.
10      Q.  Well, you said you did know that some banks
11  or lending institutions --
12      A.  I don't know if she --
13      Q.  -- were not disclosed?
14      A.  She may well have disclosed that one, I
15  don't know.  As I said, I don't know until I see the
16  reconciliations.
17      Q.  Now, Wachovia Bank, I believe they loaned
18  her roughly $8 million at the same time, happened to
19  be March '08 when you terminated the sale.  Was that
20  one of the banks that was disclosed or not
21  disclosed, if you know, on the financial statement?
22      A.  I said I don't know.
23      Q.  Okay.  Now, American Bank sometime between
24  March '08 and the time you gave her the $35 million

27 (Pages 102 to 105)

Electronically signed by Anne H. Bohan (601-244-937-3064)                                                    a94780ef-7906-452a-b8d9-64992afda49a