## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC**, **et al.**<br><br>          Debtors. | Case No.  **08-61570-11**<br><br>JOINTLY ADMINISTERED |
| **TIMOTHY L BLIXSETH**,<br><br>          Plaintiff.<br><br>-vs-<br><br>**MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**,<br><br>          Defendant. | Adv. No.  **09-00014** (consolidated with Adv. No. 09-00017) |

## MEMORANDUM   OF   DECISION

At Butte in said District this 17th day of February, 2010.

In this adversary proceeding the Plaintiff/Intervenor/Counterclaimant Defendant Timothy Blixseth (hereinafter "Blixseth") has moved for summary judgment with a supporting brief and a

1

Statement of Undisputed Facts (Docket No. 486) seeking dismissal of all claims[1] against him brought by the Defendant/Counterclaimant Marc S. Kirschner, as Trustee of the Yellowstone Club Liquidating Trust (the "Trust"). The Trust filed a response in opposition and "Statement of Genuine Issues" (Dkt. 499). Blixseth filed a reply (Dkt. 521). A hearing on Blixseth's Motion was held at Missoula on February 16, 2010. Blixseth was represented at the hearing by Brent Bastian of Boise, Idaho. The Trust was represented by Steven L. Hoard of Amarillo, Texas. The Court heard argument. After review of the Motion, briefs, attachments, the record and applicable law, this matter is ready for decision. The Court concludes that Blixseth has failed to satisfy his burden under FED. R. BANKR. P. 7056 (applying FED. R. CIV. P. 56 in adversary proceedings) of showing that no genuine issue of material fact exists and that Blixseth is entitled to summary judgment as a matter of law with respect to any of the Trust's claims. Blixseth's Motion for Summary Judgment is denied.

This Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b). The Trust's claims against Blixseth are proceedings brought pursuant to the terms of the confirmed Chapter 11 Plan in the above-captioned Chapter 11 case.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is governed by FED. R. BANKR. P. 7056. Rule 7056, incorporating FED. R. CIV. P. 56(c)(2), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[1]The parties identify the Trust's claims against Blixseth as fraudulent transfer claims brought under 11 U.S.C. §§ 544 and 548, breach of fiduciary duty, fraudulent transfer brought under Montana's Uniform Fraudulent Transfer Act ("MUFTA"), MONT. CODE ANN. ("MCA") § 31-2-327 *et seq.*, conversion, and MCA § 35-8-604 ("Distributions"), alter ego, and unjust enrichment.

2

as to any material fact and that the movant is entitled to judgment as a matter of law." *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117 (9th Cir. 2009). "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan dissent) (citations omitted). *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving

3

party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

   To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. "When determining whether a genuine issue of material fact remains for trial, we must view the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations." *Hauk*, 552 F.3d at 1117-18, citing *Liberty Lobby*, 477 U.S. at 255. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or

4

defense." *Id.*

If a rational trier of fact might resolve disputes raised during summary judgment

proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec.*

*Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine

whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed

background or contextual facts, are such that a rational or reasonable jury might return a verdict

in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any

disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a

matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## ALLEGED FACTS & ISSUES

Blixseth attached his statement of undisputed facts in support of his motion for summary

judgment (Docket No. 486), setting forth the following forty (40) alleged undisputed facts:

> 1. On or around September 30, 2005, Credit Suisse and Debtors entered into a credit agreement. *See* Debtors' Answer and Amended Complaint, Doc. No. 42, at ¶ 47; Committee's Complaint, Doc. No. 1 in Adv. Pro. No. 09-00017, at ¶ 34. That agreement was non-recourse as against Timothy Blixseth. *See generally* the Credit Agreement dated September 30, 2005 Among Debtors and Credit Suisse, a true and correct copy of which is attached to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment as Exhibit H (document provides no remedies against Timothy Blixseth personally); *see also* Credit Suisse's Proof of Claim, Doc. No. 633-1 of the main bankruptcy matter (08-61570-RBK) (Timothy Blixseth not listed as a borrower or guarantor).

> 2. As part of entering into that agreement, Debtors sought and obtained assistance from Stephen Brown with the law firm of Garlington, Lohn & Robinson. *See* the Deposition of Stephen Brown, dated April 10, 2009, Doc. No. 148, at 12:20-22; 41:15-42:4. Among other things, Brown was asked to render an opinion letter concerning the legality of the Credit Suisse loan. *Id.* at 54:17-23. Brown testified that he knew that the Debtors were relying on him to provide an opinion as to the

Credit Suisse loan that was "accurate and that was appropriately put together and that was satisfactory to the lender in the context of the credit agreement." *Id.* at 234:4-9.

3. Brown also testified that his responsibility was to opine on the legality of the Credit Suisse loan under Montana law, with the exception of its effect on securities, pension, employee benefits, taxes, and other laws not normally associated with secured business loans and credit agreements. *Id.* at 173:8-174:22, 178:6-10. Brown testified that he found nothing objectionable with the Credit Suisse loan, and that he sees no reason, even today, to modify his Opinion. *Id.* at 175:13-20, 207:7-208:12.

4. In addition to Brown, Timothy Blixseth had the advice of other attorneys as well, such as Michael Doyle, who were also responsible for rendering advice to close the transaction. *See* the Transcript of Proceedings in Adv. Pro. No. 09-00014, dated April 29, 2009 (*i.e.*, the trial transcript), at pp. 226:17-229:23. Similarly, Credit Suisse and its lawyers approved the loan, represented that it conformed to all laws, and provided no disclosures that it violated FIRREA or any other laws. *See* the testimony of Steve Yankauer with Credit Suisse Securities in the Transcript of Proceedings in Adv. Pro. No. 09-00014, dated May 5, 2009 (*i.e.*, the trial transcript), at pp. 1270:5-1271:6.

5. On or around December 15, 2006 Edra Blixseth filed for divorce from Timothy Blixseth in the state of California, County of Riverside, in a case styled *In Re Marriage of Blixseth*, Case No. RIDIND91152. *See* the Mutual Waiver and Release Agreement, Doc. No. 181, at p. 1, Recital A.

6. After a year-and-a-half of litigation in that divorce, on or around June 26, 2008, Edra Blixseth and Timothy Blixseth entered into a "Marital Settlement Agreement" or "MSA." *See generally* the Marital Settlement Agreement, a true and correct copy of which is attached as Exhibit A to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment. Two amendments were made to this Marital Settlement Agreement: (1) an "Amendment to Marital Settlement Agreement," dated July 2, 2009 (the "First Amendment"); and (2) a "Second Amendment to Marital Settlement Agreement," dated August 12, 2009 (the "Second Amendment"). True and correct copies of those amendments are attached as Exhibits B and C, respectively, to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment.

7. Among other things, the MSA provided:

   a. That Edra Blixseth was receiving all of Timothy Blixseth's interest in

6

the stock and assets of BGI, which was defined to be, among other things, all of BGI's controlling interest in Debtors, Porcupine Creek, Yellowstone Club World, and Big Springs Realty. *See* the MSA at ¶ 16(A). Edra Blixseth was to take that interest "subject to all liabilities and obligations" of these entities. *Id.*

b. That Edra Blixseth would provide to Tim Blixseth a release and waiver of all obligations and liabilities relating to BGI and Debtors, among others. MSA at ¶¶ 16, 29, 36 (particularly ¶¶ 36(C)-(D)).

c. That:

The parties acknowledge that all outstanding obligations that BGI has to Yellowstone Development, LLC are being transferred to [Edra] with BGI as part of the award to [Edra] of BGI and [Edra] shall fully and completely indemnify and hold [Timothy] free and harmless from any liability of any kind, in connection therewith. *Id.* at ¶ 29(C).

d. That the Blixseths waived any personal claim against the other relating to, *inter alia*, breach of fiduciary duty. MSA at ¶ 36(A).

e. That each entity received by one of the Blixseths pursuant to the MSA would also waive any claim against the conveying party relating to, *inter alia*, breach of fiduciary duty and "any similar type of potential liability based on failure to act properly on behalf of said entity." MSA at ¶ 36(B).

f. That the parties would execute a release agreement in order to clearly evidence the releases and waivers in the MSA on behalf of the parties' respective entities. MSA at ¶ 36(C).

g. That the waivers and releases would be provided by Debtors and BGI, among others (through Edra Blixseth), and by Western Pacific Timber (through Timothy Blixseth). MSA at ¶ 36(D).

h. That the parties were represented by counsel, had an adequate amount of time to understand the ramifications of the MSA, and had seen all the documents they felt were necessary in order to enter into the MSA. MSA at ¶¶ 4(C), 36(A).

i. That as part of the MSA, Edra would pay off the so-called "LeMond I" litigation. MSA at ¶ 17.

j. That the waivers in the MSA are material consideration for entering into the MSA. MSA at ¶ 36.

