## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>　　　　　　Debtor. | Case No.  **08-61570-11** |
| **TIMOTHY L BLIXSETH,**<br><br>　　　　　　Plaintiff.<br><br>-vs-<br><br>**MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,**<br><br>　　　　　　Defendant. | Adv No.  **09-00014** |

## *MEMORANDUM of DECISION*

At Butte in said District this 16th day of August, 2010.

### INTRODUCTION

Rule 9017, F.R.B.P., provides that the Federal Rules of Evidence apply in cases under the

Bankruptcy Code.  It is a commonly-accepted practice to take "judicial notice" of a court's

records.  *See* 3 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶¶ 201 [03] at 201-35 to -40

(1992).  The practice is particularly useful in bankruptcy litigation in which individual adversary

1

proceedings and contested matters, each of which is procedurally distinct and has its own record, all occur within, and are affected by, the context of the parent bankruptcy case.  *See id.*  For the reasons discussed above, this Court takes judicial notice of the proceedings in the related bankruptcy cases and adversary proceedings discussed in this Memorandum of Decision for the purpose of providing additional background regarding the nature of the dispute and the relationship of the parties.

Timothy L. Blixseth ("Blixseth"), the plaintiff-in-intervention and the now captioned Plaintiff in this matter, and his former spouse, Edra Blixseth ("Edra"), were the founders of Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC.  The four aforementioned limited liability companies comprise the Yellowstone Club and will be referred to generally as the Debtors or the Yellowstone Club entities.  Through the Yellowstone Club entities, Blixseth and Edra began development in the late 1990's of the Yellowstone Club on land that Blixseth acquired through various transactions.  The parties maintain that the Yellowstone Club is the world's only private ski and golf community.  The Yellowstone Club is a members only master-planned unit development, situated on 13,500 acres of private land in Madison County near Big Sky, Montana.  At its conclusion, the Blixseths contemplated that the Yellowstone Club would consist of roughly 864 dwelling units situated in seven planned residential areas or neighborhoods.

Members join the Yellowstone Club because of its amenities, including the Warren Miller Lodge, 17 ski runs, equestrian center, Tom Weiskopf 18-hole golf course, kids' facilities

and other various amenities such as food and retail shops.[1]  The Blixseths anticipated that the Yellowstone Club would eventually have in the neighborhood of 900 members.  As of the Debtors' petition date, the Yellowstone Club had roughly 340 members.  To get the Yellowstone Club off the ground, Blixseth sold equity interests in the Yellowstone Club to various persons who were referred to as Pioneer and Frontier Members.  The 25 Pioneer and 15 Frontier Members were permitted to purchase their lots at the Yellowstone Club and their Yellowstone Club memberships at substantially reduced prices.

YMC was formed on November 7, 1997, and is primarily engaged in operating the Yellowstone Club.  YD was formed on June 10, 1999, and is engaged primarily in the business of retail and land sales and development of residential lots in the Yellowstone Club.  Big Sky Ridge, LLC was formed in 2002 for the purpose of acquiring and developing land located outside but contiguous to the boundaries of the Yellowstone Club.  YMC and YD had two classes of members; Class A members who had voting rights, and Class B members who had no voting rights.  Yellowstone Club Construction Company, LLC is owned by YD and was formed in 2006 for the purpose of constructing various buildings within the boundaries of the Yellowstone Club.  Each of the Debtors is a limited-liability company organized under Montana law.

---

[1]  Cushman & Wakefield's appraisal as of July 1, 2005, states that the Yellowstone Club "appeals to ultra-wealthy families as a second-home (or third-home) location for its private recreational facilities (particularly the ski area), views, and proximity to winter and summer recreation.  Prospective buyers are required to have a net worth of over $3 million, but based on the costs of membership and housing, we would expect nearly all buyers to have investable assets of at least $5 million, if not $10 million.  The membership price for residents is $250,000 for a 30-year refundable deposit.  The price is expected to be increased during the sell-out period.  Annual dues . . . were recently raised from $10,600 to $16,000 per year.  Property owners association (POA) dues are currently $5,100 per year."  During the course of the trial, more than one witness referred to the Yellowstone Club members as "penta millionaires."

From its inception to August 12, 2008, Blixseth was the sole managing member of Big Sky Ridge, LLC.  From their inception to August 12, 2008, YMC and YD were controlled by Blixseth through his holding company, Blixseth Group, Inc. ("BGI").  Since August of 2001, BGI has owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family Investments, LLC has owned 5.1020 percent of Class A stock.  The Class B Members, or Class B Shareholders--consisting of the following twelve entities or individuals: Bankers Financial Corporation, Gregory C. Branch Family Limited Partnership, Blixseth Family Investments, LLC, Jorge V. Jasson, Greg LeMond, A.C. Markkula and Linda K. Markkula Trustees of the Arlin Trust, Mountain Vista Properties AG, David L. Morris and Sacia B. Morris, Sacia Enterprises, Inc., Michael L. Snow, Spano Yellowstone Holdings Limited Partnership and Robert P. Watson and Katharine M. Watson--each owned 1.0204 percent of YMC and YD, or a total of 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Blixseth as President and CEO from 1999 to August 12, 2008.  Blixseth and Edra separated in December of 2006, and effective August 12, 2008, Edra and Blixseth agreed, pursuant to a June 26, 2008, confidential Marital Settlement Agreement ("MSA"), that Edra would receive BGI and the Yellowstone Club entities.  On August 19, 2008, just days after obtaining control of BGI, Edra changed the name of BGI to BLX Group, Inc. ("BLX").

Various creditors filed an involuntary Chapter 11 bankruptcy petition on behalf of BLX Group, Inc. on September 21, 2009.  *See* Bankruptcy Case No. 09-61893.  Edra filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009.  *See* Bankruptcy Case No. 09-60452.  Edra's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009.

4

Blixseth and Edra were also the founders of Big Springs Realty, LLC and Yellowstone Club World, LLC, both of which were awarded to Edra under the couples' MSA.  On January 31, 2001, Charles Callander ("Callander") went to work for Blixseth and Edra as the Director of Marketing and Sales at the Yellowstone Club.  Callander explained that in 2005, Blixseth decided to split the marketing and sales departments at the Yellowstone Club, placing the sales department under Big Springs Realty, LLC.  However, the sales department at the Yellowstone Club did not change its office, letterhead or business cards.  According to Callander, the only change he noticed was the addition of a signature line for Big Springs Realty, LLC on resale listings and resale purchase and sale agreements.  Because sales at the Yellowstone Club had grown from $10 million in 2001 to somewhere in the neighborhood of $150 million in 2005, Callander believed that Blixseth formed Big Springs Realty, LLC for the purpose of spreading his risk of liability.  In Callander's words, Big Springs Realty, LLC "became a private bank account for someone, for Mr. Blixseth, that was segregated from other accounts at the [Yellowstone] Club."

Edra caused Big Springs Realty, LLC to file a voluntary Chapter 7 bankruptcy petition on June 5, 2009.  *See* Bankruptcy Case No. 09-61079.  The Chapter 7 Trustee in the Big Springs Realty, LLC bankruptcy filed a complaint against Blixseth on September 3, 2009, alleging that Blixseth took in excess of $5 million from Big Springs Realty, LLC between August of 2007 and June of 2008, which precluded Big Springs Realty, LLC from paying its other obligations as they became due.

Blixseth had a conceptual idea of Yellowstone Club World in 2005 but he did not have a functioning business plan.  Blixseth formed Yellowstone Club World, LLC with the vision of

taking the Yellowstone Club concept worldwide.  High-wealth individuals who purchased

memberships in Yellowstone Club World were promised "access to life's most luxurious

amenities, activities and services."  In particular, Yellowstone Club World members had access

to "premier properties," including the Yellowstone Club, a castle near Paris, France (Chateau de

Farcheville), a 30,000 square foot mansion in the Turks and Caicos Islands, a golf course resort

in Manzanillo, Mexico, Blixseth's private golf course estate in Rancho Mirage, California

(Procupine Creek), a luxury ranch near Cody, Wyoming, and a Tom Weiskopf golf course in St.

Andrews, Scotland, among others.  The use of various yachts and private jets, and access to

"[s]mall scale world class properties in exquisite locations" were also held out as benefits to

members of Yellowstone Club World.  Blixseth testified that Yellowstone Club World ended up

with eight members who each paid a membership deposit of $1.5 million each.

     An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World,

LLC on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  The Chapter 7 Trustee in the

Yellowstone Club World, LLC bankruptcy filed an action against Blixseth on October 20, 2009,

alleging that Blixseth owed Yellowstone Club World, LLC at least $2.8 million for inappropriate

transfers from Yellowstone Club World, LLC to Blixseth's personal accounts.

FACTUAL BACKGROUND

CREDIT SUISSE[2] and the YELLOWSTONE CLUB

     Sometime prior to 2004, a team at Credit Suisse First Boston crafted a new syndicated

loan product that allowed Credit Suisse to offer a loan product the size of which had previously

---

[2] "Credit Suisse" is used synonymously throughout this Memorandum with "First Lien Agent" as defined in Art. I, § 1.63 of  Debtors' Third Amended Joint Plan of Reorganization.

been unavailable to borrowers in the corporate bank loan market.  The loan product was designed to allow owners of high-end master-planned residential and recreational communities to realize their anticipated future profits from their developments through distributions made possible by Credit Suisse's syndicated equity recapitalization loan.  Credit Suisse's new loan product had several unique aspects.  For instance, the loan product relied on an appraisal methodology that was based on future gross revenues, without any discount to current dollar value.  The new loan product was not tied to an as-is appraisal that set forth the fair market value of the real estate securing the loan.  To syndicate such loans, Credit Suisse targeted investors who were described as highly sophisticated parties who were more than qualified to perform their own quantitative analysis to assess the risk of the loans that were being offered to entities such as the Yellowstone Club.

In December of 2004 and early 2005, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, began actively pursuing Blixseth in an effort to sell Credit Suisse's equity recapitalization loan to the Yellowstone Club.  Barcy first attempted to contact Blixseth via teaser emails, providing Blixseth with a brief overview of Credit Suisse and its equity recapitalization or syndicated term loan, which was described to Blixseth as something akin to a "home-equity loan."  Blixseth initially rebuffed Barcy's emails but eventually developed an interest in the loan product and contacted Barcy to learn more.

Barcy and another person from Credit Suisse met Blixseth and Chris Campbell ("Campbell"), Yellowstone Club's Vice President of Finance, at Blixseth's home in Rancho

Mirage, California ("Porcupine Creek").[3]  Barcy explained that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas.  Each of the aforementioned entities accepted a syndicated loan from Credit Suisse's Cayman Islands branch.  In a Memorandum dated January 6, 2005, and addressed to "Bank and High Yield Finance Committee" regarding "Project Powder - Potential Recapitalization Opportunity," Barcy and his team at Credit Suisse reported that "Blixseth made clear that he and the other owners of the Yellowstone Club (the 'Partners') were eager to proceed with a financing transaction so that they could take a dividend and use the capital to finance a separate transaction."  Exhibit D-50. At that time, Barcy and his team were projecting a loan amount of $225 million with a dividend to the partners of $219.5 million.

After numerous discussions, Blixseth originally agreed to accept a loan of $150 million from Credit Suisse.  To assist with the Credit Suisse loan process, Blixseth formed an in-house team that consisted of Blixseth, Edra (who was serving as Chief Operating Officer of the Yellowstone Club), Campbell (who Blixseth referred to as the point guard on the deal, and an ex-Wall Streeter from Smith Barney), Robert Sumpter (Vice President of Real Estate Development, who Blixseth said was "pretty savvy in the financial world"),[4] Callander (Vice President of

---

[3]  The Porcupine Creek property, together with the two homes located on Gardess Road, is 264.77 acres.  On that acreage is a 18,380 sq. ft. estate residence with four guest suites (casitas), four additional guest houses, 2 service houses and a private 19-hole PGA golf course.

[4]  Blixseth hired Sumpter to do consulting work at the Yellowstone Club in the summer of 1999.  Sumpter transitioned to an employee of the Yellowstone Club in September of 1999. Sumpter was originally hired as vice president of real-estate development as well as vice president of sales and marketing but in approximately January of 2001, Blixseth hired Callander to handle sales and marketing.

Sales), Bill Griffon (Vice President of Operations), Hank Kashiwa (Vice President of Marketing), Bruce Bales (Director of Privacy) and Denise Tuohy (Comptroller). Blixseth's team also included lead attorney Michael W. Doyle ("Doyle"), two attorneys from Doyle's law firm, Montana attorney Stephen R. Brown ("Brown"), and Blixseth and the Debtors' accountant, George Mack ("Mack"). Interestingly, Moses Moore ("Moore"), who went to work as a Senior Accountant for Yellowstone Development in July of 2005 and was promoted to Comptroller of the Yellowstone Club in October of 2006,[5] did not learn of the Credit Suisse loan until $342 million showed up in the Debtors' bank account on September 30, 2005.

As negotiations between Credit Suisse First Boston and Blixseth progressed, the proposed amount of the loan grew from $150 million to $375 million and the language of the credit agreement evolved. For instance, similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas, and consistent with the purpose for which the Credit Suisse loan was developed, the Yellowstone Club credit agreement was initially drafted to provide that the proceeds of the Yellowstone Club's loan could be used, in part, for "distributions" to members for purposes unrelated to the Yellowstone Club. However, Credit Suisse's standard credit agreement language that allowed for the loan proceeds to be used for "distributions' was problematic for Blixseth. According to Blixseth, the problem was two-fold. First, Blixseth would incur a substantial tax liability if he took the loan proceeds as a distribution. Second, Blixseth testified that recording such a large distribution on the Debtors's books would leave Blixseth with a negative balance in his owner's equity account. According to Blixseth,

---

[5] Moore was appointed Comptroller after Denise Tuohy died in an accident at the Yellowstone Club.

9

Mack informed him approximately 30 to 45 days prior to September 30, 2005, that "if we took a distribution, that we would have a negative capital account to the point where he didn't think that an audit firm would or could audit the Debtor companies."

Although disputed by Blixseth, the "distribution" language was also problematic because characterizing a disbursement of the Credit Suisse loan proceeds as a distribution would require Blixseth to share the loan proceeds with the "B" shareholders.  In an attempt to eliminate the issues attendant to the "B" shareholders, Blixseth, during the spring and summer of 2005, sought to buy the interests of the "B" shareholders under the guise that Blixseth wanted to repurchase the "B" shares for estate planning purposes and to involve his children in ownership of the Yellowstone Club.  Exhibit D-270 is a letter dated May 25, 2005, signed by Blixseth and addressed to Michael Snow wherein Blixseth proposed to buy Michael Snow's interest in the Yellowstone Club for "$1.25 million in cash, and one lot in phase 3A[.]"  *See also* Exhibit D-263E, letter from Blixseth to Jorge Jasson.  Blixseth contends he was offering the "B" shareholders an opportunity to triple or quadruple their $750,000 investments.

Blixseth's letter advised the "B" shareholders: "This proposal will be held open and valid until June 15, 2005.  At such time if all 'B' holders have agreed to this proposal, we will commence the paperwork."  Also in the May 25th letter, Blixseth represented that he had "arranged financing that would allow [him] to re-purchase these outstanding shares and will take this financing on only if [he could] reacquire all of the outstanding 'B' shares."[6]  Blixseth intended to purchase the "B" shareholders' interests with proceeds from the Credit Suisse loan.

---

[6]  Blixseth wrote in his letter that "[c]losing [was] to be on September 6, 2005," yet Blixseth testified that he would not have been in a position to buy the B shareholder's interests until the Credit Suisse loan closed.

Blixseth's accountant Mack assisted Blixseth with his efforts to purchase the "B" shareholders' interests in the Yellowstone Club. Debtors' Exhibit 263D is a letter dated July 14, 2005, addressed to "Mike" from Mack. In the letter, Mack informs Mike, a "B" shareholder, "that between 2005 and 2011 sales will be approximately $1.4 billion with net income before taxes of $900 million. Hence, after taxes at a 40% rate, the net income is $540 million. So, with this analysis, each 1% member's equity would be $5,400,000." Mack goes on to explain that "[o]n a present value basis at an 8% return over seven years, each share would be worth approximately $4,500,000. However, as we both know, with marketability and monetary discounts between 30% and 55%, each share could be valued at between $2,025,000 and $3,150,000." Mack's letter concluded that Blixseth's "offer is a tremendous offer which yields an excellent return."

Attorney Doyle also weighed in on Blixseth's efforts concerning the "B" shareholders. Blixseth recalled telling Doyle during the negotiations with Credit Suisse, that "this would be a good opportunity to try and buy the 'B' shares back." In fact, while Blixseth's May 25, 2005, letter was on BGI letterhead, Blixseth could not recall whether the letter was sent by Blixseth or whether it came from Doyle's office. Doyle also recalled discussing with Mack the fact that if the money was removed from the Debtors as a distribution that Blixseth would have to share such distribution with the "B" shareholders. Consistent with his discussion with Mack, Doyle sent Blixseth correspondence on August 31, 2005, stating:

> With regard to the Class B investors, the Operating Agreement does not provide
> for any way to expel those people. Moreover, you are required under Montana
> law and the Operating Agreement to treat the Class B people equally with you, or
> at least not discriminate against them.

11

As far as cash distributions are concerned, (as opposed to taxable profit) the Operating Agreement provides that all Net Cash Flow is to be distributed to the Members pro rata as to their ownership interest.  However, the Net Cash Flow is the amount of money left over after all of the operating expenses, debt service and reasonable reserves for construction and operations are held back as determined at the sole discretion of the manager.

Therefore, you can decide as Manager not to make any cash distributions over tax obligations, if you want to, but you have to do that for all the Members.  You could not make a cash distribution to just the Class A Members and not make a proportional cash distribution to the Class B Members.

The result of the above quickly leads one to the conclusion that it only makes good sense to get rid of all the Class B Members as soon as reasonably possible.  So long as you have even one Class B Member hanging around, you will forever be having to deal with that person and not be able to take distributions without also making a proportional distribution to that investor.

Exhibit D-263F.[7]

Unfortunately for Blixseth, not all "B" shareholders agreed to accept Blixseth's offer and Blixseth ultimately purchased none of the "B" shareholders' interests because, as Blixseth testified, the offer was an all or nothing deal.  Blixseth subsequently made the decision, "the sole decision," that any transfer of money from the Debtors to BGI would be in the form of a loan rather than a distribution.  Blixseth contends that he thought a loan was better for the Yellowstone Club because the "Yellowstone Club would receive interest" from BGI.  However,

---

[7]  Consistent with Doyle's comments, Debtors' Exhibit 20, the Operating Agreement of Yellowstone Development, LLC and Exhibit 21, the Operating Agreement of Yellowstone Mountain Club, LLC, provide in paragraph 7.4 that "[d]istributions may be made annually or more frequently, in the reasonable judgment of the Manager, and will be allocated among the Members, *pro rata*, in proportion to a Member's percentage ownership interest in the Company." Yellowstone Development, LLC's Operating Agreement was later amended to, in part, delete paragraph 3.6 and add 3.6.1 and 3.6.2.  Paragraph 3.6.2 provides that "Class A Members may not vote to decrease the ownership percentage interest of any Class B Member or substantially and materially alter the Class B rights or the business purpose of the Company without a two-thirds consent of Class B Members."

the interest that Blixseth and BGI ultimately paid on the notes was minuscule. Moreover, despite Blixseth's assertion that "the [Debtors] had an unconditional intention to seek repayment of the loans," the Debtors, under Blixseth' direction, never made demand of BGI on the notes, even when the Yellowstone Club desperately needed cash.

Blixseth contends that the "B" shareholders did not factor into his decision to take the Credit Suisse loan proceeds as a loan rather than a distribution, but Blixseth's testimony on this matter is not credible and is controverted by the evidence. Contrary to his testimony, Blixseth sent Edra an email on or about September 5, 2005, stating that "[w]ith the 6 B's now starting to nose around we must make sure we have not made any 'distributions' to BGI as the 'B's' would be entitled to their equal share, loans are OK in the operating agreement." Exhibit D-266. Edra also testified that the Yellowstone Club loan team had several discussions about whether Blixseth would take the loan proceeds as a distribution or a loan. Edra could not recall any discussion about Blixseth having to take the money in the form of a loan in order to avoid creating a negative equity position. Consistent with the evidence, Edra testified that Blixseth wanted to take the money in the form of a loan because Blixseth could then avoid paying the "B" shareholders their fair share. Edra also testified that Blixseth was not overly concerned about having to repay the loan because he intended to find creative ways to avoid any meaningful repayment. Edra testified that Blixseth never intended to repay the $209 million that he took out of the Yellowstone Club for personal purposes.

At or about the time that Blixseth realized that he would not be able to purchase the "B" shareholder's interests, Blixseth contacted Credit Suisse and requested that the proposed credit agreement be modified to provide that the majority of Credit Suisse loan proceeds could be used

for either a distribution or a loan.[8]   At Blixseth's request, the loan agreement was amended to

reflect that the Credit Suisse loan proceeds could be used "(i) for distribution *or loans* up to [$

____] to affiliates of the borrower for purposes unrelated to the Yellowstone Development[.]"

Blixseth Exhibit 30.  Between September 4, 2005, and September 30, 2005, the recitals were

once again amended to finally provide that the proceeds of the loan would be used "(i) for

distribution or loans up to $209,000,000 to members of the Borrower for purposes unrelated to

the Yellowstone Development, (ii) for investments up to $142,000,000 into Unrestricted

Subsidiaries for purposes unrelated to the Yellowstone Development, (iii) to pay the Transaction

Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and

construction costs associated with the Yellowstone Development in accordance with the

Financial Plan[.]" YCLT Exhibit 71A.

As previously noted, the transfer of loan proceeds out of the Yellowstone Club was a key

feature used to sell the Credit Suisse loan product.  Steve Yankauer ("Yankauer"), a Managing

Director at Credit Suisse Securities, USA, testified that the cornerstone of Credit Suisse's loan

product was that it allowed preferred resort owners, such as Blixseth, to capitalize on the value of

their asset.[9]   For example, under the agreement between the Yellowstone Club and Credit Suisse,

Blixseth was allowed to in essence realize in 2005 the revenue stream he hoped the Debtors

would achieve in the years to come.  How Blixseth elected to capitalize on his asset and his

dilemma with the "B" shareholders was not a concern to Credit Suisse.  Barcy testified that it

---

[8]  As shown by Exhibit CS-54, the term "loan" appeared as an acceptable use of proceeds in a red-line version of the Credit Agreement prepared August 23, 2005.

[9]  Yankauer reviews new loans from the real estate industry that come in for approval and also recovers loan proceeds for troubled loans.

was Blixseth's "responsibility to figure out what he had to do internally to make those distributions or not make those distributions.  And as a controlling shareholder of the Yellowstone Club, that was in his court."  As far as Barcy was concerned, Blixseth could have taken the entire $375 million of loan proceeds as a distribution.

Even though Blixseth's efforts with the "B" shareholders were not going as hoped, Blixseth was nonetheless proceeding full speed ahead in his negotiations with Credit Suisse.  As of August 22, 2005, the loan amount had grown to $330 million.  Also, in addition to allowing Blixseth to use a substantial amount of the loan proceeds for a distribution or loan, Credit Suisse had also agreed that Blixseth could use another substantial amount of the loan proceeds for purposes unrelated to the Yellowstone Club.

Blixseth was also negotiating the transaction costs charged by Credit Suisse.  Credit Suisse generally charged borrowers a transaction fee equal to 3 percent of the loan amount but Blixseth wanted the transaction costs reduced to 2 percent.  Blixseth and Barcy thus met at the Yellowstone Club sometime during the summer of 2005 and determined the applicable loan fee with the toss of a coin.  Blixseth won the coin toss and the transaction fee was set at 2 percent, rather than Credit Suisse's customary 3 percent.

Credit Suisse did its initial offering of the Yellowstone Club loan in early September 2005.  The loan amount at that time was $300 million and the syndication was 400 percent oversubscribed.  Because the Yellowstone Club was deemed creditworthy, the loan amount crept up to $375 million.  Yankauer testified that the loan increased to $375 million because one, Blixseth wanted more money and two, lenders were clamoring to get a piece of the loan.

After months of negotiations, Credit Suisse and Blixseth reached an agreement on the

15

final terms of a credit agreement.  Credit Suisse, Cayman Islands Branch, and Blixseth, on behalf

of YMC, YD and Big Sky Ridge, LLC entered into a First Lien Credit Agreement dated

September 30, 2005 ("Credit Agreement").[10]  As negotiated by Blixseth, paragraph 2.6 of the

Credit Agreement, Use of Proceeds, provided that "[t]he proceeds of the Loans made to the

Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to

$209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone

Development, (ii) pursuant to Section 6.3(ii), for investments or loans up to $142,000,000 into

any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing

Indebtedness, (v) to finance a portion of the development and construction costs associated with

the Yellowstone Development in accordance with the Financial Plan."  YCLT Exhibit 71A.  The

Credit Suisse loan was secured by substantially all of the Debtors' assets, but the Warren Miller

Lodge was carved out of the Credit Suisse Credit Agreement and was not subject to Credit

Suisse's first position security interest.[11]  The Credit Agreement provided the Debtors with a

$375 million Senior First Lien Credit Facility that was funded in its entirety on September 30,

2005.

BLIXSETH'S USE OF THE LOAN PROCEEDS

Blixseth argued that he sought the Credit Suisse loan on behalf of the Debtors, in part, to

fund development and construction of the Yellowstone Club properties and to acquire worldwide

resorts.  Contrary to Blixseth's arguments, the Credit Suisse loan was created so that resort

---

[10]  Debtor Yellowstone Club Construction Company, LLC, was not a party to the Credit
Agreement.

[11]  Blixseth testified that the Yellowstone Club was not required to pay off the Warren
Miller Lodge debt with funds from the Credit Suisse loan.

owners, such as Blixseth, could extract large distributions from their development projects, without the need for any personal guarantee.  Thus, the overall purpose of the loan was not for development of the Yellowstone Club, but instead, the purpose was to permit Blixseth to take money out of the Yellowstone Club and in fact, the record shows that very little, if any, of the Credit Suisse loan proceeds were used to fund development and construction at the Yellowstone Club.

Pursuant to the Disbursement Authorization dated September 30, 2005, UCC Exhibit 222, Blixseth approved use of the $375 million Credit Suisse loan proceeds as follows:

| | |
|---|---|
| $7.5 million | To Credit Suisse in payment of its 2 percent Arrangement Fee |
| $100,000.00 | To Credit Suisse in payment of its First Annual Administration Fee |
| $45,077.89 | To Credit Suisse for payment of its out-of-pocket expenses |
| $10,000.00 | To Credit Suisse for payment of Syndtrak |
| $380.00 | To Credit Suisse for payment of Cusip |
| $70,500.00 | To Credit Suisse for payment of Clear Par Settlement[12] |
| $15,500.00 | To Credit Suisse for payment of Cushman Wakefield Appraisal |
| $325,000.00 | To Latham & Watkins LLP in payment of estimated legal fees incurred to date[13] |

---

[12] Even though Blixseth signed the Disbursement Authorization on behalf of YMC, YD and Big Sky Ridge, LLC, Blixseth, when questioned about the payment of $70,500 "for payment of Clear Par Settlement" testified that he had "never seen this before."

[13] Latham & Watkins LLP was the legal firm that represented Credit Suisse in connection with the $375 million loan to the Yellowstone Club.

| | |
|---|---|
| $581,368.60 | To Security Title of Montana for payment of title fees, endorsements and recording costs |
| $19,758,458.93 | To American Bank in repayment in full of the Existing Indebtedness |
| $4,483,452.05 | To Silver Ridge, Inc. in repayment in full of the Existing Indebtedness[14] |
| $342,110,262.53 | To Yellowstone Mountain Club, LLC, a Montana limited liability company |

The $342.1 million disbursed to the Debtors was distributed in two significant ways. First, the Credit Agreement designated up to $209 million of the loan proceeds to be used as "distributions or loans" for "purposes unrelated" to the Yellowstone Club. Additionally, up to $142 million was authorized to be used for investments in "unrestricted subsidiaries" for "purposes unrelated" to Yellowstone Club development. As the numbers show, the bulk of the loan proceeds were designated to be used for purposes outside of, and unrelated to, the Yellowstone Club.

Specifically, of the $342,110,262.53 that went to YMC, UCC Exhibits 213 and 218 show that as contemplated, $209 million went to BGI and the remainder of $133,110,262.53 stayed with YMC. Of the latter amount, Blixseth put $100 million in a 6 month CD at US Bank, $30 million in a 6 month CD at American Bank and $3,110,262.53 went into a checking account. In 2006, portions of the remaining funds held by YMC were used to purchase the Chateau de Farcheville in France for approximately $28 million, Tamarindo in Mexico for $40 million, the Turks and Caicos property for $28 million and a down payment of $12 million on the St.

---

[14] This payment went to Wayne Prim for his one-half interest in Big Sky Ridge, LLC ($3.5 million plus interest).

18

Andrews property in Scotland.

On the same date that Credit Suisse transferred $342,110,262.53 to the Debtors, Blixseth transferred approximately $209 million out of the Yellowstone Club to BGI. Almost all of the $209 million proceeds transferred to BGI were disbursed to various personal accounts and payoffs benefitting Blixseth and Edra personally; Blixseth put $25 million into a 6 month CD at First Bank, used $11,939,598.24 to payoff an existing obligation owed to First Bank on a line of credit that Blixseth had used to build his and Edra's residence at Porcupine Creek in California, purchased a $17 million 6 month CD at Palm Desert National Bank, put $14,018,227.87 in a money market account, used $4,133,623.50 to payoff an existing obligation owed to Palm Desert National Bank ($3,169,118.75 related to Blixseth's real estate development project in the Palm Springs area of California, $79,629.54 was used to pay off a condo owned by Edra and $884,875.21 was used to pay off two lines of credit), purchased a $15 million 6 month CD at Jackson State Bank, paid off five existing obligations owed to American Bank totaling $7,434,226.76, purchased a 3 month CD at U.S. Bank for $100 million, purchased a 6 month CD for $5 million at Pacific Western Bank, paid off an existing obligation owed to Pacific Western Bank in the amount of $2,971,443.02, and paid off existing obligations owed to Union Bank totaling $336,142.06. Blixseth also set aside $2,007,930.55 for a payoff to Commercial Bank on October 3, 2005, and paid the balance of $3,888,321.00 owed to GECC on two aircraft owned by Yellowstone Aviation & Marine, LLC and $272,590.00 owed to World Savings. Blixseth testified that the Debtors had no interest in any of the aforementioned accounts or payoffs.

Blixseth testified that he "absolutely" would not have taken the $209 million from the Debtors if anyone on his legal or consulting team or anyone from Credit Suisse, would have told

Blixseth that it was illegal or a breach of his fiduciary duty to take the money out of the Debtors.

Relying on a letter dated September 30, 2005, Blixseth asserts the advice of legal counsel

defense.  The September 30, 2005, letter was written by Brown of the Garlington, Lohn &

Robinson, PLLP law firm, and was addressed to Credit Suisse.  In the letter, Brown states that

"as of [September 30, 2005] . . . [e]ach Loan Party has the requisite power and authority to

execute, deliver and perform its obligations under the Loan Documents[;] . . . [and] [e]xecution

and delivery by the Loan Parties, and performance of their respective obligations under, the Loan

Documents does not: violate any of their organizational documents; violate any laws; to the best

of our knowledge violate any orders, judgments, or decrees; to the best of our knowledge, breach

any material contract or create liens or encumbrances; or require filing or registration with any

governmental agency."  Blixseth's Exhibit 4.  Blixseth interpreted Brown's third-party opinion

letter to Credit Suisse to also mean that Blixseth would not be breaching any laws in the State of

Montana.

THE B SHAREHOLDERS and the LeMOND LITIGATION

Prior to September 30, 2005, the "B" shareholders were not aware that Blixseth was

pursuing a loan on behalf of the Yellowstone Club.  However, the "B" shareholders were trying

to obtain financial information from Blixseth regarding the Yellowstone Club.  Doyle sent

Blixseth an email on October 10, 2005, advising Blixseth that it "would serve nobody's best

interests to have some kind of legal action taken to force the disclosure of financial information

that is very clearly required to be provided under the Operating Agreement.  It is your call, but I

would think it would make a lot of sense to authorize George [Mack] to release all of the prior

reviewed financial statements through 2004, and then put a concerted effort into getting the

20

insurgents bought out." Exhibit 263Z.

The "B" shareholders eventually learned of the Credit Suisse loan and in early May 2006, "B" shareholders Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc., threatened suit against Blixseth. After the "B" shareholders threatened suit, Blixseth's counsel conferred and on May 8, 2006, Doyle sent Blixseth an email stating that the attorneys were in agreement that the main thrust of the "B" shareholders' complaint involved the $209 million loan from the Yellowstone Club to BGI and that the Montana attorneys, while they agreed that a loan was permitted under the operating agreement, they "were a bit dismayed when I had to tell them that this loan was not evidenced by a Promissory Note." Debtors' Exhibit 263G.

The immediate transfer of funds out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any contemporaneous loan documents. The $209 million was originally recorded in a suspense account though a journal entry, and was later reclassified as a note receivable from the managing member.[15] As a result of the threatened suit by the "B" shareholders, Blixseth drafted a two-page promissory note in the amount of $209 million. The $209 million unsecured demand note, payable by BGI to the Debtors was drafted in May 2006, but was backdated to September 30, 2005. At or about the same time, BGI also executed a promissory note, payable on demand and dated September 30, 2005, in favor of YMC in the amount of $7.8 million, exhibit D-263L, and a third promissory note, payable on demand and dated September 30, 2005, in favor of YMC in the amount of $55,798,796.68. In 2007, Doyle, on behalf of Blixseth, drafted notes evidencing BGI's transfer of funds to Blixseth.

---

[15] Per Exhibit D-263K, the exact amount of the Promissory Note is $208,831,158.45.

On May 31, 2006, Greg LeMond, Jorge V. Jasson, David L. Morris, Sacia B. Morris, and Sacia Enterprises, Inc. (the "LeMond Plaintiffs"), filed a complaint in Madison County, Montana, captioned *LeMond v. Blixseth Group, Inc.*, C.V. No. DV-29-06-26 (the "LeMond Litigation"). In general, the LeMond Plaintiffs complained that the $209 million loan Blixseth took from the Debtors was a distribution, not a loan. Therefore, the LeMond Plaintiffs argued that they were entitled to a proportionate distribution under the Debtors' applicable operating agreements. Blixseth, on behalf of himself and the Debtors, settled the above-referenced litigation for $38 million.

The remaining "B" shareholders consisting of Michael L Snow, Gregory C. Branch Family Limited Partnership, A.C. and Linda K. Markkula, Spano Yellowstone Holdings Limited Partnership, Robert P. And Katharine M. Watson, Bankers Financial Corporation, and Mountain Vista Properties AG commenced Adversary Proceeding No. 09-00018 against Blixseth on March 3, 2009. The claims in Adversary Proceeding No. 09-00018 are similar to the claims previously asserted by the LeMond Plaintiffs. Trial in Adversary Proceeding No. 09-00018 is scheduled to commence on August 23, 2010.

### THE YELLOWSTONE CLUB'S FINANCIAL CONDITION and the CUSHMAN & WAKEFIELD APPRAISALS

In the years leading up to 2005, the Yellowstone Club had receivables due from BGI and other affiliates of approximately $55 million. The Yellowstone also carried an additional debt load ranging from a low of approximately $4 to $5 million to a high of approximately $60 million on a revolving line of credit. Such debt load was in addition to the membership deposits that the Yellowstone Club listed as a liability on its balance sheet, along with equipment leases

and a myriad of other small items.  According to Blixseth, the day before the Loan Transaction with Credit Suisse, the Yellowstone Club carried, in addition to any amounts owed to BGI and its affiliates, approximately $19 to $20 million in debt on its books, consisting of a combination of a revolving line of credit and a term loan with American Bank.[16]  In all, prior to the Credit Suisse loan, Blixseth thought the Yellowstone Club's membership deposits and other miscellaneous liabilities totaled "well over $100 million[.]"

Although the Yellowstone Club had a reputation of being slow to pay its debts, Edra testified that in her opinion, the Yellowstone Club did not need the Credit Suisse loan for operations or development.  Edra explained that during the period of time from 2004 to 2005, the Yellowstone Club's debt was "revenue-driven."   For example, the Yellowstone Club took on debt to build the Warren Miller Lodge, but Blixseth intended to sell condominiums in the Warren Miller Lodge to repay the debt.  In Edra's words, the Yellowstone Club was playing catch up in 2005 because of certain capital expenditure decisions that had been made, such as building the Warren Miller Lodge, more roads, and more infrastructure.

In September of 2004, Cushman & Wakefield did a limited appraisal of the Debtors' property for American Bank.  In that limited appraisal, as of September 21, 2004, Cushman & Wakefield determined that the "as-is market value" of those assets that later served as collateral for Credit Suisse's $375 million loan was $420 million.  Just a year later, Credit Suisse commissioned Cushman & Wakefield to perform a total net value appraisal of the Yellowstone Club.  Cushman & Wakefield's "total net value" appraisal of the Yellowstone Club as of

---

[16]  According to Blixseth, the Yellowstone Club had a construction loan of approximately $20 million associated with the Warren Miller Lodge and a revolving line of credit that the Debtor "could draw up and down on."

23

September 30, 2005, was $1,165,000,000.00.[17]  In Cushman & Wakefield's July 1, 2005, appraisal, the Debtors had purportedly sold 243 lots or units, and another 42 lots were listed under contract. The lot sales for 2000 through 2005 are summarized by closing date, lot number, price and type in Addendum B to the appraisal.[18]

Cushman & Wakefield's 2005 "total net value" appraisal was based in large part on revenue and expense projections provided by Blixseth.  In 2005, Callander was employed as vice president of sales and Campbell was vice president of finance.  However, it was Sumpter – the vice president of real estate development[19] – who Blixseth selected to help prepare the Debtors' revenue and expense projections for Cushman & Wakefield and Credit Suisse.  Sumpter explained that when preparing the projections for Credit Suisse, "the valuation wasn't just done on developer transactions with the Club, it was done on third-party transactions within the Club, as well."  In other words, the projections that Blixseth provided to Credit Suisse included not only sales that the Debtors anticipated, but also the resale of other properties by third parties within the Yellowstone Club.  Historically, Sumpter testified that the Yellowstone Club sold between $315 and $320 million of property between 2000 and 2005, or roughly $50 million per year.  According to Sumpter, sales in 2005 were roughly $93 to $96 million.  Sumpter and

---

[17]  Blixseth testified that in the fall of 2005, he would have sold the Yellowstone Club for $800 million.

[18]  Addendum B shows 19 lots sales in 2000, 40 lots sales in 2001, 28 lots sales in 2002, 52 lots sales in 2003, 56 lots sales in 2004 and 45 year-to-date lots sales in 2005.

[19]  Up until 2006, Sumpter reported to Blixseth.  Starting in 2006, Sumpter reported to Blixseth and Dieter Huckestein, who was a minority shareholder of Yellowstone Club World, LLC.  As vice president of real estate development, Sumpter was responsible for taking the Yellowstone Club's raw land through the entitlement process to the point where the Yellowstone Club had a marketable piece of property.

24

Blixseth's revenue projections, which apparently included monies that would go to third parties as opposed to the Yellowstone Club, also did not include any interest revenue projections.  In other words, Blixseth was not anticipating any interest payments from BGI or its affiliates.

When questioned about the projections, Sumpter attempted to explain that the Debtors missed their projections in 2005 because the Debtors pushed some of the 2005 sales into 2006 for tax purposes.  According to Sumpter, developer sales were roughly $93 to $96 million in 2005.  Blixseth testified that deferred revenue for 2005 was $17 million (and also testified that deferred revenue in 2005 could have been as high as $40 to $45 million) and deferred revenue in 2006 was roughly $50 million.  Sumpter testified that 2006 was better because "almost $425 million that came into the Yellowstone Club that year."  But as Sumpter later clarified, $299 million of the $425 million was attributable to third party sales that did not directly benefit the Yellowstone Club, other than the commissions paid to the sales staff, leaving the Yellowstone Club with only $135 to $136 million in developer sales.  In 2007, developer sales were just under $100 million, with third party sales totaling between $250 and $260 million.

Charles Bradley Foster ("Foster"), a Managing Director for FTI Consulting–the consulting company hired to serve as the Debtors' post-petition financial advisor –gave a simplistic, but enlightening, explanation of the impact the Credit Suisse loan had on the Debtors' cash flow.  Under the Credit Suisse Credit Agreement, the Yellowstone Club was required to pay Credit Suisse $800,000 from the sale of each dwelling unit for principal curtailment.  Foster testified that between September 30, 2005, and February of 2009, the Debtors sold a total of 85 dwelling units at an average sales price of $2.4 million per dwelling unit.  From the $2.4 million realized from each unit, Foster did a rudimentary calculation to ascertain the "free cash flow"

25

from each of the sales.  In simple terms, Foster subtracted from $2.4 million the $800,000 that the Debtors were required to pay Credit Suisse for principal curtailment,[20] $835,000 in interest costs for each of the lots, along with $120,000 of closing costs for each of the lots, which initially left the Debtors with cash of $765,000 from each of the sales.  However, the Debtors also had $51 million in development costs.  After completing his calculations, Foster concluded that the Debtors were generating under $50,000 of free cash flow from the sale of each of its lots.

It is clear that the Debtors began a downward spiral on September 30, 2005, that took them to the inevitable bankruptcy filing on November 10, 2008.  At the end of 2005, the Debtors's audited financial statements showed $130 million in cash or cash equivalents.  The Debtors spent $70 to $80 million in 2006 acquiring assets outside the confines of the Yellowstone Club.  Factoring in the Debtors' annual cash needs of $25 to $30 million a year, above and beyond land sales, the Debtors were left with just under $29 million of cash or cash equivalents at the end of 2006 and only $5 million at the end of 2007.

From 2005 through the filing of the bankruptcy case, the Yellowstone Club was persistently behind on its accounts payable.  When the Yellowstone Club needed cash, Moore, who took over as Comptroller at the Yellowstone Club in October of 2006, would make a request for money to Mack, who acted as the intermediary between Blixseth and Moore when Moore needed money to pay bills at the Yellowstone Club.  After making a plea for money, Moore testified that funds might or might not appear in the Yellowstone Club's accounts.  Moore

---

[20] Edra testified that when the original amount of the Credit Suisse loan was $150 million, the release price or pay-down per lot was $500,000.   Based upon the numbers that Denise Tuohy was putting together, with input from Campbell, the $150 million loan "seemed to pencil out okay."  However, the release price increased to $800,000 per lot as the loan amount ratchetted up.

testified that it was not uncommon to have to shuffle the Yellowstone Club's accounts payable due to a lack of money, with creditor and vendor invoices often going unpaid for 90 days or more.

Even though the Yellowstone Club was consistently struggling to pay its creditors, Blixseth continued to siphon money from the Debtors. In addition to the Credit Suisse loan proceeds, Blixseth took approximately $90 million in distributions from the Debtor entities and later reclassified such distributions as loans. For instance, Blixseth and BGI took $4 million plus of distributions from YD in 2003. Also, the Debtors' 2004 year end financial statements show a distribution of $19,000,617.51 to Blixseth. In 2005, Blixseth or BGI took total disbursements of $35,478,750.24 out of YMC. Of the foregoing amount, $23,853,0000 was reclassified as a loan on March 13, 2006. The evidence suggests that the 2004 and 2005 distributions were eventually reclassified as a $55 million note payable from BGI.

Despite the Debtors' consistent and often desperate need for cash from the time of the Credit Suisse loan to the date of the Debtors' bankruptcy petition, neither Blixseth nor Edra made a demand of BGI for payment on any of the BGI notes. BGI also never made any type of consistent payment on the obligations. The evidence shows that after September of 2005, the Debtors were only able to meet their financial obligations by selling bulk pieces of property at deep discounts.

Samuel T. Byrne ("Byrne") is one person who purchased bulk property from the Yellowstone Club. Byrne, the founder and managing partner of CrossHarbor Capital Partners,

LLC ("CrossHarbor"),[21] first visited the Yellowstone Club in 2004 or 2005 as a guest of another

Yellowstone Club member.  Following Byrne's visit, Byrne and/or CrossHarbor sponsored the

acquisition of four single-family lots at the Yellowstone Club in 2005.  Blixseth later approached

Byrne and asked whether he would be interested in making a bulk purchase of Yellowstone Club

lots at a substantially reduced price.  Byrne made his first bulk purchase in 2006 by taking over

the 43 remaining Sunrise Ridge Condominium units for a price of $60 million.  According to

Byrne, CrossHarbor bought the Sunrise Ridge units from an entity controlled by Blixseth.  Either

the Yellowstone Club or Blixseth had started construction on the Sunrise Ridge Condominiums

but because the Yellowstone Club and Blixseth were struggling with construction financing,

Byrne agreed to "buy out the balance of the project."[22]  Byrne, through CrossHarbor, spent in

excess of over $100 million improving the Sunrise Ridge property.  At the time Byrne purchased

the Sunrise Ridge Condominiums, he was not aware that there was significant leverage against

the Yellowstone Club.  Byrne did a title search before buying the Sunrise Ridge Condominiums,

but because the condominiums were not subject to Credit Suisse's lien, Byrne did not discover

the Credit Suisse obligation.  Byrne understood from Blixseth that the Yellowstone Club was,

except for construction financing associated with the Warren Miller Lodge, debt free.  Byrne

later heard, as a result of the LeMond Plaintiffs' litigation, that the Yellowstone Club was not

debt free, but was in fact indebted to Credit Suisse for $375 million.  Blixseth assured Byrne at

---

[21]  CrossHarbor is in the business of real estate and real estate related investment management.

[22]  In February 2005, Blixseth acquired 50 percent of Sunrise Ridge from YD in exchange for a $5 million note to be paid back out of the sale of properties.  Blixseth then turned around and sold Sunrise Ridge to Byrne for $60 million in 2006, taking one-half the sales proceeds.

that time that the referenced debt belonged to Yellowstone Club World and not the Yellowstone Club. Byrne later purchased 31 golf course lots in August of 2007 for $54 million.[23]

Consistent with the foregoing, Moore testified that the Yellowstone Club was only current on its payables during the first few months of 2006, in early 2007, in August of 2007 and again in April or May of 2008. Moore explained that Byrne's $60 million bulk purchase in 2006 allowed the Debtors to bring their payables current in 2006. Also, the Debtors sold a Gulfstream jet in January of 2007 for approximately $45 million and received roughly $20 million of the proceeds. Those monies were sufficient to bring the Yellowstone Club's accounts payable current for a brief period of time. The Debtors then sold 31 golf course lots to Byrne in August of 2007 for $54 million. That bulk sale allowed the Yellowstone Club to once again brings its obligations current. Moore also testified that the Debtors sold five lots to Overlook Partners in March or April of 2008 for $15 million, which allowed the Debtors to bring their accounts payable current and still leave $5.6 million in the bank accounts. The Debtors also drew down a line of credit at American Bank in 2008 to meet their financial obligations. That cash was used to bring the Yellowstone Club's accounts payable current at that time. The Debtors were not current on their accounts payable in August of 2008. To further frustrate the Yellowstone Club's financial plight, testimony at trial indicated that perhaps the Office of the Comptroller of the Currency had instructed American Bank not to loan any more money to the Debtors and U.S. National Bank had told its branches not to extend more credit to the Debtors.

---

[23] While it is not clear whether some or none of the Sunrise Ridge units belonged to the Yellowstone Club at the time they were sold to Byrne, it is clear that the 31 golf course lots belonged to the Yellowstone Club. Said 31 lots are presumably part of the 85 dwelling units that were sold post-September 30, 2005, as referenced by Foster.

Without denying the Debtors' dire financial condition, Blixseth testified that the Credit Suisse loan was current in August of 2008 when he relinquished control of the Yellowstone Club to Edra. While Blixseth may be technically correct, the evidence also shows that Blixseth was almost three years into a five year note but had repaid only $65 million of principal; all arguably attributable to the required release price of $800,000 per lot. Blixseth was able to make the interest payments on the Credit Suisse loan obligation by essentially cannibalizing the Yellowstone Club. Blixseth then left the Yellowstone Club to Edra in August of 2008, saddled with enormous debt that the Yellowstone Club had no prospect of repaying.

Also noteworthy is the fact that the Debtors' audited financial statements show that the outstanding balance owed by BGI and its affiliates to the Debtors was $272 million on December 31, 2005, $254.8 million on December 31, 2006, and $243.7 million on December 31, 2007. Approximately $18 million of the $28.3 million paid on the BGI notes was the result of a payment made by BGI toward the $38 million settlement with the LeMond Plaintiffs. Moore recalled that BGI only paid $5 million toward principal on the $209 million note.

Blixseth also seeks refuge in various audits performed by KPMG. With respect to the BGI notes, no evidence exists in the record that KPMG audited BGI to determine the true value of the BGI notes. Notably, KPMG did not assign a value of the BGI notes, but merely noted under paragraph 1(p) of the Notes to [the Debtors'] Combined Financial Statements of December 31, 2007 and 2006, that "[t]he fair value of the [note] due from managing member company and affiliates has not been determined as it is not practical to estimate." YCLT Exhibit 81.

Various aspects of the Debtors' financial condition were also examined by several experts:

<u>David Abshier</u>

David Abshier ("Abshier") performs financial advisory services for LECG and specializes in credit and risk management.  Abshier was retained in this case to evaluate the Debtors' loan transaction with Credit Suisse in accordance with regulatory and customary banking industry standards.  Abshier began his testimony by noting that the Credit Suisse Loan Agreement did not comport with the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").[24]  Because the new loan product was not FIRREA-compliant, Credit Suisse First Boston had to syndicate the loan through its newly formed Credit Suisse, Cayman Island Branch.  As previously noted, Credit Suisse created the loan product at issue with a view toward marketing the loan to sophisticated non-U.S. Bank investors, such as private equity and hedge funds, CDOs (collateralized debt obligation), CLOs (collateralized loan obligation) and similar funds that were not interested in FIRREA-compliant appraisals because such sophisticated parties did their own assessment of risk and applied their own discount rates.[25]  The 2005 appraisal done by Cushman & Wakefield in contemplation of the Credit Suisse Loan Agreement looked only at projected future gross revenues without any type of present value discount.  Abshier explained that a fair market value appraisal is "common sense" because it protects not only the lender, but also the borrower by ensuring that a borrower does not borrow more money than their collateral is worth.  Abshier saw absolutely no benefit to providing

---

[24]  FIRREA requires an appraisal in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP").

[25]  FIRREA requires that federal regulated entities who contemplate originating a loan in excess of $1 million must perform a market value appraisal.  Abshier later testified that federally regulated banks, including foreign banking organizations that have an insured branch, could not participate or invest in the Credit Suisse loan because it did not comply with FIRREA.

investors with a "total net value" appraisal as opposed to the traditional market value appraisal required under FIRREA.

Abshier also observed that Credit Suisse's loan product was nonconforming in that 100 percent of the loan proceeds were disbursed on the closing date. Abshier testified that it is not customary for lending institutions to lend 100 percent of approved loan funds at the closing date for large real-estate development projects. Instead, projects, such as the Yellowstone Club, are generally done in phases and the associated loan is funded accordingly. Furthermore, Credit Suisse's loan product allowed the bulk of the loan proceeds to flow directly to the borrower's principal, in this case BGI and Blixseth, for purposes unrelated to the underlying development. Yankauer countered that 100 percent funding of the loan in this case was appropriate because the loan was not a construction loan and Blixseth had already invested a substantial amount of equity into the project.

Abshier went on to observe that Credit Suisse did not require any type of reserve account with which to fund future payments on the Credit Suisse Loan Agreement. As explained by Abshier, a reserve requirement, which is typical in a land development case, allows a developer to remain current on a loan, even when costs increase or when there is a slowdown in development or absorption. Credit Suisse also did not require a secondary source of repayment. In fact, paragraph 9.20 of the September 30, 2005, Credit Agreement specifically provides that "[n]otwithstanding anything in any of the Loan Documents to the contrary, no partner or member or managing member in the Borrower shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrower to pay in full when due all Obligations in accordance with the

32

provisions of the Loan Documents." (Emphasis in original)

Finally, Abshier noted that while Credit Suisse First Boston provided all the marketing materials, made all the contacts in the United States, and engaged a United States appraiser, the signatory on the Credit Agreement was Credit Suisse, Cayman Island branch.[26]  Abshier found Credit Suisse's arrangement highly "unusual."

Kent Mordy

Kent Mordy ("Mordy") is a certified public accountant and a certified insolvency and reorganization advisor.  Mordy examined the Debtors' financial performance both pre- and post-September 30, 2005.  Mordy testified that the Debtors experienced negative cash flows in several of the years leading up to the Debtors' September 30, 2005, agreement with Credit Suisse. Several witnesses used the term EBITDA, which is earnings before interest, taxes, depreciation and amortization.[27]  Mordy testified that Credit Suisse's offering memorandum included cash EBITDA projections.  Using Credit Suisse's methodology, Mordy calculated that the Debtors' cash EBITDA in 2002 was a negative $15,701,772, in 2003 was a positive $20,369,766 and in 2004 was a negative $45,910,598.

In the offering memorandum, Credit Suisse projected cash EBITDA for the Debtors of $83,500,000 in 2005, $97.6 million in 2006, $135 million in 2007 and $269 million in 2008.

---

[26]  Yankauer explained that the New York Branch of Credit Suisse that created the loan product at issue was federally regulated.  Yankauer also stated that Credit Suisse was not participating in the Yellowstone Club loan, but was only "arranging" the loan.

[27]  EBITDA can be used to analyze and compare profitability between companies and industries because it eliminates the effects of financing and accounting decisions. However, this is a non-GAAP measure that allows a greater amount of discretion as to what is, and is not, included in the calculation.  EBITDA is a good metric to evaluate profitability, but not cash flow.

Reducing the above numbers for interest expense, Mordy testified that Credit Suisse's true cash EBITDA projections were $60 million in 2005, $72 to $73 million in 2006 and $113 million in 2007, yet Debtors' actual cash EBITDA in such years was woefully short of Credit Suisse's projections. The Debtors missed the Credit Suisse projections by $42,660,000 in 2005 because Debtors in fact had only $17 million with which to repay debt in that year. In 2006, Debtors missed the mark by $46 million because cash EBITDA was only $25 million. Similarly, in 2007, Debtors missed the mark by $90 million because cash EBITDA was $23 million rather than $113 million. Mordy characterized Credit Suisse's projections as a "leap of faith."

Mordy noted several deficiencies in Credit Suisse's projections. First, Credit Suisse failed to consider the Warren Miller Lodge, which was a major undertaking.[28] As of September 30, 2005, the Debtors had spent approximately $38 million on construction of the Warren Miller Lodge. However, by the petition date, the Debtors had spent a total of $101 million on the Warren Miller Lodge, which was an additional $63 million above and beyond what had been spent as of September 30, 2005. Also, the Credit Suisse offering memorandum stated that the Warren Miller Lodge was 90% complete and the Debtors expected to close on 21 of the Warren Miller Lodge condominium units in the fourth quarter of 2005 for $42 million. In reality, the Warren Miller Lodge, according to Sumpter, was a shell in September of 2005 and Debtors collected revenues of about only $1.6 million in 2005 and $1.2 million in 2006 from the Warren Miller Lodge. The Warren Miller Lodge units finally started closing more quickly in 2007.

---

[28] UCC Exhibit 50 is a Confidential Information Memorandum that states: "Any management projections or forward-looking statements included in the Confidential Information Memorandum are based on assumptions and estimates developed by management of the Company in good faith and management believes such assumptions and estimates to be reasonable as of the date of the Confidential Information Memorandum." P.6.

Credit Suisse's projections also failed to account for the $140 million that was used to purchase Yellowstone Club World assets. Instead, Credit Suisse's projections showed $140 million as staying in the Debtors' bank accounts for reserves to pay interest and principal on the Credit Suisse loan.

Mordy also pointed out that the Debtors, and thus Credit Suisse, were including in their income projections the anticipated revenues from Big Sky Ridge. However, the record shows that Big Sky Ridge was wholly-owned by Blixseth in 2002. In April of 2002, Big Sky Ridge paid $3.5 million for some land. Blixseth then sold 50% of Big Sky Ridge to Voyager Group, LP for $2.5 million. In September of 2003 Blixseth sold the other 50% of Big Sky Ridge to Yellowstone Development for $17 million. That same month, Blixseth bought back Voyager Group, LP's 50% interest in Big Sky Ridge for $3 million. Thus, in September of 2005, Blixseth owned 50% of Big Sky Ridge and Yellowstone Development owned the other 50%, entitling Blixseth to 50% of Big Sky Ridge's profits, yet Blixseth was including his profits from Big Sky Ridge in the revenue projections that he was supplying to Credit Suisse.

Mordy concluded that in exchange for a possible $164 million benefit, the Debtors undertook an obligation to repay $375 million plus interest. Mordy arrived at his $164 million calculation by adding the $133 million cash that stayed in the Yellowstone Club on September 30, 2005, the $6 million of principal payments from BGI on the $209 million note and approximately $25 million paydown on the $375 obligation by the Debtors.

Yankauer countered Mordy's testimony, arguing that EBITDA was in the neighborhood of $55.5 million. Yankauer considered 2005 income of $39,299,732 and added interest of $6,442,264 and depreciation and amortization of $9,868,957. Yankauer then included deferred

35

income from 2004 to reach the $83.5 million number used by Credit Suisse. Mordy apparently did not consider deferred income and subtracted real estate under development of roughly $13,660,000. Mordy also excluded $17.9 million for the purchase of property and equipment, and $9.6 million from construction in process. Mordy found Credit Suisse's assumptions unreasonable based upon the Yellowstone Club's historical performance.

After performing his forensic review of the Debtors' books, Mordy concluded that the purported $209 million loan to BGI and its affiliates was not in fact a loan under generally accepted accounting principles, but rather, was a distribution and a return of capital to BGI and its then owner, Blixseth. Six factors led Mordy to his conclusion. First, Mordy referred to the Credit Agreement which referred to funds that were earmarked as a return of capital. Second, repayment of the BGI notes payable, which were due on demand, was controlled by Blixseth, who controlled BGI. Third, the $209 million note payable included no scheduled principal payments and in fact, only minimal principal reductions were made. Moreover, the principal reduction payments that were made also benefitted BGI and Blixseth. Fourth, the Debtors continued to finance acquisitions and fund operations through bulks sales of lots rather than make demand on the BGI note payable. Next, Blixseth used funds from the Debtors, rather than BGI as contemplated, to purchase St. Andrews in Scotland. Finally, KPMG indicated in the footnotes of Debtors' 2006/2007 audited financial statements that the fair value of BGI's notes payable was not determined because it was not practical to estimate the value of such notes.

Based on his determination that the $209 million was a distribution rather than a loan, Mordy determined that as of December 31, 2005, the Debtors's books should have reflected

negative equity of approximately $141 million.[29]  In sum, Mordy concluded that the $209 million distribution left the Debtors highly leveraged and with too little capital with which to fund their financial plans and projections.

John S. Hekman

Dr. John S. Hekman ("Hekman") has a Ph.D in economics and is employed by LECG to provide expert witness testimony in the area of real estate and real estate finance.  Hekman was hired to examine Cushman & Wakefield's September 30, 2005, appraisal and tailor the appraisal to more accurately reflect Debtors' historical reality.  Hekman, like Mordy, also performed EBITDA calculations.

Hekman testified that the Debtors' had very small losses or profits in 2001 and 2002. Debtors' income in 2003 and 2004 was slightly higher with the Debtors' having $24 million in the best of the two years to service debt.  Hekman's EBITDA calculation for 2005 was $39 million.

Hekman observed that Cushman & Wakefield's cash flow projections went through 2012, and required the sale of 89 lots in a single year.  Credit Suisse, in turn, compressed Cushman & Wakefield's absorption period by two years, thereby effectively and unrealistically increasing the appraiser's cash flow projections for 2006 through 2010.  Hekman testified that Credit Suisse's cash flow projections were completely out of proportion to the Yellowstone Club's historical performance.  Hekman believed that Credit Suisse's aggressive projections warranted a 20 to

---

[29]  This amount represents the audited owners' equity balance of $67,701,812 as of December 31, 2005, less the $209 million, leaving roughly a negative $141 million.

30% discount rate.[30]  Hekman noted that Dean R. Paauw ("Paauw"), the appraiser who performed the September 30, 2005, Cushman & Wakefield appraisal, used a discount rate of 15% and Credit Suisse's expert, Christopher T. Donaldson ("Donaldson"), used a discount rate of 20%.  Using 2003 and 2004 as the baseline prices and sales (which increased Credit Suisse's compressed absorption period)--and Paauw's discount rate of 15%, Hekman determined that the Yellowstone Club had a value of $469 million in 2005 and a loan-to-value ratio of 80 percent.[31] Using Donaldson's 20% discount rate, Hekman calculated that the Yellowstone Club had a value of only $396 million and a loan-to-value ratio of 97 percent.  Hekman's calculations were in stark contrast to Cushman & Wakefield's "total net value" of $1,165,000,000, which produced a loan-to-value ratio of approximately 32 percent.

Interestingly, the total net value of the Club in 2005 was $1,165,000,000 but as of March 31, 2006, that value increased to $1,222,000,000.  In the total net proceeds report as of June 30, 2006, such amount increased to $1,225,000,000 and in the report as of September 30, 2006, the value was $1,250,000,000 and as of March 31, 2007, and June 30, 2007, that value was $1,361,000,000.  The total net value, according to Cushman & Wakefield, did not decline until late 2007.  As of September 30, 2007, the total net value decreased to $1,268,000,000. Consistent with the updated appraisals, which suggest that the value of the Club was increasing, Certificates of Compliance required under the Credit Agreement indicated that the loan to value ratio was consistently dropping.  The Credit Agreement specifically provided that the loan to

---

[30]  Blixseth's accountant Mack, in his July 14, 2005, letter to the "B" shareholders was representing that "marketability and monetary discounts" were between 30 and 55 percent.

[31]  Hekman's calculation also assumed a 3 percent increase in lot prices starting at the beginning of the absorption period.

38

value ratio could not exceed 45%. Per the compliance certificates, the loan to value ratio continued to decrease, going from 29.6%, Exhibit 18, to 28.4% on November 29, 2006, to 24.85% on May 29, 2007, and to 25.8% on May 29, 2008, and then to 27.6% on August 26, 2008.

Ignoring Cushman & Wakefield's "total net value" appraisals and the attendant loan-to-value ratio, Hekman found the more realistic loan-to-value ratio of 20% troubling because it left little room for fluctuations in the real estate market. Hekman explained that while it is difficult to predict a downturn in the real estate market, experts agree that downturns always come. Hekman testified that the real estate market was very strong in the late 1990's but real estate went down during the recession in 2001. In order to keep the economy moving during the recession, the Federal Reserve aggressively lowered interest rates which set off a wave of real estate investment and increases in real estate prices because the cost of financing was so low. Hekman characterized 2003 and 2004 as the peak years for real estate. However, due to concerns about a real estate bubble, the Federal Reserve began raising interest rates in 2005, which caused the beginning of a slowdown in the real estate markets. Indeed, the July 1, 2005, appraisal prepared by Cushman & Wakefield for Credit Suisse First Boston, LLC, UCC Exhibit 144, acknowledges on page 33 that "[t]he years 2003 and 2004 were record years for the national housing market. The housing market has continued to remain very strong in 2005. While price appreciation and sales activity have started to moderate in most markets across the country, continued low mortgage rates and strong housing demand have kept prices and sales at levels which are still near record highs in an historical perspective."

Other than using historical reality to reach a valuation determination, Hekman did not

change any other assumptions used in the 2005 appraisal.  For example, Hekman did not change

Paauw's projections for membership sales revenues.  Similarly, Hekman did not adjust Paauw's

projected development costs because he did not have enough information to determine whether

Paauw's other assumptions were reasonable.

To illustrate, Hekman looked at funds available to service debt.  The Yellowstone Club's

best year for income was 2005.  In that year, the Club had $39 million available to service debt.

Credit Suisse projected that the Yellowstone Club would have interest expense of $25 million in

2006.  On top of the interest expense, the Yellowstone Club was also required to pay a release

payment of $800,000 as each lot was sold.  Using the 48 lots sold in 2005 as a gauge, Hekman

calculated that the Yellowstone Club would be required to make release payments of

approximately $38 million.  Adding the interest expense of $25 million and the release payments

of $38 million meant that the Yellowstone Club needed to generate revenues of $63 million in

2006 just to service the Credit Suisse obligation.[32]  Hekman concluded that the Yellowstone

Club's historical cash flow were not sufficient to service the Credit Suisse loan going forward.

The Yellowstone Club's ability to service the Credit Suisse debt was only possible if the

Yellowstone Club had enormous increases in lot prices and/or lot sales.  Hekman highly doubted

that probability in a real estate market that was beginning to decline.

Hekman prepared a demonstrative exhibit showing actual lot sales at the Yellowstone

Club from 2001 through 2005.  *See also,* Addendum B to Cushman & Wakefield's September

30, 2005, appraisal.  On his demonstrative exhibit, Hekman also plotted projected lot sales from

---

[32]  Such debt service projection of $63 million does not include the 1% paydown of the
loan as required under the Credit Agreement.

2006 through 2012, which Hekman referred to as the absorption period.  Hekman pointed out the

obvious; that projected lot sales were significantly higher than actual lot sales.  Hekman found

the absorption period simply unrealistic because the absorption period was not based on

historical lot sales, was not justified by looking at comparable sales in other developments, and it

was not justified given the somewhat weakening economy, which was recognized in Cushman &

Wakefield's 2005 appraisal.  According to Hekman, in 2005, the Debtors' projected future lot

sales or absorption period should have mirrored historical sales.  Credit Suisse then took

Debtors' lofty projections and reduced the absorption period from 2012 to 2010 to comport with

Credit Suisse's proposed five-year loan.[33]  Hekman also criticized Cushman & Wakefield's 2005

appraisal because it projected prices that were significantly higher than historical prices.

Mordy explained that his cash EBITDA numbers differed from Hekman's 2003, 2004 and

2005 EBITDA calculations because Hekman did not subtract capital expenditures and

development costs.  Mordy subtracted capital expenditures and development costs in order to

more closely parallel Credit Suisse's cash EBITDA projections.  As discussed earlier, Yankauer

disputed Hekman's and Mordy's EBITDA calculations for 2005, arguing that such figure was

---

[33]  Paauw in 2005 and Donaldson when later doing his retrospective appraisal in 2009,
had the absorption period running to 2012 and 2013, and by June 30, 2008, Donaldson had
extended the absorption period out to 2016, clearly showing the error of Credit Suisse's projected
absorption period that ended in 2010.  The perverse effect of the total net value methodology is
illustrated by considering a 3% rate of inflation:  A lot carried on the books today at $1 million,
is growing in value by 3% for each year it is held, without any corresponding discount for the
time value of money or risk.  In contrast, a lot valued at $1 million today under a FIRREA
appraisal that is projected to sell three years from today's date would have a lower fair market
value, not higher value, because of the time value of money.

closer to $55,610,953.[34]  Whatever the accurate number, it is clear that even though the Debtors'

had experienced nine months of operations as of September 30, 2005, they missed their

profitability projections by a substantial amount.  Such numbers show that Debtors' projections

for the future, upon which Credit Suisse relied, had no foundation in historical reality.

Christopher T. Donaldson

Donaldson is a real estate appraiser employed as the managing director of the Utah office

of the global real estate firm of Cushman & Wakefield of Colorado.[35]  Donaldson took over

Paauw's appraisals of the Yellowstone Club in mid-2007.  In preparation for trial, Donaldson did

a retrospective appraisal of the Yellowstone Club and set the value at $571 million.  The

methodology that Donaldson used was a development analysis for a discounted cash flow, which

generally calculates discounted cash flows over a projected selling period.  Donaldson explained

that his approach involves four components: (1) revenue, which would be lot sales and

memberships sales and perhaps unit sales; (2) absorption, projecting anticipated sellout over a

certain period of time; (3) expenses such as developments costs, selling costs, and holding costs;

and (4) discount rate.  Donaldson consulted and included excerpts from Paauw's July 1, 2005,

and December 31, 2005, appraisals in his retrospective appraisal.

Donaldson's retrospective appraisal continued to assume that the Debtors would sell their

national memberships at a price of $650,000 each, even though Debtors had not previously sold a

---

[34]  The Debtors' combined audited financial statements show that the Debtors' operating
income for the year ending December 31, 2005, was $37,819,067.  Debtors' operating income for
the year ending December 31, 2006, dropped to $9,020,546.  *See* CS Exhibit 34.

[35]  Donaldson is a Member of the Appraisal Institute ("MAI") and is also a Certified
Commercial Investment Member ("CCIM").

single national membership and even though the highest membership fee that Donaldson could

find at any comparable membership club was $125,000.  Donaldson similarly calculated that the

Pioneer Mountain condos would sell for $3.5 million, or roughly $1,000 per square foot, even

though no Pioneer Mountain condo had ever sold for $1,000 per square foot.  Finally, Donaldson

assumed that 325 single-family lots could be sold, but the 325 number was not based on

engineered drawings.  Donaldson also did not contemplate any bulk sales.

Regardless of whose numbers are utilized, in conjunction with the Credit Suisse loan,

Moody's Investors Service reviewed the business fundamentals and financial condition of YMC

and YD in 2005 and assigned a private rating of B1 to the Credit Suisse Loan as of September

30, 2005.[36]  Debtors' Exhibit 235.  Such rating was based on the assumption that $16 million of

the Credit Suisse loan proceeds would be used to refinance existing debt, $209 million would be

distributed to shareholders and $142 million would fund a development reserve.  Under such

scenario, Moody's concluded that "the debt leverage figures look as follows: first-lien debt/total

net value of 32.2% and total debt/total net value of 39.0%."  Debtor's Exhibit 235.  As the parties

concede, $142 million was earmarked for investments and unrestricted use by subsidiaries

unrelated to the Yellowstone Club, and not a development reserve.  Such fact would have

undoubtedly reduced Moody's rating even lower to either "substantial risks" or "extremely

speculative."

Robert Reilly

---

[36]  According to Moody's rating system, the Credit Suisse loan rating was at the high end
of "Highly Speculative," but below the non-investment grade speculative (Ba3 to Ba1), lower
medium grade (Baa3 to Baa1), upper medium grade (A3 to A1), high grade (Aa3 to Aa1) and
prime ratings (Aaa) and just above the substantial risks (Caa1) , extremely speculative (Caa2), in
default with little prospect for recovery (Caa3 to Ca) and in default ratings (C).

Although Blixseth called not a single expert witness at Part I of this trial held in 2009, Blixseth called two expert witnesses to testify in February of 2010; Robert Reilly and Joanne Sheridan.  Robert Reilly ("Reilly") is an expert in the area of business valuations and solvency opinions and was retained to offer testimony solely as to the solvency of Blixseth and BGI as of September 30, 2005, December 31, 2006 and December 31, 2007.

As background, Reilly explained the Statement on Standards for Valuations Services No. 1 ("SSVS1")[37] as promulgated by the American Institute of Certified Public Accountants ("AICPA"), and then outlined the three solvency tests: the balance sheet test (does the value of an entity's assets exceed its liabilities); the cash flow test (based on an entity's income and the longest term of debt instruments, can the entity generate enough cash to pay the principal and interest on its obligations as they become due); and the capital adequacy test (on the solvency date, does the entity have enough capital to continue operating as a going concern business for a period of approximately one year).  Reilly testified that an entity is considered insolvent if it fails any one of the three solvency tests.

Reilly explained that a certified public accountant ("CPA") can give solvency opinions without complying with SSVS1 but if CPAs have the appropriate credentials and experience, and if they comply with SSVS1, they can give independent valuation opinions as well.  If an independent valuation opinion is contained within a solvency opinion, CPAs must comply with the AICPA standards, including SSVS1.

Reilly examined the solvency of Blixseth as of September 30, 2005, December 31, 2006,

---

[37] Reilly was a member of the Business Valuation Committee that developed SSVS1 and a member of the Executive Committee that approved SSVS1.

and December 31, 2007, using all three of the solvency tests and concluded that Blixseth was solvent on such dates.  Reilly also examined the solvency of BGI as of September 30, 2005, the end of 2006 and the end of 2007 using all three solvency tests and concluded that BGI was solvent on all three of the aforementioned dates.

Based upon information that Reilly received from Mack and Blixseth's counsel, Reilly's balance sheet test for BGI originally included the assumption that BGI had cash of $242 million on September 30, 2005.  Reilly later learned that BGI did not have cash on hand of $242 million on September 30, 2005, because such money had gone directly to Blixseth, and that the $242 million "really should be a note receivable."  In addition, to complete his balance sheet tests for BGI and Blixseth, Reilly relied upon Sheridan's balance sheet test of the Yellowstone Club.  As for Blixseth, Reilly was initially provided with a balance sheet as of 2004 and had to inform Blixseth's counsel that he would need starting balance sheets for 2005, 2006 and 2007.  On November 5, 2009, Blixseth's counsel forwarded Blixseth's and BGI's balance sheets to Reilly with a note that "[a]ll attached are 'WAG' balance sheets for [Blixseth] personally and BGI for the valuation period.  As part of the call this morning we hope to fill in some of the blanks."[38] Reilly proceeded to explain that he and his colleague continued to receive a number of revised balance sheets from November 7th or 8th of 2009 up until the date that they issued their final report.  Reilly's draft expert report was distributed to Blixseth's counsel on November 12, 2009, and his final report was dated November 13, 2009.  Interestingly, Blixseth's personal financial statements provided to Reilly for 2006 and 2007 both show "Cash & Securities" of $5,046,000, "Inventory" of $1,125,000 and "Automobiles" of $900,000 for total current assets of $7,071,000.

---

[38] The suggestion of counsel at the hearing is that "WAG" stands for wild a– – guess.

Reilly testified that he also performed a cash flow test and the capital adequacy test of the Yellowstone Club as of September 30, 2005, the end of 2006 and the end of 2007, and concluded that the Yellowstone Club was solvent on the three dates examined. Reilly could not give an overall solvency opinion of the Yellowstone Club because he did not perform the third solvency test, the balance sheet test.[39] Reilly did not see the need to perform a balance sheet test on the Yellowstone Club because one, the balance sheet test would not effect his solvency analysis of either BGI or Blixseth and two, Reilly understood that another expert was going to perform the balance sheet test for the Debtors and "it just wasn't part of [his] assignment." Reilly was confident in his solvency opinions, testifying that "my entities were not close to the zone of insolvency until, for example, the discount rates were well into the 20 percent range[.]"

Reilly's due diligence with respect to the two solvency tests he performed on the Yellowstone Club consisted of interviewing Blixseth, Mack and Sumpter.[40] Reilly testified that he relied on historical financial statements, tax returns, appraisals, management projections and business plans for the Yellowstone Club, and his own independent research, but testified later that he ignored the 2001, 2002, 2003 or 2004 financials, or actual historical performance of the Yellowstone Club when doing his analysis. Even though Reilly ignored the Yellowstone Club's historical performance, Reilly concluded overall that the Yellowstone Club's projections for

---

[39] Later, Reilly gave conflicting testimony that "there is no doubt in my mind that the three entities that I talked passed the three tests that I described on the dates that I described."

[40] As read into the record, Reilly qualifies his report: "The information I relied on in this analysis was provided to me by legal counsel and by the accounting firm Mack Roberts & Co., the accountants. I have not independently verified the accuracy and completeness of the information supplied by legal counsel or by the accountants, and I do not assume any responsibility with respect to that information. I have not made any physical inspection or independent appraisal of any of the properties or assets owned by YC, BGI, or Mr. Blixseth."

2005, 2006 and 2007 were "fairly reasonable" because on average, the projections for the Yellowstone Club were off by only about 7.5 percent.[41]

Reilly criticized Mordy's solvency opinion on grounds that Mordy was making critical assumptions that equated to an independent valuation. As explained by Reilly earlier in his testimony, when an expert gives a valuation opinion within a solvency opinion, the expert must comply with SSVS1. Also, Reilly contends that Mordy violated the "known or knowable rule." However, Reilly's criticisms were directed to Mordy's December 11, 2009, report and not Mordy's subsequent addenda and Reilly conceded that SSVS1 does not apply to the typical solvency analysis in the bankruptcy context. Reilly also acknowledged that violation of SSVS1 or the known and knowable rule does not render a solvency opinion invalid or unsupportable.

<u>Joanne Sheridan</u>

Joanne D. Sheridan ("Sheridan") was retained by Blixseth to perform the balance sheet test portion of the solvency analysis by examining the Debtors' financial statements as of December 31, 2005, December 31, 2006, and December 31, 2007. For example, using Cushman & Wakefield's September 30, 2005, appraisal, Sheridan concluded that the fair market value of Debtors' total assets was $1,120,089,177.00 as of December 31, 2005. Sheridan's asset number included cash and cash equivalents in excess of $120 million, property and equipment in excess of $696 million[42] and receivables in excess of $272 million due from the managing member

---

[41] Reilly testified that he tested the Yellowstone Club's 2005 projections by comparing them to the numbers the Debtors actually achieved in 2005, 2006 and 2007.

[42] Sheridan applied a discount rate of 14.5 percent to Cushman & Wakefield's 2005 appraisal to reach her fair market value of $696,300,000 for property and equipment. In their various appraisals, Cushman & Wakefield's discount rates ranged from 18 to 20 percent.

company and affiliates. Sheridan listed the value of the members' equity at $572,648,475.00. Subtracting members' equity from total assets puts current and long-term liabilities at roughly $547,440,702.00.

CROSSHARBOR'S PRE-PETITION EFFORTS TO PURCHASE
the YELLOWSTONE CLUB

On June 28, 2007, Byrne, on behalf of CIP Yellowstone Acquisition LLC ("CIP") and Blixseth, on behalf of YMC, YD and Big Sky Ridge, LLC, entered into a letter of intent wherein Byrne and CrossHarbor, through CIP, agreed to purchase all of the assets of YMC, YD and Big Sky Ridge, LLC for the sum of $510 million. As part of the anticipated purchase, Byrne and his group proceeded with a due diligence analysis of the Yellowstone Club. Byrne explained that given the state of the Yellowstone Club's books, coupled with the lack of cooperation by employees at the Yellowstone Club, CIP was forced to build its own financial models from the ground up. CIP spent roughly $4 million on its due diligence.

Edra, upon learning of Blixseth's agreement with CIP, sought to enjoin the sale, believing that the Yellowstone Club was worth far more than $510 million. Upon request by Blixseth, Judge Waters of the Superior Court of California, Riverside, who was presiding over the Blixseths' divorce, enjoined Edra from interfering with the sale.

After signing the letter of intent, Blixseth approached Byrne in August of 2007, to see if Byrne would be interested in purchasing 31 golf course lots at the Yellowstone Club. Byrne explained that "there was a lot of pressure put on us in the summer [of 2007] to make a purchase that would pay off the past-due payables, allow them to do some capital spending, and pay down [Credit Suisse First Boston]." According to Byrne, "we were solicited for virtually everything

that was available to be purchased at different points in time from probably the first quarter of 2006 right up until April of 2008. . . . [C]learly when it came time to purchase the golf course lots, there was a desperate cash need.  And, you know, that was really the only reason that that transaction was effected, was to provide the club enough cash to continue to operate."  The golf course lot sale was consummated in August of 2007 at a price of $54 million.  Byrne viewed the purchase of the 31 golf course lots as a bridge to CIP's overall purchase of the entire Yellowstone Club.

Following purchase of the golf course lots, another Byrne entity, Club YC Acquisition LLC entered into an Asset Purchase Agreement dated January 15, 2008, with YMC, YD, Big Sky Ridge LLC and Big Springs Realty LLC, agreeing to purchase the Yellowstone Club for $455,690,000, subject to various adjustments as set forth in the Asset Purchase Agreement.[43]  *See* Debtors' Exhibit 94.  In late March of 2008, Byrne and Blixseth were negotiating a $30 million discrepancy attributable to a purported utility easement and the nature and extent of the refund obligations of the Yellowstone Club under the Pioneer and Frontier memberships.  Byrne testified that he was "ready, willing and able" to close the deal in March of 2008 at a price between $403 to $408 million.  Byrne contends that Blixseth was not able to close the deal at $403 to $408 million because Blixseth would not be able to satisfy all the Yellowstone Club's liabilities with the sales proceeds.  In Byrne's words, Blixseth and the Yellowstone Club "would either have to write a big check or come up with a different way to move forward."  Byrne believed that if he purchased the Yellowstone Club for $403 million that Blixseth would have

---

[43]    Because Byrne had already purchased the golf course lots, the $510 million purchase price reflected in the letter of intent was reduced to account for the $54 million golf course sale.

had to bring $50 to $60 million to closing to satisfy the Yellowstone Club's liabilities.  As Byrne expressed in an email to Edra, "it is clear to all that the termination of the sale was the result of there simply not being enough money at the closing to deal with all of the liabilities."  In an effort to protect his financial deposit, Byrne terminated the sale by letter dated March 26, 2008.

Byrne obviously wanted the sale to go through because as the sale began to unravel, Byrne proposed to Blixseth that the Yellowstone Club file bankruptcy.  In an email dated April 1, 2008, Byrne told Edra that he "understood from a number of people . . . that you are telling them that I intended to bankrupt the Yellowstone Club and that I don't have the interest of the Club at heart and this is conclusive proof."  To address Edra's apparent concern over Byrne's "fleeting" solution to the Club's financial problems, Byrne explained, "the discussions on the prepackaged bankruptcy were so that an entity and not an asset deal could be done that would eliminate the trigger on all the tax liabilities and eliminate the need for the reps and warranties, and hold backs of $10 million."   The discussion of a possible bankruptcy was also addressed with Credit Suisse as a way to get around a 100% approval requirement but according to Byrne, Blixseth was adamant that bankruptcy was not a path he wanted to pursue.

Like the letter of intent, Edra undertook to undermine the Asset Purchase Agreement. From 2005 through August 12, 2008, Edra believed that the Yellowstone Club was worth far in excess of $510 million, the price that CIP originally agreed to pay for the Club.  Edra testified that her belief that the Yellowstone Club was worth far in excess of $510 compelled her to oppose Blixseth's sale of the Yellowstone Club to Byrne.

In July of 2008, after the proposed sale of the Yellowstone Club fell through, Byrne threatened suit against the Yellowstone Club.  Debtors' Exhibit 101, an email that Byrne sent to

Edra dated July 17, 2008, shows that Byrne was proposing to settle his claims under the Asset Purchase Agreement for his actual out-of-pocket costs associated with the due diligence of the Yellowstone Club purchase.  Byrne also stated in his email that "YC has real liability to us under this agreement, including our perspective that we pursue specific performance at the net price of approx $407 million."

Although Blixseth was negotiating to sell the Yellowstone Club to Byrne, CrossHarbor and CIP as late as March of 2008, Blixseth contends he remained current on the Credit Suisse loan agreement up until August 12, 2008.  Blixseth testified that CIP's termination of the Asset Purchase Agreement negatively impacted the Yellowstone Club's ability to repay the Credit Suisse loan.  This latter contention of Blixseth's is not supported by any credible evidence, other than the evidence showing that the Yellowstone Club simply did not have the ability to pay any of its bills in a timely fashion.

THE BLIXSETHS' DIVORCE

Blixseth and Edra separated sometime in 2006 and Blixseth retained sole control of the Debtors and the Yellowstone Club until August of 2008, when Edra was awarded BGI and the Debtors as part of the MSA.  During Blixseth and Edra's "bitter" divorce, Edra made several attempts to gain control of the Yellowstone Club, arguing that the Yellowstone Club was going broke under Blixseth's control.  Blixseth was successful in obtaining two orders against Edra restraining her from meddling in the Yellowstone Club's affairs.  Edra also tried to intervene in the action filed by the LeMond Plaintiffs against Blixseth and the Yellowstone Club.  Blixseth

contends that Edra's actions devastated sales at the Yellowstone Club.[44]

Even though Blixseth had "frozen" Edra out of the Yellowstone Club since December of 2006, Edra knew the Yellowstone Club was in a tough financial position in July and August of 2008.  Edra testified that the revenues at the Club were "hurt extensively" by the LeMond litigation, the Blixseths' divorce and the failed sale to CrossHarbor.  However, she did not know the exact nature of the financial condition.  The information that Edra had during the summer of 2008 was coming from Byrne and what he was learning through his due diligence.

As mentioned above, after a long and acrimonious divorce, Blixseth and Edra divided their marital property pursuant to the June 2008 MSA that was approved and incorporated into a California Superior Court final Judgment, Riverside County Case No. RIDIND91152.  As part of the MSA, both parties received full and comprehensive releases from the other party and those corporate entities to which the party obtained ownership.  The Debtors are listed as signatories on the releases, releasing Blixseth "from any claim, right or demand that any such Edra Entity has, or may have against any of the Timothy Released Parties."

After receiving his portion of the marital assets free and clear of any claims by, among others, the Debtors, Blixseth transferred his marital assets to Desert Ranch  LLLP, and in return, received 98% of the limited partnership interests in the LLLP.  The LLLP is a Nevada LLLP.  The LLLP's general partner is Desert Ranch Management, LLC, a Nevada LLC.  The LLC owns 2% of the LLLP and its membership interests are owned 40% by Blixseth, 30% by Blixseth's son, and 30% by two Trusts, whose Trustee is Mack.

---

[44] However, in an email to Doyle dated May 8, 2006, Blixseth said that if the LeMond Plaintiffs "actually file a suit and if they lose, I want to pursue them ALL with vengeance as it will likely cause the club some harm."  Exhibit 263I.

The Debtors were not parties to the MSA or any of its amendments. The Debtors were similarly not parties to the divorce proceedings and were not present at a divorce hearing held July 3, 2008, wherein that Waivers and Releases were approved at a perfunctory, non-confrontational hearing. At that hearing, the divorce court did not make any type of determination that the values on each side of the transaction between the Debtors and Blixseth (i.e. the Release) were equal. Indeed, the divorce court did not even make a determination as to equality in the value of the transaction as between Blixseth and Edra.

To finalize the MSA, Edra was required to make a cash payment to Blixseth. Edra originally secured a commitment for funding but that commitment would not allow Edra to consummate the MSA in mid-August of 2008. Edra thus approached Byrne asking for a 15-day loan so she could finalize the MSA. Edra and Byrne reached an agreement whereby CIP would loan Edra $35 million ("CIP Loan"). The CIP Loan was part of a larger transaction that was meant to bring financial stability to the Yellowstone Club. The CIP Loan was intended to be a short-term bridge loan that would provide Edra time to secure longer-term financing. The CIP Loan was evidenced by two notes:

> 1. A Promissory Note in the principal sum of $13,000,000.00 made by BLX and Edra to CIP; and
>
> 2. A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Edra to CIP.

The CIP Loan was secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing granted by BGI for the benefit of CIP. The BGI Deed of Trust encumbers the Porcupine Creek Property as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property and commonly

known and numbered as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California.  The CIP Loan is also secured by real property commonly referred to as the 160-acre Blixseth Family compound located within the Yellowstone Club.  The CIP Loan became due and payable in full on September 30, 2008.

Edra believed that she would be able to repay the CIP Loan within 15 to 30 days because she had been promised long-term financing from another financial institution.  Edra also believed that she would receive a cash infusion from the sale of Chateau de Farcheville, which Edra thought she could sell for $50 to $60 million.  The CIP Loan reached maturity and neither BLX nor Edra were able to repay the CIP Loan in full.  Once it was clear that Edra would not be able to secure long-term financing, Byrne once again suggested that the Yellowstone Club file bankruptcy.  Blixseth maintains that this bankruptcy is nothing but a sham concocted by Edra and Byrne so Byrne could purchase the Yellowstone Club at a deep discount.

Blixseth seeks to discredit Edra's testimony claiming Edra overstated the value of her assets in various pleadings before this Court.  Based upon what she knew in 2008, Edra  believed that Porcupine Creek was worth $207 million; Chateau de Farcheville was worth $64 million; Casa Captiva in Mexico was worth $22.5 million; and the Family Compound at the Yellowstone Club was worth $40 million.  While it is clear now that the aforementioned assets are worth far less than what Edra believed in 2008, her mistaken belief as to value does not undermine her credibility.  Unfortunately for Edra, she mistakenly believed that the assets she was acquiring under the MSA were worth much more than they really were.

Blixseth also seeks to discredit Edra by pointing out that Edra failed to list BLX in her personal bankruptcy schedules as one of her 20 largest unsecured creditors.  As part of the MSA,

Edra assumed the obligation that Blixseth owed BGI stemming from Blixseth's personal use of the Credit Suisse loan proceeds. Blixseth contends that Edra owed BLX $181 million on her petition date and that it was incumbent upon her to list BLX as a creditor. The Court is not going to discredit Edra's testimony simply because she essentially failed to list herself as a creditor on the list of 20 largest unsecured creditors.

CONFIRMATION of the YELLOWSTONE CLUB ENTITIES'
THIRD AMENDED JOINT PLAN of REORGANIZATION

On May 17, 2009, the Debtors and the Unsecured Creditors Committee settled and released their claims against Credit Suisse. Shortly thereafter, the Debtors filed their Third Amended Joint Plan of Reorganization on May 22, 2009. Following a hearing held June 1, 2009, the Court entered an Order on June 2, 2009, confirming the Debtors' Third Amended Joint Plan of Reorganization. Under the Yellowstone Club entities' confirmed Third Amended Joint Plan of Reorganization, the bankruptcies of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, and Yellowstone Club Construction Company, LLC were substantively consolidated, and are being jointly administered with the Chapter 11 bankruptcy of Big Sky Ridge, LLC. Bankruptcy Case Number, 08-61570 was designated by this Court as the lead case number for the consolidated and jointly administered cases.

Pursuant to Debtors' confirmed Third Amended Joint Plan of Reorganization, YCLT was created on July 17, 2009. As contemplated by the Debtors' confirmed Third Amended Joint Plan or Reorganization and pursuant to an Assignment and Assumption Agreements, the claims of the Debtors' were assigned to YCLT. On September 18, 2009, YCLT was substituted in place of the Debtors and the Unsecured Creditors Committee in this consolidated Adversary Proceeding.

PROCEDURAL POSTURE of this ADVERSARY PROCEEDING

During several debtor-in-possession financing hearings, the $375 million Credit Suisse loan and Blixseth's personal use of the loan proceeds was a popular topic of discussion. Those discussions eventually prompted the Court to schedule a show cause hearing on January 13, 2009, for parties in interest to appear and show cause why the Court should not lift the automatic stay to allow enforcement of the three Promissory Notes between the Debtors and BGI (now BLX) in the approximate stated amount of $275,000,000. Following the January 13, 2009, hearing, the Court entered an Order on January 16, 2009, lifting the automatic stay to allow "[the Official Committee of Unsecured Creditors], as fiduciary of the bankruptcy estate, [to] conduct a full review of the causes of action belonging to [the Yellowstone Club entities] that are related to the Promissory Notes to determine how [the Yellowstone Club entities'] bankruptcy estates should best proceed to recover the divested proceeds of the Credit Suisse loan[.]"

Shortly thereafter, the Official Committee of Unsecured Creditors (the "Committee"), on February 11, 2009, filed a combined "Notice of Claim Against Credit Suisse, Objection to Claim of Credit Suisse, and Motion for Authorization to File Complaint Against Credit Suisse." Blixseth's counsel received notice of the Committee's February 11, 2009, combined pleading, including the proposed complaint attached thereto. In anticipation of the Committee's complaint and as a protective measure, Credit Suisse filed a complaint against the Yellowstone Club entities and the Committee on February 25, 2009, thereby commencing this Adversary Proceeding. Credit Suisse's complaint was accompanied by a Motion to Expedite Proceedings and Set an Immediate Scheduling Conference.

The Committee then filed a separate complaint against Credit Suisse and John Does 1-15

56

on March 3, 2009, thereby commencing Adversary Proceeding 09-00017.  This Adversary

Proceeding and Adversary Proceeding 09-00017 were consolidated by the Court on March 3,

2009.  Blixseth's counsel, along with the other attorneys involved in the Yellowstone Club

entities' bankruptcies, including counsel for the Yellowstone Club entities, the Committee and

Credit Suisse, appeared at a hearing held March 4, 2009.  At the March 4, 2009, hearing, counsel

for the Yellowstone Club entities, the Committee and Credit Suisse discussed the need for an

expedited trial in this consolidated Adversary Proceeding because of the Debtors' need to secure

confirmation of a Chapter 11 plan before their already extended debtor-in-possession financing

expired.  At the conclusion of the March 4, 2009, hearing, the Court directed the parties to

submit a proposed scheduling order.  On March 11, 2009, the Yellowstone Club entities, the

Committee and Credit Suisse filed a Stipulated Scheduling Order, which the Court adopted as the

Scheduling Order governing this consolidated Adversary Proceeding.  The Scheduling Order set

April 22, 2009, as the date for commencement of trial.

On March 16, 2009, Blixseth filed a Motion to File Complaint in Intervention.  Following

an expedited hearing held March 24, 2009, the Court granted Blixseth's motion to intervene.

While the Court advised Mr. Guthals, one of Blixseth's attorneys, that it would entertain requests

to extend discovery and other such deadlines, the Court made it very clear to Mr. Guthals that

trial would commence on April 22, 2009, as scheduled, and that Blixseth would not be permitted

to delay the proceedings.

Blixseth's counsel promptly filed Blixseth's complaint in intervention on March 24, 2009,

and on March 25, 2009, Blixseth filed a request for shortened time for the other parties-in-

interest to respond to his complaint in intervention, which the Court granted.  Despite the Court's

prior directive to Blixseth and his counsel that they be ready for trial on April 22, 2009, Blixseth

filed a Motion to Amend Scheduling Order and Continue Trial Date on March 26, 2009.

arguing:

> 11. On behalf of Mr. Blixseth, the undersigned requests that the present trial date
> be continued to a date and time convenient to the Court and counsel, but not
> earlier than May 11, 2009 and that the pretrial deadlines be adjusted and the time
> for parties to respond to discovery requests be shortened, all to allow Mr. Blixseth
> to have a fair opportunity in the trial of this consolidated adversary proceeding.

> 12. Mr. Blixseth and his lawyers appreciate the Court's need to promptly decide
> the issues in this case, prior to confirmation of the Chapter 11 Plan, and are
> willing and able to handle this litigation in an expeditious fashion, as they have so
> far demonstrated.

Following a hearing held March 27, 2009, the Court entered an Order denying Blixseth's motion

for continuance.

Prior to commencement of trial, Blixseth filed on April 14, 2009, an emergency motion to

dismiss the Committee's claims against Blixseth.  In said emergency motion, Blixseth claimed

that the Committee had violated Blixseth's attorney-client relationship and gained confidential

attorney-client information from attorney Brown on matters that were the subject of the litigation

in this consolidated Adversary Proceedings.  Blixseth argued that he had been damaged by

Brown's alleged divulgence of information that was protected by Blixseth's attorney-client

privilege.

Brown admittedly represented the Debtors in various matters between the late 1990's

through 2008.[45]  Doyle testified that Brown was "prime" Montana counsel for the Yellowstone

---

[45]  The Debtors explicitly waived the attorney-client privilege with regard to the Debtors
and Credit Suisse loan or communications with counsel.  Also, Brown withdrew as the Debtors'
counsel in the fall of 2008.

Club, and as Sumpter explained, during the Credit Suisse transaction "[Brown] was our Montana counsel. And so everything, basically – Mike Doyle basically managed [Brown] because [Doyle] managed our attorneys at that point in time." Brown also represented Blixseth personally in a separate action brought by Greg LeMond against certain of the Debtor entities and Blixseth starting in October of 2007[46] and then also from June of 2008 to sometime in the fall of 2008 in connection with Blixseth's divorce from Edra as it pertained to the division of Montana assets. Both the LeMond Plaintiffs' litigation and LeMond's separate litigation were stayed on November 10, 2008, as a result of the Debtors' bankruptcies and thus, Brown has not done any work for Blixseth personally since that time.

Brown and his law firm, Garlington, Lohn & Robinson, PLLP ("GLR"), have a substantial unsecured claim against the Debtors for work that Brown and GLR did for the Debtors prepetition. Because of the substantial claim, Brown agreed to serve as Chairman of the Committee. Brown was one member on an eleven member committee and testified that he served as a layperson on the Committee, performing no legal work for the Committee.[47] The Committee was represented by various attorneys from Parsons, Behle & Latimer of Salt Lake City, Utah and by attorney James H. Cossitt of Kalispell, Montana.

Blixseth claims Brown's alleged violations of Blixseth's attorney-client privilege has tainted every aspect of the trial in this matter. Given the seriousness of the allegations, the Court

---

[46] Brown did some initial work in the LeMond Group litigation, but that suit named only Yellowstone Mountain Club, LLC and Yellowstone Development, LLC. Blixseth was not named as a defendant in the LeMond Group litigation.

[47] Jorge V. Jasson of the LeMond Group also served on the Committee but Greg LeMond was not on the Committee, despite suggestions by Blixseth that Greg LeMond was a member of the Committee.

instructed the Committee to initially produce copies of those email communications on

Blixseth's Exhibit 8 that originated from Brown.  The Committee complied with the Court's

request by producing, on May 1, 2009, copies of various email communications between

December 22, 2008, and March 19, 2009.[48]  The Court carefully reviewed each of the emails and

found that the emails in question were protected by the Committee's attorney-client privilege.

Moreover, and more importantly, the Court found absolutely no evidence that Brown violated

Blixseth's attorney-client privilege.  In sum, Blixseth failed to show any actual disclosure of

attorney-client communication.  Blixseth's arguments on this point were nothing but baseless

allegations intended to derail these proceedings.

Blixseth's counsel also took every opportunity to complain that Blixseth was denied due

process because of his inability to properly prepare for trial given the speed with which the

matter went to trial.  For example, on the eve of trial, Blixseth's counsel filed an expedited

motion to bifurcate trial of claims regarding Blixseth arguing that Blixseth had not had an

opportunity to conduct and complete adequate discovery and trial preparation.  In response to that

argument, the Court wrote:

> The Committee and the Debtors oppose Blixseth's motion for bifurcation
> arguing that this case has been a monumental undertaking for every party, not just
> Blixseth. Once Blixseth asked to be a part of this case, the parties worked with
> Blixseth–including delaying Blixseth's deposition while he was on his
> honeymoon–and now Blixseth is an integral part of this proceeding. Credit Suisse
> similarly opposes Blixseth's request arguing that Credit Suisse could potentially
> be collaterally estopped from proceeding with its claims against Blixseth.
>
> The Court agrees with the positions of the Committee, Debtors and Credit
> Suisse regarding bifurcation. Particularly as Blixseth's counsel filed a notice of

---

[48]  The Committee later provided the Court with four disks that contained all the
privileged communications identified on Exhibit 8.

appearance on November 24, 2008.  Moreover, Blixseth's counsel received notice of the Committee's proposed complaint as early as February 11, 2009, and while Blixseth is not specifically named as a defendant in said complaint, as Blixseth's counsel argues, it's quite apparent from a reading of the complaint that Blixseth is one of the John Does. Blixseth's request for bifurcation would put this entire proceeding into a tailspin at this juncture, resulting in a vicious circle of piecemeal litigation.

Blixseth next complained on April 22, 2009, the date trial was scheduled to commence, that the other parties in this matter had not formally produced all their exhibits to Blixseth.  After considering Blixseth's numerous grievances, the Court, for Blixseth's benefit, delayed the trial for a period of one week, explaining:

> [T]he Court is troubled by the parties' lackadaisical attitude toward producing their exhibits to each other. While the Committee did not have a great deal of documents to produce in this case, the Committee . . . established an FTP server where all the parties could deposit all documents relevant to this case. That server contains thousands and thousands of pages of documents. Because all the parties, including Blixseth, had access to the FTP server, the parties failed to produce their exhibits to each other under the time set forth in the Scheduling Order, as amended on April 16, 2009. To be specific, even though exhibits were to be provided to opposing parties on April 20, 2009, Blixseth did not receive some exhibits until 11:00 p.m. on the eve of trial. Moreover, as of 09:00 a.m. on the day of trial, this Court did not yet have a pretrial order from the parties. The Court will not allow this case to go forward if it would deny a party its Constitutional right to fundamental due process.
>
> Blixseth now has copies of the Debtors' Exhibits, the Committee's Exhibits and Credit Suisse's Exhibits. Because bifurcation is not a viable option, the Court's only alternative is to delay the trial to afford Blixseth time to review and digest the exhibits from other parties.

Blixseth's counsel also argued on a regular basis that Blixseth was being denied due process because the Committee, the Debtors and Credit Suisse had a full month more to prepare for trial.  The evidence showed otherwise.  The parties all agreed that Blixseth was originally named as a defendant in the Committee's complaint and in fact, on or about February 7, 2009, the

Committee's counsel contacted Blixseth's counsel, Michael Flynn, as a courtesy, prior to the date the Committee filed its Complaint, to apprise Blixseth that he was going to be named as a defendant. About this same time, Blixseth was making noise that he was going to possibly put an end to the increasing litigation associated with the Debtors' bankruptcy cases by proposing to pay many of the unsecured creditors in full.  Blixseth's statements obviously prompted Brown to send an email to the Committee's counsel asking the Committee to hold off on filing the Complaint against Blixseth stating "we need to hear what Tim Blixseth has to say first[.]"  Sometime between February 7, 2009, and March 3, 2009, Blixseth was removed from the Committee's Complaint as a named defendant.

Still, as Blixseth's counsel explained, the complaint filed in Adversary Proceeding No. 09-17 contained numerous references to Blixseth. Thus, Blixseth felt compelled to intervene. While Blixseth was not granted leave to officially intervene until March 24, 2009, Blixseth knew the Committee had its sights on him as early as February 7, 2009.  Accordingly, Blixseth had just as much time as the other parties to prepare for trial, yet Blixseth continued to complain that he was being denied due process under the deadlines and trial date set forth in the stipulated scheduling order.

Part I of the trial in this consolidated Adversary Proceeding finally commenced on Wednesday, April 29, 2009.  Part I of the trial was held in Missoula on April 29, April 30, May 1, May 4, 5 and 6, 2009.  At Part I of the trial, the Debtors were represented by Tom Hutchinson, Troy Greenfield, Connie Sue Martin and David A. Ernst of Seattle, Washington, and James A. Patten of Billings, Montana; Credit Suisse was represented by Mark S. Chehi, Robert S. Saunders and Joseph O. Larkin of Wilmington, Delaware, George A. Zimmerman, Evan R. Levy

and Jeremy M. Falcone of New York, New York, Edward J. Meehan of Washington, D.C. and

Shane Coleman of Billings, Montana; the Committee was represented by J. Thomas Beckett,

Chris P. Wangsgard, Derek Langton, Sean D. Reyes and Mark W. Dykes of Salt Lake City, Utah,

and James H. Cossitt of Kalispell, Montana; and Blixseth was represented by Michael J. Flynn of

Boston, Massachusetts, Joseph M. Grant of Houston, Texas, and Joel E. Guthals of Billings,

Montana.  The Court heard expert testimony from David Abshier, John Hekman, Kent Mordy

and Christopher Donaldson.  The Court heard fact testimony from Blixseth, Michael W. Doyle

(currently in-house counsel for Blixseth Group of Washington, LLC), Stephen R. Brown, Moses

Moore, Brad Foster, Samuel T. Byrne, Edra Blixseth, Steve Yankauer, and Robert Sumpter.  The

testimony of the following witnesses was submitted through deposition transcript:[49] Jeff Barcy,

Dean R. Paauw and William G. Griffon.

Following conclusion of Part I of the trial on May 6, 2009, the Court entered a Partial and

Interim Order on May 12, 2009.  The Partial and Interim Order dealt solely with the Debtors' and

the Committee's claims against Credit Suisse.  The Court specifically noted in the Partial and

Interim Order that the Court was issuing "an interim ruling for purposes of facilitating the

upcoming auction of the Debtors' assets" and that a detailed memorandum of decision and order

would be entered at a later date to decide all matters heard at trial.  On June 11, 2009, the Court

---

[49]  Blixseth listed George Mack as a trial witness in his Amended List of Witnesses filed
April 27, 2009.  Blixseth testified at trial that George Mack was in Missoula at the time of trial
and available to testify.  However, Blixseth did not call George Mack as a witness.  After trial, a
question arose regarding the admission into evidence of George Mack's deposition.  Because
George Mack was available to testify, but was not called, the Court declines to consider George
Mack's deposition under Fed.R.Civ.P. 32(a), made applicable to this proceeding by F.R.B.P.
7032.  For the reasons just stated, and because Stephen R. Brown testified, the Court will
similarly not consider the deposition testimony of Stephen R. Brown.

entered its subsequent Memorandum of Decision in which it denied Blixseth's then pending motions to dismiss.  The Court also "found absolutely no evidence that Brown violated Blixseth's attorney-client privilege" concluding that "Blixseth's arguments on this point are nothing but baseless allegations intended to derail these proceedings."[50]  GLR has a substantial claim against the Debtor entities stemming from the legal services provided by GLR to the Debtors.  It thus made sense for Brown to serve on the Committee.  Although Brown had also represented Blixseth personally in some very specific matters, the evidence showed that Blixseth encouraged Brown to serve on the Committee, Blixseth understood the constraints under which Brown was proceeding, that Blixseth was fully aware that Brown could not represent him in the Debtors' bankruptcy cases and that Brown recused himself from any Committee activities that might conflict with his prior representation of Blixseth.  For instance, Brown recused himself from participating in the subcommittee of the Committee that made the decision to file suit against Credit Suisse and Blixseth.  Blixseth did not produce any evidence to show that Brown's involvement on the Committee in any way compromised Blixseth or tainted these proceedings.

The Court also wrote in the June 11, 2009, Memorandum of Decision:

> The evidence to date is not favorable for Blixseth. However, this Court is very cognizant of how fast this matter went to trial, and thus, the Court will keep

---

[50]  Blixseth also sought in another motion the "imposition of sanctions and contempt for intentional spoliation of books, records and electronic evidence of Edra Blixseth."  Blixseth, in the spoilation motion sought, in part, dismissal of this Adversary Proceeding because of Edra's alleged spoilation of evidence.  In denying such motion, which contained not a single allegation of wrongdoing by the Debtors or YCLT, the Court concluded that Blixseth had failed "to show how the alleged destruction of emails, particularly 'a gap of sent emails from October 2008 through December 2008,' ha[d] any relevance to the Credit Suisse loan in 2005 or the use of proceeds therefrom."  Dkt. 546, p.5.  Many of Blixseth's claims to date have been nothing more than unsubstantiated rhetoric meant to divert this Court's attention away from the controlling facts.

the record open and will set a further scheduling conference in August. At that
time, the Court will schedule a continued trial date at which the parties will be
afforded additional time to present additional evidence for and against Blixseth.
By keeping this record open and allowing Blixseth additional time to prepare
for trial, the Court will permit Blixseth an opportunity to further develop the
merits of his case with new, not cumulative, evidence and will further permit and
authorize Blixseth to immediately pursue any additional new, not cumulative,
discovery that may be permissible under the Federal Rules of Bankruptcy
Procedure, without waiting for the August scheduling conference.

After the Court entered the above Memorandum of Decision on June 11, 2009, the Court

entered an Order on June 29, 2009, dismissing all claims brought by or against Credit Suisse in

this consolidated Adversary Proceeding.  The Court also vacated its Partial and Interim Order

entered May 12, 2009.

Following a scheduling conference held August 12, 2009, the Court entered a further

scheduling order which directed that Part II of the trial in this Proceeding would commence on

February 24, 2010.  After entry of the further scheduling order on August 12, 2009, the now-

named Defendant/counter claimant, Yellowstone Club Liquidating Trust ("YCLT"), filed a

Motion for Party Substitution on September 3, 2009, seeking to substitute YCLT in place of the

Committee and the Debtors on grounds that YCLT is the successor-in-interest to the claims

brought by the Committee and the Debtors in this action, which were transferred to YCLT on

July 17, 2009, pursuant to the Debtors' confirmed Third Amended Joint Plan of Reorganization

and an Assignment and Assumption Agreement.  YCLT's motion for substitution was granted on

September 18, 2009.

Part II of the trial was held February 24, 25 and 26, 2010, in Missoula.  Blixseth was

represented at Part II of the trial by Michael J. Flynn of Boston, Massachusetts, Benjamin A.

Schwartzman, Thomas A. Banducci and Wade L. Woodard of Boise, Idaho, and Joel E. Guthals

of Billings, Montana.  YCLT was represented at Part II of the trial by Steven L. Hoard and John

G. Turner, III of Amarillo, Texas, Brian A. Glasser and Athanasios A. Basdekis of Charleston,

West Virginia, and Shane P. Coleman of Billings, Montana.  The Court heard additional

testimony from Marc S. Kirschner, Ani Garikian of Kolodny & Anteau, Richard Samson, Robert

Reilly, Joanne B. Sheridan, David Thornton, Blixseth, Moses Moore, Michael Snow, Kent

Mordy and Harry Potter.

Following Part II of the trial, the parties participated in a post-trial mediation in May of

2010.  The Court has been advised that the mediation was not successful in resolving the pending

matters in this Adversary Proceeding.

## JURISDICTION and VENUE

This consolidated Adversary Proceedings arises under title 11 of the Bankruptcy Code,

and arises in and is related to the Debtors' substantively consolidated and jointly administered

bankruptcy cases, which are pending in this Court.  This Court has jurisdiction over these

proceedings under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

Venue is proper under 28 U.S.C. § 1409.  Blixseth withdrew his request for a jury trial after

YCLT withdrew its claim for punitive damages.

## CONTENTIONS OF THE PARTIES

The parties contend that there are two central unresolved issues in this case: "(i) whether

Mr. Blixseth breached his fiduciary duties to the Debtors by causing the Borrowers to enter into

the Credit Suisse Loan and by subsequently using the proceeds for his personal benefit and for

the benefit of third parties, and the damage, if any, caused by the alleged breaches; and (ii)

whether the Credit Suisse Loan and the subsequent transfers of those loan proceeds were

fraudulent transfers under Montana state law."

Notwithstanding his actions, Blixseth claims that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the Debtors into bankruptcy so that Byrne could purchase the Debtors at a deep discount, with no apparent benefit to Edra.  The Court is not persuaded by Blixseth's attempts to lay blame at Edra's doorstep, particularly when Blixseth was the driving force behind the Credit Suisse transaction.

Blixseth attempts to justify his use of the money arguing that Blixseth knew he needed to reach a bigger market if the Yellowstone Club was going to succeed financially.  Thus, he sought to take the Yellowstone Club international and that is why Yellowstone Club World was created. But those properties, with perhaps the exception of Chateau de Farcheville and the Scotland property, ended up in the hands of Edra and Blixseth personally.  Blixseth's counsel summarized in oral argument that Blixseth "built it, he owned it, he was absolutely entitled to take this money out, and it was part of his business vision to go international.

Blixseth contends, and Mordy agrees, that BGI paid back approximately $6 million of the $209 million note.  Interest was also paid over a period of time, but eventually stopped.  There was no real distinction between Blixseth and BGI, other than BGI's corporate structure and Blixseth agrees that he had sole control of BGI's affairs in 2005.

In his complaint-in-intervention, Blixseth seeks declaratory judgments: (1) that the Committee's and the Debtors' claims are barred by the statute of limitations; (2) that the Credit Suisse Loan was not a fraudulent transfer; (3) that Blixseth has been released from liability for any claim asserted by the Debtors; (4) that Blixseth did not have a fiduciary duty to the Debtors'

67

creditors; (5) that the loan or a portion of the Credit Suisse Loan proceeds to BGI was not a fraudulent transfer; and (6) that YCLT's claims assigned from the Debtors' and its amended claims are based on defective assignments under Montana law, that said claims are based on the bad faith of the Debtors, Cross Harbor Capital and Edra, that said claims are barred as a matter of law, and that the real party in interest of YCLT is Credit Suisse, which is contractually prohibited from pursuing claims against Blixseth on a nonrecourse loan.

YCLT counterclaims that in directing the Debtors to enter into the Credit Suisse Loan and immediately transferring a substantial portion of those proceeds to BGI (for Blixseth's personal use), Blixseth breached his fiduciary duties to the Debtors, entitling YCLT to damages and/or disgorgement of all funds received by Blixseth from the Credit Suisse loan proceeds.  Also, YCLT claims that in directing Debtors to purchase certain assets for the benefit of third parties using proceeds from the Credit Suisse Loan, Blixseth breached his fiduciary duties to Debtors, entitling YCLT to damages and/or disgorgement of all funds received by Blixseth from the Credit Suisse loan proceeds.  Next, counsel for YCLT asserts that YCLT is entitled to recover damages in the amount of at least $286.4 million for Blixseth's breaches of fiduciary duties. YCLT maintains that pursuant to 11 U.S.C. § 544(b), the transfer of proceeds from the Credit Suisse Loan to BGI and Blixseth for the benefit of Blixseth was a constructively fraudulent transfer under MONT. CODE ANN. ("MCA") § 31-2-333(1)(b), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).  YCLT argues that the transfers/distributions described above constitute a violation of MCA § 35-8-604(1)(a) and (b).  YCLT also claims that pursuant to 11 U.S.C. § 544(b), the purchase of certain assets for the benefit of third parties using proceeds from the Credit Suisse Loan were constructively fraudulent transfers under MCA §

68

31-2-333(1)(b), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).

Next, YCLT contends that the transfer/distribution described above constitute a violation of

MCA § 35-8-604(1)(a) and (b).  YCLT argues that it is entitled to a judgment against Blixseth

for the value of the transfers in the amount of at least $286.4 million.  According to YCLT, the

transfers of Credit Suisse loan proceeds constitute conversion.  Furthermore, YCLT argues that

Blixseth has been unjustly enriched by such transactions.  Therefore, YCLT argues that it is

entitled to a judgment against Blixseth for the value of the loan proceeds that he converted in the

amount of at least $286.4 million.  YCLT states that this is also the amount by which Blixseth

has been unjustly enriched.  Finally, YCLT maintains that Blixseth and BGI were the alter egos

of one another at all times prior to August 13, 2008.

The parties also assert additional defenses.  With respect to the alleged release of claims

purportedly given to Blixseth on behalf of the Debtors and/or BGI, YCLT asserts that such

release is a fraudulent transfer that should be set aside and declared to be unenforceable as a

matter of law.  YCLT argues that the claims against Blixseth constitute a valuable asset of the

Debtors' consolidated estate. The release of such claims would constitute a fraudulent transfer

under MCA §§ 31-2-333 and 31-2-334 and 11 U.S.C. § 548(a)(1), and can be avoided pursuant

to 11 U.S.C. § 550 and MCA § 31-2-339(1)(a).  YCLT asserts that the releases were obtained by

Blixseth with the actual intent to hinder, delay, or defraud the creditors of the Debtors.  Likewise,

the Debtors did not receive a reasonably equivalent value in exchange for the release.  No

consideration was given to the Debtors in return for the release.  The Debtors were engaged or

were about to be engaged in a business or transaction for which their remaining assets were

unreasonably small in relation to the business or transaction, and Blixseth knew that Debtors had

69

incurred debts beyond the Debtors' ability to pay as they became due.  The Debtors were insolvent within the meaning of MCA § 31-2-329 and 11 U.S.C. § 548(a)(1)(B) at the time the release was given.  Blixseth was an insider of the Debtors, and he either knew the Debtors were insolvent or had reasonable cause to believe that the Debtors were insolvent.  The release is unenforceable under California law, Montana law and federal bankruptcy law.

YCLT asserts that it has stated claims upon which relief can be granted.  YCLT also asserts that its claims are not barred by any statute of limitations either because the limitations period had not run by the time this adversary proceeding was filed or because accrual of its claims was tolled under the adverse domination doctrine, the discovery rule and/or fraudulent concealment.  Also, YCLT asserts that Blixseth's defenses of waiver, estoppel, laches, and unclean hands are not supported by the facts in this case and, in any event, these defenses  may not be asserted against YCLT as a matter of law.

YCLT also counters that it has standing to assert the claims herein by virtue of the Debtors' Third Amended Joint Plan of Reorganization and certain assignments executed by the Debtors.  According to YCLT, because the breach of fiduciary duty claims asserted by YCLT are intentional torts, Blixseth's arguments regarding proximate causation and intervening/superseding cause fail as a matter of law.  Also, YCLT argues that because the relevant time period for analyzing fraudulent transfer claims is the time of the transfer, Blixseth's causation arguments fail as a matter of law.  In addition, the causation arguments are not relevant or applicable to YCLT's fraudulent transfer claims against Blixseth.  YCLT asserts that the self-dealing actions of Blixseth are not protected by the business judgment rule; the alleged reliance on experts defense asserted by Blixseth is not supported by the facts of this case; and

Blixseth never received any expert advice relating to his breaches of fiduciary duty or the fraudulent transfers at issue herein. Furthermore, such defense is not applicable as a matter of law because of Blixseth's self-dealing and conflicts of interest. YCLT argues that the allegations made by Blixseth relating to alleged breaches of Blixseth's attorney-client confidences and privileged communications do not warrant dismissal of YCLT's claims. YCLT also asserts that Blixseth's defenses of accord and satisfaction, payment and assumption of the risk are not supported by the facts. YCLT further incorporates all the legal arguments made in its Response in Opposition to Blixseth's Motion for Summary Judgment including without limitation the arguments regarding the unenforceability of the release, YCLT's standing, the doctrine of issue preclusion, the Rooker-Feldman doctrine, the statute of limitations, and the alleged reliance on advice of counsel. YCLT further incorporates herein all the legal arguments made in its Response in Opposition to Blixseth's Motion for Reconsideration of his prior motions to dismiss, including without limitation the arguments regarding Blixseth's claims of intervening or superseding cause.

In his reply to YCLT's amended counterclaim, Blixseth denies the Committee's counterclaims and further asserts that the Committee's counterclaims are barred in whole or in part by failure to state a claim upon which relief can be granted; statute of limitations; MCA §§ 1 -3-208, 1-3-215, 27-1-703; waiver; release; estoppel; laches; unclean hands; *in pari delicto*; accord and satisfaction; payment; settlement with Credit Suisse and accompanying offset; the doctrine of issue preclusion; the Rooker-Feldman doctrine and federalism principles; YCLT's lack of standing because Debtors are not creditors entitled to relief; YCLT's lack of standing because the creditors were not creditors at the time of the Credit Suisse loan transactions;

71

YCLT's lack of standing because the Debtors unlawfully transferred their claims; YCLT's lack of standing because the Debtors' transfer of claims was void *ab initio*; YCLT's lack of standing because it is controlled by a party who participated in the allegedly bad behavior; assumption of risk by creditors who advanced credit after the Credit Suisse loan transactions; Blixseth's lack of proximate cause for the Committee's claims and damages; proximate causation by the conduct of other persons, including but not limited to, the collusion of Edra, Sam Byrne and CrossHarbor Capital to thwart a purchase of the Debtors by the filing of a Chapter 11 petition in bad faith; causation by unforeseen and unforeseeable events over which Blixseth had no control; Blixseth's conduct and transactions are protected by the business judgment rule; Blixseth's conduct and transactions were based upon Blixseth's reasonable reliance on advice of qualified professionals, including legal and accountant opinions; Blixseth is only subject to liability equal to that which could have been distributed without violating the Montana Limited Liability Act; and the claim for unjust enrichment is barred by the existence of legal remedies including, but not limited to, contractual, tort and statutory remedies.

This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.  For the reasons discussed below, judgment is entered in favor of YCLT, in part and in favor of Blixseth, in part.

DISCUSSION

At the commencement of Part I of the trial in this matter, Blixseth's counsel argued that when this trial was over, the Court would understand that the primary reason the Yellowstone Club went into bankruptcy was because of Edra's "obsession to control the Yellowstone Club[.]" Blixseth failed to make any such showing.  Instead, the evidence shows that, as a threshold

matter, Blixseth removed funds from the Debtor entities and attempted to disguise the removal of

such funds as a loan, when in fact, the money was a distribution to BGI and then Blixseth.

Blixseth's removal of funds from the Debtors was the primary, and perhaps the sole reason the

Debtors are in bankruptcy today.

      **1.**      **Loan versus Distribution.**

      The evidence in this case shows beyond any doubt that Blixseth took a substantial amount

of money from the Debtor entities with no intention whatsoever of repaying those monies back to

BGI or the Debtors.  In that vein, Blixseth did whatever was necessary to disguise his taking of

over $200 million as a loan.  A substance over form analysis puts matters in perspective by

highlighting Blixseth's efforts to dress up his dividend/distributions as loans.  *Bergersen v.

Commissioner*, 109 F.3d 56, 60 (1st Cir. 1997).  As explained by the First Circuit Court of

Appeals, the ultimate issue is "whether the owner is trying to smuggle earnings out of the

company without paying personal income tax[,]" for "if a 'loan' by the company to an owner is

not intended to be repaid, then allowing that label to control would effectively deprive the

government of its tax bite on dividends and salaries."  *Id.* at 59.

> The heart of the inquiry – intent to repay – is measured by objective factors:
>
> The conventional test is to ask whether, at the time of the withdrawal in question,
> the parties actually intended repayment.  Explaining that "intent" is difficult to
> discern, courts regularly resort to objective criteria, asking whether the transaction
> bears the traditional hallmarks of a loan or of a dividend.

*Id*. (citations omitted).  Thus, even allegedly heartfelt claims of an intent to repay cannot survive

the weight of adverse evidence:

> At the most, the mentioned testimony shows a subjective intent of the taxpayers to
> repay. A declared intent to repay is insufficient if it fails to jibe with the
> undisputed facts indicating the intrinsic economic nature of the transaction. The

self-serving declarations must be balanced against the surrounding circumstances.
*Williams v. Commissioner*, 627 F.2d 1032, 1034 (10th Cir..1980).

The objective facts reveal a distribution, not a loan.  First, the BGI Notes were not created until mid-2006, months after Blixseth, through BGI took $209 million from the Debtors.  Until months later, the purported "loan" was evidenced by nothing more than a journal entry, and Blixseth admitted that a portion of the monies taken from the Debtors was previously classified as dividends.  Second, the notes from BGI to the Debtors were not created until after the LeMond parties threatened litigation.  *See Williams*, 627 F.2d at 1035 (citing a "failure to execute notes until the tax problems became acute").

Third, the promissory notes from BGI contained no terms of repayment.  *See Bergersen,* 109 F.3d at 59 ("no fixed repayment schedule").  Fourth, for the BGI Notes to be paid, Blixseth – who repeatedly testified to his sole control of BGI – would have had to make demand on himself for payment.  *See Bergersen,* 109 F.3d at 60 ("at the very outset of the loans, the Bergersens knew that there was no effective corporate constraint to induce repayment.").

Also, the BGI Notes were unsecured.  Even though Porcupine Creek had been paid off with Credit Suisse proceeds and thus easily could have been pledged as collateral for the BGI Notes, it was not.  *See Bergersen*, 109 F.3d at 59 ("the loans had no collateral").  In response to his counsel's questions, Blixseth testified that he owned 100% of BGI so it "never crossed his mind" to mortgage Porcupine Creek to secure the notes.  He further testified he did not believe that he needed "security for himself," and that the security was "his promise to pay," although "in hindsight" he thought perhaps Porcupine Creek should have been pledged.  Sixth, Blixseth used the money for personal purposes.  *Williams*, 627 F.2d at 1035 ("Use of the withdrawals for

74

personal interests and repayment after the start of an audit are incompatible with an intent to repay when the withdrawals were made."); *Bergersen*, 109 F.3d at 69 ("the proceeds were used by the Bergersens for personal purposes.")

Furthermore, Blixseth's alleged repayments are not controlling. *See Williams*, 627 F.2d at 1035 ("[r]epayment is a factor to be taken into consideration along with all pertinent circumstances attending the transactions."); *Bergersen*, 109 F.3d at 60 ("Here, the payments had some of the traditional indicia of loans (notes existed, interest was paid). In other respects, formalities were absent (no fixed repayment date, no collateral, no credit limit)"). The payments in this case were nothing more than capital contributions. The payments were not made in regular amounts, but varied in relation to the intensity of Moses Moore's pleas for cash. Sam Byrne confirmed – in unrebutted testimony – that Blixseth repeatedly asked Byrne to make bulk purchases of lots to keep the Debtors afloat. The Debtors sold an aircraft to pay bills. The Debtors were cannibalizing their assets in order to meet their financial obligations. Yet Blixseth did not pay the BGI Notes. *See Williams*, 627 F.2d at 1034 (shareholder had ability to pay, yet did not).

Moreover, Credit Suisse's new loan product was created as a mechanism for resort owners to realize their profits up front, which is the equivalent of a transfer of retained earnings (before they were earned). *See Bergersen,* 109 F.3d at 60 ("regardless of formalities, the nominal loans, paid by a controlled company that was accumulating large earnings but paying its main owners no dividends, effectively gave the Bergersens permanent tax-free control over the moneys.") Also, the Debtors' financial projections for the Credit Suisse loan failed to account for an interest payment on any loans to related entities.

The Court is similarly not persuaded that KPMG's audit somehow creates validity in the BGI Notes. KPMG did not audit BGI/Blixseth and refused to certify the BGI Notes' value in 2006 and 2007. *See Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 409 (Bankr. D. Mass. 1991) ("clean audit report" not dispositive on debtor's finances).

In his testimony, Blixseth claimed that he had relied heavily on Mack's opinion that a transfer to BGI "had" to be a loan to avoid negative capital accounts. Blixseth's testimony was not credible on this point. The evidence shows that Blixseth was not concerned about avoiding negative capital accounts. Instead, Blixseth was driven by the sole desire to take all the money and avoid having to share anything with the "B" shareholders. In sum, the "objective factors . . . outweigh" Blixseth's claims of "subjective intent." *William*s, 627 F.2d at 1035.

Blixseth's efforts to avoid paying anything to the "B" shareholders further bolsters the Court's finding that Blixseth took a distribution from the Debtors, not a loan. Doyle told Blixseth in an August 30, 2005, memo that if the money came out as a distribution, it would have to be shared with the minority holders. Blixseth later warned Edra in a September 5, 2005, e-mail – right in the thick of the Credit Suisse negotiations – that the "B" shareholders were "nosing around" and a distribution must be avoided lest those holders claim a share. The Debtors' credit agreement with Credit Suisse was the only one of the similar resort loans that added the language of "or loans" ; even though, the purported "loan" was not documented until the LeMond case was filed. Blixseth's goal in calling his distribution a "loan" was to evade minority interests, not to provide reassurance to the Debtors of repayment. The BGI Notes were nothing more than phantom obligations created by Blixseth in an effort to avoid sharing the Credit Suisse loan proceeds with the "B" shareholders.

In a final attempt to convince this Court that the distributions were in fact true loans, Blixseth introduced correspondence to and from the Internal Revenue Service. The Court finds that any determination the Internal Revenue Service may have made with respect to the BGI notes is not binding on this Court. 26 U.S.C. § 6110(j)(3); *see also Disabled American Veterans v. C.I.R.*, 942 F.2d 309, 314-15 (6th Cir. 1991); *Mercantile Bank & Trust Co. v. U.S.*, 441 F.2d 364, 368 (8th Cir.1971); *B.F. Goodrich Co. v. U.S.*, 94 F.3d 1545, 1550 (Fed. Cir. 1996); *In re. Comp.*, 134 B.R. 544, 556 (Bankr. M.D. Pa. 1991); *In re Pulley*, 111 B.R. 715, 742 (Bankr. N.D. Ind. 1989). The evidence clearly shows that the BGI notes were nothing but a sham to disguise Blixseth's distributions.

Correctly characterizing the three notes at issue as distributions, as opposed to loans, basically renders the expert opinions of Reilly and Sheridan moot because the expert opinions of Reilly and Sheridan were premised on the belief that the Debtors had a legitimate $272 million receivable on their books from BGI. However, even if the BGI notes were legitimate, which they clearly were not, the Court would still not rely on Reilly and Sheridan's opinions in this case because Blixseth's counsel masterfully divided the work between Reilly and Sheridan so as to cast Blixseth in a light that simply does not shine in this Court.

Reilly did not give a solvency opinion as to the Debtors nor did he testify to such. Moreover, on cross-examination, Reilly confirmed that he had not been retained to render a solvency opinion on the Debtors. Reilly's opinion as to the Debtors was confined to whether the Debtors passed the cash flow and the capital adequacy tests. Moreover, Reilly's solvency opinions as to Blixseth and BGI were to some extent dependent upon Sheridan's opinion as to whether the Yellowstone Club passed the balance sheet test.

Blixseth retained Sheridan to perform one prong of a three-prong test, the balance sheet test. In order to perform that test, Blixseth provided Sheridan with Cushman & Wakefield's September 30, 2005, appraisal. Utilizing that appraisal and Debtors' 2005 income tax return, Sheridan concluded that the fair market value of Debtors' total assets was $1,120,089,177.00 as of September 30, 2005, which far exceeded Debtors' liabilities of $547,440,702.00. The Court is not persuaded by Sheridan's opinion regarding the balance sheet test. While Sheridan ostensibly based her solvency opinion as of September 30, 2005, on the discounted present value of the cash flow projections contained in the September 30, 2005, Cushman & Wakefield appraisal, the evidence is uncontroverted that Cushman & Wakefield's cash flow projections are based on Yellowstone Club's management's over-inflated cash flow projections for 2005[51] that had no basis in historical reality and appeared to be nothing more than unsupported puffery.

The Court, however, made no finding whatsoever at Part I of the trial with respect to whether the Debtors were insolvent from a balance sheet perspective as of September 30, 2005. Accordingly, the opinions of Ms. Sheridan (even if accepted by the Court) do not cause this Court to disturb its findings of insolvency as to the Debtors on a cash flow basis and capital adequacy basis as of September 30, 2005.

Rejecting Sheridan's opinion on the balance sheet test leaves Blixseth with the expert opinion of Reilly. Reilly was an extremely qualified and compelling expert. But Reilly, for reasons unexplained, did not perform a solvency analysis of the Yellowstone Club and Reilly's

---

[51] The Court also notes that the discount rate used by Sheridan is substantially less than the discount rate used by Cushman & Wakefield in both 2004 and 2008 – the only two occasions on which Cushman &Wakefield did a discounted cash flow analysis. In 2004, Cushman & Wakefield used a discount rate of 18%, and in 2008 they used a rate of 20%.

solvency opinions regarding Blixseth and BGI were, to some extent, dependent upon Sheridan's flawed balance sheet conclusions regarding the Yellowstone Club.

Moreover, Reilly acknowledged that in giving his opinions, the information that he was relying upon was provided to him by Blixseth's legal counsel and accounting firm. Reilly also acknowledged the he had not "independently verified the accuracy and completeness of the information supplied by Legal Counsel or by the Accountants." Reilly conceded that he had heard and did not disagree with the concept of "garbage in/garbage out." After considering the information relied upon by Reilly, the Court finds that the information relied upon is not reliable and in fact that the garbage in/garbage out maxim is applicable. Indeed, by e-mail dated November 5, 2009, a mere eight days before Reilly issued his opinion, counsel for Blixseth provided Reilly "WAG" balance sheets for Blixseth and BGI. The unrealistic nature of the information provided to and relied upon by Reilly and the limited scope of his engagement leads this Court to conclude that his opinion, while generally credible, was so restricted by Blixseth and his counsel as to render his opinion in this case simply inapplicable.

Reilly testified that he did his own analysis of Yellowstone Club's management's cash flow projections in conjunction with his cash flow and adequate capital solvency opinions on Tim Blixseth and BGI. Like Sheridan, Reilly relied on the cash flow projections provided by the Yellowstone Club's management. However, Reilly's, like Sheridan's, reliance on such faulty projections is flawed and unpersuasive. To test the reliability of the projections, Reilly chose to compare projected gross revenues to actual gross revenues, as opposed to projected cash flows to actual cash flows as was done by Mordy and attempted to be done by Sheridan. Reilly chose to compare gross revenues even though a company could theoretically be on target with its

projected gross revenues but still miss its cash flow projections by a large number.

Reilly testified that he compared gross revenues, instead of cash flows, because there was too much "noise" in the cash flow numbers, by which he meant too many non-recurring, non-operating expense and income items. Reilly conceded, however, that the only two such items he specifically mentioned, the LeMond settlement and the gain on sale of an airplane, were itemized on the actual financials and could have easily been accounted for by a "normalization adjustment."

In any event, Reilly's comparative analysis of projected gross revenues to actual gross revenues is fraught with the same type of mistakes as Sheridan's comparative analysis of cash flows. It is also noteworthy that Reilly chose to ignore, or was instructed to ignore or not consider, the actual historical financial performance of the Debtors in the period prior to September 30, 2005. The reason is obvious. Debtors' actual historical financial performance did not support Debtors' future projections and, in fact, Debtors' historical financial performance demonstrates conclusively that the Debtors would not be able to sustain the burden of the Credit Suisse debt, especially after Blixseth extracted his large distributions.

Reilly testified that Yellowstone Club's management's projections represented "the best then available estimates of future results of operations." He also testified that the Cushman & Wakefield cash flow projections were "well supported and not materially different from management's projections prior to 2008. In fact, as shown on the following chart, the Cushman & Wakefield projections for 2007 and 2008 were substantially lower than management's projections for those same time periods:

|  | 2007 Cushman & Wakefield | 2007 Yellowstone Management | Variance |
|---|---|---|---|
| Lot Sales | 35 | 53 | (18) |
| Gross Proceeds from Sale of Home sites | $99 Million | $148.5 Million | ($49.5 million) |
| Cash Flow | $34.6 Million | $137.9 Million | ($103.3 million) |

|  | 2008 Cushman & Wakefield | 2007 Yellowstone Management | Variance |
|---|---|---|---|
| Lot Sales | 35 | 53 | (18) |
| Gross Proceeds from Sale of Home sites | $99 Million | $148.5 Million | ($49.5 million) |
| Cash Flow | $34.6 Million | $137.9 Million | ($103.3 million) |

Given Reilly's acknowledgment that Cushman & Wakefield had substantial experience in doing these types of cash flows and that Blixseth had no experience, Reilly's decision to rely on management's projections for his opinions is highly questionable. Confronted with this issue, Reilly asserted that the Cushman & Wakefield projections were done on an accrual, as opposed to a cash basis, and that they were based on "a different business model." However, since the Cushman & Wakefield projections are based on management's own projections and purport to project actual lot sales and cash flow, Reilly's assertions appear to be unfounded. Mordy confirmed that Reilly's assertions were unfounded.

The Court also rejects Blixseth's argument that YCLT's case must fail because KPMG gave the Debtors clean, unqualified audit opinions in 2005, 2006 and 2007. Those unqualified audit opinions were based upon the assumption that the BGI notes were fully collectible. As

determined above, the notes were in fact distributions that should not have appeared as an asset on BGI's balance sheet.  Moreover, nothing in the evidence suggests that KPMG audited BGI to determine whether the BGI notes were collectible.  Blixseth seeks to convince the Court that BGI paid down roughly $70 million on the BGI notes, thereby proving that the BGI notes were collectible.  That alleged pay down was nothing more than an infusion of cash by Blixseth in an attempt to keep the Debtors afloat.

Having concluded that the purported loans from the Debtors to BGI were in fact distributions, the Court now turns to various contentions set forth in the Amended Pretrial Order filed February 17, 2010, at docket entry no. 538:

### 2.      Statute of Limitations.

The burden of proof on an affirmative defense such as the statute of limitations rests with the party asserting the defense.  F.R.B.P. Rule 7008; Fed.R.Civ.P. 8(c); *E.F. Matelich Construction Co., Inc. v. Goodfellow Brothers, Inc.*, 217 Mont. 29, 32, 702 P.2d 967, 969 (1985).  MCA § 27-2-204 provides a three-year statute of limitations on claims "not founded upon an instrument in writing[,]" such as a claim for breach of fiduciary duty.  The statute of limitations for conversion and violation of the MCA § 35-8-604 is two years.  MCA §§ 27-2-207 and 35-8-605(4).  The parties disagree as to accrual.  YCLT argues that Montana common law applies the discovery rule towards this statute of limitations.  *See Shupak v. N.Y. Life Ins. Co.*, 780 F. Supp. 1328, 1339 (D. Mont. 1991) (applying MCA § 27-2-102 to breach of fiduciary duty claim); *Burgett v. Flaherty*, 663 P.2d 332, 334 (Mont. 1983); *Stanley L. and Carolyn M. Watkins Trust v. Lacosta*, 92 P.3d 620, 629-30 (Mont. 2004) (legal malpractice claim in which attorney owed fiduciary duties to client); *Estate of Watkins v. Hedman, Hileman & Lacosta*, 91 P.3d 1264,

1270 (Mont. 2004) (same).  *See also Orr v. State*, 106 P.3d 100, 117 (Mont. 2004).

Blixseth argues that "[l]ack of knowledge of the claim or cause of action, or of its accrual, by the party to whom it has accrued does not postpone the beginning of the period of limitation." MCA § 27-2-102(2); *see also Bennett v. Dow Chemical Co.*, 713 P.2d 992 (Mont. 1986) ("The fact that a party with a cause of action has no knowledge of his rights, or even the facts out of which the cause arises, does not delay the running of the statute of limitations until [the party] discovers the facts or learns of his rights under those facts." (citing *Carlson v. Ray Geophysical Division*, 481 P.2d 327, 329 (Mont. 1971)).  Blixseth further argues no concealment of YCLT's alleged claims occurred as everything about the loan transaction was done in the open and cites to the fact that other members—such as the LeMond Plaintiffs—were able to file suit within months of the September 30, 2005, Credit Suisse loan transaction.  Additionally, Blixseth asserts that the discovery rule does not extend to YCLT's claim under MCA § 35- 8-604 because section 605 of that statute contains a statute of repose that provides that a "proceeding under this section is barred unless it is commenced within 2 years after the date of the distribution."  MCA § 35-8-605(4).

MCA § 27-2-102(3) provides that "[t]he period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts constituting the claim are by their nature concealed or self-concealing; or (b) before, during or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause."  YCLT also argues that the doctrine of adverse domination tolls the statute of limitations period on a cause of action against a

corporation while wrongdoers control the corporation. *United States v. First National Bank & Trust*, 1994 WL 775440, *5 (D. Mont. 1994). "Under the doctrine of adverse domination, a statute of limitations is tolled on an action against director/officer misconduct so long as a majority of the board is controlled by the alleged wrongdoers. The doctrine rests on the theory that if the wrongdoers control the corporation through a majority of stock ownership and control the directorate[,] there [would] consequently [be] no one to sue them." *Id*. Finally, YCLT contends that the discovery rule prevented the running of limitations in this case.

Blixseth asserts that the doctrine of adverse domination does not apply. In order to prove adverse domination, "the wrongdoer's control [must] result[] in the concealment of causes of action from those who otherwise might be able to protect the corporation." *Frazer v. U.S.* 49 Fed.Cl. 734, 737 (Fed.Cl., 2001). Because of this standard, if a derivative action is possible and the facts giving rise to the claim are available, the adverse domination doctrine cannot be asserted, since an ability to "protect the corporation" existed. *Id.*; *Rx.com v. Medco Health Solutions*, Inc. 322 Fed.Appx. 394, 398-99 (5th Cir. 2009). Under Montana law, a derivative action is available to the members of a limited liability corporation. *See* MCA §35-8-1104; *Elf Atochem North America, Inc. Jaffari*, 727 A.2d 286, 293-94 (Del.Supr., 1999). Because a derivative suit was open to members of the Debtors, Blixseth concludes that adverse domination is not a viable theory in this matter. *Frazer*, 49 Fed.Cl. at 737; *Rx.com*, 322 Fed.Appx. at 398-99.

The evidence does not support Blixseth's position on this issue. The Debtors in this case filed bankruptcy on November 10, 2008. Thus, if the applicable statute of limitations had not expired by November 10, 2008, the claims were timely asserted because two years had not

passed since the filing of the bankruptcy before the claims asserted herein were filed.[52]  Blixseth

argues that since many of YCLT's claims arise out of the Credit Suisse loan transaction that

occurred on September 30, 2005, that the statute of limitations bars recovery.  However, many of

YCLT's claims involve transfers that occurred in April and May of 2006, which breach of

fiduciary duty claims would clearly not be barred by the statute of limitations.  Nevertheless, for

the reasons set forth below, the Court finds that none of YCLT's claims accrued on September

30, 2005.  YCLT's causes of action have been timely asserted.

Pursuant to Montana's codified discovery rule, a "cause of action for an injury to person

or property [does not commence] until the facts constituting the claim have been discovered or,

in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts

constituting the claim are by their nature concealed or self-concealing; or (b) before, during or

after the act causing the injury, the defendant has taken action which prevents the injured party

from discovering the injury or its cause."  MCA § 27-2-102(3).

Blixseth's actions that form the basis of the claim are by their nature concealed.  On

September 30, 2005, Credit Suisse transferred $342,110,262.52 to the Yellowstone Club and on

that same date, Blixseth transferred approximately $209 million out of the Yellowstone Club to

BGI.  The funds were then transferred from BGI to Blixseth, individually.  The transfer of funds

out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any

contemporaneous loan documents, but was simply recorded in the Yellowstone Club's books

with a journal entry.  It was not until the "B" shareholders threatened litigation in May 2006 that

---

[52]  11 U.S.C. § 108(a) extends a period to the later of the end of the period, or 2 years
after the order for relief.

Blixseth drafted his two-page unsecured promissory notes which were executed by BGI and payable to Yellowstone Club on demand. Even though the promissory notes were dated September 30, 2005, they were admittedly not drafted and executed until May of 2006.

The overwhelming evidence shows a pattern of deception as it relates to the use of the Credit Suisse loan proceeds. One of the minority shareholders, Michael Snow, testified that he was led to believe that the proceeds from the Credit Suisse loan were going to be used for operating expenses and capital expenditures at the Club. Notably, when Blixseth later took the stand on rebuttal he did not deny Mr. Snow's testimony in this regard. Moore, who at the time was second in command of finances at the club, testified that he did not learn of the actual disposition of the Credit Suisse proceeds until February 2006. William G. Griffon, who was Vice President of Operations at the time, testified that he did not learn of the disposition of the loan proceeds until after the LeMond litigation was filed, around June of 2006. Brown, former counsel for the Debtors, testified that he was unaware of the use of the loan proceeds until May 2006. And finally, Byrne testified that Blixseth originally represented that the Yellowstone Club was essentially debt free and when Byrne later learned of the Credit Suisse loan, Blixseth explained that the loan was related to Yellowstone Club World and not the Yellowstone Club.

Because the transfers from the Debtors to BGI were not documented until May of 2006, the facts forming the basis of the claim against Blixseth were concealed. As such, the statute of limitations is tolled "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party . . . ." Discovery could not have occurred until May of 2006, at the earliest.

However, the Court finds that Blixseth was in sole control of the Debtors until they were

transferred to Edra in August 2008.  Given Blixseth's total control and domination of the Debtors

until August 2008, the statute of limitations did not begin to run, and in fact was tolled, on

YCLT's claims until August of 2008, a mere three (3) months prior to the bankruptcy filing.  *See*

*Rands, LLC v. Young (In re Young)*, 384 B.R. 94 (Bankr. D.N.J. 2008).[53]  Blixseth has failed his

burden of showing that the statute of limitations has expired. YCLT may assert its claims.

   **3.     Ownership of the claims in this Adversary Proceeding.**

   Blixseth asserts that the assignment of the Debtors' claims to YCLT is invalid and that, as

a result, YCLT does not own the claims it asserts herein.  The Court disagrees and concludes that

YCLT does in fact own the claims.

   A hearing under 11 U.S.C. § 1128(a) and Bankruptcy Rule 3020(b)(2) was held May 18,

2009, in Butte on approval of the Debtors' Second Amended Joint Plan of Reorganization filed

April 3, 2009, at docket entry no. 691.  Prior to the May 18, 2009, confirmation hearing, the

---

   [53]  In discussing the discovery rule and equitable tolling as it applies to a statute of
limitations, the court in Young explained:

   > The discovery rule mandates that "the limitations period does not
   > commence until the injured party actually discovers or should have discovered
   > through reasonable diligence the fact essential to the cause of action." *R.A.C. v.
   > P.J.S.*, 192 N.J. 81, 98, 927 A.2d 97 (2007).  Equitable tolling applies in certain
   > limited circumstances where the wrongful conduct of one party warrants tolling
   > the running of the statute of limitations period.  *Id*. at 100, 927 A.2d 97.  An
   > example of such conduct would be "where 'the complainant has been induced or
   > tricked by his adversary's misconduct into allowing the filing deadline to pass.' "
   > *Freeman v. State*, 347 N.J.Super. 11, 31, 788 A.2d 867 (App.Div.2002) (quoting
   > *Dunn v. Borough of Mountainside*, 301 N.J.Super. 262, 280, 693 A.2d 1248
   > (App.Div.1997)).  "State common law tolling doctrines are incorporated by 11
   > U.S.C. § 108 and are, therefore, applicable in bankruptcy proceedings." *Levitt v.
   > Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.)*, 199 B.R. 502, 513
   > (Bankr.D.N.J.1995).

*Young*, 384 B.R. at 104.

Debtors filed a ballot report compiled by Kurtzman Carson Consultants LLC which showed that Classes 4, 6, 9, 10, 12 and 14 voted to accept Debtors' Second Amended Joint Plan of Reorganization, while classes 3, 7, 8 and 13 voted to reject Debtors' Second Amended Joint Plan of Reorganization.  However, in the hours leading up to the May 18, 2009, confirmation hearing, the Debtors; Credit Suisse, Cayman Islands Branch; the Committee; New CH YMC Acquisition LLC; CIP Yellowstone Lending LLC; CrossHarbor Capital Partners LLC; and CrossHarbor Institutional Partners, L.P. agreed in principal to a global settlement termed "Yellowstone Club Settlement Term Sheet" ("STS").   A signed copy of the STS was presented to the Court on May 18, 2009, but was not filed until May 22, 2009, when the Debtors filed their Third Amended Joint Plan of Reorganization, at docket entry no. 995.

The STS, because it was a settlement that included Credit Suisse, arguably impacted whether Class 3 and Class 8 creditors would accept or reject the Debtors' Plan. Counsel for the Debtors, the Committee, CrossHarbor and Credit Suisse thus agreed that the Debtors should have an opportunity to re-solicit the votes of Class 3 and Class 8 creditors.  Moreover, while amendment of the Debtors' proposed joint plan was not required by the STS, the Court, in an effort to provide clarity to all parties going forward, directed the Debtors to amend their plan to specifically incorporate the STS.

Also at the May 18, 2009, confirmation hearing, counsel for YCW, the Montana Department of Revenue and the Internal Revenue Service noted that their objections to confirmation were not insurmountable and in fact, counsel for YCW made the statement that YCW may withdraw its objection to confirmation. The Debtors also sought to cure the objections of various other parties and concluded that the three remaining substantive objections to

88

confirmation were those of Sumpter, Blixseth and Desert Ranch, LLP.  No appearance was made at the May 18, 2009, confirmation hearing by or on behalf of Sumpter.  Thus, in an Order entered May 18, 2009, the Court summarily overruled Sumpter's objection to confirmation.

The STS was filed separately with a new Credit Agreement on May 28, 2009, at docket entry number 985.  Highland Capital Management, L.P., although not objecting to Debtors' Second Amended Joint Plan of Reorganization or appearing at the confirmation hearing, filed an Objection to Confirmation of the Debtors' Third Amended Joint Plan of Reorganization and approval of the STS on May 22, 2009, at docket entry number 943.  Blixseth objected to Debtors' Third Amended Joint Plan on May 26, 2009, at docket entry no. 969, by referencing his prior objection filed May 11, 2009, at docket entry no. 860.  In his May 11, 2009, objection, Blixseth incorporated Credit Suisse's objections to confirmation and also objected to the Debtors' Third Amended Joint Plan "on the grounds that the Chapter 11 Plan is not filed in good faith, but is a continuation of prepetition and post-petition acts of bad faith by the CEO of the Debtors-in-Possession, Edra Blixseth, in concert with others, all is more fully described in evidence previously presented or proffered to this Court in proceedings in the above captioned main bankruptcy case and in Adv. Pro. 09-00014/09-00017."

While the Court considered the record on confirmation closed at the conclusion of the May 18, 2009, confirmation hearing, the Court held an additional hearing on June 1, 2009. Following the June 1, 2009, hearing, the Court entered an Order Confirming Debtors' Proposed Plan of Reorganization on June 2, 2009.  The Court also entered Findings of Fact and Conclusions of Law in connection with its approval of the Plan, wherein the Court specifically held that the Plan was proposed in good faith.  Blixseth has appealed confirmation of the

89

Debtors' Plan, again maintaining that the Debtors' bankruptcy cases and the Third Amended

Joint Plan were not filed in good faith.  Blixseth also filed a motion to stay the order confirming

the Debtors' Plan pending the appeal.  The Court denied Blixseth's motion to stay the

confirmation order, specifically concluding that the Plan was filed in good faith.

Debtors' Third Amended Joint Plan provides for the disposition of the assets of the

Debtors in two major components.  First, the "Project" was transferred to the "Reorganized

Debtors" on the "Effective Date."  Second, the non-Project Assets, including "Transferred

Actions," were transferred by the Debtors on the Effective Date to the "Liquidation Trust"

created under the terms of the Plan and organized pursuant to a Trust Agreement in substantially

the form set forth in Schedule 1.85 to the Plan.

Section 8.2.2 of the Plans provides that "pursuant to section 1123(b)(3)(B) of the

Bankruptcy Code, on the Effective Date, all Transferred Actions of any kind or nature

whatsoever against third parties arising before the Confirmation Date shall be transferred by the

Debtors to the Liquidating Trust."  The "Transferred Actions" include the claims asserted by

YCLT against Blixseth in this Adversary Proceeding.  The Court finds that the claims asserted by

YCLT against Blixseth were assigned by virtue of the specific terms of the Plan, which was

approved by the Court.

In addition to the foregoing, on July 17, 2009, Edra in her capacity as manager/president

of BLX, the Manager of each of the Debtor limited liability companies, executed a certain

Assignment and Assumption Agreement on behalf of the Debtors.  The Assignment and

Assumption Agreement includes the assignment of the Transferred Actions to YCLT.  At the

time Edra executed the assignments she was in personal bankruptcy.  The Court does not find

90

this fact significant since, as stated above, the Assignment was not executed in her individual

capacity.  Nevertheless, out of an abundance of caution, the parties obtained a Consent and

Authorization from Richard Samson, Edra's Chapter 7 bankruptcy trustee, authorizing Edra to

"take such actions" as necessary to "complete and carry out the transactions contemplated by the

[Plan]."  Richard Samson confirmed his consent in testimony before the Court.

   After Debtors' Third Amended Joint Plan was confirmed, Marc S. Kirschner was

appointed Trustee by the vote of the Trust Advisory Board (the "Board").  Subsequently, the

Yellowstone Club Liquidating Trust Agreement was entered into and executed.  Section 1.1 of

the Trust Agreement states that YCLT is organized for "the purposes of holding and liquidating

Trust Claims and Trust Assets."  The Trustee has all the "rights, powers, and duties . . . that are

necessary and proper to fulfill the purposes of the Trust" pursuant to Section 5.3.1 of the Trust

Agreement.  The Trustee's duties include prosecution of "all suits as may be necessary,

appropriate or incident to the purposes of the Trust" as set forth in Section 5.3.2.4.

   Pursuant to Debtors' confirmed Third Amended Joint Plan and the Assignment and

Assumption Agreement, Kirschner, as Trustee of YCLT, succeeds to "all Causes of Action that

the Debtors or their Estates could assert immediately prior to the Effective Date," except certain

claims released by the Confirmed Plan of Reorganization.  YCLT owns the claims asserted in

this case and is the proper party to be asserting the claims being asserted against Blixseth.

Kirschner testified that he believed that the assignment was confirmatory only to give notice to

third parties instead of asking bankers and vendors to review a complex plan.

   As contemplated by the Debtors' confirmed Plan, on September 3, 2009, YCLT filed its

Rule 25 Motion for Party Substitution seeking to substitute YCLT in place of the Committee and

Debtors.  Blixseth did not object to this Motion, and on September 18, 2009, the Court entered

an ordered substituting YCLT for the Committee and the Debtors in this action.

After reviewing applicable law, the Court finds that YCLT owns the claims asserted

against Blixseth in this case.  In a prior Order, this Court addressed Blixseth's standing

arguments in the context of a motion for summary judgment wherein the Court noted:

> Blixseth argues that the Trust lacks standing to bring the Debtors' claims
> because the assignment of the claims are void as a matter of law, as tort claims are
> not assignable under Montana law.  The Trust responds that it stands in the
> Debtors' shoes under Bankruptcy Code § 1123(b)(3)(B) as a representative of the
> estate appointed for the purpose of retention and enforcement of any claim or
> interest belonging to the Debtors or to the estate under the confirmed Chapter 11
> Plan. The Trust cites provisions of the confirmed Plan which transferred non-
> Project Assets to the Trust, which under its Trust Agreement authorizes it to hold
> and liquidate Trust Claims, including prosecution of all suits as may be necessary.

> The Trust argues that, by contesting the validity of the assignment of
> causes of action to the Trust, Blixseth is inappropriately contesting the validity of
> the Plan, citing *In re Sherman*, 491 F.3d 948, 967 (9th Cir. 2007) (a timely filing of
> a notice of appeal typically divests a bankruptcy court of jurisdiction over those
> aspects of the case involved in the appeal, [but] the bankruptcy court retains
> jurisdiction over all other matters that it must undertake to implement or enforce
> the judgment or order, although it may not alter or expand upon the judgment).
> Based upon the authority granted the Trust under the confirmed Plan and §
> 1123(b)(3)(B), the Court declines to grant Blixseth summary judgment based
> upon state law barring assignment of tort claims.

Memorandum of Decision entered February 17, 2010, at docket entry no. 535.  As previously

discussed, under the Debtors' confirmed Third Amended Joint Plan of Reorganization including

the Liquidation Trust Agreement, YCLT is the owner of the claims asserted against Blixseth and

asserted in this suit.  Moreover, 11 U.S.C. § 1123(b)(3)(B) specifically allows a plan of

reorganization to provide for "the retention and enforcement by the debtor, by the trustee, or by a

representative of the estate appointed for such purpose" any claim belonging to the Debtors.  *See*

*also Collins & Aikman v. Stockman*, 2010 Lexis 3818 (D.C. Del. 2010).  Furthermore, the

assignment later executed by Edra as Manager for the Debtors is valid.  Finally, the Debtors are "creditors" of Blixseth by virtue of their claims for breach of fiduciary duty and thus can seek to set aside fraudulent transfers under the UFTA as well as the applicable bankruptcy provisions.

        **4.**        **Fraudulent Transfers**.

YCLT's avoidance action was brought under 11 U.S.C. § 544(b), which gives trustees the right to avoid transfers voidable by unsecured creditors under state law.  YCLT asserts, and Blixseth denies, that Blixseth's use of funds from the Yellowstone Club, and in particular the Credit Suisse loan proceeds, was a fraudulent transfer under MCA § 31-2-333(1)(b).  YCLT also argues that execution of the Releases in the MSA was a fraudulent transfer under MCA § 31-2-33(1)(a) and (1)(b).

        **a.**        **Blixseth's use of the Credit Suisse loan proceeds was a fraudulent transfer**.

YCLT's first fraudulent transfer claim pertains to Blixseth's use of the Yellowstone Club's funds and implicates Montana's Uniform Fraudulent Transfer Act ("UFTA") 31-2-333(1)(b).  UFTA provides, in relevant part, that transfer of an asset by a debtor is fraudulent as to existing and future creditors if the debtor transferred the asset without receiving a reasonably equivalent value in exchange for the transfer and the debtor (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.  MCA § 31-2-333(1)(b).  The language of MCA § 31-2-333(1)(b) implies that constructive fraud does not require proof of intent.

Prior to being diverted to BGI and Blixseth, the Credit Suisse loan proceeds rested

93

for a moment in the Debtors' accounts. The Court deems it appropriate to collapse the constituent

parts and treat the various transfers that occurred on September 30, 2005, as phases of a single

transaction for analysis under fraudulent transfer law, *HBE Leasing Corp. v. Frank*, 48 F.3d 623,

635 (2d Cir.1995), especially in a case such as this where Credit Suisse's own Credit Agreement

was designed to remove the funds from the Debtors.

Collapsing the constituent parts is also appropriate where BGI was Blixseth's alter ego.

The "law of the forum state" determines whether a corporation is an alter ego of its shareholder.

*Towe Antique Ford Found. v. Internal Revenue Serv.*, 999 F.2d 1387, 1391 (9th Cir. 1993).  In

*Towe*, the Ninth Circuit Court of Appeals explains:

> In Montana, "no concrete formula exists under which a court will disregard the separate identity of the corporate entity." [*Hando v. PPG Indus., Inc.*, 236 Mont. 493, 771 P.2d 956, 960 (1989)].  The factors relevant to a finding of alter ego include, but are not limited to:
>
> 1.  Whether the individual is in a position of control or authority over the entity;
> 2.  Whether the individual controls the entity's actions without need to consult others;
> 3.  Whether the individual uses the entity to shield himself from personal liability;
> 4.  Whether the individual uses the business entity for his or her own financial benefit;
> 5.  Whether the individual mingles his own affairs in the affairs of the business entity;
> 6.  Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts.
>
> *See generally Hando*, 771 P.2d at 960; *Drilcon, Inc. v. Roil Energy Corp., Inc.*, 230 Mont. 166, 749 P.2d 1058, 1063-64 (1988); *Meridian Minerals Co. v. Nicor Minerals, Inc.*, 228 Mont. 274, 742 P.2d 456, 462 (1987); Jody J. Brewster, *Piercing the Corporate Veil in Montana*, 44 Mont.L.Rev. 91, 95-97 (1983); *see also Valley Finance*, 629 F.2d at 172-73.

*Towe Antique*, 999 F.2d at 1391.

During the time that Blixseth was the controlling shareholder of BGI, Blixseth dominated and controlled the affairs of BGI to such an extent that BGI had no separate corporate identity apart from Blixseth.  Blixseth and BGI were one in the same.  Blixseth's accountant Mack testified that no real distinction existed between Blixseth and BGI, other than corporate structure.  Blixseth was BGI's sole owner and had sole control of BGI's affairs.  Corporate formalities were not followed as is illustrated by the fact that promissory notes in connection with the alleged "loans" were not executed until well after the transactions took place.  Finally, Blixseth held himself out as the owner of the Yellowstone Club, when in fact the Yellowstone Club entities were owned by BGI.  BGI was clearly Blixseth's alter ego.

Because of the alter ego relationship between BGI and Blixseth, Blixseth was able to fix liability to the Debtors and to his alter ego, BGI, and not himself as primary beneficiary of the Credit Suisse loan.  Because of the control he exercised over BGI, and the Debtors (through BGI), Blixseth was able to ensure that BGI would never have demand made on it by the Debtors and in turn that BGI would not make demand on Blixseth even though there were numerous times after the disbursement of the Credit Suisse loan proceeds where a demand would have been in the best interest of the Debtors.

Turning to the merits of YCLT's claim under MCA § 31-2-333(1)(b), MCA § 31-2-328 defines the term "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Blixseth cannot argue in good faith that the $209 million he appropriated to himself was anything other than a transfer.  Thus, YCLT must next show that Blixseth's transfer of $209 million to himself lacked

reasonably equivalent value.  The Court concludes that YCLT has done so, despite Blixseth's contention that BGI's notes constitute reasonably equivalent value.  Blixseth claims that the BGI notes protected the Debtors against loss arising from the transfers of loan proceeds to BGI/Blixseth, and that the secondary transfer from BGI to Blixseth enjoyed similar safeguards from other "notes."

In a lengthy discussion, supported by an abundance of evidence, the Court previously concluded that the transfer of money from the Debtors to BGI was a distribution and not a loan. It is thus obvious that Debtors did not receive reasonably equivalent value for the transfer of their assets, namely in the form of money, to BGI and ultimately Blixseth.

The third element of constructive fraudulent transfer requires that the Debtors were either insolvent when the transfer occurred, or that the transfer made Debtors insolvent.  In analyzing whether a debtor was left with unreasonably small assets following the transaction at issue, "[t]he test is aimed at transfers that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

At trial, Credit Suisse repeatedly asked witnesses rote questions taken from the text of the fraudulent transfer statute, such as whether Mr. Foster, who came onto the scene later, had any evidence of a contemporaneous Debtor intent or belief that bills would not be paid as they came due, or whether witnesses "believed" that the transaction left the Debtors with unreasonably small assets.  The proof in this case lies in objective results, not subjective beliefs.  That proof is uncontestable.

First, the use of a "Total Net Value" (later changed to "Total Net Proceeds," undoubtedly

to avoid the impression that actual "value" was being addressed) appraisal was devastating to the Yellowstone Club.  Paauw explained that he had never heard of a total net value appraisal until he was asked to perform one by Credit Suisse.  Donaldson testified that he had no idea why a loan participant would want such an appraisal.  Neither Hekman (a real estate economist and professor) nor Abshier (a former financial institution regulator) knew of such a vehicle.  A FIRREA-compliant market value appraisal (unlike the Credit Suisse appraisals) would contain all the information contained in the Credit Suisse appraisal, including undiscounted cash flows.  The reasonable inference is that Credit Suisse, with Blixseth's tacit approval, wanted to bulk up the alleged value of the Yellowstone Club in order to inflate the size of the loan.  It is highly probable that the loan amount to the Yellowstone Club would have been substantially less than $375 million had Credit Suisse asked Cushman & Wakefield to perform a FIRREA-compliant appraisal.

Even if Credit Suisse's "sophisticated foreign hedge-fund investors" did not want a FIRREA-compliant appraisal (with a discount rate), Abshier explained that fair market value appraisals also benefit the borrower by assuring that loan sizes remain reasonable in connection with the collateral's value.  Yet the Debtors, represented by Blixseth (whose duty of loyalty was hopelessly conflicted), never asked for that kind of appraisal.  The result, as Abshier again explained, was a loan that failed to comply with good real estate loan practice, that was suffused with excessive risk of failure, and that was unsafe, unsound, and imprudent.

Blixseth's exuberant financial projections exacerbated the problem.  As explained by the Third Circuit Court of Appeals:

> Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the

relevant data are cash flow, net sales, gross profit margins, and net profits and losses . . . . However, reliance on historical data alone is not enough.  To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992).

Sumpter, who prepared the projections, offered nothing at trial to substantiate them. Blixseth confirmed that projections of lot sales were based on the assumption that the economy would continue at then current levels.  Hekman confirmed that such an assumption was foolhardy at the time given that real estate investment was fueled in 2002 and 2003 by Federal Reserve interest rate cuts, and that by 2004 the Federal Reserve was raising interest rates to avoid a bubble, thus causing a market slowdown, just as the Credit Suisse loan was being pursued. Indeed, Credit Suisse's own appraisal confirmed that the market was already slowing, and Credit Suisse knew, given Yankauer's testimony, that real estate is the first victim of any downturn.

Hekman also testified that Sumpter's projections contained extremely optimistic assumptions concerning the prices to be obtained from future lot sales, including projections that were 36% higher than Debtors' historical performance, and with no buffer in case those unprecedented and unsupported projections were not met, thus leaving the Debtors with an enormous balloon payment in 2010.  *See In re O'Day Corp.*, 126 B.R. at 412 ("The projections prepared by the Bank had no cushion, no room for error.").

Mordy deemed the projections seriously erroneous with critical omissions, such as the Warren Miller Lodge overruns and information available at the time about the Debtors' prior performance, as well as being replete with factual errors, such as claims that the $142 million was still somehow part of the Debtors' cash reserves.  Mordy confirmed that proper projections

would have shown that there was insufficient cash flow from operations to pay the debt being

undertaken. *See In re O'Day Corp.*, 126 B.R. at 381 ("Notwithstanding the availability of current

information about the company's financial performance, neither Funston nor Meritor took steps

to revise the reduced sales scenario projections, which implicitly assumed a gross profit margin

of 21.84 percent.")

Despite all this, Credit Suisse accepted the Debtors' unfounded optimism, and agreed to

provide a five-year loan to the Debtors, even though Cushman & Wakefield knew the Debtors'

claimed absorption rate was far too optimistic, and provided its appraisal based on a seven-year

absorption rate. *See In re O'Day Corp.*, 126 B.R. at 407 ("In the face of such unequivocal

financial information, Jones and Funston projected that, in a *worst case scenario*, O'Day would

somehow match or exceed its best financial performance of the 1980's.") (emphasis original).

Moreover, subsequent appraisals were forced to continually extend the absorption rate into the

future when the original projections were proven to be unrealistic.

All these facts notwithstanding, Credit Suisse blames the Debtors' downfall on the

allegedly unanticipated financial calamities of 2007. Lenders have tried this argument before:

> The projections employed by Funston and O'Day were imprudent. Although
> Meritor points to a variety of unpredictable, internal and external problems, such
> as poor management, bad marketing decisions, decline in the number of dealers
> and sales people, and the stock market crash of October 1987 as the causes of
> O'Day's dismal performance following the LBO . . . . the Court finds that labor
> problems, cost variances and cyclicality in the industry were the major
> contributors to O'Day's fiscal woes and were manifest and readily predictable
> prior to the LBO. Thus, using the Credit Managers test outlined above, the Court
> concludes that O'Day was left with unreasonably small capital.

*In re O'Day Corp.,* 126 B.R. at 412. This case presents the same result. Blixseth blames the

Debtors' downfall on the lawsuit filed by the LeMond Plaintiffs, the alleged conspiracy between

Edra and Byrne, and Byrne's failure to follow through with purchase of the Yellowstone Club in 2008. Given the evidence, Blixseth's arguments are without support.

Also, the KPMG audits provide no support for Blixseth's arguments. Nonetheless, at trial, Credit Suisse and Blixseth repeatedly invoked the KPMG audits as the touchstone of the Debtors' alleged financial condition, forgetting that neither "book value" nor "generally accepted accounting principles" control a court's decision on projections or value. *In re O'Day Corp.*, 126 B.R. at 398. Particular emphasis at trial was placed on KPMG's failure to include a "going concern" qualification. However, "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern." *Codification of Accounting Standards and Procedures, U.S. Auditing Standards* § 341 (Am. Inst. of Certified Pub. Accountants 2005). *See also O'Day Corp.*, 126 B.R. at 409 (rebuffing lender's efforts to rely on "Arthur Andersen's failure to include a going concern qualification in its fiscal year end 1988 audit."). The KPMG audit does not absolve Blixseth of liability in this case.

Finally, both Credit Suisse, in Part I of the trial, and Blixseth, in Part II of the trial, were careful not to produce a solvency opinion with respect to the Yellowstone Club. However, history confirms what a proper solvency opinion would have revealed. As a result of the Credit Suisse transaction, the Debtors were unable to pay their bills as they became due. Blixseth testified that the Credit Suisse loan was current until mid-August of 2008. While the Yellowstone Club may have avoided any default until August of 2008, the term "current" simply means that the Debtors were paying interest, the applicable lot release price and the required annual paydown. As Hekman confirmed, in 2010 an enormous principal balance – far beyond

the Debtors' ability to repay – would have remained because of the Debtors' failure to meet their unfounded projections.

Hekman opined that the Debtors never had sufficient cash flows following the Credit Suisse loan.  Cash flows in 2005 were $39 million, yet in 2006 the Debtors needed $63 million simply to pay anticipated lot release payments and interest to Credit Suisse, a number that does not include the money needed to operate the Yellowstone Club.  Foster testified that because the Club was burning between $25 and $30 million a year, it obviously could not afford this loan.

Moore corroborated this with testimony that Debtors were rarely current with bills, and had to sell assets (such as an airplane) to provide cash.  *See In Re O'Day Corp.*, 126 B.R. at 407 ("Clearly, the 45 day payable stretch anticipated by Funston and Jones in their projections was a fiction after September of 1987.  In short, O'Day was not paying its trade debt as it came due, particularly given the testimony establishing that most payment terms were net 30 days.").  Byrne also testified that Blixseth repeatedly asked Byrne to make bulk purchases of lots to fund the Yellowstone Club.  Again without rebuttal from Blixseth, Byrne testified that Blixseth told Byrne that the Yellowstone Club had no debt and that the Credit Suisse loan was related to Yellowstone Club World assets.  Byrne also recounted the disarray of the Debtors' books, and the millions he spent recreating solid and reliable financial data.

Byrne's bulk purchases, coupled with the drastic measures undertaken by the Debtors to pay bills, created the illusion that Debtors had the ability to pay their debts.  In a similar case, the United States District Court for the Southern District of Texas convincingly explained:

> The fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive. In this case, ASARCO was not regularly paying its creditors, not only before the transfer, but also between the time of the transfer and filing for bankruptcy two years later. Additionally, ASARCO survived for

> over two years primarily because it took drastic measures to do so, such as highgrading mines, monetizing insurance policies, and stopping some operations altogether. Therefore, ASARCO's ability to avoid a total collapse for over two years after the transfer does not persuade this Court that ASARCO's cash flow was sufficient to meet its capital needs. In 2003, ASARCO might accurately have been described as insolvent and "doomed to failure."

*ASARCO LLC, v. Americas Mining Corp.*, 396 B.R. 278, 398–99 (S.D. Tex. 2008).  For the reasons discussed above, the Court finds that Blixseth's transfer of funds from the Debtors to BGI, and ultimately himself, was a fraudulent transfer under MCA § 31-2-333(1)(b).  Pursuant to 11 U.S.C. § 544(b), Blixseth's misappropriation of the Credit Suisse loan proceeds for his own use and directing the Debtors to purchase assets with the Credit Suisse loan proceeds for the benefit of himself and related third parties were constructively fraudulent transfers under 11 U.S.C. § 548(a)(1) and MCA §§ 31-2-333(1)(b) and 31-2-334(1), and can be avoided pursuant to 11 U.S.C. § 550 and MCA § 31-2-339(a).  Additionally, the Court heard substantial evidence with respect to transfers concerning Unit 304 at the Warren Miller Lodge, Overlook, Sunrise Ridge and Big Sky Ridge transactions.  Blixseth attempted to explain these transactions, but his testimony in this regard was simply not credible.

However, the foregoing were not Blixseth's only fraudulent transfers.  The Release set forth in Blixseth and Edra' MSA was also fraudulent.

### b.    The Release in the MSA was a fraudulent transfer by Blixseth.

YCLT next asserts that the MSA Release was both constructively fraudulent under MCA § 31-2-333(1)(b) and actually fraudulent under MCA § 31-2-333(1)(a).  The applicable law under § 333(1)(b) is set forth above and need not be restated here.  Pursuant to § 333(1)(a):

> (1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

incurred the obligation:

> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

Actual intent may be established either by direct or circumstantial evidence.

Circumstantial evidence can be used to establish the existence of "badges of fraud," with consideration given, among other factors, to whether:

(a) the transfer or obligation was to an insider;

(b) the debtor retained possession or control of the property transferred after the transfer;

(c) the transfer or obligation was disclosed or concealed;

(d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) the transfer was of substantially all the debtor's assets;

(f) the debtor absconded;

(g) the debtor removed or concealed assets;

(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) the transfer occurred shortly before or shortly after a substantial debt was incurred; or

(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

MCA § 31-2-333(2).

Blixseth contends that California law permits release of fraudulent transfer claims, particularly in a case such as this where Blixseth secured a § 1542 release under California Civil

Code § 1542.[54]  The applicable Release reads:

> The Release by the Edra Entities at paragraph 4(b) reads in part: "[E]ach of the
> Edra Entities hereby fully and absolutely releases and discharges Timothy and
> each of the Timothy entities (collectively, the "Timothy Released Parties"), from
> any claim, right or demand that any such Edra Entity has, or may have against any
> of the Timothy Released Parties based on conduct from the beginning of time
> until the Effective Date relating to, or based on any fact, circumstance, event or
> document signed by Timothy or any of the Timothy Released Parties, including,
> but not limited to, (a) breach of fiduciary duty, (b) breach of corporate or business
> opportunities, (c) any similar type of potential liability based on failure of any of
> the Timothy Released Parties to act properly on behalf of any said Timothy Entity
> or (d) any document signed by Timothy or any of the Timothy Released Parties.

The MSA is to be construed under California law which permits the release to be set

aside if it is determined to be a fraudulent transfer.  *Mejia v. Reed*, 74 P.3d 166 (Cal. 2003) and

*Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221 (9th Cir. BAP 2007), *aff'd,* 551 F.3d 1092

(9th Cir. 2008).  *Mejia* noted that "[i]t is settled California law that a transfer accomplished

through an MSA can be avoided as a fraudulent transfer pursuant to UFTA."  *Mejia*, 74 P.3d at

173-174; *Beverly*, 374 B.R. at 233-34.  Specifically the California Supreme Court noted its

expectation that a bankruptcy trustee could "set aside the property division of a dissolution

judgment on the ground of fraud."  *Beverly*, 374 B.R. at 234, quoting *Mejia*, 74 P.3d at 174.  In

this Court's view *Mejia* and *Beverly* are dispositive.

At the outset, the Court notes that the fairness and appropriateness of the Release as it

relates to the Debtors were not actually, fully and fairly litigated.  The Release was not an arms

length transaction between the Debtors and Blixseth because Blixseth was negotiating the

---

[54]  Cal.Civ.Code § 1542 reads: "A general release does not extend to claims which the
creditor does not know or suspect to exist in his or her favor at the time of executing the release,
which if known by him or her must have materially affected his or her settlement with the
debtor."

Release while he was in control of the Debtors.  Furthermore, neither the Debtors nor any of Blixseth's creditors had an opportunity to contest or litigate the MSA or the Release.  As such, this Court concludes that nothing that occurred in the Blixseth divorce proceeding is binding upon the Debtors.

Considering the factors set forth in MCA § 31-2-333(2), the Release at issue in this case was obtained with the actual intent to hinder, delay and defraud the Debtors and their creditors. The Release was clearly a "transfer" as contemplated under § 333(1).  At the time the Release was negotiated, Blixseth was an insider of the Debtors as that term is defined in the Montana Fraudulent Transfer Statute as well as the United States Bankruptcy Code.  The Release was in a confidential court proceeding (hence concealed), Blixseth gave no value to the Debtors in exchange for the Release, the Debtors were insolvent at the time of the release, Blixseth transferred all his investment assets into a Nevada entity as an additional measure to avoid liability, Blixseth was aware of numerous claims against him, and the Debtors received no tangible or concrete value in exchange for the Release.

In addition to the above badges of fraud, at the time Blixseth obtained the Release, he was fully aware of the serious financial problems faced by the Debtors.  Blixseth was also cognizant of the material and negative changes in the real estate market, testifying that "prices ha[d] stopped escalating and buyers ha[d] dried up."  In pleadings filed in connection with the divorce, Blixseth recognized that dramatic changes had occurred and were occurring in the economy and stock markets in the United States and the world, creating "change and uncertainty in the financial and lending markets."  Further, according to Blixseth, "[b]ecause of the overall slow-down in the real estate market, sales at Yellowstone Club, which ha[d] been the primary

source of cash funding . . . ha[d] diminished dramatically."  While acknowledging the changing economy and the decline in the real estate market, according to Blixseth, the LeMond Plaintiffs' litigation, coupled with Edra's efforts to thwart any sale of the Yellowstone Club and then the eventual termination of the purchase agreement by Byrne is what really hurt the Yellowstone Club.

The Debtors's cash flow issues were directly attributable to slow lot sales and the payments that the Debtors were making to Credit Suisse.  As a result of Debtors' cash crunch, Blixseth testified the Yellowstone Club was unable to pay BGI's "management fee."  No funds were available to fund Porcupine Creek or to pay taxes without borrowing money in 2007.  The Debtors were forced to do bulk sale transactions because, according to Blixseth, the Yellowstone Club "needed the money."  To further compound the Debtors' financial problems, testimony suggest that in 2008, the Office of the Comptroller of the Currency had instructed American Bank to not loan more money to the Debtors and U.S. National Bank had told all of its branches not to extend more credit to the Debtors.

Edra testified that she was insolvent at the time she and Blixseth executed the MSA.  As discussed below, evidence also shows that Blixseth knew that the Debtors and Edra, were on the brink of bankruptcy.

As discussed below, at the time the Release was executed, Blixseth was also aware the Debtors possessed potential claims against him.  Blixseth was also aware at the time of the Release was executed that CIP had terminated its agreement to purchase the Yellowstone Club. Blixseth maintained throughout this litigation that Byrne pulled out of the sale because he was conspiring with Edra and others to bankrupt the Debtors so that Byrne could purchase the

Debtors at a deep discount.  The Court has not yet seen any credible evidence to support this particular conspiracy theory asserted by Blixseth.

Instead, the evidence shows that Blixseth did not want to consummate the proposed sale to CIP because the proceeds from the sale would not have been sufficient to pay off all the Yellowstone Club's outstanding obligations.  According to Blixseth's divorce attorney, Ari Garikian ("Garikian"), Blixseth testified at a March 21, 2008, hearing in the divorce proceeding that he estimated that he and Edra would owe between $50 to $100 million in taxes as a result of the CIP sale and that "the proceeds may not have been sufficient to pay everything and all of the taxes."  Blixseth thus understood that if the CIP transaction was consummated, he would not have received any money from the sale and would have, in fact, had to find additional funds to close the sale.

Blixseth's own emails contradict his testimony.  On March 26, 2008 at 10:10 p.m., Blixseth e-mailed Doyle indicating that he was "in 100% opinion NOT to extend" the closing date for the transaction.  Blixseth Exhibit 23, page 46.  Less than an hour later, Doyle sent an e-mail indicating that "we will be sending a termination notice shortly."  *Id*. p.47.  Subsequently, Club YC Acquisition LLC sent its termination letter in order to preserve its right to a refund of its deposit.  Blixseth Exhibit 33.  The evidence establishes that Blixseth had no intention of proceeding with the sale to CIP.

After the sale to CIP fell through, Blixseth agreed to transfer the Debtors to Edra as part of the MSA.  By doing so, Blixseth avoided a $50 to $100 million tax liability by foisting the potential tax liability on Edra.  Blixseth and his professional team examined the impact on Blixseth if Edra and/or the Debtors filed bankruptcy.  In a June 17, 2008, e-mail between

Blixseth and eight of his legal and financial advisors the "potential for a tax liability arising if Yellowstone Club, BGI and/or Mrs. Blixseth declared bankruptcy and defaulted on the [Credit Suisse] loan after the property settlement and divorce were final" was discussed.  YCLT Exhibit 232

Also, during the course of his divorce, Blixseth sought legal advice from the law firm of Thornton Byron LLP (Blixseth's so-called "wealth preservation" lawyers) for alleged estate planning purposes, but the invoices from that firm indicate Blixseth was also seeking a means to avoid any liability to the Debtors for his many breaches of fiduciary duty, including but not limited to, the Credit Suisse loan transaction and subsequent transfers.  The invoices from Thornton Byron are replete with references to analyzing ways to shield Blixseth from potential liability to Debtors and BGI.  For example, a June 17, 2008, in the Thornton Byron invoices provides:

> [D]iscussion with George Mack regarding particular concern regarding Mr. Blixseth's possible liability to creditors of Mrs. Blixseth, Blixseth Group, Inc. or the Yellowstone Club entities i[f] Mrs. Blixseth were to assume liabilities of business entities and the marital community on which Mr. Blixseth is currently obligated; revise correspondence to client and representatives regarding same; analysis of documentation and transactional steps to limit Mr. Blixseth's exposure on subsequent efforts with respect to liabilities assumed by Mrs. Blixseth; discussion to analyze same; draft correspondence regarding recommendation for limiting Mr. Blixseth's liability after Mrs. Blixseth's assumption of debt; draft multiple correspondence responding to questions and concerns raised by Mr. Blixseth and other representatives regarding same.

YCLT Exhibit 149A.

As illustrated above, Blixseth and his advisors were contemplating the financial demise of the Yellowstone Club and Edra and they were developing a plan to shield Blixseth from the fallout.  Blixseth's plan involved not only obtaining releases from the Debtors, it involved the

creation of Desert Ranch LLLP, a structure referred to by his attorney as a "personal Berkshire Hathaway" that provided "general creditor protection." Desert Ranch LLLP ("Desert Ranch") is a Nevada limited liability limited partnership. Blixseth owns a 98% limited partnership interest in Desert Ranch. The remaining 2% is held by the general partner of Desert Ranch, Desert Ranch Management, which is a Nevada limited liability company. Blixseth owns 40% of Desert Ranch Management and his son, Beau Blixseth, owns 30% of this entity. The remaining 30% of Desert Ranch Management is owned by two trusts. Blixseth's long-time accountant and trusted advisor, Mack, serves as Trustee of the trusts. As admitted by his own lawyer, one of the purposes of this structure is to remove assets from the reach of creditors. Virtually all of Blixseth's assets were transferred into this vehicle. Interestingly, Desert Ranch LP was converted to Desert Ranch LLLP on November 12, 2009; a mere two days after the Debtors filed bankruptcy.

The Desert Ranch structure was an integral part of Blixseth's plan to shield himself from the consequences of his breaches of fiduciary duty and fraudulent transfers in connection with the Debtors. Securing a Release was another integral part of Blixseth's plan. Indeed, in the first phase of the trial, Blixseth testified unequivocally that getting a release from any claims for breach of fiduciary duty or fraudulent transfer was the "cornerstone" of the MSA.

Blixseth's fraudulent intent could not be more clear. Blixseth obtained the Release with the actual intent to hinder, delay and defraud his creditors, including the Debtors. As such, the Release is, for purposes of this Adversary Proceeding, voidable pursuant to MCA § 31-2-333(1)(a).

YCLT also asserts a meritorious claim under § 31-2-333(1)(b). First, the Debtors did not

receive reasonably equivalent value in exchange for the Release.  YCLT, through expert

testimony, established that the Release was worth approximately $420 million.  Of that amount,

$133.6 million was attributable to Blixseth's transactions involving Big Sky Ridge, Sunrise

Ridge, Overlook, Unit 304 and the LeMond Plaintiffs' settlement.  The remaining $286.4 million

was attributable to Blixseth's use of the Credit Suisse loan proceeds.  The Debtors received little

or no direct consideration from Blixseth in connection with giving up $420 million in claims.

This is confirmed by many sources, including Edra and Blixseth's testimony.

Edra Blixseth testified as follows:

A.      Yellowstone Club did not get benefit from the things that were taken.

Q.      - - Yellowstone Development - -

A.      Correct.

Q.      - - BSR - -

A.      Correct.

Q.      - - none of those entities got a single thing from releasing him
[Tim Blixseth] of all this and giving him all these assets; is that
right?

A.      That's correct.

Similarly, Blixseth testified that at the time of the MSA release he knew of no claims he

was releasing against YMC or Big Sky Ridge, LLC.  With respect to YD, Blixseth testified that

he knew of two potential claims he was releasing:  one dealing with a note owed American Bank

on the Warren Miller Lodge; and the other dealing with some bonds with Madison County.  He

believed that the value of those bonds were around $750,000.   Blixseth testified that no lawsuits

existed against YD at the time of the Release.

However, with respect to the American Bank note, YD's accountant Moore testified that on the eve of the MSA deal, Blixseth caused BGI to take the one unsold unit from the Warren Miller Lodge at a loss to YD of over $700,000, leaving only two units under that American Bank note, both secured by the real estate and subject to sales agreements that subsequently closed. Accordingly, as it turns out, the value of those claims was, in fact, zero and did not approximate $420 million. Even using Blixseth's value of the potential claim against YD ($750,000) relating to the Madison County bonds, the Court concludes that this does not constitute reasonably equivalent value for the Release, which is valued at $420 million.

YCLT proved that none of the Debtors received reasonably equivalent value in exchange for the Release. In fact, no direct value was received in exchange for the Release of over $400 million of claims against Blixseth. The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc*., 129 F.3d 382, 387 (7th Cir. 1997). "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecommunication Network, Inc. v. Allen*, 490 F.3d 1325, 1336 (11th Cir. 2007). Furthermore, in reaching its conclusion herein, the Court has also considered that the transaction between the Debtors and Blixseth involving the Release was not an arm's length transaction. *Grigonis v. U.S. West Communications, Inc.*, 208 B.R. 950, 956 (Bank. D. Mont. 1997) (a factor of considerable importance in assessing reasonably equivalent value is whether the transaction was arm's length).

Two types of benefits need to be considered in analyzing reasonably equivalent value: benefits that the debtor receives directly ("direct benefits") and those it receives indirectly

("indirect benefits").  To make out the elements of a fraudulent conveyance claim, a plaintiff

must prove that a debtor did not receive direct benefits reasonably equivalent to the value which

it gave up.  If the plaintiff meets that burden, the burden is then on defendants to produce (if they

can) evidence that the debtors indirectly received sufficient, concrete value. *See Welt v. Jacobsen*,

361 B.R. 567, 582 (Bankr. S.D. Fla. 2007) ("[o]nce the Trustee has made his prima facie case

that a transfer constitutes a fraudulent transfer . . . the burden of producing evidence shifts to the

transferee to demonstrate that the debtor received a benefit or that there was some legitimate

purpose for the transfer.").  The burden of proof for Blixseth includes a requirement to show that

the "indirect benefits" were tangible and concrete, and to quantify their value with reasonable

precision.  *See, e.g., Pummill v. Greensfelder, Hemker & Gale*, 267 B.R. 602, 614 (8th Cir. BAP

2001) ("party claiming to have delivered value must quantify it."); *Official Committee of

Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am. Inc.*, 422 B.R. 783 (Bankr. S.D. Fla.

2009).

Blixseth contends that the Release bestowed an indirect benefit on the Debtors by

bringing "peace in the valley."  Blixseth testified that all the litigation, including his divorce

proceedings, had a very negative impact on the Debtors and that settling matters between he and

Edra bestowed a great benefit upon the Debtors.  Thus, according to Blixseth, the Debtors

received "peace in the valley" in exchange for the Release.  It is a dubious proposition that one

can create a negative situation and then claim that he has bestowed a benefit by eliminating the

negative situation that he created.  Nevertheless, the Court finds that an intangible and ephemeral

"benefit" such as "peace in the valley" as a result of Blixseth's divorce settlement does not

constitute reasonably equivalent value to the Debtors under the circumstances of this case.

112

Blixseth has failed to carry his burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision. *In re Richards & Conover Steel, Co.* 267 B.R. 602, 614 (8th Cir. BAP 2001) (party claiming to have delivered value must have quantified it); *In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 418 (D. Minn. 1990) (it is transferee's burden to produce evidence of indirect benefit); *Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am. Inc.*, 422 B.R. 783 (Bankr. S.D. Fla. 2009). Not a single expert or fact witness for Blixseth attempted to quantify the value of the indirect benefits he claims were received by the Debtors. For that reason alone, it is appropriate to rule in favor of YCLT on the issue of reasonably equivalent value.

YCLT has convincingly demonstrated by a preponderance of the evidence that the Debtors did not receive any type of consideration that would constitute reasonably equivalent value. Claims of approximately $420 million were given up and nothing was received by the Debtors in exchange. Blixseth has wholly failed to produce any credible evidence that constitutes a tangible and concrete value flowing to the Debtors. In fact, the evidence in this case is just the opposite. Less than three (3) months after entering into the MSA transaction, the Debtors filed bankruptcy. This hardly constitutes "peace in the valley" or concrete and tangible value to the Debtors. Indeed, the Debtors' bankruptcy has disrupted the lives of hundreds of employees, creditors, and members. The Court thus concludes that the Debtors did not receive reasonably equivalent value in exchange for the Release.

The Court also finds that the Debtors were insolvent upon consummation of the Release. Mordy testified the Debtors were insolvent upon consummation of the MSA on August 13, 2008.

While certain aspects of Mordy's opinions were challenged by Blixseth's counsel, the Court finds on whole that Mordy's testimony was credible and his opinions reliable for purposes of this Adversary Proceeding.

In analyzing the Debtors' solvency, Mordy utilized the Balance Sheet test, the Cash Flow test and the Adequate Capital test. All experts in this case agreed that if a debtor fails any one of the three solvency tests, the debtor is considered insolvent for all purposes relevant to this case. Mordy concluded that as of August 13, 2008, the Debtors were insolvent under all three of the solvency tests.

Blixseth failed to offer any evidence to refute Mordy's opinion regarding the Debtors' solvency as of August 13, 2008. Instead, Blixseth's expert Reilly criticized certain adjustments that Mordy made to asset values in connection with his balance sheet solvency analysis. Reilly contends that Mordy did not comply with the requirements of SSVS1. Reilly testified that, in his opinion, Mordy inappropriately adjusted asset values. Conversely, Mordy testified that he did not believe that SSVS1 applied to his balance sheet analysis because of the exception to SSVS1 that applies to typical solvency opinions. Mordy also testified that he did not intend to perform any independent valuation of assets or offer a valuation opinion. The Court, however, need not dwell on this issue because Mordy also performed the balance sheet test without making any adjustment to values. Mordy's revised analysis demonstrates that the Debtors were insolvent under the Balance Sheet test on August 13, 2008.

The criticisms offered by Reilly in connection with Mordy's original balance sheet insolvency have no bearing on Mordy's cash flow analysis or his adequate capital analysis. Mordy found the Debtors to be insolvent under both of these tests and as all the experts agreed,

114

the Debtors were insolvent if they failed any one of the solvency tests.

In summary, Blixseth produced no credible evidence that the Debtors were solvent as of August 13, 2008. Mordy's opinions on cash flow insolvency and adequate capital insolvency were not rebutted, and even if the Court were to find Mordy's conclusions deficient or faulty as to the Balance Sheet test, which it does not, the Court would still conclude that the Debtors were insolvent upon consummation of the Release under the Cash Flow test and the Adequate Capital test. In sum, the Release set forth in the MSA was clearly a fraudulent transfer by Blixseth.

Contrary to Blixseth's assertions, the Rooker-Feldman doctrine does not insulate the Release from an attack as a fraudulent transfer. The Rooker-Feldman doctrine states that a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court. The Rooker-Feldman doctrine is not applicable, however, because YCLT is seeking to set aside fraudulent transfers under §§ 544 and 548. *In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000) (en banc). Furthermore, the Rooker-Feldman doctrine has no application because YCLT was not a party to the divorce proceedings. *In re Erlewine*, 349 F.3d 205, 210 (5th Cir. 2003). Judicial estoppel and issue preclusion do not bar YCLT's claims regarding the Release because neither YCLT nor the Debtors were parties to the Blixseths' divorce proceeding or in privity with any one who was a party. *Kubacki v. Molcha*, 172 P.3d 594, 597 (Mont. 2007). Furthermore, YCLT's fraudulent transfer claims under the Bankruptcy Code were not and could not have been actually litigated or decided in the divorce court.

The language of section 548 of the Bankruptcy Code clearly states that "the debtor" must receive reasonably equivalent "value" "in exchange for" the transfer or obligation. 11 U.S.C. § 548(a)(1)(B)(I) (trustee may avoid transfer or obligation "if the debtor . . . received less that a

reasonably value in exchange for such transfer or obligation" (emphasis added)).  That language means that a benefit is cognizable only if three requirements are satisfied.  First, the benefit must be received, even if indirectly, by the debtor, and the touchstone of a cognizable benefit is whether the "debtor's net worth has been preserved and the interests of the creditors will not have been injured by the transfer.  *General Electric Credit Corp. v. Murphy*, 895 F.2d 725, 727 (11th Cir. 1990) (quoting *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991).  Second, any purported benefits must also be limited to cognizable "value."  Section 548 does not refer to "benefits" whether direct or indirect.  It requires reasonably equivalent "value" and includes a precise definition of "value" that encompasses only "property" and "satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. §§ 548(a) (1)(B)(I), (d)(2)(A).  Since this case does not concern the satisfaction of debt, "property" received by the Debtors is the only value relevant here.  Third, property must have been received by the debtors "in exchange for" the transfers or obligation.  Any "property" that the debtors would have enjoyed regardless of the MSA and the Release cannot be regarded as property received "in exchange for" the transfer or obligation.

Just like the Bankruptcy Code, MCA § 31-2-330 provides that "value" is given when "property" is transferred or an antecedent debt is secured or satisfied.  Section 31-2-328 of the Montana code defines "Property" as "anything that may be the subject of ownership."

The Debtors' claims against Blixseth constituted a valuable asset of the Debtors' estate. Uncontested testimony demonstrated that the Debtors had $286.4 million in claims against Blixseth.  Furthermore, the Court heard testimony regarding an additional $133.6 million in claims the Debtors had against Blixseth.  The Debtors received absolutely nothing in exchange for

releasing their $420 million claims against Blixseth.  The Release was, therefore, a constructively

fraudulent transfer under § 333(1)(b).

### 5.      Fiduciary Duties.

YCLT's remaining substantive claim is that Blixseth breached his fiduciary duties.  MCA

§ 35-8-310 sets forth the fiduciary duties of limited-liability-company members as follows:

> (1)  The only fiduciary duties that a member owes to a member-managed
> company and the other members are the duty of loyalty imposed by subsection (2)
> and the duty of care imposed by subsection (3).
>
> (2)  A member's duty of loyalty to a member-managed company and its
> other members is limited to the following:
>
> > (a) to account to the company and to hold as trustee for it any
> > property, profit, or benefit derived by the member in the conduct or
> > winding up of the company's business or derived from a use by the
> > member of the company's property, including the appropriation of a
> > company's opportunity;
> >
> > (b) to refrain from dealing with the company in the conduct or
> > winding up of the company's business on behalf of a party or as a
> > person having an interest adverse to the company; and
> >
> > (c) to refrain from competing with the company in the conduct of
> > the company's business before the dissolution of the company.
>
> (3)  A member's duty of care to a member-managed company and the other
> members in the conduct of and winding up of the company's business is limited to
> refraining from engaging in grossly negligent or reckless conduct, intentional
> misconduct, or a knowing violation of law.
>
> (4)  A member shall discharge the duties under this chapter or the
> operating agreement to a member-managed company and its other members and
> exercise any rights consistently with the obligation of good faith and fair dealing.
>
> (5)  A member of a member-managed company does not violate a duty or
> obligation under this chapter or under the operating agreement merely because the
> member's conduct furthers the member's own interest.

(6)  A member of a member-managed company may lend money to and transact other business with the company. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

(7)  This section applies to a person winding up the limited liability company's business as the personal or legal representative of the last-surviving member as if the person were a member.

(8) In a manager-managed company:

(a) a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member;

(b) a manager is held to the same standards of conduct as those prescribed for members in subsections (2) through (6);

(c) a member who pursuant to the operating agreement exercises some or all of the rights of a manager in the management and conduct of the company's business is held to the standards of conduct prescribed for members in subsections (2) through (6) to the extent that the member exercises the managerial authority vested in a manager by this chapter; and

(d) a manager is relieved of liability imposed by law for violation of the standards prescribed for members by subsections (2) through (6) to the extent of the managerial authority delegated to the members by the operating agreement.

Blixseth owed fiduciary duties of loyalty and care to the Debtors under the Montana Limited Liability Company Act ("MLLC Act").  Officers and directors must discharge their duties in good faith, with the care an ordinarily prudent person in a similar position would exercise under similar circumstances, and in a manner the director or officer reasonably believes is in the companies' best interests.  *Trifad Entertainment Inc. v. Anderson*, 306 Mont. 499, 508, 36 P.3d 363 (2001).  While *Trifad* discusses the duty of care and loyalty under Montana's Business Corporation Act, the Court finds its analysis applicable to limited liability companies.  Blixseth

118

breached these duties when he caused the Debtors to pledge nearly all of their assets for loan proceeds that he applied for his own use, and by using the proceeds of the Credit Suisse loan for his own benefit rather than for the benefit of Debtors. Blixseth did not act in the Debtors' best interests.

Pursuant to MCA § 35-8-310, Blixseth, as an owner of the Debtors, owed fiduciary duties to the Debtors, the minority owners of those entities, and the Yellowstone Club to protect their interests in connection with the Credit Suisse Loan Transaction. Blixseth breached those duties by entering into the Credit Suisse loan transaction and simultaneously siphoning those proceeds from the Debtors for his own personal benefit or the benefit of other entities in which he held an interest. The Court finds Blixseth's conduct to be intentional misconduct. As a result of the Credit Suisse loan transaction and Blixseth's breach of his fiduciary duties, Debtors and their creditors have been damaged.

Blixseth's actions also violate MCA § 35-8-604(1)(a) and (b), which prohibit distributions to the members of a limited liability company ("LLC") if such distributions render the LLC unable to pay its debts as they become due in the usual course of business and/or if such distributions cause the LLC's total assets to be less than the sum of its total liabilities. Mordy testified that the damages incurred by the Debtors as a result of Blixseth's breaches of fiduciary duty exceed $286.4 million. YCLT also presented convincing testimony from the Debtors' comptroller, Moore, regarding additional breaches of fiduciary duties and self-dealing by Blixseth in connection with the transactions known as Big Sky Ridge, Sunrise Ridge, Overlook Partners and Unit 304 at the Warren Miller Lodge.

For example, on April 1, 2002, Big Sky Ridge, LLC purchased property contiguous to the

Yellowstone Club.  The property was purchased from Silver Ridge, Inc. in the amount of $3,500,000.  At that time the owner of Big Sky Ridge was Blixseth.  The consideration was in the form of a Note.  Blixseth's capital contribution to Big Sky Ridge was only $50,000.  On May 7, 2002, Blixseth sold a 50% interest in Big Sky Ridge to Voyager Group, LP for $2,500,000.  Blixseth then sold his remaining 50% interest in Big Sky Ridge to Yellowstone Development on September 17, 2003, for $17,000,000.  Two years later, in September 2005, Blixseth purchased Voyager's 50% interest for $3,000,000.  Subsequent to September 2005, Big Sky Ridge was owned 50% by Blixseth and 50% by YD.  When Big Sky Ridge sold certain lots, Big Sky Ridge would pay the sales proceeds as dividends to Blixseth and YD.  Blixseth received at least $26,541,818.60 in distributions from Big Sky Ridge by virtue of his ownership.

Next, on February 1, 2005, YD transferred its interest in the Sunrise Ridge Condominium Development at Yellowstone Club to Blixseth in exchange for a $5 million promissory note.  Subsequently, on June 28, 2006, the Sunrise Ridge Condominium Development was sold to CIP Sunrise Ridge Owner, LLC for $60 million.

Blixseth's pattern of self-dealing continued in 2008 when Blixseth and Wayne Prim formed Overlook Partners, LLC ("OP").  The Yellowstone Club was in desperate need of cash.  Wayne Prim loaned OP $15,000,000 and OP turned around and purchased five lots from YD for $3,000,000 each.  This sale closed on or around May 7, 2008.  The lots were appraised by Cushman & Wakefield for $5 million and were being marketed by the Yellowstone Club for $6,000,000 each, making the value of this transaction for OP between $10,000,000 and $15,000,000.  Blixseth confirmed this value by immediately contracting on behalf of OP to cause the same lots to be sold for no less than $5,500,000 each.  The net result was a benefit to Blixseth

of between $5 and $7.5 million at the expense of YD.

Blixseth also committed acts of self dealing in connection with the sale of Warren Miller Lodge Unit 304. Prior to August 2008, this Unit was owned by YD and had a value of approximately $3.2 million. YD owed American Bank a debt of $2,511,000 that was secured by Unit 304. Blixseth caused YD to convey Unit 304 to BGI. BGI, in return, assumed the debt to American Bank. Blixseth thus immediately benefitted from this deal in an amount of at least $700,000.

Blixseth again breached his fiduciary duty in connection with the LeMond Plaintiffs' litigation and the settlement thereof. After the LeMond Plaintiffs filed suit against Blixseth, Blixseth engineered a settlement in the amount of $38 million. But Blixseth did not pay that amount personally. Instead, as reflected in Debtors' financial statements, Blixseth had the Debtors pay at least $18 million of that settlement amount on his behalf.

The record is riddled with instances where Blixseth breached his fiduciary duties. Such breaches caused substantial harm to the Debtors.

### 6.    Advice of Counsel.

Blixseth asserts the advice of counsel defense with respect to his use of the Credit Suisse loan proceeds and as to the MSA Release. With respect to his use of the Credit Suisse loan proceeds, Blixseth testified that he discussed the need to take the money out as a loan with his accountant Mack because that "was in the lane of the accounting department[.]" Blixseth did not discuss the matter specifically with counsel because it "wasn't in their lane, it wasn't their bailiwick." Nevertheless, Blixseth asserts the advice of counsel defense based upon Brown's September 30, 2005 opinion letter and Doyle's email of May 8, 2006.

121

Brown's opinion letter was drafted pursuant to Paragraph J of the executed September 20, 2005, Credit Agreement, which reads: "The Administrative Agent and its counsel shall have received the written opinions of (i) Stephen R. Brown, of Garlington, Lohn & Robinson, PLLP and (ii) McDermott, Will & Emery, counsel for the Loan Parties (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent."  Doyle, who was Blixseth's lead attorney on the Credit Suisse transaction, explained that Brown's responsibility was to deal with environmental matters, entitlements and title issues that dealt specifically with Montana law.

Credit Suisse's Due Diligence Request List, Exhibit 263Q, shows that as of July 7, 2005, Brown, because he was already representing the Debtors on various matters, was in charge of "[d]ocumentation relating to any past and present litigation, arbitration or other dispute proceedings relating to the project or involving a member of company management (also include any threatened proceedings)," "[l]ist of existing entitlements/approvals and any future entitlements/approvals required to be obtained in the future," "[d]ocumentation evidencing existing entitlements, including documentation relating to any of the following: Permits, Specific plan, Subdivision maps, Water rights," "[c]opy of any public financing or assessment district in place or contemplated to finance infrastructure or other public improvements," "Environmental a. Schedule or material environmental licenses, permits and authorizations held by any of the Entities," and "Third Party Approvals/Consents (including governmental approvals)[.]"  When questioned about Credit Suisse' checklist and whether anyone was assigned the responsibility of determining whether a distribution or loan of money by the Debtors to BGI would be a breach of

fiduciary duty, Doyle testified that the purpose of the due diligence requested by Credit Suisse "was just to gather documentation that was needed for Credit Suisse to go ahead with the loan.  So it's title insurance, copies of master-plan development, you know, reliance letters and so forth."

Doyle believed that the final form of Brown's opinion letter may have even been provided by Credit Suisse, but Brown testified that he used his law firm's standard form opinion letter used for loan transactions.  Brown's opinion letter states that it "is governed by and shall be interpreted in accordance with the Legal Opinion Accord ('Accord') of the ABA Section of Business Law (1991), as modified by the ABA/ACREL Real Estate Report ('Report')."  Section 19 of the Accord specifically states that "an Opinion does not address any of the following legal issues unless the Opinion Giver has explicitly addressed the specific legal issue in the Opinion Letter: . . . (f) compliance with fiduciary duty requirements; . . . (i) fraudulent transfer and fraudulent conveyance laws[.]"  Consistent with the foregoing, Brown testified that he did not give any opinion with respect to compliance with fiduciary duty requirements or fraudulent transfer and fraudulent conveyance laws because he is not qualified to do such.  The only item under § 19 of the ABA Accord that Brown opined on was 19(h) dealing with the creation of a security interest in property.[55]  Moreover, Brown was not requested to opine on the use of the proceeds of the Credit Suisse loan, or on whether the loan would result in a breach of fiduciary duty, and he was not asked to give a fraudulent transfer opinion.  Brown's opinion letter to Credit Suisse contained not a single shred of financial analysis, which analysis would generally appear in a fraudulent

---

[55]  Section 19(h) deals with "the characterization of [the] Transaction as one involving the creation of a lien on real property or a security interest in personal property, the characterization of a contract as one in a form sufficient to create a lien or a security interest, and the creation, attachment, perfection, priority or enforcement of a lien on real property or a security interest in personal property[.]"

transfer opinion.

Interestingly, while Blixseth claims he relied on Brown's September 30, 2005, opinion letter, Blixseth could not recall whether he read Brown's opinion letter prior to entering into the credit agreement.  Blixseth's only specific memory was that Doyle and the people on Blixseth's team advised Blixseth "that the opinion letter that was required to do the deal from Montana counsel was prepared and was ready to sign."  Such letter was signed by Brown, and recites at paragraph 7 that Brown's "opinion is being delivered solely to the addressees (i.e., the Administrative Agent and the Lenders) named in [the] letter, their successors and assigns, and may not be relied upon by any other person or entity and may not be disclosed, quoted, filed with a governmental agency or otherwise referred to without [Brown's] written consent."

Based upon the evidence, the advice, if any, that was given by Brown to Blixseth pertained to whether it was permissible for the Debtors to enter into a loan agreement with Credit Suisse. Brown did not take, and was not asked to take, the next step to determine whether Blixseth's withdrawal of funds from the Debtors violated any law.

Blixseth cannot rely upon an opinion letter he received from Brown that speaks to the validity of the Credit Suisse loan to absolve him from any liability for his conduct in connection with that loan.  The case against Blixseth is not about the validity of the Credit Suisse loan, in the abstract, but about Blixseth's breach of his fiduciary duty in procuring the loan and fraudulently transferring the bulk of the loan proceeds to himself for his personal benefit.  No evidence exists in the record that Blixseth received any advice from Brown regarding Blixseth's ability to use the proceeds of the Credit Suisse loan for his own purposes.

Blixseth also claims that he relied on advice of counsel in connection with the MSA and

124

the Release although it is not entirely clear to the Court exactly what advice Blixseth received in this regard.  Blixseth's divorce attorney, Ari Garikian, testified her firm did not warrant that the Release would protect Blixseth from claims by the Debtors.  The Court fails to see how any advice Blixseth may have received from any counsel relating to the Release would change the Court's opinion that the Release should be set aside as a fraudulent transfer.  Blixseth has wholly failed to carry his burden in this regard.

       **7.**       **Unclean Hands and *In Pari Delicto*.**

       Originally, when Blixseth's interests were aligned with Credit Suisse, Blixseth's counsel argued that "Blixseth is an honest man" who wanted more than anyone to see the unsecured creditors in this case get paid, but Blixseth could not get that done because the Committee was controlled by the LeMond Plaintiffs, who trumped up and fabricated this proceeding in order to get money from Blixseth.  Blixseth also argued that the Yellowstone Club bankruptcy was cleverly orchestrated by Byrne and CrossHarbor in order to obtain the Yellowstone Club and other properties at substantial discounts.  Now that the Committee is out of this proceeding, Blixseth complains that he is not getting a fair shake because YCLT is controlled by Credit Suisse.  Blixseth's latest complaint stems from events that transpired subsequent to Part I of the trial in this matter.

       Following Part I of the trial in this matter, Credit Suisse on behalf of itself and the Prepetition Lenders[56], the Official Creditors Committee and the Debtors negotiated a Third Amended Joint Plan of Reorganization Plan, and related Settlement Term Sheet to deal with the

---

[56] "Prepetition Lenders" is used synonymously throughout this Memorandum with "First Lien Lenders" as defined in Art. I, § 1.66 of  Debtors' Third Amended Joint Plan of Reorganization.

fact that this Court had subordinated Credit Suisse's $375 million loan.  In other words, the Plan

effectuated the Court's subordination ruling against Credit Suisse and the Prepetition Lenders.

Under Debtors' confirmed Third Amended Joint Plan, the claims of the Prepetition

Lenders (who actually advanced the loan funds to the Debtors under the Credit Agreement) were

allowed in the amount of $309,376,110.42, less $80 million paid at Plan closing as a participation

in an Equity Note distributed under the Plan.  The Prepetition Lenders' allowed claim was divided

into a secured portion under Class 3 and a deficiency claim under Class 8, per this Court's

Memorandum of Decision Setting Forth Findings of Fact and Conclusions of Law Regarding

Debtors' Proposed Plan of Reorganization of June 2, 2009.  As partial distribution on the Class 3

claims, the Prepetition Lenders were to receive "100% of the net proceeds from the sale or other

disposition of the Debtors' interest in its Farcheville property"  Plan § 3.3.

Under Section 6.14 of the Plan, YCLT was created and funded.  All of the property and

assets of the Debtors, including all of their claims and causes of actions, including this

then-pending Adversary Proceeding, were transferred to YCLT.  In turn, the Plan provided broad

releases to the Committee and the Debtors.  Credit Suisse contends the Plan also provides broad

releases to Credit Suisse and the Prepetition Lenders.  The Prepetition Lenders released any

claims they may have had against Credit Suisse for its bad conduct or otherwise.

The Yellowstone Club Settlement Term Sheet approved as Schedule 1.123 of the Plan set

out the governance and distribution provisions of YCLT.  Paragraph 5(c) of the Settlement Term

Sheet provides that YCLT would be governed by a seven-member Trust Advisory Board

appointed as follows:

> The Liquidating Trusts shall be governed by seven (7) member boards appointed
> as follows until such time as the Allowed Class 4 Claims are paid in full (and no

126

further Class 4 Claims are pending): four (4) by the Prepetition Agent, two (2) by the UCC and one (1) by the Ad Hoc Class B Members Committee. Holland & Hart LLP [previously Credit Suisse's local counsel] shall be designated as the initial legal counsel for the Liquidating Trusts. Decision making by the board shall be by majority vote provided that any change or selection of any additional legal counsel for the Liquidating Trusts shall require a unanimous vote of the boards of the Liquidating Trusts. Settlement of the claims identified on Schedule C attached hereto and made a part hereof (collectively, the "Designated Claims") shall require the vote of least five (5) members of the board. The UCC shall have the exclusive right for forty-five (45) days after the Effective Date to negotiate proposed terms of any settlement of the Designated Claims for approval by the board. Such board shall appoint the trustees of the Liquidating Trusts. Enforcement of the BGI Notes shall be transferred to the Liquidating Trusts. Following the payment in Full of Allowed Class 4 Claims, the boards of the Liquidating Trusts shall have three (3) members appointed by the Prepetition Agent and one (1) member appointed by the Ad Hoc Class B Members committee.

(Docket No. 985-1, Settlement Term Sheet § 5(c).)

The parties built into the Trust majority, super-majority and unanimity voting provisions. Also, YCLT was required to hire the Holland & Hart law firm that represented Credit Suisse as local counsel in Part I of the trial, and was not permitted to hire another law firm without unanimous approval.  The Settlement Term Sheet provided a waterfall for the distribution of any funds to be collected by the YCLT.  The specifics were as follows:

The distribution provisions of the Liquidation Trusts shall be modified to provide that funds received after the Effective Date (net of reserves for expenses) with respect to Non-Project Assets (excluding Farcheville) shall be paid first, the amount of $2,000,000 to the Trade Creditor Fund; second, up to the amount of $15,000,000 to pay CIP Lending or its assignees on account of Allowed Class 4 Claims paid by the Trade Creditor Fund; third, up to the next $10,000,000 to pay any Allowed Class 4 Claims; fourth, the balance shall be paid pro rata among all unpaid Allowed Claims including all unpaid Allowed Claims of the Prepetition Agent and the Prepetition Lenders after application from the Project Assets and Farcheville, all on a pari passu basis.

Settlement Term Sheet § 5(d).

Since its inception, the largest creditor in this case has been Credit Suisse and the

Prepetition Lenders.[57]  YCLT is only a successor of the Debtors.  Blixseth has shown no evidence

to suggest any wrong doing by the Debtors.  Similarly, YCLT is not a successor in interest to Edra

and the Court, to date, has not agreed with Blixseth's grand conspiracy theory regarding Byrne

and Edra.  Thus, the Court is not convinced that YCLT has unclean hands in this matter.

Moreover, while Credit Suisse was permitted to appoint four of the seven members to the Trust

Advisory Board, the Court is not convinced that Credit Suisse controls YCLT.[58]  The Court also

agrees with YCLT that no basis exists whatsoever upon which any misconduct that may have

been engaged in by Credit Suisse should be imputed upon YCLT.

However, under the unique facts of this case, the Court finds merit in Blixseth's *In Pari

Delicto* defense.  *In Pari Delicto* is an "at equal default" defense that relieves a defendant from

liability where a court determines that the plaintiff bore equal responsibility for the alleged harm.

In the context of federal securities law, the United State Supreme Court discussed the *in pari

delicto* defense:

> The equitable defense of *in pari delicto*, which literally means "in equal
> fault," is rooted in the common-law notion that a plaintiff's recovery may be

---

[57]  According to Kirschner, and indeed Credit Suisse's Proof of Claim No. 633 filed
March 16, 2009, Credit Suisse Loan Funding, LLC retained 5.5% of the loan with other entities
owning the remainder of the loan.

[58]  According to the terms of the confirmed Plan, Credit Suisse, as agent for the
Prepetition Lenders, was entitled to appoint four of the seven members of the Board.  Two of its
designees are representatives of independent hedge funds (Scoggin and Babson) who are
Prepetition Lenders that vote in their own economic interest.  Scoggin has a 5% interest in the
loan and Babson has an 11% interest.  The Prepetition Lenders are the entities, funds and others
who purchased the debt placed by Credit Suisse.  The other two Credit Suisse designees on the
Board are Messrs. Hunt and McGloin, who are independent businessmen.  The remaining three
members represent other constituencies not aligned with the Prepetition Agent or the Prepetition
Lenders — Yellowstone Club World, LLC, the LeMond Plaintiffs, and the non-settling Class B
shareholders.

barred by his own wrongful conduct. *See* [*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, and nn. 12 and 13, 105 S.Ct. 2622, 2626, and nn. 12 and 13, 86 L.Ed.2d 215]. Traditionally, the defense was limited to situations where the plaintiff bore "at least substantially equal responsibility for his injury," *id.,* at 307, 105 S.Ct., at 2627, and where the parties' culpability arose out of the same illegal act. 1 J. Story, Equity Jurisprudence 399-400 (14th ed. 1918). Contemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the "unclean hands" doctrine, where the plaintiff has participated "in some of the same sort of wrongdoing" as the defendant. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968).

*Pinter v. Dahl*, 486 U.S. 622, 632, 108 S.Ct. 2063, 2070-71, 100 L.Ed.2d 658 (1988).[59]

In the Partial & Interim Order entered May 13, 2009, which Order was later vacated by agreement of the Debtors, the Committee, Credit Suisse and the Court, the Court wrote:

Credit Suisse, Barcy, Yankauer and others on the Credit Suisse team only earned fees if they sold loans. Credit Suisse thus devised a loan scheme whereby it encouraged developers of high-end residential resorts, such as Blixseth, to take unnecessary loans. The higher the loan amount, the fatter the fee to Credit Suisse. This program essentially puts the fox in charge of the hen house and was clearly self-serving for Credit Suisse.

The fee structure was undoubtedly the catalyst that led to the most shocking aspect of Credit Suisse's newly developed loan product. As noted earlier, Credit Suisse's new loan product was marketed to developers on grounds that developers were authorized to take a substantial portion of their Credit Suisse loan proceeds as a distribution, or as Blixseth argues, a loan. In this case, Credit Suisse had not a single care how Blixseth used a majority of the loan proceeds, and in fact authorized Blixseth to take $209 million and use it for any purpose unrelated to the Yellowstone Club. Blixseth, however, had a problem in this case because he was not the sole owner of the Yellowstone Club and he did not want to share the loan proceeds with the B shareholders. Thus, Blixseth booked the $209 proceeds that he took from the Yellowstone Club as a loan months after he

---

[59] In actions brought by securities investors under the Securities Exchange Act, the *in pari delicto defense* is available "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 472 U.S. at 310-311, 105 S.Ct., at 2629.

actually took the proceeds.  Blixseth claims he always intended to repay the $209 million BGI note, but Blixseth's former wife Edra testified to the contrary.

Blixseth testified that he always intended to take the $209 loan proceeds as a loan rather than a distribution because booking the transaction as a distribution would have caused his owner's equity account to have a negative balance.  The negative owner's equity would have appeared as a qualification on the Debtors' audited financial statements and may have caused the Debtors' to be out of compliance with the Credit Agreement.  A sophisticated lender such as Credit Suisse had to have known what a distribution would do to the Debtors' financial statements, and in particular, their balance sheets, yet Credit Suisse proceeded with the loan, and thus earned its large fee.

In addition to turning a blind eye to Debtors' financial statements, Credit Suisse's due diligence with respect to the $375 million loan was almost all but non-existent.  Credit Suisse spent a fair amount of money on legal bills to ascertain that the Debtors did in fact own the property at the Yellowstone Club, and Credit Suisse also spent a fair amount ensuring that it was not violating any laws with its loan product.  Credit Suisse, however, did little financial due diligence.  Barcy testified that Credit Suisse was aware that Cushman & Wakefield had appraised Debtors' assets in 2004 and thus either knew or should have known that the collateral that Blixseth proposed for the Credit Suisse loan had a fair market value of $420 million in 2004.  The Court highly doubts that Credit Suisse could have successfully syndicated the Yellowstone Club loan if the loan to value ratio was 90 percent.  Thus, Credit Suisse instead commissioned Cushman & Wakefield to employ its newly devised valuation methodology.  In applying the new valuation methodology, Credit Suisse relied almost exclusively on the Debtors' future financial projections, even though such projections bore no relation to the Debtors' historical or present reality.

Moreover, the Debtors' past debt had bounced between $4 to $5 million on the low end to $60 million on the high end.  Credit Suisse proposed to increase the Debtors' debt load by at least six times.  Barcy, Yankauer and the rest of the Credit Suisse syndicated loan team could not have believed under any set of circumstances that the Debtors could service such an increased debt load, particularly when the Debtors had several years of net operating losses, mixed with a couple years of net operating revenues.

The only plausible explanation for Credit Suisse's actions is that it was simply driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may.  Unfortunately for Credit Suisse, those chips fell in this Court with respect to the Yellowstone Club loan.  The naked greed in this case combined with Credit Suisse's complete disregard for the Debtors or any other person or entity who was subordinated to Credit Suisse's first lien position,

130

shocks the conscience of this Court.  While Credit Suisse's new loan product
resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for
several residential resort communities.  Credit Suisse lined its pockets on the
backs of the unsecured creditors.  The only equitable remedy to compensate for
Credit Suisse's overreaching and predatory lending practices in this instance is to
subordinate Credit Suisse's first lien position to that of CrossHarbor's
superpriority debtor-in-possession financing and to subordinate such lien to that of
the allowed claims of unsecured creditors.

While the Court agreed to vacate its Partial & Interim Order, the Court cannot and will

not ignore the findings therein.  Barcy testified that Credit Suisse cared not one iota what

Blixseth did with the loan proceeds once Credit Suisse got its fat fees.  That same sentiment

applies to the Prepetition Lenders who snatched up the syndicated notes hoping to reap huge

profits.  The Prepetition Lenders had information available to them, had they bothered to look,

indicating that the Yellowstone Club loan was very risky.  For example, the Prepetition Lenders

surely had access to the underlying Credit Agreement, which plainly disclosed that Blixseth

could take $209 million as a distribution and could use another $142 million in unrestricted

subsidiaries for purposes wholly unrelated to the Yellowstone Club.  Moreover, the Prepetition

Lenders surely had access to the fact that Moody's assigned a rating of B1 to the Yellowstone

Club loan.  And perhaps most important, Credit Suisse and the Prepetition Lenders knew the

Yellowstone Club Credit Agreement was nonrecourse.  Despite all the red flags, the Prepetition

Lenders nevertheless clamored to get a piece of Credit Suisse's syndicated loan product.

In this case, Credit Suisse and the Prepetition Lenders are just as a culpable as Blixseth

and as aptly noted by the U.S. Supreme Court, "[r]egardless of the degree of scienter, there may

be circumstances in which the statutory goal of deterring illegal conduct is served more

effectively by preclusion of suit than by recovery.  In those circumstances, the *in pari delicto*

defense should be afforded.  Cf. *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38,

131

43-44, 61 S.Ct. 414, 417, 85 L.Ed. 500, and n. 2 (1941)." Pinter, 486 U.S. at 634, 108 S.Ct. at 2072.

In a clever legal maneuver, counsel for Credit Suisse negotiated to insulate Credit Suisse from claims by the Prepetition Lenders and also negotiated a position that allowed YCLT to step in and seek payment on behalf of Credit Suisse on a nonrecourse loan. If Credit Suisse had wanted to go after Blixseth in the event of a default, it should have included such provision in the Credit Agreement. This it did not do.

Blixseth and Credit Suisse have done a lot of finger pointing in this case, but in the end, their conduct prompted Debtors' bankruptcies. Following Part I of the trial in this matter, the Court was not inclined to enter an order that would benefit the people who took the funds out of the Debtor entities and the Court will not at this time enter an order that would in any way benefit Credit Suisse, the Prepetition Lenders or other parties who have speculated on a monumental award against Blixseth. The parties who suffered compensable damages in this case are the parties who have legitimate claims against the Debtors and who did not participate in the Credit Suisse loan debacle.

In an attempt to deflect Blixseth's unclean hands and *in pari delicto* defense, YCLT argues the Montana Supreme Court recently recognized that "there is no statutory basis in Montana for an offset of damages arising from the commission of intentional torts." *Ammondson v. Northwestern Corporation*, 220 P.3d 1, 59 (Mont. 2009). Montana law provides for several liability that allocates damages in proportion to the amount of fault, but not in the case of intentional torts. *Id.; Cartwright v. Equitable Life Assur. Soc. of U.S.*, 276 Mont. 1, 36, 914 P.2d 976, 998 (1996). Generally, each person who commits a tort that requires intent is jointly and

132

severally liable for any indivisible injury legally caused by the tortious conduct. RESTATEMENT (3d) of Torts § 12.

Contrary to YCLT's above argument, the Court is not apportioning liability between Blixseth and Credit Suisse. Rather, the Court is precluding Credit Suisse and the Prepetition Lenders from benefitting from their participation in the Yellowstone Club loan. More importantly, the Court is prohibiting Credit Suisse and the Prepetition Lenders from converting a nonrecourse loan into a recourse loan through crafty legal negotiations with the Debtors and the Committee.

While Blixseth caused substantial harm to the Debtors through his self dealings, the only compensable damages in this case are repayment of remaining legitimate allowed claims as of the date of the bankruptcy and as allowed under Debtors' confirmed Third Amended Joint Plan of Reorganization, together with any amounts already paid, including amounts paid through the Trade Creditor Fund established under ¶ 6.17 of Debtors' confirmed Third Amended Joint Plan of Reorganization. Payment of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except those of the First Lien Lender), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth claims are "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571. The damage award against Blixseth only includes the amounts that creditors in the above classes would be entitled under the terms of Debtors' confirmed Third Amended Joint Plan of Reorganization. For

instance, Blixseth is not required to pay membership rejection damages if the memberships were assumed by the purchaser of the Yellowstone Club.

Also, YCLT has spent a considerable amount of time objecting to various claims in this case. Blixseth shall also be required to compensate YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims. With respect to this litigation, each party shall pay their own fees and costs.

Commensurate with prior "scorched earth" trial tactics, the parties have included various other claims and defenses. Those claims and defenses require no discussion by this Court, other than to express that they are denied.

Blixseth testified at trial that he wanted to see the creditors of the Yellowstone Club paid and that the buck stopped with him. The Court agrees. Thus, in accordance with the forgoing, the Court will enter a separate judgment providing as follows:

IT IS HEREBY ORDERED and ADJUDGED that Judgement is entered in favor of Blixseth, in part, and YCLT, in part, with each party to pay their own fees and costs of suit; and YCLT is awarded that amount of money required to pay: (1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for

134

the fees and costs it has incurred, and will incur, objecting to and liquidating such claims.

BY THE COURT

_____

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana