UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>Debtor. | Case No. **08-61570-11** |
| **TIMOTHY L BLIXSETH**,<br><br>Plaintiff.<br><br>-vs-<br><br>**MARC S KIRSCHNER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**,<br><br>Defendant. | Adv No. **09-00014** |

## MEMORANDUM of DECISION

At Butte in said District this 5th day of December, 2012.

In this Adversary Proceeding, after due notice, a hearing was held March 6, 2012, in Butte on Marc S. Kirschner ("Trustee"), Trustee of the Yellowstone Club Liquidating Trust's ("YCLT"), Motion for Amendment to, and Entry of, Final Judgment filed October 26, 2011, at docket entry no. 664.  The Trustee was represented at the hearing by Shane P. Coleman of Billings, Montana; Timothy L. Blixseth ("Blixseth"), the plaintiff-in-intervention and the now-captioned Plaintiff, was represented at the hearing by Michael J. Flynn ("Flynn") of Boston, Massachusetts, Philip Stillman of Encinitas, California, Christopher Conant of Denver,

1

Colorado, and Patrick Fox of Helena, Montana; the Ad Hoc Committee of Class B Unit Holders was represented at the hearing by Ronald Bender of Missoula, Montana; and the Class B Group of shareholders was represented by Clark Whitmore of Minneapolis, Minnesota. John Amsden and Chuck Hingle testified. Blixseth's Exhibits A through P and the Trustee's Exhibits 1 through 33 were admitted into evidence.

## PROCEDURAL POSTURE OF CASE

This Court entered a Memorandum of Decision on August 16, 2010, a Memorandum of Decision on September 7, 2010, and an Amended Judgment against Blixseth in the amount of $40,067,962.43 on September 7, 2010. Blixseth, the Trustee, and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), for itself and as agent for the prepetition lenders, appealed this Court's September 7, 2010, Amended Judgment. On October 11, 2011, United States District Court Judge Sam E. Haddon entered an Order concluding this Court's Amended Judgment of September 7, 2010, was not a final judgment from which an appeal could be taken. Thus, Judge Haddon dismissed the parties' appeals without prejudice to refiling upon entry of a final judgment.

While the Court's Amended Judgment was on appeal, Blixseth filed on December 14, 2010, an amended motion to disqualify the undersigned. This Court denied Blixseth's amended motion for disqualification in an Order entered February 25, 2011. On September 19, 2011, Blixseth filed notice of his appeal of this Court's order denying the amended motion for disqualification. Judge Haddon entered a Memorandum and Order on November 16, 2012, affirming this Court's denial of Blixseth's amended motion for disqualification.

Blixseth also filed on October 12, 2011, a motion to dismiss this Adversary Proceeding

2

for lack of subject matter jurisdiction. This Court denied Blixseth's motion to dismiss on December 13, 2011. In response to this Court's December 13, 2011, Order, Blixseth filed with the United States District Court for the District of Montana, a motion to withdraw reference on January 6, 2012. Judge Haddon denied Blixseth's motion to withdraw reference on January 27, 2012.

In response to Judge Haddon's October 11, 2011, Order dismissing the appeal of this Court's September 7, 2010, Amended Judgment, the Trustee filed the pending Motion for Amendment to, and Entry of, Final Judgment, and Blixseth filed a motion to reopen discovery pertaining to damages. Following the March 6, 2012, hearing, the Court entered a Memorandum of Decision and Order, found at docket entry nos. 701 and 703, denying Blixseth's motion to reopen discovery. The Court similarly denied a motion to quash subpoena that was related to Blixseth's motion to reopen discovery. At the conclusion of the March 6, 2012, hearing, the Court granted the parties time to file briefs in support of their respective positions on the Trustee's Motion for Amendment to, and Entry of, Final Judgment. The parties have filed their briefs and the matter is ready for decision. This Memorandum of Decision includes the Court's findings of fact and conclusions of law with respect to the Trustee's Motion for Amendment to, and Entry of, Final Judgment. For the reasons discussed below, the Court grants the Trustee's request for amendment to, and entry of a final judgment, and will enter an amended judgment against Blixseth in the amount of $40,992,210.81.

PRELIMINARY MATTERS and CONTENTIONS OF PARTIES

The Court intends that this Memorandum of Decision be read in conjunction with the now vacated Partial & Interim Order entered May 13, 2009, at docket entry no. 289 and the

Memoranda of Decision entered June 11, 2009, at docket entry no. 292; August 16, 2010, at docket entry no. 575; September 7, 2010, at docket entry no. 580; and March 12, 2012, at docket entry no. 701.  As the record will reflect, all parties have had ample opportunity to fully present their evidence.  Notwithstanding, over the course of this Adversary Proceeding, Blixseth and his counsel have used this Court's lenience as an opportunity to substitute evidence with specious and frivolous arguments that have no relevance in this Proceeding.

For example, at the March 6, 2012, hearing, Flynn objected to this Court conducting any further proceedings in this Adversary Proceeding because Blixseth and his counsel had appealed this Court's Order denying Blixseth's motion for disqualification.  In a 47-page Memorandum of Decision entered February 25, 2011, I concluded that my disqualification was neither required nor appropriate because Blixseth had not established actual bias nor had he shown any facts which established an appearance of such impartiality as to require recusal.  As mentioned above, Judge Haddon recently entered a Memorandum and Order affirming this Court's February 25, 2011, ruling.

Blixseth next argued on March 6, 2012, that Samuel T. Byrne ("Byrne")[1], through Blixseth's ex-spouse, Edra D. Blixseth ("Edra"), conspired to file Debtors' bankruptcy cases in bad faith.  Flynn argued on March 6, 2012, that Byrne "was scheming this bankruptcy as early as February - March 2008" so he could "essentially steal $800 million of Blixseth's marital community assets . . . for about $10 million or less out of [Byrne's] pocket."[2]  In support of the

---

[1] Byrne's role in this case is set forth in the Court's August 16, 2010, Memorandum of Decision, starting at page 27.  That Memorandum of Decision is found at docket entry no. 575.

[2] Blixseth also argues that Edra and Byrne "colluded to file this bankruptcy in bad faith to leverage Credit Suisse and set up Mr. Blixseth."

4

theory that Byrne was scheming to steal marital assets, Flynn read from a November 22, 2008, email[3] apparently sent by Byrne wherein Byrne supposedly acknowledged he had been negotiating with "bondholders" in February of 2008 behind Blixseth's back.[4]

Blixseth's theory that Byrne stole marital assets contains a critical flaw. The Court would agree that Byrne acquired control of several assets, including the Yellowstone Club, that previously belonged to Blixseth and Edra as community property. However, those assets were awarded to Edra as part of a Marital Settlement Agreement ("MSA"), and as Blixseth's counsel has argued in other proceedings before this Court:

> Edra Blixseth filed for divorce in the Riverside Superior Court in December 2006, *In re Marriage of Blixseth*, Riverside Superior Court Case No. RIDINDO91152. From that time through the ultimate court-approved marital settlement and division of their assets, the divorce was extremely acrimonious and highly contested. Both parties were represented by counsel and engaged in extensive litigation and discovery, largely focused on valuing the parties' marital assets. Over 40,000 pages of documents were produced, and disclosures of assets and liabilities and their values were exchanged as required by California law.

*See* Adversary Proceeding 09-64, Memorandum in Support of [Blixseth's] Motion for Summary Judgment and Adjudication of Issues, docket entry no. 64-1, p.1.

On or about June 26, 2008, Blixseth and Edra finalized and executed the MSA.

---

[3] As to the email, Blixseth's counsel stated that they are conducting or have conducted an investigation into the Debtors' bankruptcy proceedings and in connection with that investigation, recently discovered "an email from Mr. Byrne . . . [which] contradicts the foundation of Mr. Byrne's testimony before this Court." Blixseth's counsel stated at the March 6, 2012, hearing that "Mr. Byrne suggests several times in this email that he has foreknowledge of how this Court is going to rule."

[4] Blixseth's counsel explained later in the hearing that "Mr. Byrne [met] with the Governor in February of 2008 when he's negotiating with the bondholders." The Court would note that such meeting, if it did in fact take place, happened nine months before the Debtors' bankruptcy petitions were filed on November 10, 2008.

Thereafter, Blixseth and Edra executed First and Second Amendments to the MSA, a Mutual Waiver and Release Agreement, and an Assumption Agreement. After approval by the Superior Court of California, Edra was given sole ownership and control of the Yellowstone Club Entities and other business entities and Blixseth was given sole ownership and control over certain other assets and business entities. Effective August 13, 2008, Blixseth and Edra transferred their community property as agreed in the MSA.

In discussing the hearing held by the Superior Court of California on approval of the MSA, Blixseth's counsel writes:

> On July 3, 2008, the California Superior Court held an evidentiary hearing and both parties were examined about their understanding and acceptance of the terms of the MSA documents, and after the evidentiary hearing, approved the terms of the MSA by signing an extraordinarily detailed order (the "Order"). In that Order, the parties and the Court were careful to ensure that the terms of the MSA, including the terms of the waivers and releases, be enforceable. By way of example, the parties agreed that the conclusive presumption that the facts recited in the MSA were true, as codified in California Evidence Code § 622. Furthermore, the Court approved the parties' request for an absolute and complete waiver of any breach for all claims—including fiduciary claims—by each party against the other. The parties also agreed to waive California Civil Code § 1542, expressly requesting the Court approve, which it did, the waiver and release of all claims, known or unknown, against each other. For each waiver and release articulated in the MSA, the Court found that such waivers and releases were made voluntarily and knowledgeably after the opportunity to consult with counsel. Finally, the Superior Court found that the MSA was the result of intensive litigation, without fraud or collusion between the parties and was binding on the parties and the entities signing the releases.

*Id.*, p.5-6. Taking Blixseth's theory that Byrne stole $800 million of assets for $10 million to its logical conclusion would necessarily require this Court to believe that the MSA, and the entire divorce proceeding, was a fraud orchestrated by Byrne. As of this date, Blixseth has not presented any evidence to this Court showing that Blixseth and his counsel were outwitted during

6

the divorce proceeding as a result of a fraud orchestrated by Byrne.

In furtherance of the theory that Byrne concocted an "evil scheme" to throw the Debtors into bankruptcy, Flynn also argued that he had information "proving without a doubt that Ms. Blixseth defrauded six banks and individuals of over $50 million on blatantly fraudulent loan applications that, if you look at the people who have been convicted for loan fraud, her applications are infinitely more fraudulent then some of these people."

In an attempt to tie the foregoing argument to the current proceedings, Flynn argued at the March 6, 2012, hearing:

> [A] federal task force was convened and began an investigation into the bankruptcy fraud and bank fraud of Edra Blixseth. They worked on it for two and a half years. Pursuant to DOJ protocols, in several of the victims of Edra Blixseth - including John Stack [phonetic] that she ripped off for $450,000 and other individuals - those individuals went to the task force, and they complained. The task force prepared comprehensive reports. Because I was dealing with these individuals who complained to the United States Attorney's Office and to this task force. And in one case, they had a handwritten loan application by Edra Blixseth that was just blatantly fraudulent.
>
> * * *
>
> So for two and a half years, they collected evidence. They then prepared, pursuant to DOJ guidelines -- recommended prosecution of Edra Blixseth. They sent a target letter to Ms. Blixseth. At that point, and this is apparently around mid-September of 2011, at that point, somehow -- and we believe we have some, from inferences, evidence of the political machinery that shut down that investigation. These individuals - Mr. Stack and these others, including Mr. Blixseth, who also complained - were informed that the investigation was over and that they had been informed to cease all further investigation, including an investigation into this court.
>
> At that point in time, we began to continue our investigation on our own with regard to events that occurred throughout the bankruptcy proceedings, and we began to put together a memorandum to submit on behalf of Mr. Stack and other individuals who had been cheated by Edra Blixseth that now had the criminal investigation being swept under the rug by the political machinery in

> Montana.
>
> And so we prepared, on behalf of them, a 108-page memo detailing everything in the motion for disqualification, new documents that we have uncovered like this, the Court's rulings, and we have submitted that to two houses in Congress. In that memo, we have requested two congressional investigations; referral to the Public Integrity Division of the Department of Justice; and, if the investigation proceeds as we believe it will proceed, the appointment of a special prosecutor.
>
> Given everything that has happened, particularly the obvious evidence in this case, the undisputed, unquestionable evidence that Edra Blixseth stole $50 million from banks, then made a deal with Mr. Byrne in which Mr. Byrne took control of $800 million of assets probably for less than $10 million in case at this point, given everything that's occurred, given the numerous discrepancies in the evidence -- for example, during AP-14, this court said there were four CDs on the 400-page privilege log with Mr. Brown and these various individuals. Yet on July 25th, this court said there was only one CD.[5]

This fraud alleged by Blixseth, if true, would generally come to light in the form of a dischargeability action filed in connection with Edra's bankruptcy case. As the Court explained in it February 25, 2011, Memorandum of Decision found in Case No. 08-61570, at docket entry no. 2129, pp.35-40, while there have been numerous complaints filed against Edra, only one has gone to trial and in that one Adversary Proceeding, the Court found in favor of Edra and dismissed the complaint with prejudice. *See* Adversary Proceeding No. 10-00018, docket entry nos. 119, 120 and 121. Notwithstanding, whether Edra did or did not defraud creditors does not establish that these Debtors' bankruptcy cases were filed in bad faith.

Furthermore, this Court has not and will not succumb to "political pressures." As the Court previously explained to Blixseth and his counsel, this Court has no knowledge or

---

[5] The Court clarified at the March 6, 2012, hearing that the Court does indeed have four CDs in its possession which contain email communications between the Official Committee of Unsecured Creditors and its counsel which are protected by the Official Committee of Unsecured Creditors's attorney-client privilege.

8

involvement in any "political machinery that shut down" a federal investigation.

Blixseth's counsel next raised an argument first made January 16, 2010, at docket entry no. 473, that Edra destroyed evidence. The Court's thoughts on that matter are fully discussed in an Order entered February 22, 2010, at docket entry no. 546. The Court need not belabor the matter further here.

Flynn also argued:

> It is time, Your Honor, for the Court to step aside and, at the very least, have another court come in; or to obey *Stern*[6], simply follow what the Supreme Court has said in *Stern* and what it appears Judge Kozinski is going to do in *Bellingham*, and apply *Stern* broadly. If *Stern* is applied broadly, all of the rights that this court denied to Mr. Blixseth – and if a jury[7] hears them, if he can sue Credit Suisse, sue Mr. Byrne, sue Edra Blixseth, and they hear this entire story, there is not a doubt that Mr. Blixseth would be exonerated. But this court denied all of the federal rules of civil procedures that Mr. Blixseth was entitled to, to sue Credit Suisse, sue Mr. Byrne. This court, this court allowed exculpation clauses so he couldn't sue them, which Judge Haddon then overturned.

In conclusion, Blixseth's counsel argued at the March 6, 2012, hearing that "[t]he entire matter screams out for a correction." The Court would counter that it is not correction this matter needs, it is finality. To that end and in response to Judge Haddon's October 11, 2011, Order that this Court's Amended Judgment entered September 7, 2010, was not a final judgment from which an appeal could be taken, the Trustee filed the pending Motion on October 26, 2011, requesting entry of judgment against Blixseth in the amount of $286.4 million, or in the alternative, for entry of judgment against Blixseth in the amount of $40,992,210.81. Putting

---

[6] Flynn refers to the United States Supreme Court's June 23, 2011, decision in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

[7] As noted in the Court's August 16, 2010, Memorandum of Decision, Blixseth withdrew his request for a jury trial after Plaintiff withdrew its claim for punitive damages.

aside Blixseth's nonsensical arguments, it appears Blixseth opposes entry of a final judgment in this Adversary Proceeding because, according to Blixseth, the Trustee failed to prove his damage claim and because this Adversary Proceeding should be dismissed for lack of subject matter jurisdiction.

## DISCUSSION

1. Jurisdiction

Blixseth urges this Court to both obey *Stern v. Marshall*, 131 S.Ct. 2594 (2011), and apply it broadly. As previously discussed in the Memorandum of Decision entered August 16, 2010, Blixseth sought to intervene in this Adversary Proceeding on March 16, 2009, and sought such intervention on an expedited basis. The Court granted Blixseth's request to intervene.

Thereafter, in a proposed Final Pretrial Order filed by Blixseth on April 27, 2009, and in an Amended Final Pretrial Order – approved as to form and content by both counsel for Blixseth and the Trustee -- filed by Blixseth's counsel on February 17, 2010, Blixseth agreed:

> These adversary proceedings arise under title 11, and arise in and relate to the Debtors' substantively consolidated and jointly administered bankruptcy cases, which are pending in this Court. This Court has jurisdiction over these proceedings under 28 U.S.C. § 1334. These are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409.

The "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). A bankruptcy court's jurisdiction is, generally, prescribed by 28 U.S.C. § 1334(b). In addition to granting jurisdiction to bankruptcy courts over bankruptcy cases, the statute provides that "the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original

10

but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  For the reasons just discussed, the Court agrees with the parties that it has jurisdiction over this Adversary Proceeding and further agrees venue is proper.

Blixseth, however, argued for the first time, in a motion to dismiss filed October 12, 2011, which was well after entry of this Court's Amended Judgment on September 7, 2010, that based upon the United States Supreme Court's ruling in *Stern v. Marshall*, this Court lacked subject matter jurisdiction to decide the matters herein.  The Court disagreed and denied Blixseth's motion to dismiss, concluding that the Supreme Court's ruling in *Stern v. Marshall* did not take away a bankruptcy court's subject matter jurisdiction.

Blixseth nevertheless continues to object to this Court conducting any further proceedings in this Adversary Proceeding.  The majority of Blixseth's objections on this point are difficult to understand.  The sole illuminating argument in support of Blixseth's objection was made at the March 6, 2012, hearing wherein Blixseth's counsel argued this Court should "simply follow what . . . it appears Judge Kozinski is going to do in *Bellingham*, and apply *Stern* broadly."  Counsel references *Executive Benefits Insurance Agency v. Peter H. Arkison, Trustee (In re Bellingham Insurance Agency Inc.)*, No. 11-35162, 2011 WL 5307852 (9th Cir. Nov. 4, 2011), wherein the Ninth Circuit Court of Appeals accepted discretionary review and then invited supplemental briefs by *amicus curiae* to address whether *Stern v. Marshall* prohibits bankruptcy courts from entering a final, binding judgment in a fraudulent conveyance action and if so, whether the bankruptcy court may nevertheless hear the proceeding and submit a report and recommendation to the district court in lieu of entering a final judgment.  Blixseth's counsel expressed at the March 6, 2012, hearing his belief that the Ninth Circuit in *Bellingham* would rule that bankruptcy

11

courts may neither enter a final, binding judgment in a fraudulent conveyance action nor hear the proceeding and submit a report and recommendation to the district court in lieu of entering a final judgment. Blixseth submits that as a result of *Stern v. Marshall,* he and the Trustee are compelled to relitigate, in another forum, the issues already tried in this Adversary Proceeding.

On December 4, 2012, the Ninth Circuit issued its decision in *Bellingham* and agreed that fraudulent conveyance claims did not fall within the public rights exception and, therefore, could not "be adjudicated by non-Article III judges." *In re Bellingham Ins. Agency, Inc.*, — F.3d —, 2012 WL 6013836, *5 (9th Cir. 2012). However, the Ninth Circuit in *Bellingham* went on to conclude that "§ 157(b)(1) provides bankruptcy courts the power to hear fraudulent conveyance cases and to submit reports and recommendations to the district courts." *Id.* at *10. More important to this case, the Ninth Circuit in *Bellingham* agreed with the Supreme Court's decision in *Stern* that parties can impliedly consent to a bankruptcy court's jurisdiction. *Id*. at *12.

This Court concludes that Blixseth's course of conduct, through his affirmative actions from March 16, 2009, when he sought to intervene, until September 7, 2010, when this Court entered its Amended Judgment, constitutes an implied consent by Blixseth to this Court's jurisdiction.[8] As Justice Roberts explained in *Stern v. Marshall*:

> Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary). We have recognized "the value of waiver and forfeiture rules" in "complex" cases, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487–488, n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), and this case is no exception. In such cases, as here, the consequences of "a litigant ... 'sandbagging'

---

[8] If a reviewing court concludes Blixseth did not, through his actions, consent to this Court's entry of a final judgment, a reviewing court could nevertheless treat this Court's August 16, 2010, Memorandum of Decision as proposed findings of fact and conclusions of law as permitted by the Ninth Circuit in *Bellingham*.

> the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor," *Puckett v. United States*, 556 U.S. 129, ——, 129 S.Ct. 1423, 1428–29, 173 L.Ed.2d 266 (2009) (some internal quotation marks omitted)—can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and said so promptly. *See United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited ... by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it' " (quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944))). Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad.

*Stern v. Marshall*, 131 S.Ct. At 2608. Like Pierce in *Stern v. Marshall*, and like EBIA in *Bellingham*, Blixseth appeared quite content litigating matters in this Court until the Court entered its Memorandum of Decision and original Judgment on August 16, 2010. As the Ninth Circuit explained in *Bellingham*:

> "[T]he consequences of a litigant sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor-can be ... severe." [*Stern*] at 2609 (internal quotation marks, alterations, and citations omitted). Having lost before the bankruptcy court, EBIA cannot assert a right it never thought to pursue when it still believed it might win. *Id*.

*Bellingham,* at *13.

Having concluded that Blixseth's actions up to August 16, 2010, constitute implied or informal consent to this Court's authority to render a final decision under *Stern v. Marshall* and *Bellingham*, the sole remaining task for this Court is entry of a final judgment that comports with the Court's August 16, 2010, Memorandum of Decision.

2.   Entry of a Final Judgment

Blixseth opposes further amendment of the judgment in this matter and also opposes entry of a final judgment, arguing, in part, that the Trustee failed to prove his damage claim.

13

Such argument by Blixseth prompted Blixseth's Motion to Reopen Discovery Pertaining to Damages. As explained in the March 12, 2012, Memorandum of Decision, the Trustee was requesting judgment against Blixseth in the amount of $286.4 million. In the Memorandum of Decision entered August 16, 2010, this Court found ample evidence to support the Trustee's claim of $286.4 million. However, for reasons explained in that Memorandum of Decision, the Court elected to award the Trustee not the amount of damages requested, but rather, because of a meritorious defense asserted by Blixseth, award the Trustee an amount sufficient to pay all claims except those asserted by Credit Suisse. The dilemma thus became what value to assign to Blixseth's asserted defense.

Exhibit A attached to Blixseth's Post-Trial Brief filed March 19, 2010, at docket entry no. 571 showed Class 1 claims totaling $40,000; Class 4 claims totaling $122,381,604.96; Class 5 claims totaling $124,212.71; Class 9 claims totaling $14,717,800; Class 11 claims totaling $10,095,123.29; Class 13 claims totaling $750,000; Class 14 claims totaling $3,750,000; and Claims Not Classified totaling $31,216,000. The total of the foregoing classes, based upon the Exhibit submitted by Blixseth, exceeded $180 million. Blixseth did not provide any totals for Classes 2, 6, 10 or 12.

Following entry of the Court's original judgment on August 16, 2010, which identified the Classes to be paid rather than specific dollar amounts, the Trustee filed a motion for amendment of the judgment. In his request, the Trustee again asked that damages be fixed in the amount of $286.4 million plus interest; or in the alternative, for an order that damages be fixed against Blixseth in the amount of $40,067,962.43 plus interest. Evidence suggests the actual amount is $40,992,210.81, instead of $40,067,962.43.

For the reasons set forth in the August 16, 2010, Memorandum of Decision, the Court chose not to increase its judgment against Blixseth to $286.4 million. Instead, the Court agreed that entry of a judgment which identified a specific dollar amount, as opposed to mere identification of particular classes of claims, was appropriate. Unfortunately, other than Exhibit A attached to his Post-Trial Brief, Blixseth failed to present any numerical evidence consistent with his defenses. The Court was thus left with the question whether damages were closer to $180 million, as reflected in Blixseth's Exhibit A, or closer to $40,067,962.43, as asserted by the Trustee. The Court elected to accept the smaller number proffered by the Trustee and awarded damages in the amount of $40,067,962.43.

Based upon the evidence presented during the trial in this Adversary Proceeding and after considering the arguments of counsel made at the March 6, 2012, hearing, the Court finds entry of judgment against Blixseth in an amount sufficient to pay all creditors in full, save Credit Suisse. Credible evidence exists in the record that the Debtors owed creditors, other than Credit Suisse, approximately $40,992,210.81 as of November 11, 2008. Consistent with the Court's August 16, 2010, Memorandum of Decision, the Court once again concludes that Credit Suisse receive nothing from the $40,992,210.81 because this Proceeding deals in the first instance with Blixseth's misappropriation of the Credit Suisse loan proceeds paid to the Debtors, which misappropriation was permitted under the express language of Credit Suisse's Credit Agreement.

For the reasons discussed above and to bring this matter to a conclusion, the Court will enter a separate Order as follows:

IT IS ORDERED that Marc S. Kirschner, as Trustee of the Yellowstone Club Liquidating Trust's Motion for Amendment to, and Entry of, Final Judgment filed October 26, 2011, at

docket entry no. 664 is granted; and the Court will enter a separate and final amended judgment in favor of Marc S. Kirschner, as Trustee of the Yellowstone Club Liquidating Trust and against Timothy L. Blixseth in the amount of $40,992,210.81.

                                                       BY THE COURT

                                                       HON. RALPH B. KIRSCHER
                                                       U.S. Bankruptcy Judge
                                                       United States Bankruptcy Court
                                                       District of Montana