8. Among other things, the First Amendment stated that:

7

> [Edra], as the sole shareholder of BGI, shall cause BGI in
> consideration for the assumption of liability by [Edra] and in
> recognition of her future management and control of BGI and the
> assets and entities over which it has the right of ownership and/or
> management, to release [Timothy] from any and all claims,
> obligations or liabilities associated with the BGI Indebtedness.  *See*
> First Amendment, ¶ 16A(2)(j).

9. As a condition of ¶ 36 of the MSA, the Blixseths were also required to enter
into a "Mutual Waiver and Release Agreement," the contents of which were made
part of the MSA. *See* the Mutual Waiver and Release Agreement (the "Release
Agreement"), Doc. No. 181, at Recital C; MSA at ¶ 36. The Blixseths executed
such an agreement on August 13, 2008. *See generally* the Release Agreement,
Doc. No. 181.

10. Among other things, the Release Agreement provided:

> a. A general release by Edra Blixseth and Debtors of all claims against
> Timothy Blixseth, including, but not limited to (a) breach of fiduciary duty, (b)
> breach of corporate or business opportunities, (c) any similar type of potential
> liability based on failure to act properly on behalf of said entity or (d) any
> document signed by Timothy. *See* the Release Agreement, Doc. 181, at § 4(b) and
> its Exhibit B.

11. On or around July 3, 2008, and as a result of the execution of the MSA, the
Hon. Sharon J. Waters, of the Superior Court of the State of California for the
County of Riverside, entered an "Order Approving Waivers and Releases" (the
"Order"). *See* ¶ 2 to that Order, a true and correct copy of which is attached as
Exhibit D to the Affidavit of Michael Flynn in Support of Timothy Blixseth's
Motion for Summary Judgment. Among other things, the court found, and the
Order concomitantly provided:

> a. That the MSA was a result of competent negotiations between the
> parties. *See* the Order at, *e.g.*, ¶¶ 3-4, 6, 9, 10-12.

> b. That the Blixseths had ample opportunity to consult with their
> respective attorneys prior to execution of the MSA, and that, in fact, they did
> consult with their attorneys prior to the execution of the MSA. *See* the Order at,
> *e.g.*, ¶¶ 4-6, 9, 8-13.

> c. That either Blixseth might have obtained a different outcome in the
> divorce had the parties allowed the Court to render its own decision, but that, after
> having had the chance to perform discovery, they both considered the MSA to be

a fair settlement. *See* the Order at, *e.g.,* ¶¶ 3-5, 9, 11-13.

     d. That the MSA was negotiated and compromised "in a manner satisfactory to" the parties and that "the overall division of assets is essentially a fair division of assets." *See* the Order at, *e.g.*, ¶¶ 3 and 4.

     e. That:

[E]xcept in connection with the representations and warranties contained in this Stipulation, each party shall cause (a) each entity which she/he receives as a result of this Stipulation, (b) or received as a result of the prior Stipulations and Orders, (c) or which she/he has the right to ownership of, or (d) is the majority stockholder of, or (e) manages, directs or controls, directly or indirectly, to waive, and on behalf of that entity does hereby waive, fully and absolutely, any claim, right or demand that entity has, or may have against the other party based on conduct from the beginning of time until the date this formal stipulation is signed by her/him relating to, or based on any fact, circumstance, event or document signed by the other including, but not limited to, (a) breach of fiduciary duty, (b) breach of corporate or business opportunities, (c) any similar type of potential liability based on failure to act properly on behalf of said entity or (d) any document signed by said party. *See* the Order at ¶ 16 (emphasis in original).

     f. That:

[T]he Court finds that [Edra] has agreed to, and is ordered to, cause such waivers and releases in favor of [Timothy] to be executed by Yellowstone Development, LLC, Yellowstone Mountain Club, LLC, Big Sky Ridge, LLC . . . The Court finds and orders that the waivers in this section of the Order relate to any conduct for which a claim of any nature could be based against a released party, whether known or unknown as of the time of the signing of this Stipulation/MSA, which occurred prior to the signing of this Stipulation/MSA. *See* the Order at ¶¶ 17(E)-(F).

     g. That the parties had represented to the Court that the facts they recited in the MSA were true, and that they had read and understood *California Evidence Code* § 622, which states that the "facts recited in a written instrument are conclusively presumed to be true as between the parties thereto." *See* the Order at ¶ 7.

     h. That the parties agreed to waive their rights under *California Civil Code* § 1542, thus expressly waiving any defense that a claim was unknown to a party at the time of waiver. *See* the Order at ¶ 15(A).

12. On or around June 26, 2008, BGI and both Blixseths entered into an Assumption Agreement (the "Assumption Agreement"). A true and correct copy of that Assumption Agreement is attached to the Affidavit of Michael Flynn as Exhibit E.

13. Edra Blixseth testified that one of the properties she received in the MSA, Porcupine Creek, was worth at least $200MM when she received it. *See* the Deposition of Edra Blixseth, December 17, 2009, which is attached as Exhibit F to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment, at 372:20-373:81; *see also* Exhibit 2 to the Affidavit of Michael Flynn in Support of Motion for Sanctions for Intentional Spoliation of Electronic Evidence and for Evidentiary Hearing Thereon, Doc. 473-2, at its first page, which is a spreadsheet created by Edra's agents showing a value for Porcupine Creek as $207,590,000.

14. Edra also testified that the value of the Debtors at the time she received them was at least $500MM. *See* the Deposition of Edra Blixseth, December 17, 2009, which is attached as Exhibit F to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment, at 239:23-240:12; *see also* Exhibits 1 and 2 to the Affidavit of Michael Flynn in Support of Motion for Sanctions for Intentional Spoliation of Electronic Evidence and for Evidentiary Hearing Thereon, Doc. 473-2, at its first page, which are financial statements prepared by Edra and Jory Russell in July and August of 2008 showing a value for Debtors at $500MM and $900MM.

15. The divorce court rendered a final judgment on October 7, 2008. A true and correct copy of that final judgment is attached to the Affidavit of Michael Flynn as Exhibit G. That document specifically incorporated the terms of the MSA. *See id.* at ¶¶ 8-11.

16. Edra Blixseth was aware of, and took part in, discussions about the terms of the Credit Suisse loan, both before and after the transaction. *See* the Transcript of Proceedings in Adv. Pro. No. 09-00014, dated May 4, 2009 (*i.e.*, the trial transcript), at pp. 928:17-929:4, 930:23-931:14 (Edra testified that she was part of discussions about how to structure the loan and how to pay it back); pp. 932:11-25 (Edra testified that she was aware in 2005 or 2006 that some of the Credit Suisse money went to pay for Porcupine Creek). Moreover, she specifically knew of and assumed the obligation for all of the remaining Credit Suisse debt on the same day she executed the MSA. *See* the Assumption Agreement at Recital "D"; *see* ¶ 1 to Exhibit "B" of the Assumption Agreement, which specifically mentions the Credit Suisse loan; and Exhibit "C" of the Assumption Agreement in which Edra assumes the debts in Exhibits "A" and "B."

17. Moreover, Edra was familiar with other litigation of Debtors as well. For example, the payoff of the so-called "LeMond I" litigation was specifically made part of the MSA. MSA at ¶ 17. Moreover, in 2007, Greg LeMond threatened and commenced the so-called "LeMond II" case against BGI, a suit which was pending during the divorce proceedings. *See* Objection of Greg LeMond to Confirmation of Second Amended Joint Plan of Reorganization, Doc. No. 851 of the main bankruptcy matter (08-61570-RBK), at ¶¶ 6-7; *see generally* Greg LeMond's Third Amended Complaint, which is attached as an exhibit to that Objection, Doc. No. 851-1 of the main bankruptcy matter (08-61570-RBK). Edra knew of LeMond II prior to her execution of the MSA. *See* Exhibit 9 to the Affidavit of Michael Flynn in Support of Motion for Sanctions for Intentional Spoliation of Electronic Evidence and for Evidentiary Hearing Thereon, Doc. 473-2, which is an email from Edra in March of 2008 talking about the need to pay off the LeMond matter.

18. In addition, Edra clearly knew about threatened litigation between Cross Harbor Capital, LLC ("CHC") and BGI prior to the MSA, since she was communicating with CHC about that possible litigation at the time it was being threatened. *See* Exhibit 7 to the Affidavit of Michael Flynn in Support of Motion for Sanctions for Intentional Spoliation of Electronic Evidence and for Evidentiary Hearing Thereon, Doc. 473-2, which is an e-mail from Edra to a Jim Fultz about Sam Byrne from CHC threatening Timothy Blixseth with litigation.

19. Stephen Brown helped to represent Timothy Blixseth throughout the MSA process, again providing advice on Montana law. *See* the Transcript of Proceedings in Adv. Pro. No. 09-00014, dated May 6, 2009 (*i.e.*, the trial transcript), at pp. 1511:24-1513:17. Brown worked extensively on these divorce proceedings, billing 300 hours to Timothy Blixseth during the summer of 2008 alone. *See id.* at 1510:3-23. He provided assistance concerning the Release Agreement and the MSA and the amendments thereto, and was in charge of putting together and making sure that the final closing and the final MSA was executed with all of the schedules and exhibits. *Id.* at 1511:24- 1513:17. Brown charged Blixseth about $88,000 for his work regarding the MSA and divorce. *See id.* at 1510:3-23.

20. During that time, Brown testified that he never alerted Timothy Blixseth to any problems under Montana law concerning breaches of fiduciary duty, fraudulent transfer, or liability under an alter ego theory. *Id.* at 1511:24-1513:17.

21. Edra formally took control of Debtors in August of 2008. *See* this Court's "Memorandum of Decision" (Doc. No. 292), pp. 30-31.

22. On or about August 15, 2008, CHC loaned Edra $35MM. *See* the Affidavit of

Michael Flynn in Support of Motion for Sanctions for Intentional Spoliation of Electronic Evidence and for Evidentiary Hearing Thereon, Doc. 473, at ¶ 2, including the exhibits cited therein. This transaction was represented by two 48-day promissory notes secured by "Community" assets she received in the MSA, including "Porcupine Creek," and part of the Yellowstone Club. At the time of this loan, CHC knew Edra's financial situation intimately—specifically that she was not going to pay certain loans—and yet leant [sic] money to her anyway. *See id.* at ¶¶ 2-13, including the exhibits cited therein.

23. The e-mails between CHC, Edra, and their agents around the time of that loan make clear that the point of this loan, and others she entered into, was to enter into these loans without intent of repayment so as to gain Debtors without any liens. *Id.*

24. Debtors filed for bankruptcy on November 10, 2008. *See* each of the Voluntary Chapter 11 Petitions in each of the consolidated bankruptcy matters (08-61570-RBK; 08-61571-RBK; and 08- 61572-RBK) at their respective Doc. No. 1.

25. On or around March 3, 2009, the Committee filed a complaint against Credit Suisse which, without naming him officially as a party, effectively implicated Timothy Blixseth. *See generally* Doc. No. 1 in Adv. Pro. No. 09-00017.

26. On or around March 25, 2009, the Debtors filed a counterclaim against Credit Suisse. *See generally* Doc. No. 42.

27. On or around July 17, 2009, the Debtors and the Committee assigned their putative claims against Timothy Blixseth to the Liquidating Trust. *See* the Liquidating Trust's Motion for Party Substitution, Doc. No. 303, p. 2; *see generally* the Assignments of each Debtor attached thereto, which can be found at Doc. No. 303-1.

28. The assignments stated that they were drawn, governed, and construed under the law of the state of Montana. *See* the Assignments of each Debtor, Doc. No. 303-1, at each respective p. 4.

29. The assignments were made as part of a Liquidation Trust Agreement in which each of Debtors again agreed, as part of the Third Amended Joint Plan of Reorganization Proposed by the Debtors, to transfer their interests to the Liquidating Trust. *See* the Third Amended Joint Plan of Reorganization Proposed by the Debtors, Doc. No. 995 of the main bankruptcy matter (08-61570-RBK), at §§ 1.85, 8.6 and p. 50; the Form Liquidation Trust Agreement, Doc. No. 947-7 of the main bankruptcy matter (08-61570-RBK), § 1.2.

30. According to the Liquidating Trust Agreement, the Liquidating Trust was "organized for the purpose of holding and liquidating the Trust Claims and Trust Assets and distributing the proceeds thereof to the Beneficiaries." Form Liquidation Trust Agreement, Doc. No. 947-7 of the main bankruptcy matter (08-61570-RBK), § 1.2. The "Beneficiaries" are defined as the holders of allowed claims in Classes 3, 4, 8, 12, 13, and 14 of the Plan. *Id.* at § 2.2.

31. Class 8 is defined as those holding "Lender Deficiency Claims." *See* the Third Amended Joint Plan of Reorganization Proposed by the Debtors, Doc. No. 995 of the main bankruptcy matter (08-61570-RBK), at § 3.8. In concrete terms, however, the only holder of the "Lender Deficiency Claims" was and is Credit Suisse. *Compare* the Form Liquidation Trust Agreement, Doc. No. 947-7 of the main bankruptcy matter (08-61570-RBK), § 6.1 *with* the Yellowstone Club Settlement Term Sheet, Doc. No. 947-12 of the main bankruptcy matter (08-61570-RBK) generally, especially §§ 2(n) and 5(c).

32. Credit Suisse was given specific rights under the Liquidating Trust Agreement. In particular, it was granted four seats on a seven-member advisory board. *See* the Form Liquidation Trust Agreement, Doc. No. 947-7 of the main bankruptcy matter (08-61570-RBK), § 6.1; the Yellowstone Club Settlement Term Sheet, Doc. No. 947-12 of the main bankruptcy matter (08-61570-RBK), at §§ 2(n) and 5(c). Though nominally titled an "advisory board," this group has the final power to approve settlement of claims, authorize investments, and even remove the trustee, among other things. *See* Form Liquidation Trust Agreement, Doc. No. 947-7 of the main bankruptcy matter (08-61570-RBK), § 6. Most of these decisions are made by majority vote only.  *Id.*

33. Credit Suisse was placed on this "advisory board" by way of its execution of the Yellowstone Club Settlement Term Sheet. *See generally* Doc. No. 947-12 of the main bankruptcy matter (08-61570-RBK), especially §§ 2(n) and 5(c). As part of that agreement, Credit Suisse also gave up certain rights it previously had in the bankruptcy. *See generally id.*

34. This Yellowstone Club Settlement Term Sheet was signed about four days after this Court entered its "Partial & Interim ORDER." *Compare id. with* the Partial & Interim ORDER, Doc. No. 289. In that document, this Court found, among other things, that "Credit Suisse's actions in the case were so far overreaching and self-serving that they shocked the conscience of the Court" and that equitable subordination would be appropriate as a result. Partial & Interim ORDER, Doc. No. 289 at pp. 15-20.

35. On or around September 3, 2009, the Liquidating Trust moved to substitute itself in place of the Debtors and the Committee. *See* the Motion for Substitution,

13

Doc. No. 303. On or around September 18, 2009, this Court granted the Motion to Substitute. *See* Doc. No. 305.

36. On or around November 25, 2009, the Liquidating Trust filed a Motion to Leave to File an Amended Counterclaim in which the claims of (1) conversion, (2) violation of [MCA] § 35-8-604, (3) alter ego, and (4) unjust enrichment were formally raised for the first time against Timothy Blixseth. *See* Doc. No. 353 and 353-1 at ¶¶ 67-74, 89-95. Before that time, neither the Committee nor the Debtors had made these claims against him directly or indirectly. *See generally*, Debtors' Answer and Amended Complaint, Doc. No. 42, at ¶ 47; Committee's Complaint, Doc. No. 1 in Adv. Pro. No. 09-00017.

37. When BGI filed its taxes for the years ending December 31, 2005 and December 31, 2006, it reported the disputed $209MM as a loan. *See* the Transcript of Proceedings in Adv. Pro. No. 09-00014, dated May 6, 2009 (*i.e.*, the trial transcript), at pp. 1671:22-1674:18. The IRS audited BGI, examining the status of that loan.

38. In response, the IRS issued two letters which stated that "[o]ur recent examination of your returns for the above years shows no change is necessary in the information reported. We have accepted the returns as filed. This is the final notice you will receive regarding the examination." *See* the letters from the IRS, true and correct copies of which are collectively attached to the Affidavit of Michael Flynn in Support of Timothy Blixseth's Motion for Summary Judgment as Exhibit I.

39. In March of 2009, Edra Blixseth filed for personal bankruptcy under Chapter 11. *See* the Chapter 11 Voluntary Petition of Edra Blixseth, Doc. No. 1 in Matter No. 09-60452-RBK, which is also administered by this Court. At that time, Ms. Blixseth noted her interest in BGI (now BLX) that she received from Timothy Blixseth in the MSA. *See* Schedule B to Doc. No. 98 in Matter No. 09-60452-RBK. On May 29, 2009, this Court ordered that the case be converted to a Chapter 7 bankruptcy, and a trustee was appointed the same day. *See* Doc. Nos. 179 and 182 in Matter No. 09-60452-RBK.

40. In March of 2009, the Committee stated that Edra was a "majority owner of BGI and YCW. As such, she now controls BGI, YMC, YD and YCW." Committee's Complaint, Doc. No. 1 in Adv. Pro. No. 09-00017, at ¶ 34.

Blixseth's motion includes affidavits of his counsel Michael J. Flynn, and exhibits attached thereto.

14

The Trust filed its response in opposition to summary judgment (Dkt. 499), attached to which is its "Statement of Genuine Issues" setting forth the following 28 alleged genuine issues of fact:

1. Whether Blixseth breached a fiduciary duty to Debtors. Substantial evidence already presented in this trial shows[2] that Tim Blixseth breached his fiduciary duty by causing the Debtors to enter into the Credit Suisse loan transaction and taking hundreds of millions of dollars from the Debtors for his own personal use. Regardless of whether these transactions are characterized as "loans" or "distributions," the result is the same. The Debtors were rendered insolvent and could not pay their debts as they came due. See, e.g., Exp. Testimony of Mordy; Testimony of Moore; MEMORANDUM (dkt. #292), p. 29 (discussing cash flow insolvency).  Substantial evidence also shows that Blixseth breached his fiduciary duties by causing the Debtors to purchase substantial assets unrelated to the operations of the Yellowstone Club.

2. Whether Blixseth is an immediate or mediate transferee of property from the Debtors in one or more fraudulent transfers of money or assets at or about the time the Debtors received the Credit Suisse loan proceeds. Substantial evidence already presented shows that substantial amounts of the Debtors' assets went to Tim Blixseth. See, e.g., Testimony of T. Blixseth; MEMORANDUM (dkt. #292), p. 28 ("Roughly all of the $209 million proceeds that were transferred to BGI [from Debtors] were then disbursed to various personal accounts and payoffs benefitting Tim and Edra Blixseth personally."). At least another $70 million was used by Blixseth to purchase other assets for which the Debtors got no benefit.

3. Whether the Debtors were solvent at the time of the transfers of money to Blixseth under a balance sheet analysis or became insolvent as a result of the transaction. See, e.g., Exp. Testimony of Mordy; Testimony of Moore; MEMORANDUM (dkt. #292), pp. 28-29.

4. Whether the Debtors were able to pay their debts as they came due in the ordinary course of business, at the time of the transfers. See, e.g., Exp. Testimony of Mordy; Testimony of Moore; MEMORANDUM (dkt. #292), p. 29.

5. Whether the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors. See, e.g., Exp. Testimony of Mordy; Testimony of Moore; MEMORANDUM (dkt. #292), p. 29.

6. Whether the Debtors received reasonably equivalent value for the transfer of assets to Blixseth. Evidence already presented shows that the Debtors received nothing in exchange for these payments to Blixseth. "Blixseth testified that the Debtors had no interest in any of these accounts or payoffs" from the appropriated

---

[2]While the Court sets out the Trust's genuine issues as presented, much of it is clearly argument.

money. MEMORANDUM (dkt. #292), p. 28. Even under Blixseth's theory that the funds were merely "lent" from the Debtors to BGI and then again "lent" from BGI to himself personally, it is clear that the Debtors never intended to call upon these alleged demand notes. "The Debtors, under Blixseth's direction, never made demand of BGI on the demand notes, even when the Yellowstone Club needed cash." Id.

7. Whether Blixseth and BGI were alter egos of each other. See Potter Report (Ex. C).

8. Whether the Debtors released Blixseth from the claims in this case, pursuant to the Release (Ex. A and dkt. #181) executed in connection with the Marital Settlement Agreement ("MSA") on August 13, 2008. As an affirmative defense, Blixseth relies upon the Release, in which the Debtors purported to specifically release him from the claims at issue, including claims for breach of fiduciary duty. Substantial evidence shows that the release is invalid as being a fraudulent transfer. This is demonstrated, for example, by the fact that the Debtors filed bankruptcy barely two months after the Release was signed. See also Mordy Report (Ex. B); Potter Report (Ex. C); Edra Blixseth deposition testimony (Ex. D), Page 332 lines 7 through 18, Page 333 line 22 through Page 335 line 3, Page 336 lines 18 through 23.

9. Whether the Debtors received reasonably equivalent value for the Release. With respect to the Release, Blixseth's entire argument is that Edra Blixseth received equal assets in the MSA, as indicated by her various statements and recited representations. That allegation is immaterial to the claims of the Debtors against Blixseth. The Debtors were not parties to the Blixseth divorce litigation, much less represented by independent counsel. Yet, Blixseth and Edra Blixseth caused the Debtors to give Blixseth the Release of claims worth hundreds of millions of dollars, without any consideration much less reasonable equivalent value. See Potter Report (Ex. C); Edra Blixseth deposition testimony (Ex. D), Page 341 line 10 through page 343 line 18.

10. Whether the Debtors were insolvent when the Release was given to Blixseth on August 13, 2008. The Debtors filed bankruptcy on November 10, 2008, with less than $35,000 cash in their collective bank accounts. See Consolidated Cases, Sched. B for YMC, YD, YCC, and BSR. This fact alone is sufficient evidence to establish that the Debtors were insolvent just three months earlier when the MSA was finalized, in view of the substantial operating costs of the Club. Further, the evidence already produced at trial establishes that the Debtors were insolvent in August of 2008. See Exp. Testimony of Mordy; Testimony of Moore; Mordy Expert Report. (Ex. B).

11. Whether the Debtors were unable to pay their debts as they came due in the ordinary course of business when the Release was given to Blixseth on August 13, 2008. See Consolidated Cases, Sched. B for YMC, YD, YCC, and BSR. This fact alone is sufficient evidence to establish that the Debtors were unable to pay their debts as they came due just three months earlier when the MSA was finalized, in view of the substantial operating costs of the Club. Further, the evidence already produced at trial establishes that the Debtors could not pay their debts as they came due in August of 2008. See Exp. Testimony of Mordy; Testimony of Moore;

16

Testimony of Byrne; Mordy Expert Report (Ex. B); Edra Blixseth deposition testimony (Ex. D), Page 332 lines 7 through 18, Page 333 line 22 through Page 335 line 3, Page 336 lines 18 through 23.

12. Whether the Debtors were adequately capitalized when the Release was given to Blixseth on August 13, 2008. See Consolidated Cases, Sched. B for YMC, YD, YCC, and BSR. This fact alone is sufficient evidence to establish that the Debtors were unable to pay their debts as they came due just three months earlier when the MSA was finalized, in view of the substantial operating costs of the Club. Further, the evidence already produced at trial establishes that the Debtors could not pay their debts as they came due in August of 2008. See Exp. Testimony of Mordy; Testimony of Moore; Mordy Expert Report. (Ex. B).

13. Whether the Debtors are bound by the order and judgment entered in the Riverside County, California Superior Court approving the Release. The Stipulated California Court Order is not binding on the Debtors or the Trust because neither were parties to the divorce proceeding. The Release is a fraudulent transfer. It was made while the Debtors were insolvent from a balance sheet standpoint, a cash flow standpoint, and an adequate capital standpoint. Further, the Debtors did not receive reasonably equivalent value in return. See Exp. Testimony of Mordy; Testimony of Moore; Mordy Expert Report. (Ex. B); Potter Report (Ex. C); Edra Blixseth deposition testimony (Ex. D), Page 332 lines 7 through 18, Page 333 line 22 through Page 335 line 3, Page 336 lines 18 through 23.

14. Whether the Debtors are estopped from contesting the validity of the Release even though the Debtors were not parties to the Blixseth divorce that gave rise to the Release. The Debtors were not parties to the Blixseth divorce and were not represented by independent counsel. Furthermore, the Release is a fraudulent transfer. It was made while the Debtors were insolvent from a balance sheet standpoint, a cash flow standpoint, and an adequate capital standpoint. Further, the Debtors did not receive reasonably equivalent value in return. See Exp. Testimony of Mordy; Testimony of Moore; Testimony of Byrne; Mordy Expert Report. (Ex. B); Potter Report (Ex. C); Edra Blixseth deposition testimony (Ex. D), Page 332 lines 7 through 18, Page 333 line 22 through Page 335 line 3, Page 336 lines 18 through 23.

15. Whether the Trust has to establish collusion between Tim and Edra Blixseth in order [to] set aside the Release. As set forth by the relevant case law cited by the Trust in its Opposition to the MSJ, the Trust may attack the Release as a fraudulent transfer irrespective on any collusion by Tim and Edra Blixseth.

16. Whether the claims against Blixseth for breach of fiduciary duty, conversion, and violation of § 35-8-604 are barred by the applicable statute of limitations. Under the discovery doctrine, the Debtors' claims against Blixseth did not accrue until they were discovered.  Blixseth concealed the transfers of assets from the Debtors. For example, even though the Credit Suisse loan closed on September 30, 2005, Blixseth did not document the subsequent transfer of assets to himself until May of 2006, which is within three years of the filing of the Debtors' bankruptcy cases. Additionally, there were separate transfers of $70 million in April/May 2006, for which there is no limitations argument as it relates to the

17

breach of fiduciary duty claims.

17. Whether the statute of limitations is tolled under the doctrine of adverse domination, because Blixseth controlled the Debtors at the time of the transferred assets. Blixseth controlled the Debtors from the time the Credit Suisse loan was made until the MSA was finalized in August of 2008. (Memorandum Dkt. # 292). As a matter of law, Blixseth's control of the Debtors tolls the limitations period of claims the Debtors had against him, because it would be unreasonable to expect that Blixseth would sue himself for breach of fiduciary duty, particularly given that the Debtors would not even make a demand for payment on notes due from other Blixseth-controlled entities, namely BGI. Additionally, there were separate transfers of $70 million in April/May 2006, for which there is no limitations argument as it relates to the breach of fiduciary duty claims.

18. Whether the Trust lacks standing to prosecute claims against Blixseth. The Trust is the assignee of the Debtors' claims against Blixseth, pursuant to the Plan. (dkt. #995, § 1.117, confirmed at dkt. #1026). The Plan provided for the disposition of the assets of the Debtors in two major components. First, the "Project" (dkt. #995, § 1.104) was to be transferred to the "Reorganized Debtors" (dkt. #995, § 1.107) on the "Effective Date" (dkt. #995, § 1.51). Second, the non-Project Assets, including "Transferred Actions" (dkt. #995, § 1.117), were to be transferred by the Debtors on the Effective Date (dkt. #995, § 6.14.2) to the "Liquidation Trust" (dkt. #995, § 1.85) created under the terms of the Plan (dkt. #995, § 6.14) and organized pursuant to a trust agreement in substantially the form set forth in Schedule 1.85.

19. Whether the assignment of the Debtors' claims to the Trust are valid under the Confirmed Plan of Reorganization. The transfers of both Project and non-Project Assets were accomplished in a transaction that closed July 17, 2009, which date was designated the Effective Date of the Plan according to its terms. See Kirschner Dec. (Ex. F). The Trust Agreement of the Yellowstone Club Liquidating Trust was settled on the Effective Date as well. The Trustee was appointed by a 6-1 vote of the Trust Advisory Board on June 17, 2009. See id. The Trust Agreement recites on page 1 the following purposes:

  1. Receive and hold in trust the Trust Assets and Trust Claims that are transferred to the Trust pursuant to the Plan and the Confirmation Order by the Reorganized Estates solely of the benefit of the Beneficiaries;

  2. Liquidate the Trust Assets and collect or compromise the Trust Claims on behalf of the Beneficiaries; and

  3. Administer the Trust and distribute to the Beneficiaries the Net Trust Recoveries in accordance with this Trust Agreement.

Section 1.1 states that the Trust is organized for "the purposes of holding and liquidating Trust Claims and Trust Assets." The Trustee has all the "rights, powers, and duties … that are necessary and proper to fulfill the purposes of the Trust" pursuant to Section 5.3.1 of the Trust Agreement. His duties include prosecution of "all suits as may be necessary, appropriate or incident to the

18

purposes of the Trust" as set forth in Section 5.3.2.4.

20. Whether the Trust is controlled by Credit Suisse. Contrary to Blixseth's assertions (SUF ¶32), Credit Suisse was merely the agent for the loan transaction. The vast majority of prepetition lender claims were never held by Credit Suisse. None of the Trust's board members are employed by Credit Suisse. The Trust Board acts only in an advisory role with respect to most litigation. The trustee is charged with managing litigation, including this litigation, and subject only to his business judgment and fiduciary duties as trustee. The Trustee, Marc Kirschner, is a well-known and respected retired New York bankruptcy and restructuring lawyer with more than 30 years of experience. He serves as trustee in cases of national importance, including In re Refco, Inc., Case No. 05-60006, in the Southern District of New York and In re LeNature's, Inc., Case No. 06-25454, in the Western District of Pennsylvania. The Court is familiar with his background from his testimony in this case as is Blixseth as a result of his extensive, recent deposition of the Trustee in this adversary proceeding. The Trustee operates independently of all creditors in all matters except those for which Board approval is required. See Kirschner Dec. (Ex. F).

21. Whether the organization and alleged control of the Trust Board prevents the Trust from pursuing the Debtors' claims against Blixseth. The Trust Board has little control over the affairs of the Trust. The Board may approve the settlement of claims by a simple majority but settlement of "Designated Claims" requires an affirmative vote of five members of the Board. See Kirschner Dec. (Ex. F). The termination and replacement of the Trustee and engagement of counsel each require the unanimous consent of the Board. Id. In all other matters the Trustee consults the Board but operates the affairs of the Trust, including prosecution of claims, in his discretion subject to the duties inherent in any fiduciary. Id.

22. Whether the Trust's claims against Blixseth are barred by the alleged wrongful acts of others. Blixseth's in pari delicto defense presupposes that the Trust succeeds to personal claims of the individuals, such as Edra Blixseth. No evidence supports Blixseth's claim. The Trust was formed by the Plan and succeeds to the interests only of the Debtors. (dkt. #995.) No actions by Edra Blixseth would provide a defense to Blixseth to the Trust's claims. Furthermore, in pari delicto is not relevant or applicable in a lawsuit by the successor to a company against a former principal.

23. Whether Edra Blixseth has the authority to assign her claims to the Trust, pursuant to the Plan. The transfer and trust documents were drafted by the parties and circulated for signature prior to, or during the week of July 13, 2009. The Trustee executed documents in New York on the 14th and had them delivered to Montana by overnight delivery. See Kirschner Dec. (Ex. F). To the best knowledge of Mr. Kirschner, Edra Blixseth executed each of the transfer and trust documents, including that certain Assignment and Assumption Agreement, in Bozeman, Montana, as of July 17, 2009. Id. She signed in her capacity as manager/president of the BLX Group, Inc., the Manager of each of the Debtor limited liability companies. Id. The Assignment and Assumption Agreement includes the assignment of the Transferred Claims to the Trust. Id. The parties declared the transaction "closed" on July 17, 2009. Despite the fact that Edra Blixseth had filed personal bankruptcy, at the time that she executed these

19

assignments she had full authority to execute the assignments on behalf of the Debtors. In any event, there is no evidence to the contrary.

24. Whether the Trust "stepped into the shoes of Edra" Blixseth and is barred from pursuing this litigation based on Edra's alleged actions. (Blixseth MSJ. at 13.) Under the Plan, the Trust was assigned all of the Debtors' Non-Project Assets, including litigation claims against Blixseth. Edra Blixseth has filed her own bankruptcy (Bankr. Mont. case no. 09-60452), and Richard Samson is appointed her Chapter 7 Trustee. Nothing suggests that the Trust "stepped into the shoes of Edra". If anything, Mr. Samson holds the legal rights that Edra Blixseth had prepetition, but not the Trust. Likewise, the Trust is not bound by the statements or actions of Edra Blixseth.

25. Whether the Trust's claims against Blixseth fail because Blixseth relied on the advice of counsel, namely Stephen Brown. A genuine issue of disputed material fact prevents Blixseth from being exonerated by Stephen Brown's alleged advice. Blixseth did not provide a full disclosure of the relevant facts to Mr. Brown, nor did he rely in good faith on a specific course of conduct recommended by Mr. Brown, either as to the propriety of entering into the Credit Suisse loan or as to the use of the loan proceeds. Mr. Brown testified that he did not believe he was offering Blixseth any opinion as to the use of the loan proceeds. Without such specific advice, Blixseth's advice-of-counsel defense fails. Further, Mr. Brown's opinion letter did not expressly state that Blixseth complied with his fiduciary duties or with fraudulent transfer law. Without these specific provisions, Blixseth's advice-of-counsel defense fails. See Brown trial testimony (Ex. E), Page 95 line 12 through Page 96 line 4, Page 100 line 7 through Page 104 line 11.

26. Whether the Trust must prove that the payments from the Debtors to Tim Blixseth were distributions rather than loans. (Blixseth Br. at 26.) Blixseth argues that he cannot be liable to the Trust because he received the money as loans and not distributions. The distinction is immaterial. Regardless of whether the money was distributed or lent to Blixseth, it still left the Debtors and rendered them insolvent. See Exp. Testimony of Mordy; Testimony of Moore; Testimony of Byrne; Mordy Expert Report (Ex. B); Edra Blixseth deposition testimony (Ex. D), Page 332 lines 7 through 18, Page 333 line 22 through Page 335 line 3, Page 336 lines 18 through 23.. This is a breach of Blixseth's fiduciary duties to the Debtors, regardless of how he characterized the transactions.

27. Whether the alleged conspiracy between Sam Byrne of Cross Harbor Capital Partners and Edra Blixseth prevents the Trust from pursuing the Debtors' claims against Blixseth. None of Blixseth's conspiracy allegations involve the Trust or suggest any wrongdoing in anyway by the trustee. Even taken as true, the alleged Edra-Byrne conspiracy would not provide a defense to the Trust's claims against Blixseth.

28. Whether the undisputed facts identified by Blixseth are sufficient to entitle him to summary judgment.

## DISCUSSION

20

Blixseth's brief makes several arguments in support of his Motion for Summary Judgment, which the Court addresses as follows.

**A.  Standing.**

Blixseth argues that the Trust lacks standing to bring the Debtors' claims because the assignment of the claims are void as a matter of law, as tort claims are not assignable under Montana law.  The Trust responds that it stands in the Debtors' shoes under Bankruptcy Code § 1123(b)(3)(B) as a representative of the estate appointed for the purpose of retention and enforcement of any claim or interest belonging to the Debtors or to the estate under the confirmed Chapter 11 Plan. The Trust cites provisions of the confirmed Plan which transferred non-Project Assets to the Trust, which under its Trust Agreement authorizes it to hold and liquidate Trust Claims, including prosecution of all suits as may be necessary.

The Trust argues that, by contesting the validity of the assignment of causes of action to the Trust, Blixseth is inappropriately contesting the validity of the Plan, citing *In re Sherman*, 491 F.3d 948, 967 (9th Cir. 2007) (a timely filing of a notice of appeal typically divests a bankruptcy court of jurisdiction over those aspects of the case involved in the appeal, [but] the bankruptcy court retains jurisdiction over all other matters that it must undertake to implement or enforce the judgment or order, although it may not alter or expand upon the judgment).  Based upon the authority granted the Trust under the confirmed Plan and § 1123(b)(3)(B), the Court declines to grant Blixseth summary judgment based upon state law barring assignment of tort claims.

Next Blixseth argues that, because Credit Suisse controls the Trust and is a named

beneficiary of the Trust, it is *in pari delicto* with Blixseth for the predatory loans and cannot recover from Blixseth under principles of equity because it has unclean hands.  The Trust denies that Credit Suisse controls the Trust, and cites the Trustee's discretion and makeup of the Trust Advisory Board according to the Trustee's Declaration, Ex. F attached to Dkt. 499.

As noted above, when determining whether a genuine issue of material fact remains for trial, this Court must view the evidence and all inferences therefrom in the light most favorable to the non-moving party, the Trust, and may not weigh the evidence or make credibility determinations.  *Hauk*, 552 F.3d at 1117-18, citing *Liberty Lobby*, 477 U.S. at 255. Therefore the Court finds that Blixseth failed his burden to show absence of a genuine issue of material fact regarding whether or not Credit Suisse controls the Trust[3], even though Credit Suisse, as Prepetition Agent, may have originally named persons to the Liquidating Trusts.

Next Blixseth argues that Edra lost her legal capacity to assign Debtors' claims to the Liquidating Trust when she signed the assignment because her personal case had converted to Chapter 7 and that case trustee controlled her interest in the Debtors.  The Trust responds that Blixseth attempts to collaterally attack the confirmed Plan which mandated the assignment of the claims, and that Blixseth failed his burden under Rule 56 of establishing that Edra did not have authority to execute the assignments of the Debtors.  The record does not include any statement by Edra's Chapter 7 trustee one way or the other regarding her authority to sign.  The Court therefore finds that Blixseth failed to satisfy his burden of showing that no genuine issue of material fact exists as to whether Edra was authorized to execute the transfer and trust documents.

---

[3]  With that finding the Court need not decide whether *in pari delicto* applies.

**B. Blixseths' Divorce.**

Blixseth argues that his divorce from Edra resulted in the MSA which contained "unambiguous waivers" of all of Debtor's claims, which "eviscerate the Liquidating Trust's ability to sue" because the Liquidating Trust is bound by the MSA and has no greater rights than those given it by the Debtors.  The Trust responds by citing paragraph 10(a) of the "Mutual Waiver and Release Agreement" between Edra and Blixseth, attached to Dkt. 499 as Ex. A, which provides that California law governs.  The Trust cites *Mejia v. Reed*, 31 Cal.4th 657, 3 Cal.Rptr.3d 390, 74 P.3d 166, 174 (Cal. 2003) and *In re Beverly*, 374 B.R. 221 (9th Cir. BAP 2007), *aff'd in part dismissed in part*, 551 F.3d 1092[4] (9th Cir. 2008).

*Mejia* noted that it is well settled California law that a transfer accomplished through an MSA in a divorce can be avoided as a fraudulent transfer pursuant to the UFTA.  *Mejia,* 74 P.3d at 173-74; *Beverly*, 374 B.R. at 233, 234.  Specifically the California Supreme Court noted its expectation that a bankruptcy trustee could "set aside the property division of a dissolution judgment on the ground of fraud."  *Beverly*, 374 B.R. at 234, quoting *Mejia*, 74 P.3d at 174.  In this Court's view *Mejia* and *Beverly* are dispositive and require denial of Blixseth's Motion for Summary Judgment based upon the agreements, waivers, releases, and orders in the divorce.

Next Blixseth argues that the Trust is barred under the doctrine of judicial estoppel because of what Edra knew of the loans from Credit Suisse to the Debtors when she entered into the MSA with Blixseth, she succeeded in her position by getting the releases approved but now the Trust, which stepped into Edra's shoes, is seeking relief inconsistent with her original

---

[4]The Ninth Circuit wrote: "[W]e . . . adopt as our own the well-reasoned BAP opinion, *In re Beverly*, 374 B.R. 221."

position, and her waivers misled Blixseth so that allowing the Trust to change its position would injuriously affect Blixseth by loss of his negotiated bargain with Edra by exposing him to liability for damages which Edra waived.  Because the MSA is interpreted according to California law and the UFTA under *Beverly* and *Mejia*, *supra*, the Court will not grant Blixseth summary judgment based upon judicial estoppel[5].

Next Blixseth argues that the Trust's claims against Blixseth for breach of fiduciary duty and fraudulent transfer are contrary to the divorce court's judgment, and this Court does not have subject matter jurisdiction to overturn the state court's judgment, under the doctrine stated in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (the "*Rooker-Feldman* doctrine").  The *Rooker-Feldman* doctrine states that a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court.

The Ninth Circuit explained the *Rooker-Feldman* doctrine as follows:

> In its routine application, the *Rooker-Feldman* doctrine is exceedingly easy.  A party disappointed by a decision of a state court may seek reversal of that decision by appealing to a higher state court.  A party disappointed by a decision of the highest state court in which a decision may be had may seek reversal of that decision by appealing to the United States Supreme Court.  In neither case may the disappointed party appeal to a federal district court, even if a federal question is present or if there is a diversity of citizenship between the parties.  *Rooker-Feldman* becomes difficult – and, in practical reality, only comes into play as a contested issue – when a disappointed party seeks to take not a formal direct appeal, but rather its de facto equivalent, to a federal district court.

*Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir. 2003).

---

[5]The maxim of equity "[p]arties must not expect relief in equity, unless they come into court with clean hands" cuts both ways.

The Ninth Circuit explained that the *Rooker-Feldman* doctrine is a statute-based doctrine

based on negative inferences of relevant statutes, the modern day successors to which are 28

U.S.C. §§ 1331, 1332, and 28 U.S.C. 1257.  *Id.*, 341 F.3d at 1154-55.  However:

> Under the modern statutory structure, the principle that there should be no
> appellate review of state court judgments by federal trial courts has two
> particularly notable statutory exceptions:  First, a federal district court has original
> jurisdiction to entertain petitions for habeas corpus brought by state prisoners who
> claim that the state court has made an error of federal law.  28 U.S.C. § 2254.
> Second, a federal bankruptcy court has original jurisdiction under which it is
> "empowered to avoid state judgments, *see, e.g.*, 11 U.S.C. §§ 544, 547, 548, 549;
> to modify them, *see, e.g.*, 11 U.S.C. §§ 1129, 1325; and to discharge them, *see,
> e.g.*, 11 U.S.C. §§ 727, 1141, 1328." [*In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir.
> 2000) (en banc)].

*Noel v. Hall*, 341 F.3d at 1155.

Since the Trust is seeking to set aside fraudulent transfers under §§ 544 and 548, the

*Rooker-Feldman* doctrine is not applicable because of the second statutory exception under

controlling Ninth Circuit authority.  *Id.*

Next Blixseth argues that the Liquidating Trust's claims are barred by the doctrine of

issue preclusion which precludes relitigation of issues argued in prior proceedings.

> Under California law, collateral estoppel only applies if certain threshold
> requirements are met: First, the issue sought to be precluded from relitigation
> must be identical to that decided in a former proceeding. Second, this issue must
> have been actually litigated in the former proceeding. Third, it must have been
> necessarily decided in the former proceeding. Fourth, the decision in the former
> proceeding must be final and on the merits. Finally, the party against whom
> preclusion is sought must be the same as, or in privity with, the party to the former
> proceeding.'

*In re Sasson*, 424 F.3d 864, 872 n.4 (9th Cir. 2005), quoting *Cal-Micro v. Cantrell, (In re

Cantrell)*, 329 F.3d 1119, 1123 (9th Cir. 2003) and *Harmon v. Kobrin (In re Harmon)*, 250 F.3d

1240, 1245 (9th Cir. 2001).  Blixseth argues that all the elements for issue preclusion are met

25

because Edra and Debtors released Blixseth, a stipulated judgment is a judgment on the merits, the negotiated waivers and releases were actually litigated, the issue sought to be precluded is the waiver during the divorce proceedings which Blixseth argues are identical to the issues in the divorce, and the issues were necessarily decided in the divorce.

The Trust opposes issue preclusion, arguing that the Debtors and the Trust were not a party to the divorce proceeding, and were not in privity with Edra because the Trust stands in the shoes of the Debtors.  The Court agrees that the Trust's fraudulent transfer claims under the Bankruptcy Code were not and could not have been actually litigated or decided in the divorce court.  Based on the clear holdings of *Noel*, *Beverly* and *Mejia*, *supra*, the Court declines to grant Blixseth summary judgment dismissing any of the Trust's claims on the basis of issue preclusion.

Next Blixseth argues that the releases and waivers approved by the divorce court constitute reasonable value for purposes of § 548, as a matter of law, citing *Batlan v. Bledsoe (In re Bledsoe)*, 569 F.3d 1106,1112 (9th Cir. 2009), and therefore the Trust's affirmative defense stating the MSA constitutes a fraudulent transfer must be dismissed.  The Trust distinguishes *Bledsoe* as based on Oregon law rather than California law as applied in *Beverly* and *Mejia*.

In footnote 2, the Ninth Circuit in *Bledsoe* notes that transfers under a MSA may raise different issues and the court did not decide whether *Greeninger v. Cromwell*, 140 Or. App. 241, 915 P.2d 489 (1996) applied to a MSA.  The Court further notes that the Ninth Circuit in *Bledsoe* held that "a state court's dissolution judgment, following a regularly conducted contested proceeding, conclusively establishes 'reasonably equivalent value" for the purpose of § 548, in the absence of actual fraud." *Bledsoe*, 569 F.3d at 1112.  In addition, *Bledsoe* agreed with the Fifth Circuit's decision *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 212-13 (5th Cir. 2003)

26

that limited its holding to cases in which the state divorce proceeding "was fully litigated, without any suggestion of collusion, sandbagging, or indeed any irregularity." *Bledsoe*, 569 F.3d at 1112, 1113.  In the instant contested summary judgment matter, this Court finds that Blixseth failed his burden to show that his divorce satisfied the requirement of *Erlewine* in that the divorce was "fully litigated, without any suggestion of collusion, sandbagging, or . . . any irregularity." *Id.*  Therefore, the Court finds that Blixseth failed his burden to show the releases and waivers approved by the divorce court constitute reasonable value for purposes of § 548 as a matter of law.

Next Blixseth argues that no evidence exists that he and Edra colluded to defraud creditors, and thus this Court cannot set aside the waivers and releases.  This argument misstates the burden under summary judgment, which is on Blixseth.  Whether actual intent to hinder, delay or defraud exists under the UFTA is a question of fact.  *Beverly*, 374 B.R. at 235. Viewing the evidence and inferences that can be drawn therefrom in the light most favorable to the Trust, the Court finds that genuine issues of material fact exist regarding whether Edra and Blixseth colluded with fraudulent intent.  *See, e.g., ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 58 (9th Cir. 1975).

**C. Debtors' Unclean Hands.**

Blixseth argues that Debtors' unclean hands barring the Trust's recovery, first because Montana's Uniform Fraudulent Transfer Act ("MUFTA") only conveys remedies on creditors and not on Edra.  Since Edra assigned her claims to the Trust, Blixseth argues, the Trust has no remedy under the MUFTA.  The Trust responds that the Debtors are creditors of Blixseth by virtue of their claims for breach of fiduciary duty, that they validly transferred their claims to the

27

Trust, and the Trust can set aside fraudulent transfers under the MUFTA and bankruptcy provisions.  Blixseth in his reply contends that Edra had no ability under the Plan to make the assignments.  The Court finds that Blixseth failed to satisfy his burden for summary judgment that no genuine issue of material fact exists regarding Edra's capacity or authority to make the assignments, and therefore denies summary judgment on that ground.

Next Blixseth argues that Edra's representations in the divorce proceedings were false when made, and she reneged on her promises to repay Creditor and breached her agreed waivers to Blixseth, so never intended to repay the loans and therefore Edra and Debtors have unclean hands, or alternatively committed fraud on the divorce court and dismissal of the Liquidating Trust's claims are appropriate.  The Trust responds that Edra's unclean hands do not bar its recovery because it is not a successor in interest to Edra and is not bound by her actions.  The Court finds that, on the issue of unclean hands, there remains a genuine issue of material fact with respect to Edra and Blixseth, and that issue remains for trial.

### D.  Stephen Brown's Opinion Letter.

Blixseth argues that the Liquidating Trust's claim for breach of fiduciary duty is barred because he sought and received advice of counsel in the form of Stephen Brown's opinion on the overall legality of the Credit Suisse transaction under Montana law.  Blixseth argues that the proceeds from the credit agreements plainly were part and parcel of the transactions on which Brown gave his opinion, and that attorney Michael Doyle testified that he also advised Blixseth that the loan was not in violation of the law.  Since Credit Suisse and its attorneys also approved the loan and represented that it conformed to all laws, and sold the loan to Blixseth, he contends that he was never advised of illegality or potential fiduciary breaches and the Liquidating Trust's

28

claim for breach of fiduciary duty must be dismissed.

The Trust responds that *United States v. Ibarra Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987), requires a party to show that he made full disclosure to an attorney of all material facts, and that he relied in good faith on a specific course of conduct recommended by an attorney. Blixseth addressed other cases cited by the Trust in his reply, but did not address *Ibarra*. Blixseth argues that few laymen would even know how to ask such a legally specific question. On this issue, the Court finds that Blixseth failed to satisfy his burden for summary judgment to show absence of genuine issue of material fact to dismiss the breach of fiduciary duty claim on the basis of advice of counsel Stephen Brown.

### E.  Statutes of Limitation.

Blixseth argues that the claim for breach of fiduciary duty is barred by the 3 year statute of limitations under MCA § 27-2-204(1), and that the statute of limitations for conversion and for violation of MCA § 35-8-604 ("Distributions") is 2 years provided at MCA § 27-2-207. Blixseth contends that the claims for breach of fiduciary duty accrued on September 30, 2005, when the Credit Suisse loan was funded and secured interests were created, and that any claims for conversion or violation of § 35-8-604 arose at the same time.  Blixseth argues the statutes of limitations bar the Liquidating Trust's claims because they were not filed until 2009.

The Trust opposes summary judgment based on the statutes of limitation, based on tolling doctrines and 11 U.S.C. § 108(a) which extends a period to the later of the end of the period, or 2 years after the order for relief.  The Trust argues that none of the Trust's claims accrued under

MCA § 27-2-102(3)[6] because Blixseth's actions were concealed and not documented until May 2006 when Blixseth drafted a 2–page unsecured promissory note, which was then backdated. The Trust further cites the doctrine of adverse domination which tolls a statute of limitations on an action against director/officer misconduct so long as a majority of the board is controlled by the alleged wrongdoers. Blixseth replies arguing facts about whether Debtors' members who were not controlled by Blixseth knew of misconduct, and that the 2 year limit at § 35-8-605(4) is a statute of repose and the discovery rule is irrelevant. Having reviewed the record the Court finds that genuine issues of material fact exist regarding whether the statutes of limitations should be tolled based on § 27-2-102(3) or under the doctrine of adverse domination[7], and that Blixseth failed his burden for summary judgment based on statutes of limitation.

**F. Internal Revenue Service Determination of Loan not a Distribution.**

Blixseth argues that all of the Liquidating Trust's claims rely on the proposition that the

---

[6]Section 27-2-102(3) provides: "The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts constituting the claim are by their nature concealed or self-concealing; or (b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause."

[7] U.S. Senior District Judge Battin, in *U.S. v. First Nat. Bank & Trust of Wibaux, Montana*, 1994 WL 775440 *6 (D. Mont. Sept. 8, 1994), concluded that the Montana Supreme Court would adopt the doctrine of adverse domination. ("This Court believes that the Montana Supreme Court, faced with a situation where an alleged wrongdoer controlled a corporation and thereby prevented the corporation from timely asserting its claims against the wrongdoer, would adopt the doctrine of adverse domination."). Given Judge Battin's analysis, and the apparent lack of any other Montana Supreme Court decision on the doctrine, this Court concludes that the doctrine is applicable in Montana and declines to follow the decision of *In re Marvel Entertainment Group, Inc.*, 273 B.R. 58 (D. Del. 2002) that declined to recognize adverse domination given Delaware's tolling mechanisms in combination with the availability of shareholder derivative actions.

$209 million in question was a distribution not a loan, but that the IRS has taken the position that the transaction in question was a true loan and not a distribution. Blixseth recognizes that the IRS determination is not binding on this Court, but argues that it should be considered an instructive tool and accorded some weight and force in aiding the Court to conclude that BGI and Blixseth took a loan rather than a distribution when considering the factors in *Welch v. Commissioner of Internal Revenue*, 204 F.3d 1228, 1230-31 (9th Cir. 2000). The Trust argues that whether the transfer is determined a loan or distribution is not dispositive, because if it is a loan it will show through expert testimony at trial that the loan could not and never was intended to be paid, and if a distribution there was no reasonably equivalent value, so either way the Trust will establish that Blixseth breached his fiduciary duties. This inquiry involves a factual question.

As noted above, when determining whether a genuine issue of material fact remains for trial, this Court must view the evidence and all inferences therefrom in the light most favorable to the non-moving party, the Trust, and may not weigh the evidence or make credibility determinations. *Hauk*, 552 F.3d at 1117-18, citing *Liberty Lobby*, 477 U.S. at 255. The question whether the $209 Million transaction was a loan or distribution remains a genuine issue of material fact for trial, and is not appropriate for summary judgment.

Having addressed each of Blixseth's contentions and the Trust's response, the Court concludes that Blixseth failed his burden to show that no genuine issues of material fact exist. Blixseth's Motion for Summary Judgment is denied. The Court will issue a separate order as follows:

**IT IS ORDERED** Blixseth's Motion for Summary Judgment filed on January 22, 2010

(Dkt. 486) is denied.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana